# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SERGIO ALBERTO BARCO MERCADO, on his own behalf and on behalf of others similarly situated,

Plaintiff,

v.

KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director, Immigration and Customs Enforcement, in his official capacity; IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCOS CHARLES, Acting Executive Associate Director, Immigration and Customs Enforcement, Enforcement and Removal Operations, in his official capacity; LADEON FRANCIS, Acting Field Office Director of New York, Immigration and Customs Enforcement, in his official capacity;

Defendants.

Case No. 25 Civ. 6568

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION .......................................................................................... 1

FACTUAL BACKGROUND ............................................................................ 3

    The Parties……………………………………………………………………...3

    Defendants' Policies…………………………………………………………….4

    Conditions at 26 Fed………………………………………………………………6

    Attorney Access at 26 Fed………………………………………………….......12

    Harm to Plaintiff…………………………………………………….………...16

LEGAL STANDARD........................................................................................ 16

ARGUMENT ................................................................................................. 17

    I.      Plaintiff Is Likely to Succeed on the Merits…………………………………17

        A.  The Conditions of Confinement at 26 Federal Plaza Violate Plaintiff's
            and Class Members' Fifth Amendment Rights…………………..…………17

        B.  The Government's Denial of Access to Counsel Violates Plaintiff's and
            Class Members' Rights……………………………………………..………22

            1.   Defendants Are Violating the Plaintiff's and Class Members' First
                 Amendment Rights…………………………………………….………22

            2.   The Government's Denial of Access to Counsel Violates
                 Plaintiff's and Class Members' Fifth Amendment
                 Substantive Due Process Rights…………………………………….…25

    II.    The Government's Denial of Access to Counsel and Imposition
        of Unconstitutional Conditions of Confinement Cause Plaintiff and the
        Class Members Irreparable Harm ……………………………….……………..27

    III.   The Balance of Equities and Public Interest Weigh Heavily
        in Favor of Plaintiff's Request for a Temporary Restraining Order…………..……28

IV.    The Court Should Not Require Plaintiff to Provide Security
         Prior to the Temporary Restraining Order…………………………………………30

V.     CONCLUSION……………………………………………………………………..31

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Clapper,*
    804 F.3d 617 (2d Cir. 2015)..................................................................... 18

*Al Odah v. United States,*
    346 F. Supp. 2d 1 (D.D.C. 2004) ............................................................ 25

*Almighty Supreme Born Allah v. Milling,*
    876 F.3d 48 (2d Cir. 2017)....................................................................... 19

*Am. Beverage Ass'n v. City & Cnty. of San Francisco,*
    916 F.3d 749 (9th Cir. 2019) ................................................................... 30

*Americans for Immigrant Justice v. U.S. Dep't of Homeland Sec'y,*
    No. 22-cv-3118, 2023 WL 1438376 (D.C.C. Feb. 1, 2023) ............... 29, 30

*Atadzhanov v. City of New York,*
    No. 21-CV-5098 (LJL), 2022 WL 4331304 (S.D.N.Y. Sept. 19, 2022) ......... 24

*Bass v. Richardson,*
    338 F. Supp. 478 (S.D.N.Y. 1971) .......................................................... 33

*Bell v. Wolfish,*
    441 U.S. 520 (1979).................................................................................. 20

*Black v. Decker,*
    103 F.4th 133 (2d Cir. 2024) ................................................................... 19

*Blissett v. Coughlin,*
    66 F.3d 531 (2d Cir. 1995)....................................................................... 20

*Butler v. Suffolk County,*
    No. 11-CV-2602 (JS) (ST), 2023 WL 5096218 (E.D.N.Y. Aug. 9, 2023)............ 21

*Charles v. Orange County,*
    925 F.3d 73 (2d Cir. 2019)....................................................................... 20

*City of New York v. Lopez,*
    No. 21 Civ. 7862 (JPO), 2025 WL 1638033 (S.D.N.Y. June 10, 2025) ............... 32

*Cruz v. Reiner,*
    No. 11 Civ. 2131 (BMC)(SMG), 2011 WL 6204101 (E.D.N.Y. Dec. 12, 2011)............. 22

*Darnell v. Pineiro,*
   849 F.3d 17 (2d Cir. 2017)................................................................................. 20, 21

*DeLoach v. Bevers,*
   922 F.2d 618 (10th Cir. 1990) ............................................................................ 25

*Denius v. Dunlap,*
   209 F.3d 944 (7th Cir. 2000) .............................................................................. 25

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
   489 U.S. 189 (1989) ........................................................................................... 19

*Doctor's Assocs. LLC v. Hai,*
   No. 19-CV-1968 (NGG)(RER), 2019 WL 3330242 (E.D.N.Y. May 13, 2019) ..................... 32

*Doe by Doe v. Perales,*
   782 F. Supp. 201, 206 (W.D.N.Y. 1991) ............................................................. 32

*Doe v. ICE,*
   490 F. Supp. 3d 672 (S.D.N.Y. 2020) ................................................................ 26

*Doe v. Kelly,*
   878 F.3d 710 (9th Cir. 2017) ............................................................................. 32

*Edwards v. Arocho,*
   125 F.4th 336 (2d Cir. 2024) ....................................................................... 23, 24

*Elrod v. Burns,*
   427 U.S. 347 (1976).......................................................................................... 29

*Eng v. Cooley,*
   552 F.3d 1062 (9th Cir. 2009) ........................................................................... 25

*Helling v. McKinney,*
   509 U.S. 25 (1993)............................................................................................ 19

*Immigrant Defs. L. Ctr. v. Mayorkas,*
   No. 20-CV-9893 (JGB), 2023 WL 3149243 (C.D. Cal. March 15, 2023) ......................... 25, 26

*Jolly v. Coughlin,*
   76 F.3d 468 (2d Cir. 1996)................................................................................. 29

*Jones v. Wolf,*
   467 F. Supp. 3d 74 (W.D.N.Y. 2020) ........................................................... 19, 20

*L.V.M. v. Lloyd*,
  318 F. Supp. 3d 601 (S.D.N.Y. 2018). ............................................................... 32

*Lareau v. Manson*,
  651 F.2d 96 (2d Cir. 1981) ................................................................................... 22

*Malinski v. New York*,
  324 U.S. 401 (1945) .............................................................................................. 20

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ................................................................................ 30

*Mills v. District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) ........................................................................... 29

*Mothershed v. Justices of Supreme Court*,
  410 F.3d 602 (9th Cir. 2005) ................................................................................ 25

*Myers v. City of New York*,
  No. 11 Civ. 8525 (PAE), 2012 WL 3776707 (S.D.N.Y. Aug. 29, 2012) ................ 22

*N.Y. Progress and Protection PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ......................................................................... 18, 29

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020) ................................................................................... 30

*New York v. Trump*,
  765 F. Supp. 3d 287 (S.D.N.Y. 2025) ................................................................. 18

*Nnebe v. Daus*,
  510 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................................. 30

*Pell v. Procunier*,
  417 U.S. 817 (1974) .............................................................................................. 25

*Prestopnik v. Whelan*,
  253 F. Supp. 2d 369 (N.D.N.Y. 2003) ................................................................. 25

*Rhodes v. Chapman*,
  452 U.S. 337 (1981) .............................................................................................. 20

*Richardson v. Sheriff of Middlesex Cnty.*,
  407 Mass. 455 (1990) ........................................................................................... 22

*Rivera v. Town of Huntington Hous. Auth.*,
    No. 12-CV-901 (DRH) (RL), 2012 WL 1933767 (E.D.N.Y. 2012)........................................ 32

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*,
    No. 18-CV-760 (CKK), 2020 WL 3265533 (D.D.C. June 17, 2020)................................ 23, 27

*Sallier v. Brooks*,
    343 F.3d 868 (6th Cir. 2002) ......................................................... 25

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ................................................... 30

*Torres v. U.S. Dep't of Homeland Sec.*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) .......................................... *passim*

*Valdez v. Rosenbaum*,
    302 F.3d 1039 (9th Cir. 2002) ...................................................... 25

*Vasquez v. Gray*,
    523 F. Supp. 1359 (S.D.N.Y. 1981) ................................................. 22

*Vasquez Perdomo v. Noem*,
    No. 25-cv-5605, 2025 WL 1915964 (C.D. Cal. July 11, 2025).......................... 27

*Walker v. Schult*,
    717 F.3d 119 (2d Cir. 2013).......................................................... 20

*Weaver v. James*,
    No. 10-CV-6609, 2011 WL 4472062 (S.D.N.Y. Sept. 27, 2011)......................... 24

*Wilson v. Seiter*,
    501 U.S. 294 (1991)................................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).................................................................... 18

*Youngberg v. Romeo*,
    457 U.S. 307 (1982).................................................................. 19

*Zadvydas v. Davis*,
    533 U.S. 678 (2001).................................................................. 19

## INTRODUCTION

Since May 2025, when the Trump administration issued an order to Immigration and Customs Enforcement ("ICE") to arrest 3,000 people per day, ICE has aggressively escalated its arrests and detentions of immigrants in the New York City area.  ICE agents have systematically arrested individuals who appear for regularly scheduled check-in appointments and court hearings at the federal building located at 26 Federal Plaza ("26 Fed"), while also ramping up enforcement activities and raids at homes, workplaces, and community spaces.  These arrests, which target immigrants who are cooperating with authorities through legal processes while living and working peaceably in their communities, have caused widespread fear and chaos.

As a result, ICE has transferred thousands of people arrested at courthouses, check-in appointments, and immigration raids in New York City to a transitional holding station at 26 Fed.  The holding station consists of concrete cells, segregated by gender, designed to hold people only temporarily for a matter of hours before they are processed for release or transport to a longer-term immigration detention facility.  However, as ICE has increased its arrests of immigrants, it has packed the holding cells at 26 Fed, detaining people for extended periods of time, often for a week or more, and in one known case, for over 15 days.  The holding cells at 26 Fed have no beds, showers, or medical support.  People detained at 26 Fed are crowded by the dozens into holding cells, forced to sleep on the floor, sometimes next to the toilet.  People are given meager rations of military-style ready-to-eat meals ("MREs"), only twice per day, leading some detained persons to lose more than 20 pounds during their detention at 26 Fed.  There is insufficient medical support, and people detained at 26 Fed have no way to bathe, brush their teeth, or change their clothes for the duration of their detention.

Immigrants detained at 26 Fed also lack any way to communicate confidentially with their legal counsel.  Defendants have not afforded Plaintiff any access to attorneys—either in person or by telephone.  When attorneys have attempted to visit or speak with their clients, Defendants have ignored the requests and have refused to even confirm the location of detained noncitizens.  Attorneys who request in-person visitation with their clients held at 26 Fed are turned away.  Attorneys cannot exchange written documents with people detained at 26 Fed.  In addition, ICE has refused to confirm the location of people held at 26 Fed on its online locator or in response to inquiries from attorneys, claiming only that they are "in transit."  This lack of attorney access immediately following individuals' arrests and detentions not only violates their constitutional rights, but also significantly impacts their ability to assert their rights, including their ability to file habeas petitions to challenge their detention, or to challenge their placement in expedited removal proceedings.  Many attorneys are unable to contact their clients until they have been transferred to facilities in other states or even removed from the country without an opportunity to first obtain legal advice.

This action challenges ICE's detention of people at 26 Fed for lengthy periods of time in overcrowded, dangerous conditions, without access to counsel.  These degrading and punitive conditions are publicly documented and well-known to Defendants.  Defendants nonetheless have been deliberately indifferent to these conditions, the constitutional rights they are violating, and the risk of harm they cause to Plaintiff Sergio Alberto Barco Mercado ("Mr. Barco Mercado") and the other detained individuals at 26 Fed.  Defendants have not remedied these problems or ensured that they adhere to their own policies on the appropriate duration and conditions of confinement, instead issuing public statements that brazenly deny these widespread and well-documented violations of the putative Class members' rights.  Defendants are causing

significant, ongoing, and irreparable harm to Plaintiff and to the putative class. Court intervention is therefore required to enjoin these violations.

For the reasons below, Plaintiff requests that the Court enter a temporary restraining order requiring Defendants to provide attorney access at 26 Fed and to ensure constitutionally adequate and humane conditions of confinement to the individuals being detained there.

## FACTUAL BACKGROUND

**The Parties**

Mr. Barco Mercado is a citizen of Peru who resides in New Jersey with his wife and two young children. He was detained by ICE on August 8, 2025, after appearing for a court date at 26 Fed. His attorney Andres Santamaria Cortes was present when Mr. Barco Mercado was detained. After Mr. Barco Mercado was detained, Mr. Santamaria Cortes tried to contact him as quickly as possible with the goal of advising him about his legal options. Declaration of Andres Santamaria Cortes ("Santamaria Decl.") ¶ 4. He was worried that Mr. Barco Mercado was being held in dangerous, inhumane conditions and wanted to try to provide him with as much relief as possible as quickly as possible. *Id.* ¶ 4. At the time of his detention, Mr. Barco was suffering from a toothache that required care. *Id.* Shortly after Mr. Barco Mercado was arrested, Mr. Santamaria visited the floor at 26 Fed where ICE holds noncitizens and identified himself as an attorney for Mr. Barco Mercado and attempted to speak with him. *Id.* ¶ 6. An ICE agent responded that visitations are prohibited for individuals detained at 26 Fed, and that he could not call 26 Fed to set up a call with his client. *Id.* He subsequently called the number listed on the ICE public website as the telephone to contact ICE at 26 Fed, but was not able to set up an attorney call with his client. *Id.* ¶ 7.

Defendants are the Department of Homeland Security ("DHS"), the United States Immigration and Customs Enforcement ("ICE"), and the various federal officials responsible for administering and enforcing the federal immigration laws, overseeing detention and removal proceedings, and implementing ICE's policies, practices, and procedures, including ICE's Enforcement and Removal Operations ("ERO").

**Defendants' Policies**

DHS and ICE have adopted written policies that govern the conditions at ICE ERO holding facilities located within Field Offices, including at 26 Fed.

On January 31, 2024, ICE issued Directive 11087.2, which is titled "Operations of ERO Holding Facilities" (the "ICE Hold Room Policy," or the "Policy"), attached as Exhibit 1 ("Ex. 1") to the Declaration of Heather Gregorio in Supp. Of Pls.' Mot. for a TRO ("Gregorio Decl."). The stated "Purpose/Background" of the Policy is to provide ICE officers who staff the Field Offices "with policy and procedures for operating holding facilities located within their respective field offices."  Ex. 1, § 1.1.

The Policy defines a "holding facility" as "[a] facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained or are being transferred to or from a court, detention facility, or other holding facility, or other agency." *Id.* § 3.2.  It notes that "short-term is defined as a period ***not to exceed 12 hours***, absent exceptional circumstances."  *Id.* § 3.2 n.3 (emphasis added).  This 12-hour limit was recently extended to 72 hours at facilities nationwide by an ICE-issued waiver.  *See* Ex. 4 to Gregorio Declaration.  The Policy defines a "hold room" as "a holding cell, cell block, or other secure enclosure within a holding facility."  Ex. 1, § 3.3.

4

The Policy states that the Executive Associate Director for ERO—here Defendant Charles—"is responsible for ensuring compliance with the provisions of this Directive within ERO." *Id*. § 4.1.

The Policy states that Field Office Directors (FODs)—here Defendant Francis—"are responsible for ensuring that field office personnel follow the procedures in this Directive for operating holding facilities located within their respective field offices." *Id*. § 4.3.

The Policy provides that "ERO Officers are responsible for," *inter alia*:

    a. "Ensuring that detainees are provided a meal at least every six hours," *id*., § 4.1.1.2; and

    b. "Ensuring that hold rooms are safe, clean, equipped with restroom facilities, and clear of objects that could be used as weapons against ERO personnel, contractors, or detainees," *id*. § 4.4.1.3.

With respect to "Procedures and Requirements," the Policy provides the following "Procedures for ERO Officers":

    a. "[E]mpty holding facilities upon the conclusion of daily operations in those field office locations operating on a daily schedule . . . absent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours," *id*., § 5.1.1;

    b. "If the hold room is not equipped with restroom facilities, ERO officers should position themselves within direct sight or earshot of the hold room so that detainees may request and have regular access to restroom facilities," *id*. § 5.2.3).

    c. "Allow detainees to keep personal inhaled medication on their person and have access to other prescribed medication as necessary," *id*. § 5.7.2; and

    d. Make a detention log for every detainee brought into custody regardless of purpose," recording, *inter alia*, (j) time in, (k) mealtime, and (l) time out, *id*. § 5.8.1.

**Conditions at 26 Fed**

The conditions at 26 Fed are horrific and degrading.  Defendants are forcing dozens and sometimes nearly a hundred detained individuals into a single hold room at a time, causing extreme overcrowding.  *See* Declaration of Hugo Sanchez Trillos ("Sanchez Decl.") ¶ 8 (estimating as many as 90 people packed into a room of approximately 20 square meters); Declaration of Marlon Garcia Morales ("Garcia Decl.") at ¶ 8 (noting some rooms had 70 or 80 people); Declaration of Daniel Quevedo ("Quevedo Decl.") ¶ 4 (estimating 70 men packed into the room); Declaration of Ibrahima Barry ("Barry Decl.") ¶ 5 (estimating 50 men in the room).

Each of the 26 Fed Hold Rooms contains one or two open toilets that are visible to the room; there is no privacy for those who need to use it.  Declaration of Geovani Maradiaga Ochoa ("Maradiaga Decl.") ¶¶ 14, 18; Sanchez Decl. ¶ 13; Barry Decl. ¶ 6; Declaration of Carlos Lopez Benitez ("Lopez Benitez Decl.") ¶ 12.  Individuals have no opportunity to bathe, and they must wear the same clothes, including underwear, for the duration of their detention even if they remain at 26 Fed for a week, two weeks, or longer; Defendants also deny them access to basic hygiene items, such as soap, clean clothes, toothbrushes, and menstrual products.  Sanchez Decl. ¶¶ 12–13 ("We were not given soap or any way to bathe or clean ourselves.  We were not given toothpaste or toothbrushes.  I was in the same clothes for the entire 18 days, including underwear."); Declaration of Joselyn Chipantiza ("Chipantiza Decl.") ¶ 6 ("I was in the same clothes the whole time.  I could not bathe or brush my teeth the entire time I was there."); Quevedo Decl. ¶ 4 ("We did not have a way to shower or clean ourselves in any capacity."); Garcia Decl. ¶ 6 ("We were not given a toothbrush, changes of clothes or any means to wash."); Maradiaga Decl. ¶ 18 ("For six days, I was not allowed to brush my teeth or shower. I felt so

dirty."); Barry Decl. ¶ 6 ("We were not allowed to bathe, to change our clothes, or to brush our teeth."); Lopez Benitez Decl. ¶ 12.

Ms. Chipantiza recalled that there was no toilet paper, and the guards would throw only a few paper napkins into the hold room every few days; the toilet often would not flush and would overflow.  Chipantiza Decl. ¶ 5.

Due to these extremely unsanitary conditions, the hold rooms smell terrible.  *See* Sanchez Decl. ¶ 13 ("Inside the holding areas . . . smells awful" because "[a]ll of these people have not bathed" and "[t]he toilets are also in the same area"); Chipantiza Decl. ¶ 5 ("The room smelled terrible because no one had bathed. There was a bathroom in that room that smelled of urine and feces."); Quevedo Decl. ¶ 4 ("There was an intense smell of sweat, urine and feces."); Garcia Decl. ¶ 6 ("it smells terrible"); Maradiaga Decl. ¶ 14 ("There was also a horrific stench in the room."); Barry Decl. ¶ 7 (the room smelled "terrible").

Declarant Joselyn Chipantiza had her period while she was detained, but was not able to obtain any menstrual products because the guards only gave the women in her hold room two pads to share among them.  Chipantiza Decl. ¶ 6.  As a result, Ms. Chipantiza had no way to prevent her underwear and pants from becoming saturated with blood, and because the detained individuals were never given a change of clothes, she had to remain in her blood-soaked clothes for the duration of her detention.  *Id.* ¶ 6.

Defendants also fail to provide individuals detained at 26 Fed with adequate meals at all, much less every six hours as required under the Policy, which governs conditions of confinement at Field Office Hold Rooms, including 26 Fed.  Ex. 1, § 4.1.1.2.  In place of actual meals, Defendants provide detained people with small rations of food only twice a day, such as military "meals ready to eat" ("MREs").  Maradiaga Decl. ¶ 15 ("The food we got was like the packets

that soldiers get where you put hot water on the sides to try to warm up the meal."); Barry Decl.

¶ 9 ("We sometimes received food only once a day; at most, we received food only twice a day.

The food seemed to be military style, meaning it was pre-packaged."); Lopez Decl. ¶ 11 ("The

food they gave us looked like dog food.  I did not think it was edible . . . . It was disgusting.").

Mr. Quevedo stated that what they received to eat was "slop" and "worse than animal food."

Quevedo Decl. ¶ 5.  Mr. Sanchez stated that he received small, processed meals in plastic bags at

8 a.m. and again at 8 p.m., with nothing in between, noting that he was "always hungry" and

ultimately lost 24 pounds during the period he was detained.  Sanchez Decl. ¶¶ 14, 26; *see also*

Lopez Decl. ¶ 11 ("We got food twice a day, at 8 a.m. and 8 p.m.").  Mr. Garcia said that the

food was "inedible," and that he could not eat it during the five days he was detained; he too lost

significant weight.  Garcia Decl. ¶ 9.  Mr. Maradiaga stated that the portions were so small that

he was usually still hungry after he ate, Maradiaga Decl. ¶ 15, and Mr. Barry stated that "[i]t was

not enough food and I often felt hungry," Barry Decl. ¶ 9.  Ms. Chipantiza recalled receiving

only one small snack for the whole day.  Chipantiza Decl. ¶ 7.  Meanwhile, the guards ate pizza

and hamburgers in front of the hungry detained immigrants, which made them feel like they were

being taunted.  Sanchez Decl. ¶ 14.

Nor do Defendants provide individuals detained at 26 Fed with adequate conditions for

sleep.  Because the Hold Rooms are designed to hold only a few people for short periods of time

and have no beds, detained people in the overcrowded cells have been forced to sleep on the bare

concrete floor with only aluminum blankets, sometimes next to toilets, with the lights remaining

on throughout the night.  Quevedo Decl. ¶ 4; Sanchez Decl. ¶ 11; Chipantiza Decl. ¶ 5; Garcia

Decl. ¶ 5; Maradiaga Decl. ¶ 12; Lopez Benitez Decl. ¶ 10.  Many are unable to sleep because of

the pain of sleeping on hard concrete and awaken regularly, Sanchez Decl. ¶ 11, and some have

lasting back pain from the experience, Quevedo Decl. ¶ 12.  It was also noisy throughout the night, with people coming in and out and guards yelling.  Maradiaga Decl. ¶ 13. Sometimes the rooms are too crowded to even allow the detained persons to lie flat to sleep, so they have to try to sleep sitting up.  Sanchez Decl. ¶ 8; Chipantiza Decl. ¶ 5; Garcia Decl. ¶ 5.

Detained individuals also are subjected to extreme temperatures.  Some 26 Fed Hold Rooms have been kept extremely cold such that detainees cannot get warm, especially while sleeping on the cold concrete floor while being denied adequate clothing or blankets beyond a single aluminum blanket per person.  *See* Chipantiza Decl. ¶ 8; Garcia Decl. ¶ 5 (calling the hold room the "hielera," or icebox); Maradiaga Decl. ¶ 12; Lopez Benitez Decl. ¶ 13 (noting he was "freezing").  In other hold rooms, individuals have been subjected to uncomfortably hot conditions, as Defendants have turned off the air conditioning for several hours at a time, despite the crowded conditions.  Sanchez Decl. ¶ 16; Maradiaga Decl. ¶ 12; Barry Decl. ¶ 7 ("The room was terribly hot . . . .").

Defendants have denied putative Class members access to prescribed or needed medications, in violation of the Policy, Ex 1., § 5.7.2.  Ms. Chipantiza's gastritis was exacerbated by the lack of food, and she experienced stomach pain, but when she asked the guards for medicine, they told her she would need to wait because "there were too many people."  Chipantiza Decl. ¶ 7.  Attorney Mei Zhou's client had recently had a stroke and suffered from high blood pressure, but the guards did not give him his blood pressure medication for the full seven days that he was detained at 26 Fed; by the time he arrived at MDC, his blood pressure was dangerously high and his left arm was trembling.  Declaration of Mei Zhou ("Zhou Decl.") ¶¶ 12, 17–18.

The ICE officers at 26 Fed are abusive and cruel to the individuals being detained, often taunting them or yelling at them. *See* Sanchez Decl. ¶ 14; Maradiaga Decl. ¶ 17. ICE officers beat one man for screaming, putting their feet on his neck and head and holding his arms behind his back. Maradiaga Decl. ¶ 17. When Mr. Maradiaga was first arrested, an ICE officer asked him why he had such a serious face. When Mr. Maradiaga responded that he was distraught about being separated from his family, the officer grew upset and told him that he had to obey whatever the officers told him. *Id.* ¶ 8. When Mr. Lopez Benitez's sister asked the ICE officers why they were arresting her brother, they pushed her and threw her to the ground. Lopez Benitez Decl. ¶ 5.[1] One of the officers who arrested Mr. Lopez Benitez thereafter showed Mr. Lopez Benitez a photo he had taken of him crying during his arrest, and mocked him for crying. *Id.* ¶ 7. The officers also falsely told him that since his next court date was in 2029, he would have to spend the next four years in detention in order to keep pursuing his asylum claim. *Id.* ¶ 6.

Media reports have confirmed these conditions. A *New York Times* article published on July 22, 2025, included a video of the inhumane conditions in a 26 Fed holding room, recorded by a detained immigrant who was held there the week before.[2]

---

[1] This interaction was documented in a video published in a recent *New York Times* article. *See* Luis Ferré-Sadurní, *Immigrants File Class-Action Lawsuit to Stop Courthouse Arrests*, N.Y. Times (July 16, 2025), *available at* https://www.nytimes.com/2025/07/16/nyregion/trump-ice-arrests-lawsuit-immigrants.html, attached as Exhibit 10 to the Gregorio Decl.

[2] Luis Ferré-Sadurní, *Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan*, N.Y. Times, July 22, 2025, *available at* https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html, attached as Exhibit 5 to the Gregorio Decl.; *see e.g.*, Alice Gainer, *Video Shows Conditions Inside NYC's ICE Processing Center at 26 Federal Plaza*, CBS News (July 23, 2025), available at https://www.cbsnews.com/newyork/news/nyc-ice-processing-center-26-federal-plaza-video/, attached as Exhibit 6 to the Gregorio Decl.; Joe Torres, *NYC Leaders Call for Inspection After Video Shows Poor Conditions at Federal Plaza Detention Center*, ABC News (July 23, 2025), available at https://abc7ny.com/post/nyc-leaders-call-inspection-video-



Screenshot taken from video embedded in New York Times article.

*Gothamist* has reported on the same conditions and long durations of confinement, citing ongoing litigation and statements by members of Congress.[3]

Meanwhile, Defendants continue to blatantly deny these well-documented violations. Tricia McLaughlin, DHS Assistant Secretary for Public Affairs, stated that "[a]ny claim that there is overcrowding or subprime conditions [at 26 Fed] is categorically false.  All detainees are

shows-poor-conditions-26-federal-plaza-detention-center-manhattan/17262378/, attached as Exhibit 7 to the Gregorio Decl.

[3] Arya Sundaram, '*They're Killing Us': Immigrants Complain of Inhumane Conditions Inside NYC Holding Site*, Gothamist (July 9, 2025), available at https://gothamist.com/news/theyre-killing-us-immigrants-complain-of-inhumane-conditions-inside-nyc-holding-site, attached as Exhibit 8 to the Gregorio Decl.

provided with proper meals, medical treatment, and have opportunities to communicate with their family members and lawyers."[4]

Upon information and belief, Mr. Barco Mercado is being subjected to all of these egregious conditions of confinement and will continue to be subjected to them in the coming days.

**Attorney Access at 26 Fed**

People detained at 26 Fed are denied the ability to communicate with their attorneys. They are not permitted to meet in person or to speak confidentially on the phone with counsel. *See* Chipantiza Decl. ¶¶ 10–11 ("I asked to speak with an attorney but was told by ICE officers that was not allowed until my hearing."); Maradiaga Decl. ¶¶ 9–11 (noting he was never given the opportunity to speak with his lawyer). Attorney Karla Ostolaza called the number provided for 26 Fed and was told "they do not schedule legal calls because they are a holding facility, not a detention center." Declaration of Karla Ostolaza ("Ostolaza Decl.") ¶ 8. She was told that she would have to wait until the people she was trying to reach were transferred to a detention center. *Id.*

The only way that individuals detained at 26 Fed can communicate with the outside world at all is via a non-confidential phone line. Sometimes the detained immigrants are denied the ability to make any calls at all for several days at a time, and an officer told one detained individual that they were not obligated to provide any calls apart from on the day they were initially detained. Sanchez Decl. ¶¶ 18–19. When the detained immigrants are permitted to make calls, the calls are limited to a few minutes, and the ICE officers hurry them if they take longer. Chipantiza Decl. ¶ 9 (noting calls were one or two minutes each); Quevedo Decl. ¶ 6 (stating he was only able to call his family five times during nine days for one or two minutes

---

[4] *Id.*

each time); Garcia Decl. ¶ 7 (noting calls were only for a few minutes, and that the guards "would yell at us to hurry up"); Barry Decl. ¶ 10 ("We were allowed to make one 5-minute phone call every few days."). Defendants permit phone calls at irregular intervals and often only late or in the middle of the night. Sanchez Decl. ¶ 17 ("[T]he calls took place late in the day, after business hours . . . one time I was not given a turn to call until 1:30 a.m.").

All calls are monitored and are not confidential. The guards require the detained individuals to provide information such as the name, address, and/or phone number of the person they are calling and stand next to them during the brief conversation, sometimes requiring the call to be put on speakerphone. Sanchez Decl. ¶ 17; Chipantiza Decl. ¶ 9; Quevedo Decl. ¶ 6; Garcia Decl. ¶ 8. Thus, even if individuals attempt to call a lawyer, they will not be able to have a confidential legal conversation. Declaration of Melissa Lim Chua ("Chua Decl."), ¶ 19.

The ICE Online Detainee Locator, which attorneys typically rely on to locate and schedule client communication, often does not accurately list an individual's location when an individual is detained at 26 Fed. Instead of a location, the website lists "Call Field Office," but when attorneys call the listed number they generally cannot get through or are told they cannot schedule a call. Declaration of David Jimenez, Esq. ("Jimenez Decl.") ¶ 10; Declaration of Sarah Borsody ("Borsody Decl.") ¶ 10; Declaration of Mei Zhou ("Zhou Decl."), ¶ 8; Declaration of Lauren Reiff ("Reiff Decl."), ¶ 8; Ostolaza Decl. ¶¶ 7-8. Calls to other New York ICE ERO phone numbers likewise generally are not answered or returned. Jimenez Decl. ¶ 12. Attorneys who email ICE to ask about the location of their client often receive no response, are told to use the ICE Online Detainee Locator System, or are told that their client is "in transit" and cannot be communicated with, even for multiple days. *Id.* ¶¶ 11, 17–18, 19–21; Borsody Decl. ¶ 10; Declaration of Rebecca Press ¶ 9; Declaration of Dominique Davila, ¶ 6; Reiff Decl.

¶ 11; Declaration of Lauren Kostes ("Kostes Decl."), ¶ 10; Declaration of Leah Wissow, ¶ 12.

Ms. Borsody was informed that a legal call would be facilitated, but one was never scheduled

despite multiple follow-ups, and she only received one missed call from the facility after 8 p.m.

on a Saturday that she was not able to answer.  Borsody Decl. ¶ 11–14.

Defendants do not allow individuals detained in the Hold Rooms to receive visitors and

do not provide access to attorneys.  Attorneys are unable to visit their clients at all.  Guards told

Declarant Hugo Sanchez that "even lawyers cannot come here."  Sanchez Decl. ¶ 12.  When Mr.

Jimenez went to 26 Fed on both July 7 and July 8 to try to see his client Mr. Maradiaga, gain

information about his case, and file an ICE Stay on Mr. Maradiaga's behalf, he was turned away

twice and given shifting explanations for why he could not file the stay request.  Jimenez Decl.

¶¶ 14–15; *see also* Barry Decl. ¶ 10 ("[i]n-person visits were prohibited").

Like other legal service providers, attorneys at New York Legal Assistance Group

("NYLAG") have experienced significant barriers to communicating with their clients.  Even

though NYLAG has represented numerous individuals who have been held at 26 Fed and

NYLAG attorneys have reached out to DHS while the individual has been detained there, to date

the attorneys have been unable to have a confidential legal call with even a single one of them

during their detention.  Chua Decl. ¶ 14.  NYLAG attorneys have been unable to speak

confidentially with clients detained at 26 Fed since the end of May 2025.  *Id.* ¶ 18.  On the rare

occasions attorneys have had non-confidential phone calls with clients, it has been because

detainees have called NYLAG on non-confidential phone calls, which last approximately five

minutes.  ICE has never permitted NYLAG to make an incoming call to a detainee held at the

facility, even if the individual has been held in custody for multiple days, or if the immigrant has

medical needs.  *Id.*

In one case, a NYLAG client who is severely hard of hearing and has intellectual disabilities was detained following his hearing in immigration court. Kostes Decl. ¶ 5. After his family retained NYLAG, Ms. Kostes, a supervising attorney with NYLAG, filed a petition for a writ of habeas corpus on his behalf and contacted DHS to ask for confirmation of our client's whereabouts, to immediately schedule a phone call particularly in light of his disabilities, and for confirmation as to why he was detained. *Id.* ¶ 9. DHS did not respond until the next day, stating that the client was "still in transit" and instead of sharing his location, stated that the attorney had to use the ICE Online Detainee Locator System to track the client. *Id.* ¶ 10.

The NYLAG attorney responded again demanding a phone call with the client, citing the Rehabilitation Act and again highlighting the competency concerns. *Id.* DHS did not respond to that inquiry. *Id.*

After filing a Motion for Custody Redetermination on the client's behalf, a NYLAG attorney emailed DHS again, noting that the client had been detained for a week without access to counsel or a phone call. *Id.* ¶¶ 11-12. NYLAG finally received an email from DHS that evening—one week after the client had been detained and after many attorney hours had been spent trying to locate him—confirming that he was detained at the Metropolitan Detention Center. *Id.* ¶ 12.

As noted above, Mr. Barco Santamaria repeatedly tried to contact Mr. Barco Mercado after he was detained, including going to 26 Fed in person and calling the listed number. Santamaria Decl. ¶¶ 4-7. He was turned away and told that he could not visit his client or set up a call with him. *Id.*

**Harm to Plaintiff and the Class**

Plaintiff and the putative Class members have been substantially harmed by Defendants' unconstitutional practices. They have suffered pain and hunger, the exacerbation of preexisting medical issues and risks of new medical problems, financial harm from being detained for days and unable to work, and psychological and emotional harm from being treated as less than human. Their inability to access legal counsel has further harmed their ability to properly prepare for their legal proceedings and in some cases has led to them being removed from the country without representation. *See* Jimenez Decl. ¶ 32 (because of attorney-access barriers at 26 Fed, attorney could not communicate with his client, who was ultimately removed from the United States despite his meritorious legal claims that may have provided a pathway for him to remain in the country with his U.S. citizen wife and young children).

## LEGAL STANDARD

A temporary restraining order should be issued if the Plaintiff establishes that he is "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (same); *N.Y. Progress and Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (same). The standards for granting a temporary restraining order and a preliminary injunction are "identical." *New York v. Trump*, 765 F. Supp. 3d 287, 291 (S.D.N.Y. 2025).

**ARGUMENT**

I.    **Plaintiff Is Likely to Succeed on the Merits**

    A.  **The Conditions of Confinement at 26 Federal Plaza Violate Plaintiff's and Class Members' Fifth Amendment Rights**

Defendants are violating Plaintiff's and the putative Class members' due process rights under the Fifth Amendment by subjecting them to punitive conditions of confinement.

It is a fundamental principle that when the government takes an individual into custody, it must provide for the person's "basic human needs–*e.g.*, food, clothing, shelter, medical care, and reasonable safety[.]"  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).  Accordingly, claims for unconstitutional conditions of confinement and deliberate indifference to serious medical needs "derive from the same principle":

> '[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being . . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment . . . .'  This rationale applies here because a detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'

*Jones v. Wolf*, 467 F. Supp. 3d 74, 82 (W.D.N.Y. 2020) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  Moreover, immigration detention is indisputably "civil, not criminal" and is therefore "nonpunitive in purpose and effect."  *Id.* at 690; *see also Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (same).  Detained immigrants, like people detained

pretrial, therefore are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982), and may not be subjected to restrictive conditions of confinement imposed for punitive purposes. *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017); *Jones* , 467 F. Supp. 3d at 82 ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.") (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

A detained person alleging unconstitutional conditions of confinement must show that an official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety." *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (emphasis in original) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017))*.* [5]

"[T]here is no static test" to determine whether a deprivation is sufficiently serious; instead, "the conditions themselves must be evaluated in light of contemporary standards of decency." *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). It is a "fact-intensive inquir[y]." *Darnell*, 849 F.3d at 31. Each condition must be evaluated in terms of its severity and duration, and in combination, not in isolation. *Id.* at 31–32 (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("noting synergy between cold temperatures and the failure to provide blankets in establishing an Eighth

---

[5] This analysis is the same under the Fifth and Fourteenth Amendments. *See Darnell*, 849 F.3d at 21 n.3 (citing *Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection.")). Plaintiffs also cite Eighth Amendment law. This is because "[a] detainee's rights are at least as great as the Eighth Amendment protections available to a convicted prisoner," *id.* at 29, and conduct that violates the Eighth Amendment necessarily also violates the Fifth and Fourteenth.

Amendment violation")).   Courts may consider the complained-of conditions in the aggregate "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Wilson*, 501 U.S. at 304).   The Second Circuit "has been reluctant to impose bright-line durational or severity limits in conditions of confinement cases, and has never imposed a requirement that pretrial detainees show that they actually suffered from serious injuries." *Darnell*, 849 F.3d at 31.

To prevail, a plaintiff must show that the defendant government official knew or should have known of a condition that posed an excessive risk of health and failed to take appropriate action.  *Id.* at 35;  *see also Butler v. Suffolk County,* 11-CV-2602 (JS) (ST), 2023 WL 5096218, at *32 (E.D.N.Y. Aug. 9, 2023) (objective deliberate indifference can be satisfied by showing that defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendant] knew, *or should have known*, that the condition posed an excessive risk to health or safety") (quoting *Darnell*, 849 F.3d at 35) (emphasis added).

The conditions of confinement at 26 Fed are shocking and inhumane.  Defendants are forcing dozens and sometimes over a hundred detained individuals into a hold room at a time, causing extreme overcrowding.  *See* Sanchez Decl. ¶ 8; Garcia Decl. ¶ 8; Quevedo Decl. ¶ 4; Barry Decl. ¶ 5.  They are forcing detained individuals to sleep on the hard concrete floor, without beds or mats, and without coverings apart from a single aluminum blanket; people often have to sleep sitting up because there is insufficient space to lie down.  Quevedo Decl. ¶ 4; Sanchez Decl. ¶¶ 8, 11; Chipantiza Decl. ¶ 5; Garcia Decl. ¶ 5; Maradiaga Decl. ¶ 12. Defendants are denying individuals access to basic hygiene items such as soap, clean clothes,

toothbrushes, menstrual products, and the opportunity to bathe.  Sanchez Decl. ¶¶ 12–13;

Chipantiza Decl. ¶ 6; Quevedo Decl. ¶ ; Garcia Decl. ¶ 6; Maradiaga Decl. ¶ 18 ; Barry Decl. ¶.

The hold rooms have one or two toilets that are visible to the room.  Maradiaga Decl.

¶¶ 14, 18; Sanchez Decl. ¶ 13; Barry Decl. ¶ 6.  For food, detained individuals are only given

small rations of inedible "slop" twice per day.  Quevedo Decl. ¶ 5; *see also* Sanchez Decl. ¶¶ 14,

26; Garcia Decl. ¶ 9; Maradiaga Decl. ¶ 15; Barry Decl. ¶ 9.  Detainees are subjected to extreme

temperatures; some hold rooms are kept oppressively hot when air conditioning is turned off;

others are freezing.  *See* Chipantiza Decl. ¶ 8; Garcia Decl. ¶ 5; Maradiaga Decl. ¶ 12; Sanchez

Decl. ¶ 16; Barry Decl. ¶ 7.  Class members are at risk of medical issues worsening without

access to care, as Defendants have denied putative Class members access to prescribed

medications and medical treatment when they fall ill.  Chipantiza Decl. ¶ 7; Zhou Decl. ¶¶ 12,

17–18.  The detained individuals are being held in these squalid conditions for several days and

sometimes week at a time, in one case up to 15 days.  Sanchez Decl. ¶¶ 12–13; Maradiaga Decl.

¶ 18.

The severity and duration of these conditions are sufficiently serious to constitute a

constitutional violation.  Requiring detained persons to sleep on floor mattresses—let alone on

bare concrete—is unconstitutional, regardless of the length of time the individuals are forced to

do so.  *See Lareau v. Manson,* 651 F.2d 96, 107–08 (2d Cir. 1981); *Myers v. City of New York*,

No. 11 Civ. 8525 (PAE), 2012 WL 3776707, at *7 (S.D.N.Y. Aug. 29, 2012), *aff'd*, 529 F.

App'x 105 (2d Cir. 2013); *Vasquez v. Gray*, 523 F. Supp. 1359, 1365 (S.D.N.Y. 1981).

Inadequate access to clean toilets and shower facilities likewise constitutes an unconstitutional

condition.  *See, e.g.*, *Richardson v. Sheriff of Middlesex Cnty.*, 407 Mass. 455, 458, 463 (1990)

(affirming trial judge's finding that two toilets and one shower for a multi-occupancy room of 60

individuals amounted to unconstitutional punishment). The conditions at 26 Fed "[fall] below the minimal civilized measure of life's necessities," and therefore violate Plaintiff's constitutional rights. *Cruz v. Reiner*, No. 11 Civ. 2131 (BMC)(SMG), 2011 WL 6204101, at *5 (E.D.N.Y. Dec. 12, 2011) (denying summary judgment on conditions-of-confinement claim where plaintiff alleged inadequate food and water over a four to five day period, and lack of access to a bathroom); *see also Edwards v. Arocho*, 125 F.4th 336, 351 (2d Cir. 2024) (reversing dismissal of conditions of confinement claim where plaintiff alleged, *inter alia*, unbearably hot temperatures, a lack of running hot water, the presence of mold, and leaking toilet).

In addition, the ICE Hold Room Policy establishes the Defendants' own standard for conditions that should be afforded to people detained in the civil immigration context. *See* Ex. 1. The Policy ensures *inter alia* that meals are provided at least every six hours, that hold rooms are "safe, clean," "equipped with restroom facilities" that detained individuals have "access to . . . prescribed medication as necessary," and that holding facilities should be emptied upon the conclusion of daily operations absent exceptional circumstances. The conditions at 26 Fed— where individuals are forced to sleep on the concrete floor, sometimes sitting up, do not receive adequate food or hygiene products, and are forced to stay in the same clothes for days or weeks—fall dramatically below that floor, and are objectively punitive.

The punitive conditions of confinement at 26 Fed do not serve any legitimate government interest, and one need look no further than the available less restrictive alternative means to achieve any legitimate governmental purpose as set forth in ICE's own minimum conditions standards. *See, e.g.*, *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019) (allegations that conditions that were more restrictive than ICE's PBNDS standards, which offered an example of less restrictive alternative measures, were "sufficient to state a

claim that the conditions at [the facility] are unduly restrictive in violation of due process"); *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-CV-760 (CKK), 2020 WL 3265533, at *30 (D.D.C. June 17, 2020) (evidence that conditions were more restrictive than the PBNDS "supports that these restrictions and conditions are punitive since there are less restrictive alternatives").

Plaintiff has adequately alleged that Defendants are or should be aware of the risk to Plaintiff's health and safety posed by the conditions of confinement at 26 Fed, *see* Exs. 5–9, and have therefore been deliberately indifferent to the risks created by the dangerous conditions. *See Edwards*, 125 F.4th at 352 (vacating dismissal of conditions-of-confinement claim where plaintiffs alleged defendants had knowledge of the challenged conditions and the attendant risks they posed); *Atadzhanov v. City of New York*, No. 21-CV-5098 (LJL), 2022 WL 4331304, at *9 (S.D.N.Y. Sept. 19, 2022) (denying motion to dismiss where plaintiff alleged failure to provide him with proper food and court found plausible inference that defendants "should have known of the risk that Plaintiff was consistently being deprived of food").

### B.  The Government's Denial of Access to Counsel Violates Plaintiff's and Class Members' Rights

Defendants' ongoing ban on attorney-client communications at 26 Fed violates the First Amendment rights of the individuals being detained there.

#### 1.  Defendants Are Violating the Plaintiff's and Class Members' First Amendment Rights

The Government's wholesale denial of Plaintiff's and the putative Class members' access to counsel during extended periods of detention plainly violates their First Amendment rights.

"The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association, and petition."  *Weaver v. James*, No. 10-CV-6609,

2011 WL 4472062, at *3 (S.D.N.Y. Sept. 27, 2011) (quoting *Denius v. Dunlap*, 209 F.3d 944,

953 (7th Cir. 2000)); *see also Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-CV-9893 (JGB),

2023 WL 3149243, at *34 (C.D. Cal. March 15, 2023) ("The First Amendment protects the right

to hire and consult with counsel.") (citing *Mothershed v. Justices of Supreme Court*, 410 F.3d

602, 611 (9th Cir. 2005), *as amended on denial of reh'g* (9th Cir. July 21, 2005)) and *Eng v.

Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009)); *Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 372

(N.D.N.Y. 2003) ("It is . . . settled that there is a right . . . to confer with counsel to obtain legal

advice.") (internal citations omitted).

      This right extends to all persons, including people who are detained and imprisoned.  *See

Pell v. Procunier*, 417 U.S. 817, 822 (1974) (recognizing that all persons, including prisoners,

have First Amendment rights); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) (under

"clearly established First Amendment rights of association and free speech," is the "right to

retain and consult with an attorney").  Detained persons have a First Amendment right to

"communicate with persons outside prison walls," *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048

(9th Cir. 2002); and barriers to legal communication between a prisoner and counsel merit

"heightened concern" given the "import for the prisoner's legal rights[.]"  *Sallier v. Brooks*, 343

F.3d 868, 874 (6th Cir. 2002); *see also Al Odah v. United States*, 346 F. Supp. 2d 1, 9 (D.D.C.

2004) (holding that government may not "inappropriately burden th[e] [attorney–client]

relationship" for individuals detained at Guantanamo).

      In light of this well-established right, the government cannot impose conditions of

confinement that unnecessarily burden a detained person's access to counsel.  In *Torres v. U.S.

Department of Homeland Security*, 411 F. Supp. 3d at 1067, the court found that far less

restrictive conditions—in which detained persons could speak with attorneys but with

restrictions upon calls, lack of proper confidentiality, and delays in appointment times—unreasonably restricted plaintiffs' First Amendment rights to communicate with the outside world, including with attorneys. *Id.* at 1045, 1067–68. The *Torres* court rejected the government's argument that only an "outright ban on communication" would violate the plaintiffs' First Amendment rights. *Id.* at 1067–68; *see also Mayorkas*, 2023 WL 3149243 at *33–35 (detained individuals adequately alleged First Amendment violation where represented individuals could only speak with their lawyers non-confidentially for up to an hour, and unrepresented individuals could not access counsel at all); *cf. Doe v. ICE*, 490 F. Supp. 3d 672, 694 (S.D.N.Y. 2020) (where ICE arrests in and around courthouses prohibited legal services organizations from providing legal services to their clients and engendered an "atmosphere of fear," Defendants' actions were the "functional equivalent of a denial of access" to the courts).

Here, there *is* an "outright ban." *Torres*, 411 F. Supp. 3d at 1067–68. The immigrants detained at 26 Fed have *no* opportunity to schedule visits with attorneys or to schedule or make confidential legal calls. Chipantiza Decl. ¶ 10; Maradiaga Decl. ¶¶ 9–11; Sanchez Decl. ¶¶ 17–19. Attorneys who attempt to visit or schedule calls with clients are ignored, turned away, or told that a call will be scheduled, even though it never is, no matter how many times they follow up. Jimenez Decl. ¶¶ 10–22; Borsody Decl. ¶¶ 7–14. No conceivable legitimate government interest could possibly justify such a blatant violation of Plaintiff's and the putative class members' rights. It does not appear that Defendants have even tried to justify this ban on attorney access. When asked for comment, government representatives instead respond with false denials, insisting that "[a]ll detainees . . . have opportunities to communicate with . . . lawyers."[6] Such statements—despite extensive evidence to the contrary—reveals Defendants'

---

[6] Sundaram, *supra* n.3.

awareness that this ban on communications is unlawful, and that there is no legitimate justification.

### 2.    The Government's Denial of Access to Counsel Violates Plaintiff's and Class Members' Fifth Amendment Substantive Due Process Rights

The denial of access to counsel also violates Plaintiff's and the putative Class members' Fifth Amendment substantive due process rights to be free from punitive conditions while in civil detention.  *See* Section I(A)(1), *supra*.

Restrictions on a detained individual's access to counsel—even far less severe or encompassing ones—have been found to qualify as unconstitutional punishment under the due process clause of the Fifth Amendment.  In *Southern Poverty Law Center*, the court held that plaintiffs were likely to succeed on their Fifth Amendment claim where the government had restricted remote legal visitation and communications with attorneys during the COVID-19 pandemic even though in-person legal visitation was still allowed.  2020 WL 3265533, at *2, *30.  In *Torres*, the court placed great weight on the fact that the plaintiffs' access to counsel was not "less restrictive" than corresponding conditions for individuals detained before criminal trials.  *See* 411 F. Supp. 3d. at 1064–65.  In that case, the plaintiffs adequately alleged a Fifth Amendment violation where the government allowed both legal calls and in-person visits with attorneys, but with significant restrictions on timing, access, and confidentiality.  *Id.* at 1045, 1064–65.  And in *Vasquez Perdomo v. Noem*, which addressed a near-total prohibition on detained immigrants' access to attorneys—with rare examples in which lawyers were permitted short visits with clients after waiting for hours—the court held the plaintiffs were likely to succeed on their access to counsel claim.  No. 25-cv-5605, 2025 WL 1915964, at *12 (C.D. Cal. July 11, 2025).  There, the court thus granted a Temporary Restraining Order requiring legal

visitation for current and prospective attorneys seven days per week, along with free, confidential legal calls. *Id.* at *27–28.

The attorney access conditions for immigrants detained at 26 Fed are not only worse than in the foregoing cases; they are substantially worse than conditions for people detained prior to their criminal trials at other facilities in New York, including the Metropolitan Detention Complex ("MDC") and Riker's Island ("Rikers"). As noted in *Torres*, showing such a comparison is one way of establishing an unconstitutionally punitive condition of confinement. *See Torres*, 411 F. Supp. 3d at 1063–65. In contrast to the blanket ban on attorney-client communication at 26 Fed, attorneys at both MDC and Rikers are permitted in-person meetings with their clients, seven days a week. *See* Declaration of Noam Biale ("Biale Decl."), ¶¶ 6, 8; Declaration of Sergio De La Pava ("De La Pava Decl."), ¶¶ 6, 8. Attorneys may schedule confidential attorney-client phone calls and videoconferences in advance during all weekdays. Biale Decl. ¶ 10; De La Pava Decl. ¶ 10. Moreover, both the Bureau of Prisons ("BOP"), which runs MDC, and the New York City Department of Correction ("DOC"), which runs Rikers, update their respective online inmate locators frequently, providing information about a client's whereabouts within 24 hours of their initial arrest. Biale Decl. ¶ 5; De La Pava Decl. ¶ 5. In contrast, attorneys have no way of locating clients at 26 Fed for days, sometimes longer. *See* Jimenez Decl. ¶¶ 7–22; Borsody Decl. ¶¶ 7–14.

Defendants have provided no justification for the total lack of attorney access at 26 Fed, and there is no plausible or even conceivable legitimate purpose that such denial of access might serve. Nor do plaintiff or the putative Class members have any alternative means of exercising their right to counsel, as Defendants have imposed an outright ban on in-person visitation, legal mail, *and* attorney calls. Chipantiza Decl. ¶ 10; Maradiaga Decl. ¶¶ 9–11; Sanchez Decl. ¶¶ 17–

19; Jimenez Decl. ¶¶ 10–22; Borsody Decl. ¶¶ 7–14 .  The government cannot defeat the

presumption of unconstitutional punishment because it cannot "establish that the conditions are

rationally related to a non-punitive purpose and those conditions are not excessive." *Americans

for Immigrant Justice v. U.S. Dep't of Homeland Sec'y*, 22-cv-3118, 2023 WL 1438376, at *12

(D.C.C. Feb. 1, 2023).  Here, the restrictions on communication with the outside world are so

severe that the government has "effectively blocked attorney-access *in toto*, [and] there is no

constitutionally sufficient justification to avoid finding such a restriction 'excessive' and,

therefore, punitive." *Id*. at *17.  Moreover, Plaintiff has provided multiple examples of less

restrictive alternative measures, including in Defendants' own guidance and regulations, *see* U.S.

Immigration and Customs Enforcement, National Detention Standards ("ICE National Detention

Standards"), attached as Exhibit 2 to the Gregorio Decl. ("Ex. 2"), and the standard levels of

attorney access afforded by the BOP and DOC to people detained in the criminal context.  *See,

e.g.*, *Torres*, 411 F. Supp. 3d at 1065 (plaintiffs argued that conditions at Adelanto exceeded

restrictions in the PBNDS, which offered an example of less restrictive alternative measures).

In short, denying detained immigrants access to attorneys at 26 Fed violates their due

process rights to be free from punitive conditions, particularly where people detained pretrial and

after criminal convictions have regular, unrestricted access to attorneys.

## II.    The Government's Denial of Access to Counsel and Imposition of Unconstitutional Conditions of Confinement Cause Plaintiff and the Class Members Irreparable Harm

Defendants' unconscionable conditions of confinement and total ban on attorney-client

communications cause acute harm to the immigrants detained at 26 Fed.  Such harm is presumed

to flow inherently from the violations of their First Amendment rights.  *See N.Y. Progress and

Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) ("The loss of First Amendment

freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.")
(quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.
1996) (discussing the "presumption of irreparable injury that flows from a violation of
constitutional rights"); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir.
2009); *Americans for Immigrant Justice v. DHS*, 22-CV-3118, 2023 WL 1438376, at *17, 20
(D.D.C. 2023) (finding irreparable injury where legal service organization demonstrated
likelihood of success on the merits that its clients were denied attorney access).

This harm to Mr. Barco Mercado and the putative Class members is compounded by the
fact that the conditions in 26 Fed are causing extraordinary emotional, psychological, and
physical distress.

### III.  The Balance of Equities and Public Interest Weigh Heavily in Favor of Plaintiff's Request for a Temporary Restraining Order

The balance of equities and the public interest merge in cases against the government.
*Nnebe v. Daus*, 510 F. Supp. 3d 179, 189 (S.D.N.Y. 2020) (citing *New York v. DHS*, 969 F.3d
42, 58–59 (2d Cir. 2020)).  The government's ban on attorney access and imposition of
inhumane and punitive conditions of confinement deprive Plaintiff and the putative Class
members of their constitutional rights and subject them to irreparable harm; thus both factors
weigh heavily in Plaintiff's favor.  "[I]t is always in the public interest to prevent the violation of
a party's constitutional rights."  *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d
749, 758 (9th Cir. 2019) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012));
*Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (same).  As discussed
above, the government's unlawful policies deprive Plaintiff and the putative Class members of
their right to access counsel and freedom from punitive conditions of confinement, subjecting
them to a range of physical, psychological, and financial harms.

In contrast, the government is unlikely to suffer any harm from a decision requiring it to follow the mandates of the Constitution and its own regulations and past practices. Defendants' own Policy states that detainees are not to be held for longer than 12 hours in holding facilities, absent exceptional circumstances, Ex. 1, § 3.2 n.3 (or 72 hours as modified by the 12-Hour Hold Waiver), that detainees be "provided a meal at least every six hours," *id.* § 4.4.1.2, that hold rooms are "safe [and] clean," *id.* § 4.4.13, and that detainees "have access to . . . prescribed medication as necessary," *id.* § 5.7(2).

Moreover, the government already affords the requested access and conditions to those held at immigration detention facilities across the country, per its own policies. *See, e.g.*, Ex. 2. The ICE National Detention Standards require facilities to "permit legal visitation seven days a week, including holidays," for eight hours per day on regular business days and four hours per day on weekends and holidays, and to permit "[a]ll detainees, including those in disciplinary segregation, . . . to place calls to attorneys [and] other legal representatives." Ex. 2 at 65, 166. *See also*, U.S. Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Service Agreement Standards ("ICE Non-Dedicated Service Agreement Standards"), at 11 (2025), attached as Exhibit 3 to Gregorio Decl., (for non-dedicated facilities, likewise requiring legal visitation seven days per week, the provision of private rooms for legal visits, and the opportunity to place calls to attorneys at no cost). They also require that hold rooms for temporary detention of individuals contain a minimum of 37 square feet plus an additional 7 square feet of unencumbered space for each additional detainee; contain sufficient seating for the maximum room capacity, and that a detainee may not be held in a hold room for more than 12 hours, and that detainees be provided with basic personal hygiene items. Ex. 2 at 31; *see also* Ex. 3 at 7 (requiring that hold rooms for the temporary detention of detainees comply with

29

maximum capacity rates, and that detainees have access to basic hygiene items and sufficient seating to accommodate every detainee).

There appears to be no legitimate justification for the government's adoption of these cruel and unlawful policies, and most importantly, "the government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017) (citation omitted); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018).

### IV.    The Court Should Not Require Plaintiff to Provide Security Prior to the Temporary Restraining Order

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." However, courts in the Second Circuit routinely "have broad discretion under Rule 65(c) to dispense with the bond requirement." *City of New York v. Lopez,* No. 21 Civ. 7862 (JPO), 2025 WL 1638033, at *2 (S.D.N.Y. June 10, 2025) (citing cases); *Doctor's Assocs. LLC v. Hai*, No. 19-CV-1968 (NGG)(RER), 2019 WL 3330242, at *8 (E.D.N.Y. May 13, 2019) ("It is within the court's discretion to determine that no bond is necessary.").

Courts regularly exercise this discretion to require no security in cases brought by indigen or detained plaintiffs. *See. e.g.*, *Rivera v. Town of Huntington Hous. Auth.*, 2012 WL 1933767, at *7–8 (E.D.N.Y. 2012) (dispensing with bond requirement in part because plaintiffs were indigent and did not have sufficient resources); *Doe by Doe v. Perales*, 782 F. Supp. 201, 206 (W.D.N.Y. 1991) (declining to require plaintiffs to post security and noting that "indigents, suing individually or as class plaintiffs, ordinarily should not be required to

post a bond under Rule 65(c)") (quoting *Bass v. Richardson*, 338 F. Supp. 478, 489–90 (S.D.N.Y. 1971)).  This Court should do so here.

## CONCLUSION

Plaintiff respectfully requests that the Court grant a temporary restraining order to remedy these constitutional violations.  Specifically, Plaintiff requests that the Court grant a temporary restraining order that requires Defendants to:

Ensure that hold rooms are not filled beyond their maximum capacity (defined as 50 square feet per person), that clean bedding mats are provided for sleeping for all individuals held overnight and such persons are provided with sufficient space to lie down to sleep without having to sleep in a toilet or bathroom area, that nutritious meals that meet acceptable dietary standards are provided three times per day at six-hour intervals, that hold rooms and bathrooms are safe and clean, that bathrooms are in a separate room from where individuals are sleeping,  that detained individuals have access to basic hygiene products, and that detained persons have access to prescribed medication as necessary.

Open 26 Fed for legal visitation seven days per week, eight hours per day on business days and four hours per day on weekends and holidays;

Permit individuals detained at 26 Fed to make outgoing confidential legal calls to counsel within 12 hours of being detained at 26 Fed and at least once during each subsequent 12-hour period while they are detained, with accommodations for interpretation;

Permit attorneys to schedule legal calls with detainees at 26 Fed within 6 hours of a request made during business hours and within 12 hours of a request made at other times.

Accurately update the location of detainees held at 26 Fed in Defendant Immigration and Customs Enforcement's Online Detainee Locator System within 24 hours of their transfer to the facility.

Maintain publicly available information regarding protocols for attorney-client communication via Defendant ICE's website.

Provide written information regarding protocols for attorney-client communication in English, Spanish, Haitian Creole, French, Wolof, and Mandarin to all people detained by Defendants at 26 Fed.

Refrain from retaliating in any form against Plaintiff in his immigration proceedings or in any other capacity for asserting their constitutional rights.

Dated: August 8, 2025                                    Respectfully submitted,


AMERICAN CIVIL LIBERTIES                                 WANG HECKER LLP
UNION FOUNDATION
Eunice Cho*                                              s/ Heather Gregorio
915 15th Street, N.W.                                    Heather Gregorio
Washington, DC 20005                                     Mariann Meier Wang
202-548-6616                                             Alice Reiter
echo@aclu.org                                            Daniel Mullkoff
                                                         Lily Sawyer Kaplan**
AMERICAN CIVIL LIBERTIES                                 111 Broadway, Suite 1406
UNION FOUNDATION                                         New York, New York 10006
Kyle Virgien*                                            (212) 620-2600
425 California Street, Suite 700                          hgregorio@wanghecker.com
San Francisco, CA 94104                                  mwang@wanghecker.com
(415) 343-0770                                           areiter@wanghecker.com
kvirgien@aclu.org                                        dmullkoff@wanghecker.com
                                                         lsawyerkaplan@wanghecker.com

*application for admission pro hac vice
forthcoming                                              MAKE THE ROAD NEW YORK
                                                         Harold A. Solis
NEW YORK CIVIL LIBERTIES UNION                           Paige Austin
FOUNDATION                                               301 Grove Street
Amy Belsher                                              Brooklyn, NY 11237
Robert Hodgson                                           Tel. (718) 418-7690
Claire Molholm**                                         Fax (866) 420-9169
Molly K. Biklen                                          harold.solis@maketheroadny.org
125 Broad Street, 19th Floor                             paige.austin@maketheroadny.org
New York, NY 10004
Tel: (212) 607-3300
abelsher@nyclu.org
rhodgson@nyclu.org
cmolholm@nyclu.org
mbiklen@nyclu.org

**SDNY admission pending

*Attorneys for Plaintiff and proposed Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 8, 2025, I served by electronic mail this Memorandum of

Law in Support of Plaintiff's Motion for a Temporary Restraining Order upon the following

counsel:

Jeffrey Oestericher, <u>Jeffrey.Oestericher@usdoj.gov</u> and
Brandon Waterman, <u>Brandon.Waterman@usdoj.gov</u>


DATED:  New York, New York
        August 8, 2025

       ___/s/ Heather Gregorio_____
       Heather Gregorio