# DECLARATION OF SARAH BORSODY

I, Sarah Borsody, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. I am a Staff Attorney with The Legal Aid Society.

3. I am an attorney in good standing in the state of New York. I am admitted in the Southern District of New York and the State of New York (2nd Department). I focus my practice on immigration law.

4. I represent a client with the initials G.F. in his immigration removal proceedings. The Legal Aid Society has represented him since approximately 2019.

5. G.F. has a pending application for legal status, and his removal proceedings have been administratively closed since 2023. However, in May of 2025, ICE's Office of the Principal Legal Advisor filed a motion to recalendar his removal proceedings. I filed an opposition, and the immigration judge never ruled on that motion to recalendar.

6. ICE detained G.F. on July 2, 2025, following an alleged criminal arrest by the New York City Police Department in or near Penn Station. The NYPD never filed any charges related to this arrest. After the arrest, the NYPD held G.F. for 2-3 hours before coordinating his transfer to ICE custody. While held in NYPD custody, an NYPD officer told G.F. that we "have nothing on you," meaning they were not proceeding with a criminal case against him, but that "ICE is looking for you, so we have to call them."

7. I first found out that G.F. was in ICE custody at approximately 11:30 p.m. on July 2, 2025 because he was able to contact his sister. The ICE locator, which said "call field office," indicated he was at 26 Federal Plaza. At 11:55 p.m. that night, I sent an email to ERONYCAPPOINTMENTS@ice.dhs.gov and NewYork.Outreach@ice.dhs.gov, two emails which are available online and commonly used by New York-area legal providers to communicate with ICE locally, stating, in sum and substance, that G.F. had pending, administratively closed removal proceedings, that he had an application for lawful status pending with USCIS, that he is represented by counsel, and not to question him outside my presence. I also provided my cell phone number and asked to be contacted immediately.

8. After G.F. was detained, I attempted to set up a call with him as quickly as possible, as I explain in detail below. G.F. had several legal remedies available to him, including seeking release on bond. I also worried that G.F. was being held in dangerous conditions, and I wanted to try to provide G.F. with as much relief from those conditions as I could,

1

and to do so as quickly as possible, especially given that he lives with a medical condition that requires specific medication. In order to preserve his privacy, I am not sharing further details.

9. The next morning, at 9:01 am, I sent a follow up email with a copy of my Form G-28, Notice of Appearance, in pdf format (I did not have access to this at the time of my first email).  I later also submitted my Form G-28 through ICE's online ERO eFile system at https://www.ice.gov/eroefile.

10.  That same day, July 3, 2025, I received a reply from NYCEROAttorneyInquiries@ice.dhs.gov, saying that my client "is currently in transit to their final detention housing. Please utilize the online detainee locator and reach out to the relevant field office to submit your email with the attached documents once a detention location is displayed."  The online detainee locator result for G.F. stated: "Current Detention Facility: CALL FIELD OFFICE 26 Federal Plaza, New York, NY 10278 Visitor Information: (212) 436-9315." I immediately replied to the email asking that my client be permitted to call me as soon as possible. I also called 212-436-9315, but there was no answer.

11. About a half hour later, I got an email from Joseph T. Pujol, Supervisory Detention and Deportation Officer, Detained Case Management Unit, New York City Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement (per his email signature line). He stated: "A legal call will be facilitated. Your client's transfer will be dependent on operational needs. Please utilize the online detainee locator to determine his detention location once he is transferred and reach out to the relevant field office. Your client was detained pursuant to ERO's custody determination that he would be detained pending the outcome of his immigration proceedings." I then called Office Pujol to make him aware of my client's medical needs and to ask about speaking with him. Officer Pujol told me my client would receive his medication and that he would call me later that day.

12. At 7:30 p.m. on Thursday, July 3rd, I still had not received a call from my client. I emailed DO Pujol again to inform him I was waiting for my client's call and to provide my cell phone number.

13. Between July 2 and July 7, I called and emailed ICE multiple times asking to speak with G.F. I called two publicly available numbers for ICE: (212) 436-9315 and (212) 863-3401. To each of my emails, ICE responded: your client is "in transit to their final detention housing. Please utilize the online detainee locator and reach out to the relevant field office once a detention location is displayed." Each time I called—the times that a live person actually answered my call—they told me that he would be given a legal call and I would hear from him soon.

14. During that time, the only call I received was at 8:09 p.m. on Saturday, July 5th. I actually had my work cell phone with me, but I was driving at the time and was not expecting a call, so I could not answer it.

15. On July 7, 2025, at 5:42 p.m., DO Pujol emailed me saying that my client had been transferred to the Metropolitan Detention Center (MDC) in Brooklyn, and "a legal call will be arranged."

16. I received my first and only call from G.F. the next morning, after he had been transferred, but there was a lot of background noise. It was not a private setting, and he was only permitted to talk to me for 5 minutes.

17. After G.F. was transferred to MDC, he described his experience of trying to call me while detained at 26 Federal Plaza from July 2 through July 7, 2025. G.F. told me that ICE initially told him he had no lawyer to call, that his case was closed, and that it was he should choose to self-deport because nothing was in process for him. They later did permit him to copy numbers from his cell phone so that he could call me, but his allotted time for a phone call was always later in the evening –always after 6 pm and often later, at 9 or 10 p.m.

18. Specifically, G.F. gave me the following details about how phone calls worked during the five days he was detained in the temporary ICE holding cells at 26 Federal Plaza. He said there was a large group of people detained there with him. Detainees held at 26 Federal Plaza were only permitted to make short outgoing phone calls after 5:00 p.m. During the work day, ICE officers sat at their desks, working on their computers, in an area somewhat separate from the holding cells. Detainees were unable to make calls during the regular work day. It was only after 5:00 pm that the ICE officers would approach the holding area and take each person, one by one, for a daily phone call. Because there were so many people, detainees waited for hours for their daily opportunity to make an outgoing call. ICE permitted detainees to make only one call per day, and if the person who was called did not answer, then each detainee lost his or her call for the day. Detainees did not get the chance to try someone else. Therefore, G. F. explained, he decided to use his one call for a close family member who he knew would be expecting his call and answer right away. He thought that if he called me, I might not answer because I was not expecting a late-night work call, and then he would not be able to speak with anyone. Also, the calls were very short – no more than 5 minutes.

19. G.F. also recounted the conditions at 26 Federal Plaza. Dozens of people were crowded into small cells, with no beds, no showers, and only one toilet in each cell, exposed to open view. There were only a few plastic benches, so most people slept on the floor with only a mylar blanket, near the toilet. The only hygiene products provided were hand soaps and mint wipes (instead of a toothbrush and toothpaste). While he was there, ICE officers told him several times that if he wanted to get out of there sooner, they could send him to Louisiana or Texas, but he always responded that he wanted to stay in New York because his family and legal representation is here.

Executed on this 28th day of July, 2025, at Bronx, NY:

_____
Sarah Borsody