```
P8C4MERC
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SERGIO ALBERTO BARCO MERCADO,
on his own behalf and on
behalf of others similarly
situated,

                Plaintiff,

       v.                           25 Civ. 6568 (LAK)

KRISTI NOEM, Secretary of the
U.S. Department of Homeland
Security, in her official
capacity, *et al.*,

                                         Video Conference

                Defendants.
------------------------------x
                                      New York, N.Y.
                                      August 12, 2025
                                      10:00 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                         District Judge

                       APPEARANCES

WANG HECKER LLP
     Attorneys for Plaintiff
BY:  HEATHER C. GREGORIO
     DANIEL E. MULLKOFF
     ALICE G. REITER
     MARIANN M. WANG

U.S. ATTORNEY'S OFFICE, SDNY
     Attorneys for Defendants
BY:  JEFFREY S. OESTERICHER

```
 1                  (Case called; appearances noted)
 2              THE COURT:  Ms. Gregorio, you may begin.
 3              MS. GREGORIO:  Thank you, your Honor.
 4              We submitted extensive evidence describing in detail
 5   the inhumane and horrifying conditions at 26 Federal Plaza over
 6   the past several weeks and months.  We've submitted 22
 7   declarations showing that individuals being detained for
 8   several days and even weeks in what was meant to be a temporary
 9   daytime holding facility, which defendants acknowledged.  While
10   there they are not permitted any ability to communicate with
11   their attorneys confidentially.  There is no ability for their
12   attorneys to reach them or schedule calls with them during a
13   time when they are in particular need of legal counsel.  They
14   are granted only sporadic outgoing calls of a few minutes that
15   are closely monitored.  They are also being subjected to
16   unsanitary and unsafe conditions, sleeping for days or weeks on
17   a concrete floor with only an aluminum blanket, often with
18   insufficient space to even lie down, often sleeping near the
19   toilets.  They are subjected to extreme temperatures.  The
20   rooms are either oppressively hot or freezing.  They receive
21   two, essentially inedible, small meals a day.  They are not
22   given the opportunity to shower, change clothes, or brush their
23   teeth even if held for a week or longer.  And they are denied
24   necessary medications.  They have access to only one or two
25   toilets shared among 40 to 90 people, and the toilets are in
```

|  |  |
|---|---|
| 1 | open view of the room, so some have resorted to try to wrap |
| 2 | their aluminum sleeping blanket around themselves for privacy. |
| 3 | They are subjected to taunting and verbal and physical abuse by |
| 4 | the ICE officers. |
| 5 | These conditions are described in eight declarations |
| 6 | of individuals who have recently been detained and experienced |
| 7 | these conditions firsthand, and their descriptions are |
| 8 | remarkably consistent.  We also submitted ten declarations from |
| 9 | attorneys who regularly represent clients in immigration |
| 10 | proceedings and who've attempted repeatedly to reach their |
| 11 | detained clients with no success. |
| 12 | We also received a supplemental declaration from our |
| 13 | client just this morning, and I apologize for the very |
| 14 | last-minute filing, but we only just received it from him |
| 15 | because his attorneys were able to speak with him.  And he |
| 16 | describes he was detained at 26 Federal Plaza over the weekend. |
| 17 | He describes the same conditions.  He describes the same |
| 18 | crowding, lack of food, lack of adequate sleeping conditions, |
| 19 | freezing temperatures, and smell of sewage.  He also describes |
| 20 | dehumanizing treatment by the guards.  He states that one guard |
| 21 | was holding up a water bottle and spraying it into the mouths |
| 22 | of the individuals who wanted water as if they were animals. |
| 23 | He also describes having been in great pain from a |
| 24 | tooth infection and not receiving treatment.  And he describes |
| 25 | making a brief call to his attorney on Sunday night because he |

1    happened to have his phone number, which is often not the case,
2    of course.  But that call was limited to one to two minutes.
3    There was a guard standing next to him, and he could hear a
4    second person breathing audibly on the line.  So this is a far
5    cry from the confidential calls that defendants say they are
6    providing.  These conditions have been extensively covered by
7    the press, including a video taken by a detained individual and
8    included in a New York Times article.
9              In the face of all of this evidence, the government
10   submits what is essentially a conclusory denial, similar to the
11   statements they have made to the press that flatly denies these
12   conditions are happening.  Ms. Zanello doesn't say what her
13   knowledge is based on, stating simply that she has access to
14   ICE records concerning the facility.  She doesn't attach
15   pictures.  She doesn't say when she last visited the facility.
16   She notably doesn't deny a single, specific allegation from our
17   declaration.  And her descriptions are all in the present
18   tense.  Nor does the government justify any of the conditions
19   described in our declarations.  They cite no authority for the
20   proposition that the conditions we've established would meet
21   the constitutional standards.
22             In light of our extensive, consistent evidence of
23   these plainly unconstitutional conditions and the government's
24   conclusory assertions that mostly just invoke their policies,
25   we submit that plaintiff has more than demonstrated a strong

1   likelihood of success on the merits, and would respectfully ask
2   the Court to grant the proposed temporary restraining order or
3   preliminary injunction.
4            THE COURT:  Thank you.
5            Mr. Oestericher.
6            MR. OESTERICHER:  Thank you, your Honor.
7            I think we all agree that conditions at 26 Federal
8   Plaza need to be humane, and we obviously share that belief.  I
9   think there is some factual disagreement.  As a threshold
10  matter, 26 Federal Plaza is a holding facility, and it's
11  designed for short-term stays.  And I think that's important
12  with regard to keeping in context the effects of some of these
13  conditions.
14           THE COURT:  Here's what's important about it, I think.
15  Doesn't your argument, to the extent it relies on the fact that
16  the particular facility was intended for short-term use, boil
17  down to saying that unconstitutional conditions of confinement
18  are okay as long as they don't go on too long?
19           MR. OESTERICHER:  I wouldn't put it that way, your
20  Honor.  I think that --
21           THE COURT:  I figured that.
22           MR. OESTERICHER:  I think the standard is whether it
23  rises to the level of a constitutional violation, and I think
24  duration is a factor in considering whether it does.  But we
25  take plaintiff's point that inhumane conditions are not

1   appropriate and should not be tolerated, and the government
2   should not tolerate it.  I think there are some factual
3   disagreements, certain things we agree on and some we don't.
4   And I think for purposes of the TRO, present conditions are
5   relevant.  To the extent they are talking about overcrowding,
6   it does not appear presently that there is overcrowding at 26
7   Federal.
8            THE COURT:  What is the history of the number of
9   people in these rooms over, say, the last three weeks, day by
10  day?  You have that information, but you haven't provided it.
11           MR. OESTERICHER:  I don't have that information.
12  There are logs.  I don't presently have that information, but
13  that information is available.  There are logs that would be
14  able to answer that question.  I just don't have that answer as
15  we sit here right now.
16           THE COURT:  Okay.  I have no reason to deny or to
17  discredit the affidavits that have been supplied by the
18  plaintiff as to numbers in some of these rooms being as high as
19  90 people in several hundred square feet at points in recent
20  history.
21           MR. OESTERICHER:  I have no present basis to deny.
22  Obviously, they're estimating.  But correct, I can say
23  presently, for purposes of the TRO, there are 26 individuals
24  total in the four rooms combined.
25           THE COURT:  Would it be a reasonable inference to

1    suppose that after the video was published in the New York
2    Times a couple of weeks ago, I guess, and the likelihood of
3    litigation began to be reasonably foreseeable, that an effort
4    was made to clean things up, at least short term?
5             MR. OESTERICHER:  I'd like to take the fifth on the
6    inference, your Honor.  I don't know whether that's a fair
7    inference or not.  But for purposes of the legal matter, I
8    think that is what one would want to have happen.  And I think
9    it can be considered for purposes of whether a TRO should be
10   granted if voluntary measures were taken to alleviate
11   conditions, that is a good thing.  Whether they were born of
12   that video or otherwise, that is a positive step, and the fact
13   that there are only 26 individuals there is a positive step.
14   So I'm not sure about the inference, but to the extent that is
15   what happened, I think that is a positive development as
16   opposed to a negative development.
17            THE COURT:  Well, but the Supreme Court has taught,
18   ever since *W.T. Grant* that the voluntary cessation of improper
19   behavior does not defeat an application for equitable relief
20   because the improper behavior, absent that relief, could resume
21   overnight or in short order.
22            MR. OESTERICHER:  I think we cite some cases in our
23   brief on this point, your Honor, and I think there are two
24   doctrines.  But here for purposes of the TRO, that condition
25   just isn't there, and the inference that the government is then

going to relapse into overcrowding is one that we, at least at present, would reject.

THE COURT: Well, what is the government doing with the numbers of people that a couple of weeks ago would have been in 26 Federal now?

MR. OESTERICHER: I think the concept is it's a short-term processing facility, and they are finding beds. I think more and more detention facilities are being made available in this general tristate area, such as they are trying to move people out within 72 hours as quickly as possible to alleviate crowding conditions, be it crowding or overcrowding.

THE COURT: Why don't I have affidavits about that?

MR. OESTERICHER: Your Honor, frankly, we were just short on time. The application was filed on Friday, late. The initial order from Judge Woods said a schedule would be established on Monday and then the schedule came down for papers by 5:00 p.m. We would be happy to provide additional information. We were just, frankly, short on time.

THE COURT: Anything else you want to add?

MR. OESTERICHER: I would say that for some of the -- I think the hardest issue is the attorney access. I think for conditions, I think some of them, to the extent there are issues that the Court believe rises to the level of constitutional violations, there are solutions: Mats, sleeping

1    mats, if that is an issue.  I think some of the issues in their
2    TRO are just not physically possible, such as bathrooms in a
3    separate room.  The bathrooms are in the holding rooms, and it
4    would be extraordinarily difficult to have holding rooms
5    without bathrooms.  I think legal visitation is really the most
6    difficult.  In-person legal visitation, just based on the
7    layout, is not feasible.  And the way it works, as I understand
8    it, is when an individual is brought into 26 Federal, they are
9    given a call at that time and that calls are available, albeit
10   in sort of an outside the holding room, not in a private room.
11   But calls are available such that that is how attorney access
12   is provided.  And given the short-term stay, that that doesn't
13   rise to the level of a constitutional violation.
14            THE COURT:  Well, I hear you, but I have an awful lot
15   of evidence before me that what you're suggesting isn't
16   happening in practice.
17            MR. OESTERICHER:  Understood, your Honor.
18            THE COURT:  What are the points on which you say there
19   is no factual dispute?
20            MR. OESTERICHER:  I would say there is no factual
21   dispute that there are no beds in these holding rooms and that
22   they are not provided with sleeping mats.  They are only
23   provided with blankets.
24            I think there is no dispute that they are provided two
25   meals instead of three.

1          I think there's no dispute that the bathrooms are
2    within the room.
3          THE COURT:  What are you feeding them?
4          MR. OESTERICHER:  I don't presently have the answer
5    beyond it's two meals per day, not three.  And I'm told it's
6    two nutritious meals.  But as far as the specifics whether it's
7    military meals, I don't have the specifics on that.
8          THE COURT:  Go ahead.
9          MR. OESTERICHER:  I think there is agreement about
10   medication.
11         I think there is agreement that visitation is not
12   in-person visitation.  In-person visitation does not occur,
13   based on the layout.
14         And I think there is disagreement about the online
15   detainee location.  So those are the issues.  There is
16   agreement and disagreement.
17         THE COURT:  All right.  Ms. Gregorio, anything else
18   you want to add?
19         MS. GREGORIO:  Sure.  I would just make a few points.
20   In all of our declarations we have not heard anything about
21   calls being made outside of the room.  The experiences
22   described by all of the declarants are that there is one place
23   to make calls, and the guards are hovering there and hurrying
24   them along.  Our client reports that happening as recently as
25   this weekend.

Case 1:25-cv-06568-LAK   Document 64   Filed 08/12/25   Page 11 of 19    11
P8C4MERC

|   |   |
|---|---|
| 1 | He also reported crowding as recently as this weekend. |
| 2 | In terms of the statement that people are generally |
| 3 | being moved out in 72 hours or less, I would note that the |
| 4 | 72-hour waiver was passed back in June.  And of the eight |
| 5 | declarations that we have collected since then, six people were |
| 6 | held significantly longer than that.  One person was held for |
| 7 | nine days, one for ten days, one for 15.  But we are skeptical |
| 8 | that even if the policy changes, that we would be able to rely |
| 9 | on that, given the fact that there have been policies in place |
| 10 | and they have not been adhered to.  So I would just add in |
| 11 | terms of the concept of voluntary cessation, obviously we are |
| 12 | happy to hear if conditions are improving, but we are extremely |
| 13 | skeptical that that will continue without some level of |
| 14 | enforcement and court oversight.  You know, the standard for |
| 15 | defendant's burden to show voluntary compliance is called |
| 16 | "stringent" and "formidable," and they must make "absolutely |
| 17 | clear that the allegedly wrongful behavior could not reasonably |
| 18 | be expected to occur."  So we feel strongly that a court order |
| 19 | is necessary and oversight is necessary to ensure compliance |
| 20 | with anything that the government says it is going to do or |
| 21 | change. |
| 22 | THE COURT:  I don't know whose device is causing that, |
23 | but please stop it. |
| 24 | You are going to hear my printer cranking for a |
| 25 | minute, just bear with me on that. |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Let me address the question of what kind of relief is
2    appropriate, assuming relief is appropriate.  I've given some
3    thought to whether a population limitation based on square
4    footage would make sense.  You can't have more than X detainees
5    in one of these rooms, unless the room is big enough in square
6    footage, discounting the toilet area, to give 50 square feet
7    per person.  Is that a problem?
8              MR. OESTERICHER:  I would say, your Honor, if the
9    Court orders it, it is not a problem.  The government will
10   comply.  Is it a logistical problem?  My math is not good
11   enough to compute how many individuals that is.
12             THE COURT:  Well, the biggest room in your affidavit
13   or your papers indicated was 800 square feet.  I don't know how
14   much to hive off for the toilet area, but roughly 15 people.
15             MR. OESTERICHER:  Right.  It's certainly not a problem
16   presently.  And if that is what the Court deems necessary,
17   obviously we will comply.  There is an 800 -- two smaller rooms
18   that would probably only accommodate three people each, if I'm
19   doing the math right and a fourth room that is larger.
20             THE COURT:  Ms. Gregorio, what's your thought about
21   that?
22             MS. GREGORIO:  I believe that that would be a
23   reasonable -- one aspect of the solution which is why we
24   requested it in conjunction with other remedies.
25             THE COURT:  Okay.  Thank you.

1           Bedding mats, sleeping mats, any reason that can't be
2    provided?
3           MR. OESTERICHER:  No, your Honor.  I just think we
4    would need some short period of time to acquire them.
5           THE COURT:  Understood.  What about all these problems
6    that I'm told about in the plaintiff's affidavits concerning
7    soap, towels, toilet paper, oral hygiene products, feminine
8    supplies?  There seems to be quite a gap between the ICE
9    standards, indeed, and what's really happening, including a
10   20-year-old, I gather, who was menstruating for five days and
11   couldn't get any supplies and what was supplied for a room full
12   of people were two items?
13          MR. OESTERICHER:  I read that as well, your Honor.  I
14   don't have a basis to comment, but we totally agree that
15   necessary hygiene products should be available.
16          THE COURT:  All right.  Probably the hardest problem
17   is access to lawyers.  And I'm inclined to require that you
18   folks do quite a different and better job of this, including
19   telephone access for legal calls, shortly after they arrive at
20   the facility, and then promptly thereafter, and privacy.  And
21   if that means taking people out of the rooms to a private
22   telephone, I have that in mind.  And requiring the dedication
23   of a certain number of telephone lines for the purpose of legal
24   calls.
25          Why shouldn't I do that, Mr. Oestericher?  That is the

1    most serious constitutional problem here, I think.

2              MR. OESTERICHER:  I think the reason not to do it,
3    your Honor, is that individuals in detention are provided a
4    call upon arrival, and their stay is short.  And they are able
5    to make calls upon request thereafter.  And given the
6    short-term nature, because it's a holding and not a detention
7    facility, that that suffices, and it is not a constitutional
8    violation.

9              THE COURT:  Well, okay.  I think, at least
10   preliminarily, we are going to have to agree to disagree about
11   that.  I understand that there may be a logistical question,
12   and if there is logistical question, that's what I'm most
13   interested in at the moment and how to solve it.

14             MR. OESTERICHER:  Understood, your Honor.  I would
15   need to discuss with the client the logistics in making that
16   happen to the extent the Court ordered it.

17             I just wanted to add, to the extent the Court has
18   other questions that I was unable to answer, if the Court wants
19   those answers, and, of course, if the Court orders it, we will
20   provide that information.

21             THE COURT:  Well, there is going to be a preliminary
22   injunction to be heard.  And it will be on a reasonable
23   schedule.  So you will have an opportunity to do that, and it
24   would be very much in your interest to do that.

25             Now, I read the declaration or affidavits you

1    submitted.  And there are lists of things that are said to be
2    available if only somebody asks.  Put aside the question of
3    whether requests that are made are actually fulfilled, which I
4    gather there is some disagreement about, how do these people
5    know about all the wonderful things they can get on request,
6    like clean clothing and the like?
7             MR. OESTERICHER:  I'm not aware of how that's
8    communicated.  But that obviously could be corrected with some
9    kind of posting, if necessary.
10            THE COURT:  Okay.
11            MS. GREGORIO:  Your Honor, may I ask one thing about
12   the legal calls?
13            THE COURT:  Yes.
14            MS. GREGORIO:  I would just request that attorneys be
15   permitted to schedule legal calls with their clients just
16   because often they don't know their attorney's phone numbers.
17   So if there could be a phone number that could be called and
18   answered with clear instructions for how to schedule a call
19   with a client, that would be extremely helpful as well.
20            THE COURT:  Okay.  Let me make a note.
21            Either of you have anything else to add?
22            MS. GREGORIO:  No, your Honor.  Thank you.
23            MR. OESTERICHER:  The only thing I would add your
24   Honor is that I think the scheduling of legal calls is a
25   complicated matter.  Having seen it through the COVID time at

 1  MCC and MDC.  It's just logistically very difficult.  And it
 2  takes an infrastructure and personnel, to the extent the Court
 3  is contemplating a system whereby attorneys could schedule
 4  calls within a certain timeframe, especially given that it's a
 5  short-term facility.  They can't wait three or four days.  I
 6  think those issues are tricky.  I'm not sure how that cuts, but
 7  I want to raise that from the experience through COVID at MDC
 8  and MCC it was not seamless from the beginning, and it is
 9  somewhat complicated.

10         THE COURT:  I don't doubt that.  I lived through COVID
11  and inmate cases myself.  But I think we're going to have to do
12  that in some fashion.  Now, you've got a lot of experience.
13  Your office has tons of experience with this, and I'm sure you
14  could be helpful to your client in working something out here.
15  And if whatever it is that I ultimately provide in a TRO needs
16  to be tweaked in a way that will be consistent with
17  practicalities and also with the rights of the detainees, I
18  will be ready to consider that.  This is a first step, in my
19  view.  And my conclusion here is that there is a very serious
20  threat of continuing irreparable injury, given the conditions
21  that I've been told about.  I have no enforceable way of
22  assuring that any progress that, in fact, has been made won't
23  backslide very quickly.

24         On the state of the current record, the plaintiff
25  clearly has a high likelihood of success and that may change.

1    But there will be a TRO in the course of the day.  And I'll
2    post it to ECF and my thought is, that it would, absent
3    modification or extension, expire in 14 days or conceivably,
4    earlier.  But that will be spelled out in the order.
5              Now, in so far as the preliminary injunction is
6    concerned, is this something that you are both prepared to do
7    entirely on papers, or am I going to have to take any evidence?
8              MS. GREGORIO:  We would submit that we have provided
9    more than sufficient evidence for a finding on the papers and
10   would ask your Honor to rule on the evidence we provided.  To
11   the extent that the government does submit evidence, we would
12   like an opportunity to reply and also assess whether additional
13   rebuttal evidence is needed on our end.
14             THE COURT:  Mr. Oestericher?
15             MR. OESTERICHER:  I think that's a little hard for me
16   to evaluate at the moment.  We would intend to put in a more
17   robust factual record, particularly a contemporaneous record.
18   And it may be that at least the government witness would want
19   to testify at a hearing so that we could answer the Court's
20   factual questions.
21             THE COURT:  How much more time do you want for any
22   additional submissions on the preliminary injunction?
23             MR. OESTERICHER:  Briefing and factual or is there
24   going to be a --
25             THE COURT:  Briefing and factual.

P8C4MERC

            MR. OESTERICHER:  I assume the plaintiff is going to
go first.
            THE COURT:  The plaintiff has gone first.
            MR. OESTERICHER:  I see.  So we would like until
Monday the 18th, maybe.
            THE COURT:  How does that sound, Ms. Gregorio?
            MS. GREGORIO:  That works for us.
            THE COURT:  How much time do you want to reply?  Do
you know?
            MS. GREGORIO:  I believe we could reply by Thursday
the 21st.
            THE COURT:  That's okay with me.  And if there is
going to be a request to take evidence, I have to have it in
writing, the request in writing, by the 21st.  And then we'll
see where we are in terms of timing if there is such a request.
            Now, Ms. Gregorio, are you going to make a class
motion?
            MS. GREGORIO:  We have filed a motion for class
certification.  We filed it when we filed the case.
            THE COURT:  I was not aware of that.
            Mr. Oestericher, when can you have your response in on
that?
            MR. OESTERICHER:  A week from tomorrow, your Honor.
Is that the 20th?
            THE COURT:  Okay.  And when would you like to reply,

1    Ms. Gregorio?
2            MS. GREGORIO:  We could reply by Friday the 22nd.  I'm
3    sorry, are my dates wrong?  Yes, Friday the 22nd.
4            THE COURT:  Okay.  Fine.  Just so you have it in mind,
5    a date that I'm kind of holding in my mind as a possibility, if
6    there needs to be some evidence taken, is September 3rd.  I'm
7    not committing to that, but it's a possibility.  I'm just being
8    up front with you about what's in my mind about that.
9            Okay.  Anything else we can usefully accomplish at the
10   moment, Ms. Gregorio?
11           MS. GREGORIO:  Not for plaintiff, your Honor.  Thank
12   you.
13           THE COURT:  Mr. Oestericher?
14           MR. OESTERICHER:  Nothing else.  We appreciate your
15   consideration, your Honor.
16           THE COURT:  I appreciate the very good submissions by
17   both sides, especially Mr. Oestericher in your case, given the
18   time pressure.
19           MR. OESTERICHER:  Thank you, your Honor.
20           THE COURT:  Okay, folks, we will be in touch.
21           (Adjourned)
22
23
24
25