UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SERGIO ALBERTO BARCO MERCADO, etc.,

                    Plaintiff,

       -against-                              25-cv-6568 (LAK)

KRISTI NOEM, Secretary of the U.S. Department of
Homeland Security, etc., DEPARTMENT OF HOME-
LAND SECURITY, TODD LYONS, etc., IMMIGRA-
TION AND CUSTOMS ENFORCEMENT,
MARCOS CHARLES, etc., LADEON FRANCIS,
etc.,

                    Defendants.

STATE OF NEW YORK,

               *Amicus Curiae*.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

        Heather Gregorio
        Mariann Meier Wang
        Alice Reiter
        Daniel Mullkoff
        WANG HECKER LLP

        Eunice Cho
        AMERICAN CIVIL LIBERTIES UNION FOUNDATION

        Amy Belsher
        Robert Hodgson
        Molly K. Biklen
        NEW YORK CIVIL LIBERTIES FOUNDATION

> Harold A. Solis
> Paige Austin
> MAKE THE ROAD NEW YORK
>
> *Attorneys for Plaintiff*
>
> Jeffrey Oestericher
> Assistant United States Attorney
> JAY CLAYTON
> UNITED STATES ATTORNEY
> *Attorney for Defendants*
>
> Ester Murdukhayeva
> NEW YORK STATE OFFICE OF THE ATTORNEY
> GENERAL
> *Attorney for State of New York Amicus Curiae*

LEWIS A. KAPLAN, *District Judge.*

During the 2024 presidential campaign, President Trump publicly promised "the largest deportation operation in the history of our country" if elected.[1]  Upon assuming office, he issued two Executive Orders that directed the Secretary of Homeland Security to increase efforts to detain removable aliens.[2]  In response to directives from the White House, U.S. Immigration and Customs Enforcement ("ICE"), a component of the United States Department of Homeland Security ("DHS"), began pursuing aggressive strategies, such as arresting immigrants attending routine immigration court proceedings, to reach a then unprecedented target of 3,000 arrests per day.[3]

---

[1] White House, *Promises Made, Promises Kept: Border Security Achieved in Fewer than 100 Days* (Apr. 28, 2025), https://www.whitehouse.gov/articles/2025/04/promises-made-promises-kept-border-security-achieved-in-fewer-than-100-days/.

[2] *See* Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025); Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025).

[3] Hamed Aleaziz, *Under Pressure From the White House, ICE Seeks New Ways to Ramp Up*

ICE's expanded enforcement efforts produced — and reportedly continue to produce — a surge of detainees that has overwhelmed existing facilities and strained operational resources.[4] Struggling to process and house, even temporarily, the influx of detainees under prior guidelines, ICE in June 2025 revised its policy to permit so-called short-term holding facilities to be used for lengthier detentions. Whereas ICE previously limited detention of any given detainee in so called "hold rooms" to 12 hours, it altered its policy to permit detention in such rooms for up to 72 hours and, in unspecified and undefined "exceptional circumstances," longer.[5]

---

*Arrests*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html; Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily,* Fox News (May 29, 2025), https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day.

The lawfulness and desirability of the administration's general policy determinations with respect to the "deportation operation" are not at issue in this case, and the Court expresses no view with respect to those matters.

[4]    *See* Dkt 11-4 (Nationwide Hold Room Waiver Memorandum) (noting that "[a]s a result of increased enforcement efforts, ICE's Enforcement and Removal Operations("ERO")s unit's average daily population [] significantly increased to over 54,000" and that "this increase [] put additional strain on finding and coordinating transfers of aliens to available beds within the required timeline detailed in Directive 11087.2").

[5]    *Id.*

4

Around that same time, media reports[6] — including video purportedly recorded by a detainee[7] — focused public attention on the allegedly crowded and unsanitary conditions at the "hold rooms" located on the tenth floor at ICE's New York regional office at 26 Federal Plaza ("26 Fed Hold Rooms"),[8] among others.  Some New York Members of Congress sought to visit the 26 Fed holding facility to investigate conditions there,[9] while Members representing other areas in the country sought access to other ICE locations.[10]  Many were rebuffed, some in disputed circumstances.[11]  Moreover, DHS and ICE adopted new, controversial policies concerning Congressional access that has led to litigation.[12]  That is the context in which this case arose.

---

[6]      *See, e.g.,* Arya Sundaram, *'They're Killing Us': Immigrants Complain of Inhumane Conditions Inside NYC Holding Site,* GOTHAMIST (July 9, 2025), https://gothamist.com/news/theyre-killing-us-immigrants-complain-of-inhumane-conditions-inside-nyc-holding-site.

[7]      Luis Ferré-Sadurní, *Video Shows Overcrowded and Unsanitary Conditions in Immigration Holding Cells,* N.Y. TIMES (July 22, 2025), http://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

[8]      *Id.*

[9]      Complaint, *Neguse et al. v. U.S. Immigration and Customs Enforcement, et al.,* No. 1:25-cv-2463-JMC (D.D.C., filed July 30, 2025), Dkt 1 at ¶¶ 145–48, 161–71.

[10]      *See generally id.*

[11]      *See, e.g., id.* at ¶ 87 ("DHS and ICE officials have denied Plaintiffs access to DHS facilities on the stated grounds that . . . some facilities, including ICE field offices, are entirely exempt from congressional oversight.").

[12]      *Id.* at ¶¶ 79–88.

The plaintiff was — and members of the putative class are or will be — detained in the 26 Fed Hold Rooms.  Plaintiff claims that detainees there have been subjected to inhumane conditions of confinement and deprived of meaningful and reliable access to legal counsel, presumably because the 26 Fed Hold Rooms were not designed to detain people for extended periods, let alone in large numbers.  On August 8, 2025, plaintiff sought a temporary restraining order ("TRO") and a preliminary injunction.  On August 12, 2025, this Court granted a TRO that barred ICE from using the 26 Fed Hold Rooms unless it made substantial improvements in conditions.

Plaintiff's preliminary injunction motion ultimately was supported by 28 declarations of persons who had been detained in the 26 Fed Hold Rooms or reported accounts of others who had been there.[13]  These declarations attested that:

- Many detainees were housed in the 26 Fed Hold Rooms for multiple days and, in some cases, weeks.[14]

---

[13]

"A preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id*. As such, hearsay evidence may be considered.  *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). "The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage." *Id.*

[14]

*See, e.g.,* Dkt 15 at ¶ 6 (detained 5 days at 26 Fed);  Dkt 82 at ¶ 5 (detained 8 days at 26 Fed); Dkt 15 at ¶ 10 (describing meeting people who had been detained 10 days and 15 days at 26 Fed); Dkt 26 at ¶ 11 (detained 5 days at 26 Fed); Dkt 27 at ¶ 6 (detained more than two weeks at 26 Fed); Dkt 28 at ¶ 4 (detained 10 days at 26 Fed); Dkt 31 at ¶ 4 (detained 9 days at Fed).  Moreover, defendants concede that some percentage of detainees – although less than a majority – are detained at 26 Fed for greater than 72 hours. *See* Dkt 74 at ¶ 4. Given the volume of people detained at 26 Fed, even assuming only 10 percent of detainees have been held for longer than 72 hours, many people have been detained for more than 72 hours.

6

- Detainees were packed into often incredibly crowded rooms, with up to 90 people in a 20 square meter room.[15]

- Detainees were forced to try to sleep, if sleep were possible, in illuminated rooms on concrete floors with no bedding and only a thin aluminum blanket. Many were unable to lie down due to the crowded conditions and sought sleep while sitting up. Some had to sleep near open toilets because there was no other space.

- Detainees were unable to bathe or shower for the duration of their detention. They were not provided with adequate basic hygiene resources like soap, sanitary napkins, toothbrushes and toothpaste, clean clothing, and toilet paper.  One detainee reported that a hold room occupied by over 20 women was provided with only two menstrual pads, that she was unable to get one, that she menstruated for several days, and that she bled into her clothing, which she wore for at least much of her 10 day detention at 26 Fed.[16]

- Detainees were provided two small rations of food a day and limited water, causing substantial weight loss in some instances.

- Some detainees were denied timely medical attention and necessary medications.

---

[15]  See e.g., Dkt 27 at ¶ 8 ("At times there were as many as 90 people in the room where I was detained. The room was around 20 square meters; it was not large.").

[16]  See Dkt 28 at ¶ 8.

- Detainees' communications with legal counsel were severely limited. Detainees' only access to legal counsel, if any, was through sporadic, time-restricted, monitored phone calls.

Among the declarations were accounts of attorneys who contended that ICE limited communication to or from detainees at 26 Fed and that the attorneys were unable to visit or schedule calls. Additionally, they stated that the ICE Online Detainee Locator, which attorneys rely on to locate their clients, did not indicate reliably whether an individual was detained at 26 Fed.

Defendants, while professing the belief that all detainees are entitled to be treated humanely, contest few of plaintiff's specific assertions about the treatment experienced prior to the entry of the TRO. Rather, they seek to justify the conditions principally with the contention that the 26 Fed Hold Rooms are "solely used for the short term confinement of aliens."[17] But they effectively acknowledge that they often detain individuals in the 26 Fed Hold Rooms for more than ICE's own "short term" time limits, first of twelve and more recently of seventy-two hours. They make little to no effort to dispute the accuracy of plaintiff's evidence of overcrowding, lack of sleeping facilities, inadequate food and water, lack of adequate toilet facilities and supplies, and lack of any bathing or shower facilities. And they seek to defend their extensive limitations on adequate access to lawyers essentially on the basis that, in their view, any deprivations experienced by detainees are permissible because they are short-lived.

The defendants' only real factual response to plaintiff's specific contentions is two-fold. They first rely on claimed improvements that were largely forced upon them by the August 12 TRO. But there is no assurance that any of those improvements would persist in the absence of

---

[17] *See* Dkt 74 at ¶ 4.

a preliminary and permanent injunction, especially given the pressure to continue increasing arrests and the concomitant influx of detainees. And defendants offer a few statistics supposedly going to the duration of detentions at 26 Fed and to the issue of overcrowding. Those few pieces of data – selected from much more complete information concededly in defendants' possession but not shared with plaintiff or the Court – give every indication that they were cherry picked to put the best possible face on this. In any case, as shown below, the chosen statistics are flawed and likely misleading. They certainly do not negate even one of the accounts of serious overcrowding and lengthy detention at 26 Fed made by those who know the facts — individuals who were subjected to those conditions.

      The record in this case demonstrates that the class plaintiff represents is very likely to succeed on the merits of the claims that the conditions of confinement at the 26 Fed Hold Rooms violate the First and Fifth Amendments and that they have been seriously and irreparably injured and/or face a clear threat of imminent serious and irreparable injury absent judicial relief. The appropriate balancing of hardships supports relief. Whatever the merits of the Administration's determination to deport illegal aliens — and the Court expresses no view of that issue, which is beyond the scope of this case — we must remember that this is the United States of America. We aspire to treat all Americans – *and* those among us – with humanity. We are legally and morally bound to adhere to the Constitution and Laws of the United States with respect to everyone within our borders. And we would do well to remember the words of one of our greatest Presidents, Abraham Lincoln, at the conclusion of the greatest internal strife in our history, the Civil War. He urged all of his countrymen and women to act "[w]ith malice toward none; with charity for all; with firmness in the right as God gives us to see the right, [and to] . . . strive to finish the work we are in

9

. . . ."[18]

In all the circumstances, the Court will grant in substantial part the preliminary injunction plaintiff seeks to protect those swept up in the administration's program and sent to the 26 Fed Hold Rooms from unconstitutional and inhumane treatment while this case proceeds to a final determination.

---

[18] President Abraham Lincoln, Second Inaugural Address (Mar. 4, 1865).

### Background

I.     ICE

ICE has the authority to civilly arrest and detain aliens believed to have committed immigration violations.[19]  According to ICE's website, its Office of Enforcement and Removal Operations ("ERO") "manages all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of aliens who are subject to removal or are unlawfully present in the U.S."[20]  ERO operates out of 25 field offices across the country, including its New York City field office at 26 Fed.[21]

II.    ICE's Hold Rooms

A.     ICE Policies and Procedures

In connection with its arrest and detention activities, ERO operates "holding facilities" within its field offices.  In January 2024, ERO issued Policy Number 11087.2 ("Directive 11087.2") on "Operations of ERO Holding Facilities."[22]  Directive 11087.2 defines a holding facility as "[a] facility that contains hold rooms that are used primarily for the short-term confinement of

---

[19]

See Cong. Rsch. Serv., *Immigration Arrests in the Interior of the United States: A Primer* (June 13, 2025).  8 U.S.C. § 1226(a) provides that, upon issuance of an administrative warrant, an alien may be arrested and detained pending a decision on whether he is to be removed.  Section 1226(a) further authorizes continued detention while removal proceedings are ongoing.

[20]

Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement (last visited Aug. 25, 2025), https://www.ice.gov/about-ice/ero.

[21]

U.S. Immigration and Customs Enforcement, Annual Report Fiscal Year 2024 at 22, 28 (Dec. 19, 2024).

[22]

See Dkt 11-1.

individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency."[23]  A hold room is defined as "[a] holding cell, cell block, or other secure enclosure within a holding facility."[24]

Directive 11087.2 sets forth several responsibilities, procedures, and requirements regarding the operation of holding facilities, including:

- ERO officers are responsible for ensuring that detainees are provided with a meal at least every six hours;

- ERO officers are responsible for ensuring that hold rooms are safe, clean, and equipped with restroom facilities;

- Absent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours;[25] and

- ERO officers must allow detainees to have access to other prescribed medication as necessary.[26]

It  does not include procedures or requirements related to attorney communications.

ICE  maintains  additional  performance-based  national  detention  standards

---

[23]     *Id.* at 2.

[24]     *Id.*

[25]     *Id.* at 7.

As discussed in more detail later, the 12 hour limit later was extended to 72 hours in June 2025 pursuant to a nationwide waiver.  *See* Dkt 11-4.

[26]     *Id.* at 9.

("PBNDS").[27]  The PBNDS state, *inter alia*, that facilities shall permit legal visitation seven days a week, allow for detainees to place calls to attorneys and other legal representatives, and keep detainees in hold rooms for no more than 12 hours.[28]  Defendants contend that the PBNDS apply only to detention facilities, not holding facilities.[29]

### B.    26 Fed

ERO's New York City field office is at 26 Fed.[30]  It contains the four 26 Fed Hold Rooms, which range from 173 to 821 square feet.[31]  Each hold room contains concrete bench seating for an unspecified number of people and one to three toilets and sinks,[32] which are partitioned off by "half walls" of unspecified height.[33]

According to Nancy Zanello, the assistant field office director at ERO's New York City field office, the 26 Fed Hold Rooms are "*solely* used for the *short term* confinement of aliens who have been recently detained or are being transferred to or from a detention facility, other

---

[27]    Dkt 11-2.

[28]    *Id.* at 31, 65, 166.

[29]    Dkt 73 at 16 n.5.

[30]    *See* Dkt 74 at ¶ 3

[31]    *Id.*

[32]    *Id.* at ¶ 8; Dkt 58 at ¶ 10.  The number of toilets and sinks is related to the particular room size.

[33]    Dkt 74 at ¶ 8.

holding facility, other agency, a court, or for removal."[34]  Ms. Zanello attests that they "operate[]

in compliance with" Directive 11087.2, but does not reference the PBNDS.[35]  Nor does she

specifically challenge any of the statements of plaintiff's declarants concerning the duration of

confinement at 26 Fed or seek to reconcile her statements with theirs.  She does, however, concede

that 26 Fed is "not equipped with the infrastructure to host in-person legal visitation or with

dedicated attorney call rooms for the aliens in custody."[36]

Upon arrival at 26 Fed, detainees are booked for processing.  For those held in

custody, ERO claims to upload information about their location to the ICE Online Detainee Locator

System. Ms. Zanello attests that updates to location information "occur on automated intervals of

every eight hours."[37]

III.    *ICE Nationwide Waiver and Effect on 26 Fed*

Pursuant to ICE Directive 11087.2 § 5.1, detainees were not permitted to be housed

in holding facilities, including 26 Fed, for longer than 12 hours absent undefined "exceptional

circumstances."[38]  On June 24, 2025, however, ICE issued a nationwide waiver of the 12-hour

---

[34]

  *Id.* at ¶ 4 (emphasis added).

[35]

  *Id.*

[36]

  Dkt 58 at ¶ 18.

[37]

  Dkt 74 at ¶ 5.

[38]

  *See* Dkt 11-1 ("Absent exceptional circumstances, no detainee should be housed in a holding
facility for longer than 12 hours.").

limit.[39]    The waiver purports to  "allow[] for aliens who are recently detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency to be housed in a holding facility for up to, but not exceeding, 72 hours, absent exceptional circumstances."[40] Consequently, following the waiver, short-term holding facilities like 26 Fed now are permitted by the Directive to house detainees for up to 72 hours or, in undefined exceptional circumstances, for longer.

ICE has acknowledged that this policy change was prompted by the recent influx of detainees, noting that "[a]s a result of increased enforcement efforts, ERO's average daily population has significantly increased to over 54,000" and that "this increase has put additional strain on finding and coordinating transfers of aliens to available beds within the required timeline detailed in Directive 11087.2."[41]  In other words, the waiver of the 12 hour rule and the pressure to hold detainees for longer periods in hold  rooms not intended for such use has been driven by the pressure to remove illegal aliens at unprecedented speed.

Around this same time, media reports alleging inhumane conditions at ICE facilities, including 26 Fed, began to circulate.[42]  On July 22, 2025, video  purportedly recorded by a detainee in custody at 26 Fed surfaced, prompting further public scrutiny of the facility's allegedly

---

[39]

See Dkt 11-4 at 1.

[40]

Id.

[41]

Id. at 2.

[42]

See e.g., Arya Sundaram, *'They're Killing Us': Immigrants Complain of Inhumane Conditions Inside NYC Holding Site,* GOTHAMIST (July 9, 2025), h t t p s : / / g o t h a m i s t . c o m / n e w s / t h e y r e - killing-us-immigrants-complain-of-inhumane-conditions-inside-nyc-holding-site.

overcrowded and unsanitary conditions.[43]  The footage shows more than a dozen men in a small room sitting on concrete benches or lying on the floor atop aluminum blankets.[44]  In addition, ICE barred Members of Congress, who claimed to have been investigating allegations of inhmane treatment, from entering the ICE detention facilities at 26 Fed.[45]  DHS representatives have denied all allegations of overcrowding and inhumane conditions at 26 Fed.[46]

IV.    *Conditions at 26 Fed*

   A.    *Plaintiff's Evidence*

Plaintiff alleges that the conditions at 26 Fed, at least prior to the Court's entry of the TRO, were "horrific," "degrading," "inhumane," and "unsanitary."[47]  In support of his motion for a preliminary injunction, plaintiff has submitted declarations from individuals who were detained at 26 Fed and from attorneys representing individuals detained there.  Many of the detainees report having been kept at 26 Fed for several days and, in some cases, weeks.  These declarations

---

[43]    Luis Ferré-Sadurní, *Video Shows Overcrowded and Unsanitary Conditions in Immigration Holding Cells*, N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

[44]    *Id*.

[45]    Jesus Jimenez, Chelsea Rose Marcus, and Nate Schweber, *5 Lawmakers in Californai and New York Are Denied Access to Federal Detention Facilities* (June 8, 2025), https://www.nytimes.com/2025,06/08/nyregion,ice-detention-federal-plaza-nyc.html.

[46]    Emily Ngo, *Is 26 Fed a Detention Facility?*, POLITICO: New York Playbook PM (July 22, 2025), https://www.politico.com/newsletters/new-york-playbook-pm/2025/07/22/ice-federal-plaza-detention-facility-00467839

[47]    *See* Dkt 10 at 6; Dkt 82 at 2.

16

document significant overcrowding, pervasive unsanitary conditions, lack of basic hygiene resources, insufficient food and water, inadequate sleeping conditions, substandard medical care, and extremely significant restrictions on attorney-client communications.

i.    Overcrowding

The detainee declarations uniformly report that the 26 Fed Hold Rooms were "incredibly crowded," in some cases packed with up to 90 detainees.[48]  One declarant held at 26 Fed from August 12 through August 14 — after the Court issued the TRO requiring the defendants to limit the occupancy of hold rooms to ensure at least 50 square feet per each detained individual — indicates that overcrowding has persisted despite the TRO.[49]

---

[48]    See e.g., Dkt 31 at ¶ 4 ("I was held in a holding cell at 26 Federal Plaza with about 70 men. It was a cell that was approximately 20 square meters."); Dkt 27 at ¶ 8 ("At times there were as many as 90 people in the room where I was detained. The room was around 20 square meters; it was not large."); Dkt 63 at ¶ 5 ("The conditions at 26 Federal Plaza were awful. We were all kept in a very small room. The number of people in the room ranged from 45-66 people every day."); Dkt 15 at ¶ 12 ("It was incredibly crowded in the holding areas we were kept in. There were about 30 or 40 people in the area I was in, but some areas looked even more crowded."); Dkt 25 at ¶ 5 ("I was in a small room with approximately 50 other men."); Dkt 61at ¶ 8 ("It was extremely crowded inside the holding areas. I estimate that the room was around 20 by 50 feet and it always had at least 40 people inside and sometimes more.").

[49]    Under the Court's TRO, the maximum occupancy of all four hold rooms combined is 22 or fewer people.  See Dkt 73 at 5.  The detainee reports seeing "as many as 30 or 40 people" in a single room during his detention.  See Dkt 84 ¶ 6 ("When I arrived, I think that a large group had just left and there were only about 20 people in the room with me. But later it held as many as 30 or 40 people. It was not a big space.").

ii.    *Inadequate Sleeping Conditions*

Plaintiff's declarations report numerous conditions that interfere with detainees' ability to sleep.  Detainees state that they were forced to sleep on the concrete floor without beds, cots or bedding mats.[50]  Due to overcrowding, some detainees had no choice but to sleep sitting up or in close proximity to toilets.[51]  Only a thin aluminum blanket was provided to them.[52]  One detainee states that he used his shoes as "a makeshift pillow to try to sleep."[53]  The lights were kept

---

[50]

See, e.g., Dkt 31 at ¶  4 ("There were no beds; we slept on the floor. The officers gave us aluminum-type blankets but I was freezing the entire time. We were all bunched up.. . . [T]he lights were kept on during our entire time there."); Dkt 27 at ¶ 11 ("There are no beds; we slept on the floor each night. The guards provided us only aluminum blankets. They never turned off the lights so it was difficult to sleep."); Dkt 15 at ¶ 12 ("We had to sleep on the floor because there were no beds.. . . It was freezing in there, yet all we were given to stay warm was aluminum blankets. We were not given pillow, so I had to use my shoes as a makeshift pillow to try to sleep. However, it was very hard to actually get rest. The lights were on the entire time and it was hard to know what time of day it was. I tried putting a shirt of a piece of aluminum blanket over my eyes to try to be able to rest."); Dkt 16 at ¶  10 ("The guards there only give us an aluminum blankets to put on the floor to sleep, there are no cushions or mattresses.. . . It was very cold. The guards kept the air conditioning on all the time even at night. We only had the aluminum blanket and had to sleep on the floor so I was freezing.").

Mr. Lucero, who was detained at 26 Fed from August 12 through August 14, indicates that he slept on the concrete floor and was not provided with a sleeping mat. See Dkt 84 at ¶ 5.

[51]

See e.g., Dkt 28 at ¶ 5 ("I had to sleep on the floor, often while sitting upright, because there were too many people and no beds. There [was] not even a chair to sit in."); Dkt 25 at ¶  5; Dkt 25 at ¶ 5 ("We all had to sleep on the floor, often while sitting upright, because there were too many people and no beds.").

[52]

See e.g., Dkt 31 at ¶ 4; Dkt 27 at ¶ 11; Dkt 15 at ¶ 12.

[53]

Dkt 16 at ¶ 12 ("We had to sleep on the floor because there were no beds . . . It was freezing in there, yet all we were given to stay warm was aluminum blankets. We were not given pillows, so I had to use my shoes as a makeshift pillow to try to sleep. However, it was very hard to actually get rest. The lights were on the entire time and it was hard to know what time of day it was. I tried putting a shirt of a piece of aluminum blanket over my eyes to try to be able to rest.");

on throughout the night, further interfering with sleep.[54]  Detainees report also experiencing extreme temperatures: sometimes oppressively hot or intolerably cold.[55]

One detainee states that he was able to sleep "[a]t most . . . a few hours per night, in short bursts because it was so uncomfortable and painful sleeping on the floor that [he] would awaken."[56]  Another detainee reports illness from persistent sleep deprivation and lasting pain from the discomfort of sleeping on the floor in cramped conditions, stating that his "feet hurt and changed into a yellowish color" and he developed "a fever and sore throat."[57]  He describes the experience as "torture."[58]

### iii.  Unsanitary Conditions and Denial of Basic Personal Hygiene Products

Detainees report unsanitary conditions and insufficient personal hygiene supplies at 26 Fed.  According to the declarants, each crowded hold room contained only one or a few toilets, all open to the room, which often dozens of detainees were forced to share in essentially plain view.[59]  Detainees had no opportunity to bathe or shower for the duration of their detentions, and

---

[54]    See e.g., Dkt 31 at ¶ 4; Dkt 27 at ¶ 11; Dkt 15 at ¶ 12.

[55]    See e.g., Dkt 28 at ¶ 8; Dkt 26 at ¶ 5; Dkt 15 at ¶ 12; Dkt 16 at ¶ 13; Dkt 27 at ¶ 16; Dkt 25 at ¶ 7.

[56]    See Dkt 27 at ¶ 11.

[57]     See Dkt 62 at ¶ 12.

[58]     Id.

[59]    See, e.g., Dkt 15 at ¶¶ 14, 18; Dkt 27 at ¶ 13; Dkt 25 at ¶ 6; Dkt 16 at ¶ 12.

they were not provided with clean clothes or adequate supplies of basic hygiene items such as soap, sanitary wipes, toothpaste, or toothbrushes.[60]  One detainee states that he was unable to bathe, brush his teeth, or change his dirty clothing, including underwear, for 18 days.[61]  Several detainees state that the 26 Fed Hold Rooms were foul-smelling due the detainees' inability to bathe, the proximity of open toilets shared by dozens of detainees, and the inadequacy of ventilation.[62]

Another detainee states that toilet paper often was unavailable, noting that "guards would throw only a few paper napkins into [the hold room] every 5 days" and that the toilet occasionally was inoperable.[63]  Moreover, she states that she was not provided adequate menstrual

---

[60]  *See, e.g.,* Dkt 28 at ¶ 6 ("I was in the same clothes the whole time. I could not bathe or brush my teeth the entire time I was there."); Dkt 31 at ¶ 4 ("We did not have a way to shower or clean ourselves in any capacity."); Dkt 26 at ¶ 6 ("We were not given a toothbrush, changes of clothes or any means to wash."); Dkt 15 at ¶ 18 ("For six days, I was not allowed to brush my teeth or shower. I felt like I was being treated like a dog. The bathrooms are also in plain sight in the holding area so there was no privacy for you to do your business."); Dkt 25 at ¶ 6 ("We were not allowed to bathe, to change our clothes, or to brush our teeth."); Dkt 16 at ¶ 12 ("I was not able to bathe during my time at 26 Federal Plaza. There were no showers and they did not provide us with any way to brush our teeth. The toilets are in the same room so there is no privacy. We would try to cover ourselves with the aluminum blanket because of the lack of privacy.").

[61]  *See* Dkt 27 at ¶ 12 ("We were not given changes of clothes and we could not bathe. We were not given soap or any way to bathe or clean ourselves. We were not given toothpaste or toothbrushes. I was in the same clothes for the entire 18 days, including underwear.").

[62]  See Dkt 27 at ¶ 13 ("Inside the holding area in 26 Federal Plaza smells awful."); Dkt 28 at ¶ 5 ("The room smelled terrible because no one had bathed. There was a bathroom in that room that smelled of urine and feces."); Dkt 26 at ¶ 6 ("The bathrooms are right there and it smells terrible"); Dkt 15 at ¶ 14 ("There was also a horrific stench in the room. The bathroom was in the same holding area so the smell was everywhere."); Dkt 25 at ¶ 7 ("There was no window in the room and the door was always closed. The room was terribly hot and it smelled terrible given the conditions.").

[63]  *See* Dkt 28 at ¶¶ 4-5.

products during her detention.[64]  With only two menstrual pads for more than twenty female

detainees, she was unable to secure a menstrual pad and, as a result, her clothing — which she could

not change or clean for the duration of her detention at 26 Fed — was soaked with blood.[65]

Plaintiff contends that these conditions have persisted, at least to some extent, despite

the Court's TRO.  One detainee held for a period following the Court's TRO states that ICE refused

to provide him with clean clothing and denied him basic hygiene products.[66]

iv.    *Insufficient Food and Water*

The detainees state also that they were provided at most with small rations of

packaged food, such as military "meals ready to eat," twice per day.[67]  Several detainees state that

they experienced persistent hunger due to the inadequate portions.[68]  One detainee reports having

---

[64]

See id. at ¶ 6.

[65]

*Id*.

[66]

See Dkt 84 at ¶¶ 4, 5, 7.

[67]

See Dkt 27 ¶ 14 ("We were served food only twice a day, once around 8 in the morning and again at 8 or 9 at night."); Dkt 25 ¶ 9 ("We sometimes received food only once a day; at most, we received food only twice a day."); Dkt 27 ¶ 7 ("At most, we received food only once a day[.]").

Mr. Lucero attests that during his detention from August 12 to August 14, he received cold food only one or two times a day. Dkt 84 at ¶ 4.

[68]

See Dkt 27 ¶ 14 ("The food was [] very small in quantity, so we were always hungry."); Dkt 63 at 9 ("I was [] hungry because we were not given inadequate food. It was mush and it was twice a day."); Dkt 16 at ¶ 15 ("The portion sizes were small so I was usually still hungry even after I ate."); Dkt 28 at ¶ 7 ("I was extremely hungry because we were not given inadequate food."); Dkt 25 at ¶ 9 ("It was not enough food and I often felt hungry.").

lost eighteen pounds during his detention,[69] and another states that he felt "physically sick and unwell, with little food and water."[70]  Detainees state also that they were provided insufficient water, leaving them consistently thirsty.[71]  One detainee recounts that she was provided only one eight ounce bottle of water a day.[72]  Additionally, detainees describe having been tormented and taunted by guards, who ate pizza and hamburgers in front of them.[73] One detainee tells of a guard who responded to some requests for water by "holding up a bottle" and "squirt[ing water] into [thirsty detainees'] mouths, like [they] were animals."[74]

>    *v.*    *Inadequate Medical Care*

Plaintiff's declarations detail consistent failures to provide necessary medication and timely medical care. One detainee asserts that she was denied medication for her gastritis because

---

[69]

See Dkt 26 at ¶ 9.

It is not clear whether he claims having lost eighteen pounds entirely during his five day detention at 26 Fed or during that detention plus additional detention in another facility.

[70]

See Dkt 62 at ¶ 12.

[71]

See Dkt 27 at ¶ 14 ("We got water only when the guards felt like it. We got water with our food and sometimes in the midday if people asked. But other times people asked and the guards did not bring water."); Dkt 16 at ¶ 15 ("If we wanted more water, we were told that there wasn't anymore so we had to drink water from the sinks next to the toilets.").

[72]

See Dkt 28 at ¶ 7; Dkt 61 at ¶¶ 7, 9 ("We did not always get enough water.").

[73]

See Dkt 27 at ¶ 14.

[74]

See Dkt 61 at ¶ 9.

there "were too many people."[75]   Another detainee states that he and "several [other] people began

to get sick with [flu symptoms]"; some "had trouble speaking . . . or showed difficulty breathing."[76]

The guards instructed sick detainees that they would have to wait to receive medical attention, and

"many people were not [called for medical visits]."[77]

   An attorney reports in his declaration that his client, who has high blood pressure and

previously had suffered a stroke, was not given his blood pressure medication during his seven-day

detention at 26 Fed.[78]  When his client finally received medication upon transfer to Metropolitan

Detention Center in Brooklyn, "his condition was very serious": "his blood pressure was

dangerously high" and his arm was "trembling."[79]   Other detainees describe untreated or

inadequately treated medical conditions, including a throat infection[80] and tooth pain with facial

swelling for which only pain medication was provided.[81] Detainees report also observing inadequate

medical care provided to others who had fainted, suffered a seizure, or required diabetes

medication.[82]

---

[75]  See Dkt 28 at ¶ 7.

[76]  Dkt 27 at ¶¶ 21-23.

[77]  *Id.*

[78]  Dkt 13 at ¶¶ 12, 18.

[79]  *Id.*

[80]  *See* Dkt 63 at ¶ 6.

[81]  *See* Dkt 61 at ¶ 12.

[82]  *See* Dkt 63 at ¶  6; Dkt 15 at ¶  6.

### vi.    Restrictions on Detainees' Ability to Communicate with Counsel

In support of his allegation that people detained at 26 Fed are denied adequate ability to communicate with their attorneys, plaintiff has submitted declarations by former detainees and attorneys.   These declarations report substantial restrictions on attorney-client communication. Numerous detainees state that they never were informed that they could speak to a lawyer.[83]   One detainee states that she was instructed that she could not speak to an attorney until her hearing,[84] and another reports that "an [ICE] official [told the detainees] they [were] not obligated to provide [them] any calls except for the day [they] were detained."[85]

Additionally, 26 Fed does not permit detainees to receive any visitors. Attorneys report having been unable to visit clients detained at 26 Fed or to arrange phone calls with them, leaving them unable to communicate confidentially with their clients for up to a week.[86]   Attorneys attest that ICE representatives advised them that 26 Fed does not schedule legal calls because it is a holding facility and that counsel "unfortunately" must wait until transfer to a detention center even

---

[83]      *See e.g.*, Dkt 31 at ¶ 7; Dkt 27 at ¶ 25; Dkt 64 at ¶¶ 10, 11; Dkt 15 at ¶ 10; Dkt 26 at ¶ 8; Dkt 62 at ¶ 10; Dkt 26 at ¶ 8; Dkt 25 at ¶ 11.

[84]       *See* Dkt 64 at ¶¶ 10, 11.

[85]       *See* Dkt 27 at ¶¶ 17, 18.

[86]      *See e.g.,* Dkt 21 at ¶¶ 6, 7 ("I was told by an ICE agent that visitations are prohibited for individuals detained at 26 Federal Plaza. I was also told that I could not call 26 Federal Plaza to set up a call with my client."); Dkt 18 at ¶ 16 ("It is not clear how long my client was at 26 Federal Plaza, but per conversations with my client, it was at least four or five days. During that entire time, I was not granted any access to him, despite multiple communications with ICE and notice regarding his disabilities."); Dkt 14 at ¶ 30 ("For a whole week, I was unable to speak with my client directly and confidentially. This delay limited my ability to promptly obtain information from my client directly relevant to his potential legal remedies.").

when detainees remain at 26 Fed "for up to 20 days."[87]  As a result, attorneys report going "a whole week" without a confidential conversation[88] and being denied "any access" despite repeated outreach.[89]  Attorneys state that these delays undermined their ability to inform and prepare their clients.[90]  They attest that the ICE Online Detainee Locator often did not indicate that an individual was detained at 26 Fed, further complicating efforts to locate and communicate with their clients.[91]

According to plaintiff's declarations, when phone calls were available, they were time-restricted and non-confidential.  These brief phone calls, which were available inconsistently and often after business hours, often were monitored or overheard by guards.[92]

### vii.    Effect of Conditions on Detainees

Multiple detainees describe their experience at 26 Fed as traumatic and degrading.[93]

---

[87]

See Dkt 32 at ¶ 8.

[88]

See Dkt 14 at ¶¶ 29, 30.

[89]

See Dkt 18 at ¶ 16.

[90]

See e.g., Dkt 17 at 11 ("Due to the delays and lack of communication from the facilities, my client underwent his fear interview without any legal preparation or guidance, and his claim was denied."); Dkt 14 at ¶ 32.

[91]

See e.g., Dkt 14 at ¶ 10; Dkt 30 at ¶ 10; Dkt 13 at ¶ 8; Dkt 19 at ¶ 8; Dkt 32 at ¶¶ 7-8.

[92]

Id.

[93]

See e.g., Dkt 31 at ¶ 9 (explaining that he was treated "worse than an animal" and that he is now "extremely traumatized"); Dkt 27 at ¶ 7 (describing experience as a "severe trauma" and noting that detainees were "like animals"); Dkt 63 at ¶ 14 ("It hurts to think about my days there[.]"); Dkt 15 at ¶ 19 ("[M]y dignity was taken from me. I was not being treated like a human."); Dkt 28 at ¶ 16 ("I feel horrible remembering all of this."); Dkt 25 at ¶ 13 ("I feel I was treated like an animal."); Dkt 85 ¶ 8 (describing hospitalization for suicidal ideation).

Detainees report enduring psychological and physical harm, including lasting pain, exacerbated medical conditions, recurring nightmares, and hospitalization.[94]   One detainee describes his experience as "like being in hell," noting that he would not "wish [it] on [his] worst enemy."[95]

B.      *Defendants' Evidence*

Defendants contend that the 26 Fed Hold Rooms are not overcrowded and that detainees receive adequate food, clothing, shelter, and medical care.[96]  As previously noted, they rely on two declarations by Ms. Zanello[97] who states that her knowledge of the conditions at 26 Fed is based on her "personal knowledge, reasonable inquiry, and information obtained from various records and other DHS and ICE employees in the regular course of business."[98]  Conditions are described as of the times of her statements — August 11, 2025 and, generally, August 18, 2025. [99] With limited exceptions, Ms. Zanello does not comment on the conditions or practices prior or subsequent to those dates.

---

[94]

*Id.*

[95]

*See* Dkt 15 at ¶ 19.

[96]

*See* Dkt 73.

[97]

*See* Dkt 58; Dkt 74.

[98]

*See* Dkt 74 at ¶ 2.

[99]

Ms. Zanello's August 18, 2025 declaration purports in one respect to speak as of 11:59 p.m. on August 15, 2025.  *Id.* at ¶ 9.

i.      *Features of 26 Fed and Response to Allegations of Overcrowding and Duration of Confinement at 26 Fed*

According to Ms. Zanello, the processing area at 26 Fed contains four hold rooms, with the following areas and lavatory features: (1) 820.78 sq. ft. with three toilets and three sinks, (2) 655.12 sq. ft with two toilets and two sinks, (3) 173.87 sq. ft. with one toilet and one sink, and (4) 173.04 sq. ft with one toilet and one sink.[100]  In her supplemental declaration dated August 18, she notes that the "lavatory areas are partitioned off by half walls to maintain sight supervision for safety and security and reasonable privacy for aliens."[101]  She does not attempt to explain how half walls of unspecified height provide "reasonable privacy" for people using toilets in otherwise open and crowded rooms, especially given the fact that the height of the half walls is intended to permit ICE to "maintain sight supervision for safety and security."

Ms. Zanello states that the maximum capacity set by the fire marshal for all four rooms is 154 people,[102] a point to which we return below, and that the hold rooms are separated by sex.[103]  She states also, in conclusory fashion and without challenging the accounts of plaintiff's multiple witnesses of longer periods of confinement, that the hold rooms are "solely used for the short term confinement of aliens who have been recently detained or are being transferred to or from

---

[100]      *Id.* at ¶¶ 3, 8.

[101]      *Id.* at ¶ 8.

[102]      *Id.*. at ¶ 3.

[103]       *Id.* at ¶ 7.

a detention facility, other holding facility, other agency, a court, or for removal."[104]  And this brings us to defendants' statistics.

To the limited extent defendants address plaintiff's specific allegations, they do so almost only in present tense — that is, essentially as of August 11 and 18, 2025.[105]  Defendants make few representations as to the situation in the facility before those dates.   The representations in defendants' August 18 submission, moreover, reported conditions following improvements brought about by the issuance of the TRO on August 12.  And the defendants have given no assurance that the conditions will not revert to those described by declarants or, for that matter, worse if a preliminary injunction were denied.

The principal subjects on which the defendants sought to address plaintiff's factual contentions are overcrowding and the duration of detainee stays in the 26 Fed Hold Rooms.  But the very limited information provided is largely unpersuasive for fairly obvious reasons.

With respect to overcrowding, the defendants rely entirely on assertions that there were only 24 detainees in the 26 Fed Hold Rooms on August 11 and 8 detainees at 11:59 p.m. on August 15.[106]  However, Plaintiff submits evidence which indicates that the number of detainees in custody reported in Ms. Zanello's August 11 declaration was misleading and nonrepresentative. Two declarations submitted by plaintiff suggest that the 26 Fed hold rooms were emptied

---

[104]

     *Id*. at ¶ 4.

[105]

     As noted previously, one exception is the assertion that there were only eight detainees in the 26 Fed Hold Rooms as of 11:59 p.m. on August 15, 2025.  Dkt 74 at ¶ 9.  The choice of 11:59 p.m. certainly piques curiosity about the numbers held there earlier that day.

[106]

     *See* Dkt 58 at ¶ 3; Dkt 74 at ¶ 9.

immediately preceding defendants' submission of Ms. Zanello's August 11 declaration.[107]

Moreover, the August 15 population figure reflects nothing except compliance with the population

limitations imposed by the TRO on August 12.

Additionally, Ms. Zanello's statement regarding the total maximum capacity set by

the fire marshal is entirely inapplicable in these circumstances. The safe occupancy for a given

space that people are free to leave at will at any moment is quite a different matter from confining

numbers of people in such a space for 24 hours a day, day after day, without adequate hygiene and

toilet facilities as, indeed, relevant regulations reflect.[108]

Defendants showing with respect to duration of confinement at 26 Fed is flawed as

well.

---

[107] *See* Dkt 82 ¶¶ at 15-16; Dkt 83 at ¶¶ 12–13

[108] Dkt 74, at ¶ 3.

This number is of little value in determining whether the hold rooms are overcrowded in the context of housing detainees overnight or in the Court's analysis of whether the conditions at 26 Fed are unconstitutional. The number referred to by Ms. Zanello presumably refers to the posted assembly occupant load: an egress fire-safety headcount that must appear on a capacity sign but does not otherwise signify an approval for maximum occupancy, which is governed by other State and City regulations. For example, Title 9 of the New York Codes, Rules and Regulations ("NYCRR") sets forth the minimum standards for county jail facilities. An individual-occupancy housing unit must contain a minimum of 60 square feet of floorspace and a multiple-occupancy housing unit must contain a minimum of 50 square feet of floorspace per inmate in the sleeping area. *See* 9 NYCRR §§ 7040.4(a), 7040.5(a). Additionally, the NYC Board of Correction minimum standards set the overnight housing limits for City detention facilities. Per Chapter 1 of Title 40 of the Rules of the City of NY, "multiple-occupancy areas shall provide a minimum of 60 sq. ft. of floor space per person in the sleeping area." 40 Rules of the City of N.Y. § 1-04(C)(2)(2025). Additionally, a multiple occupancy area shall house no more than 50 detainees or 60 sentenced prisoners. *See id.* § 1-04(c)(5)(i)–(ii)(2025).

Consistent with the restrictions placed in the TRO, the maximum number of people that can be detained at 26 Fed, according to the defendants' calculations, is 22 people. Dkt 74 at ¶ 9.

First, defendants represent that the "majority of aliens in custody [at 26 Fed] are transported to an ICE facility within seventy-two hours *absent exceptional circumstances*."[109]  But this datum fails to support the weight the defendants would have the Court place on it.

To begin with, that statement is in the present tense.  It speaks as of the date the declaration was made, which was August 18.  It says nothing about the duration of detentions at 26 Fed in the weeks and months preceding August 18.  And defendants admittedly have that information but have elected not to share it.[110]  Moreover, even if the statement were accurate and unqualified, it would not begin to address plaintiff's contention that the conditions at 26 Fed would be unconstitutional even for a period of 72 hours.  In addition, the statement is qualified entirely by the phrase "absent exceptional circumstances."

Defendants have not defined "exceptional circumstances."  Their statement thus is ambiguous at best.

Perhaps they regard the President's emergency declaration and promised "largest deportation operation in the history of our country" as "exceptional circumstances" in and of themselves.  In that case, their position would boil down to the view that there are no time limits on

---

[109]     *See id.* at ¶ 4 (emphasis added).

[110]     At oral argument, counsel for defendants explicitly noted that historical data for 26 Fed was available. Dkt 64 (Transcript) at 6:11-15 ("I don't have that information. There are logs. I don't presently have that information, but that information is available. There are logs that would be able to answer that question. I just don't have that answer as we sit here right now.").

ICE data has been acquired by news and advocacy organizations through FOIA requests. *See e.g.*,  Gwynne Hogan & Haidee Chu, *'Like Dogs in Here' — Videos Expose ICE Lockup Inside 26 Federal Plaza,* THE CITY (July 22, 2025) (updated July 23, 2025), https://www.thecity.nyc/2025/07/22/video-26-federal-plaza-immigration-ice-dhs-cells/.

30

detention in the 26 Fed Hold Rooms because everyone held there is held in "exceptional circumstances." To use the vernacular, all bets would be off.

Or perhaps their view is more modest. Possibly they mean that, as of August 18, a majority of *all* aliens held at 26 Fed were being transferred to other ICE facilities within 72 hours. But if that were so, the qualification of the purported time limit of 72 hours by the phrase "absent exceptional circumstances" that appears in Ms. Zanello's declaration would have been entirely unnecessary. The addition of that phrase thus suggests that defendants perhaps excluded from their calculation some group of aliens whom they regaed as being detained in "exceptional circumstances" – circumstances more limited in scope than the entire deportation effort. But we cannot know from defendants' submissions whether this was the case, what the extraordinary circumstances were that warranted exclusion of those held beyond 72 hours on that basis, and – most importantly for the purpose of evaluating the defendants' statistical argument – how many such persons there were. And so, the bottom line is that we cannot know from the defendants' statement what proportion of *all* aliens then held were being transported to better ICE facilities within 72 hours.

These problems are not solved for the defendants by their assertion that "the average length of stay of detainees at [26 Fed] from July 21, 2025 to August 13, 2025 was two days."[111] Even if that statement were accurate, and for the moment the Court so assumes, it would ignore the fact that an arithmetic average — like this one — that ignores the dispersion of data points used in computing the average can be misleading. The average length of stay of, say, sixteen persons, each of whom stayed for two days*,* would be two days. But if, for example, four detainees spent only an

---

[111]     *See* Dkt 74 at ¶ 6.

hour or two at 26 Fed, four more detainees were held there for one day each, and eight more were held there for four days each, the average length of stay also would be just about two days. We therefore have no assurance that defendants' statement is not misleading in just that way.

The statement is less than persuasive for another reason. The average for any given period has little value unless the period to which the average pertains is representative of the entire relevant period. But there is reason to believe that defendants' choice of the July 21 to August 13 time period is not representative of the entire relevant time period. This time period began after media reports and public scrutiny of alleged inhumane conditions at 26 Fed. And in some measure, this period post-dates the commencement of this lawsuit. Thus, the July 21 to August 13 period that defendants selected is one in which the defendants temporarily may have reduced the population of the 26 Fed Hold Rooms in response to negative publicity, to Congressional pressure, and to the filing of this action. Accordingly, this narrow time period probably is not representative of conditions at 26 Fed from the time the population increase began. But even if there were no such cherry-picking of a time period, defendants' data simply would not address the fact that the plaintiff's evidence independently establishes that many detainees were kept in the 26 Fed Hold Rooms under the challenged conditions for longer than is tolerable under the Constitution, some of them considerably longer.

### ii.    *Response to Allegations of Unsanitary Conditions*

As of August 11 and August 18, Ms. Zanello states that "[h]ygiene products are made available" to those in custody, including soap, teeth cleaning wipes, and feminine hygiene

products.[112]  Additionally, as of August 11 and August 18, those in custody were "provided with a clean change of clothes . . . at no cost . . . when requested."[113]  In her August 18 declaration, Ms. Zanello adds that "ICE provides separate surroundings for aliens to change their clothes,"[114] whatever "separate surroundings" may mean.  Ms. Zanello provides no further specifics about this alleged arrangement.  Additionally, as of August 18, Ms. Zanello attests that "the hold rooms are industrially cleaned at least three times a day, every day between 7:00 a.m. and 4:00 p.m."[115]

### iii.    Response to Allegations of Inadequate Sleeping Conditions

Defendants acknowledge that the 26 Fed Hold Rooms do not have beds or private sleeping quarters.[116]  As of August 11, 2025, detainees slept on the floor without bedding mats.[117]

---

[112]    *See* Dkt 58 at ¶ 8.

Ms. Zanello's supplemental declaration dated August 18 adds that "soap, paper towels, toilet paper, teeth cleaning wipes, feminine hygiene supplies, and sanitary wipes, are made available at no cost to the aliens in custody" and that "ICE is in the process of acquiring toothbrushes for aliens with specialized features to mitigate security risk to aliens and ICE staff while complying with the Court's TRO." *See* Dkt 74 at ¶ 13.

[113]    *See* Dkt 58 at ¶ 9; Dkt 74 at ¶ 14.

[114]    *See* Dkt 74 at ¶ 14.

[115]    *See* Dkt 74 at ¶ 12.

Ms. Zanello previously stated in her August 11 declaration that "the ICE hold rooms and bathrooms are cleaned with industrial cleaning products multiple times a day." Dkt 58 at ¶ 11

[116]    *See* Dkt 58 at ¶ 10; Dkt 73 at ¶ 5.

[117]    *See* Dkt 58 at ¶ 10.

In her supplemental declaration, Ms. Zanello notes that, in compliance with the TRO, a bedding mat subsequently was "furnished to each alien in custody who is held overnight."[118]  She declares also that, as of August 11 and August 18, detainees were provided aluminum blankets, which are "regularly cleaned,"[119] and that an unspecified amount of "[c]oncrete bench seating is available in each ICE room."[120]

### iv.    Response to Allegations of Inadequate Medical Care

Ms. Zanello attests that "[m]edical personnel from the ICE Health Service Corps (IHSC) . . . provide medical care and attention to the aliens in custody . . . from 7:00 a.m. until 9:30 p.m" and, "[i]n the event of a medical emergency requiring further medical attention, aliens in custody are transported to nearby medical facilities."[121]  She provides no information about how many medical personnel from IHSC are available to provide medical attention to detainees and no information about their qualifications.  She states also that "[a]liens in custody are permitted to bring in their prescription medication that they had in their possession at the time of arrest" and that attorneys and family members may bring additional prescription medication to the facility.[122]  All medication is administered by IHSC, with the exception of emergency-use inhalers, which those in

---

[118]    *See* Dkt 74 at ¶ 10.

[119]    *Id.*

[120]    *Id*.

[121]    *See* Dkt 58 at ¶ 14; Dkt 74 at ¶ 15.

[122]    *See* Dkt 58 at ¶ 15; Dkt 74 at ¶ 16.

custody may retain on their persons.[123]

####        v.        Response to Allegations of Inadequate Food and Water

Ms. Zanello states that potable water is available via the sink faucets in the hold rooms and, despite detainees' contrary assertions, that bottled water is provided throughout the day at no cost.[124]  She does not specify whether cups are provided to detainees to drink water from the sink faucets or if detainees are expected to use their hands.  In her supplemental declaration dated August 18, Ms. Zanello notes that electrolyte packets are provided to those in custody at least twice per day.[125]

In her August 11 declaration, Ms. Zanello states that those in custody at 26 Fed were provided "two nutritional meals a day," with "[a]dditional meals upon request," and that "ICE accommodates aliens' medical or religious dietary requirements for aliens in custody."[126]  In her August 18 supplemental declaration, Ms. Zanello states that "four meals a day" now are provided to those in custody at no cost, which typically include "bagels," "heater meal kits," and "assorted sandwiches."[127]

---

[123]
            See Dkt 74 at ¶ 16.

[124]
            See Dkt 58 at ¶ 13; Dkt 74 at ¶ 17.

[125]
            See Dkt 74 at ¶ 17.

[126]
            See Dkt 58 at ¶ 12.

[127]
            See Dkt 74 at ¶ 18.

vi.    *Access to Counsel*

Ms. Zanello acknowledges that the "facilities at [26 Fed] are not equipped with the infrastructure to host in-person legal visitation or with dedicated attorney call rooms for the aliens in custody."[128]  She claims, however, that "[b]oth before and after entry of the TRO, individuals detained at the 26 Federal Plaza Field Office have been able to make calls to attorneys via a landline telephone."[129]  Consistent to this extent with the Court's TRO, detainees now are offered three call opportunities during their first 24 hours at 26 Fed – on arrival, during processing, and on the first evening in custody.[130]  Detainees can place additional phone calls at least once during each subsequent 12-hour period of detention and  request scheduled legal calls between 9:00 a.m. and 4:00 p.m., with requests honored within six hours. [131] Attorneys who have filed a properly completed Form G-28 may schedule calls via a dedicated phone number or by email.[132]  She states also that six landlines now are available to detainees to place calls.[133]

Additionally, the ICE Online Detainee Locator System allegedly updates detainees'

---

[128]    *See* Dkt 58 at ¶ 18; Dkt 74 at ¶ 23.

[129]    *See* Dkt 73 at 15; Dkt 74 ¶¶ 20–22; Dkt 58 ¶¶ 16-17.

[130]    *See* Dkt 74 at ¶ 20.

[131]    *See id.* at ¶ 22.

[132]    *See id.* at ¶ 24.

[133]    *See id.* at ¶ 21.

36

location when they are booked for processing at 26 Fed,[134] and "[e]very newly arriving alien is promptly provided with an English and/or Spanish translation of the written Notice of Rights outlining the alien's rights per the Court's August 12, 2025, Temporary Restraining Order."[135]

### V.    Synthesis

As widely reported, ICE since late January has been pressed to arrest and remove more and more allegedly illegal aliens.  The volume of persons detained has grown rapidly, outstripping the capacity of the facilities previously used to process far smaller numbers of detainees, at least in New York.  ICE has forced these detainees into facilities that are too small to accommodate the numbers, that never were intended to hold people overnight, that are unequipped to feed them properly, and that, more broadly, are not capable of housing the detainees in a humane manner.

As noted at the outset of this decision, defendants do not significantly challenge plaintiff's witnesses accounts of the overcrowding, the inadequacy of food and sanitary facilities, the lack of decent and sufficient places to sleep, and so on.  And so the Court finds these accounts to be credible and finds the facts for plaintiff in all such respects.

Defendants' chief arguments are three.

They rely first on the fact that the 26 Fed Hold Rooms were designed and intended only for short term – i.e., 12 hours at most – detention of detainees pending processing and transfer

---

[134]    See id. at ¶ 5; Dkt 58 at ¶ 6

[135]    See Dkt 74 at ¶ 19.

to detention facilities with better capabilities.  And that presumably is true.  But it is not an excuse.
Under the Constitution, all persons – including aliens – are entitled to due process of law.   All
persons in our nation are protected by the First Amendment.  And so, as discussed in more detail
below, detained aliens are entitled to the minimum levels of humane treatment and access to counsel
that are required by the Constitution, regardless of whether the government decides not to provide
these essentials.

Second, defendants attempt to undercut the claims of overcrowding and protracted
detention at the 26 Fed Hold Rooms by offering statistics which, as previously discussed, at best are
ambiguous, relate to dates that are unhelpful, and obscure more than they illuminate.  The statistics
are unpersuasive.

Finally, defendants' only witness, Ms. Zanello, to the limited extent she engages with
plaintiff's factual contentions, speaks principally of conditions on a date after the TRO was issued.
The Court does not consider her testimony as effectively rebutting plaintiff's evidence of actual day-
to-day conditions in the 26 Fed Hold Rooms.

## VI.    Procedural History

On August 8, plaintiff Sergio Alberto Barco Mercado was taken into custody and
detained at 26 Fed.  On the same day, he filed this action and moved (a) for a TRO and preliminary
injunction enjoining defendants to remedy the alleged unconstitutional conditions of confinement
and restrictions on access to counsel, and (b) to certify a class consisting of "all immigration
detainees who are detained and those who will be detained in the future by U.S. Immigration and

38

Customs Enforcement at 26 Federal Plaza, New York, NY."[136]  On August 10, 2025, plaintiff was transferred from 26 Fed to the Orange County Correctional Facility ("OCJ") in Goshen, New York.

On August 12, 2024, the Court granted a TRO[137] that barred defendants from holding detainees at the 26 Fed Hold Rooms unless they ensured, among other things, that each room had an area of at least 50 square feet per detainee; detainees held overnight were furnished with  clean bedding mats for sleeping; the facility were cleaned thoroughly at least three times per day; basic hygiene supplies were made available; detainees were provided with means of making confidential, unmonitored, unrecorded, temporally unrestricted free telephone calls within 24 hours of being detained and at least once during each subsequent 12-hour period while they are detained, together with the ability to schedule legal calls with counsel within 6 hours of a request made within the period 9 a.m. to 4 p.m. and within 16 hours of a request made thereafter; one landline dedicated solely to accommodating legal calls were available for each five or fewer detainees; and each detainee were provided a printed Notice of Rights.[138]

Two rounds of briefing were completed on September 13, 2025.  The parties were asked if either side wished an evidentiary hearing, and both declined.[139]  Accordingly, all parties

---

[136]

    *See* Dkt 1; Dkt 34.

[137]

    *See* Dkt 64 (Transcript); Dkt 65.

    The Court modified two provisions of the TRO on August 17, 2025. *See* Dkt 70.

[138]

    *See* Dkt 65.

[139]

    *See* Dkt 78; Dkt 80.

waived any evidentiary hearing.[140]

## Discussion

### I.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[141]  "A party moving for a mandatory injunction that alters the status quo by commanding a positive act . . . must make a clear or substantial showing of a likelihood of success on the merits . . . especially [] when a preliminary injunction is sought against government."[142]  A party, however, "is not required to prove his case in full[.]"[143]

### II.    Subject Matter Jurisdiction – Mootness

As an initial matter, the Court has an independent duty to confirm that there is a live

---

[140]

"An evidentiary hearing is not required when . . . the disputed facts are amenable to complete resolution on a paper record" or when a party "waive[s] its right to an evidentiary hearing." *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998). Here, both plaintiff and defendants waived an evidentiary hearing.

[141]

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. C.L. Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (same).

[142]

*D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), opinion amended on denial of reh'g, 480 F.3d 138 (2d Cir. 2007).

[143]

*See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

40

controversy so that the Court retains subject matter jurisdiction.[144]  Here, plaintiff's individual claim for injunctive relief seems to be moot because he no longer is detained at 26 Fed.[145]

Nevertheless, "[w]here class claims are inherently transitory, 'the termination of a class representative's claim does not moot the claims of the unnamed members of the class.'"[146] "Even where the class is not certified until after the claims of the individual class representatives have become moot, certification may be deemed to relate back to the filing of the complaint in order to avoid mooting the entire controversy."[147]  This doctrine applies where defendants "will almost always be able to [moot an individual claim] before a plaintiff can obtain relief through litigation."[148] "Whether claims are inherently transitory is an inquiry that must be made with reference to the claims of the class as a whole as opposed to any one individual claim for relief."[149]

As set forth above, numerous detainees have been held at 26 Fed for multiple days or, in some instances, even weeks.  The duration of detention of detainees in the 26 Fed Hold Rooms

---

[144]

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013); *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025).

[145]

At least one detainee was transferred out of the 26 Fed Hold Rooms to another facility and then transferred back to 26 Fed for an extended period.  *See* Dkt 25.

[146]

*Robidoux v. Celani*, 987 F.2d 931, 938–39 (2d Cir. 1993) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11 (1975)).

[147]

*Id.* at 939.

[148]

*Id.*

[149]

*Amador v. Andrews*, 655 F.3d 89, 100 (2d Cir. 2011).

is "inherently temporary and of uncertain length . . ."[150]  The Court can "not determine 'that any given individual, named as plaintiff, would be in . . . custody long enough for [the Court] to certify the class.'"[151]  The Supreme Court has made clear that a class action may proceed in such circumstances.[152]  And courts in this Circuit have applied this inherently transitory doctrine to class claims on behalf of detainees held for periods much longer than those at issue here.[153]

Accordingly, the inherently transitory doctrine applies here.  Indeed, the government concedes that the apparent mootness of the named plaintiff's injunctive claim, in and of itself, does not deprive the Court of subject matter jurisdiction.[154]  Nevertheless, subject matter jurisdiction depends on whether a plaintiff may bring claims on behalf of a class.  The Court thus addresses that question before turning to the substance of the class certification motion.

---

[150]

*United States v. Sanchez-Gomez*, 584 U.S. 381, 386 (2018).

[151]

*Id.* (quoting *Gerstein*, 420 U.S. at 110–111).

[152]

*Id.*; *Gerstein*, 420 U.S. at 111.

[153]

*See Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 91 (E.D.N.Y. 2013) (inherently transitory doctrine applied to class claims of "pretrial detainees or men serving sentences of one year or less"); *Clarkson v. Coughlin*, 783 F. Supp. 789, 799 (S.D.N.Y. 1992) ("A prisoner's length of stay at a particular prison or within a prison system is 'inherently transitory and cannot be determined from the outset.'" (quoting *Jane B. v. New York City Department of Social Services*, 117 F.R.D. 64, 68 (S.D.N.Y.1987))); *see also Amador*, 655 F.3d at 101 (applying inherently transitory doctrine to class claims of inmates serving terms of varying lengths); *Zurak v. Regan*, 550 F.2d 86, 90–92 (2d Cir. 1977) (applying inherently transitory doctrine to class claims of inmates serving sentences of more than 90 days).

[154]

Dkt 94 at 2–3.

III.    *Provisional Class Certification*

    A.    *Provisional Certification Standard*

        In *A. A. R. P. v. Trump*,[155] the Supreme Court recently held that "courts may issue temporary relief to a putative class."[156]  According to a prominent class action treatise cited in *A.A.R.P.*, "the Court's holding means that the filing of a class suit (a 'putative class'), coupled with a showing that the standard for interim relief has been met, is sufficient to enable such relief to the entire putative class.  Nothing more, in terms of class certification, is necessary."[157]  The treatise concludes, however, that possible ambiguity in the Supreme Court's language and tension with its subsequent reasoning in *Trump v. CASA, Inc.*,[158] counsels that "a district court would be on safest ground if it were to go through the entire Rule 23 analysis prior to granting preliminary relief."[159]

        "Courts routinely grant provisional class certification for purposes of entering injunctive relief" prior to a final ruling on class certification.[160]  "[C]ourts that label preliminary certification 'provisional' employ that term to signal that the certification will dissolve if the

---

[155]

    145 S. Ct. 1364 (2025).

[156]

    *Id.* at 1369.

[157]

    WILLIAM RUBENSTEIN, 2 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 4:30 (6th ed. 2022 and Supp. June 2025) (hereinafter "NEWBERG AND RUBENSTEIN").

[158]

    145 S. Ct. 2540 (2025).

[159]

    NEWBERG AND RUBENSTEIN § 4:30.

[160]

    *Barbara v. Trump*, No. 25-CV-244-JL-AJ, 2025 WL 1904338, at *3 (D.N.H. July 10, 2025) (quoting *Idaho Org. of Res. Councils v. Labrador*, No. 1:25-CV-00178-AKB, 2025 WL 1237305, at *15 (D. Idaho Apr. 29, 2025) (citing cases)).

injunction does, *not* to suggest they undertook less than a full Rule 23 analysis."[161]   Although plaintiff has moved for class certification, final resolution of that motion is inappropriate at this juncture given "the deliberative and fact-intensive" nature of the class certification process[162] and the lack of discovery on class-related issues.   Accordingly, the Court conducts a full Rule 23 analysis to determine whether provisional certification of the class in connection with the preliminary injunction motion is warranted.

This analysis requires the Court to "determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation."[163]   The party seeking certification must qualify also under one of three criteria set forth in Rule 23(b).[164]   In addition, that party "bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met."[165]

    *B.*    *Class Definition*

As an initial matter, the Court must determine the scope of the putative class.

Plaintiff seeks to represent a class consisting of all immigration detainees who are

---

[161]

NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 4:30.

[162]

*Am. Council of Learned Societies v. McDonald,* No. 25-cv-3657 (CM)(BCM), 2025 WL 2097738, at *37 (S.D.N.Y. July 25, 2025).

[163]

*Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997).

[164]

*Id.*

[165]

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

or will be detained in the 26 Fed Hold Rooms.[166]  Defendants argue that the proposed class is

overbroad because plaintiff does not allege that those held there for 12 or fewer hours suffer any

constitutional violations.  Plaintiff counters that his proposed class definition is appropriate because

every detainee at 26 Fed risks injury caused by defendants.

"[N]o class may be certified that contains members lacking Article III standing.  The

class must therefore be defined in such a way that anyone within it would have standing."[167]  Here,

plaintiff does not allege plausibly that detainees held for less than 12 hours suffer any injury —

much less one that is common with the rest of the class[168] — as a result of defendants' alleged

constitutional violations.

Plaintiff counters that it is not known, at the time of arrival at 26 Fed, how long a

detainee will be held there.  But that uncertainty does not mean that all detainees will suffer a

"certainly impending"[169] injury, regardless of their length of detention.  Nor does reframing the issue

in terms of such individuals suffering a risk of a constitutional violation confer standing.  The

transfer of a detainee away from 26 Fed normally seems to extinguish any such risk.[170]  It is only

---

[166]
    Dkt 34.

[167]
    *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (citation omitted).

[168]
    *See Wal-Mart Stores, Inc.v. Dukes*, 564 U.S. 338, 349–50 (2011) ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982))).

[169]
    *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

[170]
    Plaintiff argues that "transfer out of 26 Fed does not guarantee an individual will not be detained there again."  Dkt 86 at 4 n.2.  Although at least one putative class member was transferred out to another facility and then retransferred to 26 Fed, there is not sufficient evidence of a likelihood of former detainees being returned to 26 Fed to establish a certainly

once a detainee is held for a substantial amount of time that alleged constitutional violations arise.

Plaintiff cites *Unknown Parties v. Johnson*[171] for the proposition that "length of individual detentions, the placement or grouping of individual detainees, or other personalized factors" are irrelevant.[172] But there, the proposed class definition encompassed "all individuals who are now or in the future will be detained for *one or more nights* at a [U.S. Customs and Border Protection] facility."[173] The proposed class was not overbroad because the conditions complained of allegedly affected the rights of all individuals within the putative class.[174] Here, plaintiff does not allege that the conditions complained of affect the rights of one detained only for a very short period. Rather, as in *Unknown Persons*, the violations complained of allegedly arise once a detainee has been held for a meaningful amount of time.

The overbreadth of plaintiff's proposed class is not fatal to provisional certification. The Court has authority *sua sponte* to modify a proposed class definition by carving out a narrower class from an overbroad class proposed in the complaint.[175] The key question therefore is what minimum amount of time in detention, if any, would yield a class that would satisfy the

---

impending injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("[Plaintiff's] standing to seek the injunction requested depended on whether he was likely to suffer future injury from the [challenged conduct].").

[171]    163 F. Supp. 3d 630 (D. Ariz. 2016).

[172]    *Id.* at 638–39.

[173]    *Id.* at 634 (emphasis added).

[174]    *Id.* at 638–40.

[175]    *See* Fed.R.Civ.P. 23(c)(4); *Ruzhinskaya v. Healthport Techs., LLC*, 311 F.R.D. 87, 108 (S.D.N.Y. 2015) (citing cases).

46

requirements of Rule 23(a).

To begin, plaintiff must be part of the class he seeks to represent.[176]  In this case, the plaintiff was detained at 26 Fed for approximately two days.[177] Although plaintiff does not propose a bright-line durational threshold, he does assert that ICE's policies and procedures give rise to likely constitutional violations well before a detainee's time in custody reaches 48 hours.[178]  And while they do not set a constitutional standard, both Directive 11087.2 and the PBNDS suggest the impropriety of holding detainees in hold rooms for longer than 12 hours.[179]

Accordingly, the Court amends the provisional class definition to include "all immigration detainees who now or will be detained for 12 or more hours by U.S. Immigration and Customs Enforcement at 26 Federal Plaza, New York, NY."

C.      *Rule 23(a) Requirements*

i.      *Numerosity*

Rule 23(a)(1) requires that a putative class be "so numerous that joinder of all members is impracticable."  "Courts have not required evidence of exact class size or identity of

---

[176]

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

[177]

Dkt 58 at ¶¶ 27–28.

[178]

*See* Part V, *infra*.

[179]

Dkt 11-1 at 2 n.3, 7; Dkt 11-2 at 31.

class members to satisfy the numerosity requirement."[180] "[C]lasses including future [members] generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'"[181]

Here, plaintiff's evidence shows that as many as 90 detainees have been packed into a single room. Given the volume of ICE arrests in and around the City of New York and the fact that there is considerable turnover in the detainee population at 26 Fed, the numerosity requirement obviously is met as, indeed, the defendants tacitly concede.[182]

### ii. Commonality

Rule 23(a)(2) requires that "there be issues whose resolution will affect all or a significant number of the putative class members."[183] "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question' will do."[184] That question "must be of such a nature that it is capable of

---

[180]

*Robidoux*, 987 F.2d at 935.

[181]

*J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (quoting 1 WILLIAM RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 3:15 (5th ed. 2018)); *see also Clarkson v. Coughlin*, 145 F.R.D. 339, 348 (S.D.N.Y. 1993) (numerosity satisfied where only seven class members were identified because composition of the proposed class was "inherently 'fluid'"); *Jane B. by Martin v. New York City Dep't of Soc. Servs.*, 117 F.R.D. 64, 70 (S.D.N.Y. 1987) (numerosity satisfied given "fluid composition" of the class and the undetermined number of future class members).

[182]

Dkt 79, at 1.

[183]

*Johnson*, 780 F.3d at 137.

[184]

*Dukes*, 564 U.S. at 359 (second and third alterations in original).

48

classwide resolution — which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[185]

Multiple issues of fact are common to the putative class defined above, including whether ICE provides, both as a matter of policy and, more importantly, as a matter of fact on a classwide basis, adequate bedding, meals, hygiene products, access to medical care, medication, and confidential communication with attorneys. Defendants do not contend that provision of these necessities and services varies by detainee.[186] Rather, these factual questions are "susceptible to common proof"[187] and therefore "capable of classwide resolution."[188]

Further, there are common questions of law capable of classwide resolution, including whether (1) ICE's standards and practices regarding the provision of food, hygiene products, medication, and medical care violate detainees' constitutional rights, (2) ICE's standards and practices regarding provision of bedding materials and crowding comport with constitutional standards, and (3) ICE is required to allow for in-person attorney visits, confidential calls with attorneys, and/or translation services at 26 Fed.

Defendants argue that a detainee held only for a short time at 26 Fed does not suffer the same injury as those who are detained for longer. The revised class definition addresses that concern. And while the facts underlying each detainee's claim may vary somewhat, they "need not

---

[185]

*Id.* at 350.

[186]

*See* Dkt 74 at ¶¶ 10–25.

[187]

*Johnson*, 780 F.3d at 137.

[188]

*Dukes*, 564 U.S. at 350.

be identical for them to be common."[189]  The questions set forth above are common because the truth or falsity of each will resolve an issue that is central to the validity of the claims of all putative class members.

Accordingly, the Court provisionally finds that commonality is satisfied here.

### iii.    Typicality

Rule 23(a)(3) requires that the claims or defenses of the class representative be typical of the claims or defenses of the class.  This requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."[190]  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."[191]

Here, plaintiff's claims arise from his detention in the 26 Fed Hold Rooms, where he was held for approximately two days.  As set forth in the merits discussion below, his claims involve facts and arguments that are broadly applicable to detainees at 26 Fed.

Defendants argue that typicality is not satisfied because plaintiff "was not denied medication or medical care, he was not denied the ability to speak to his attorney, and he was at 26

---

[189]    *Johnson*, 780 F.3d at 137.

[190]    *Robidoux*, 987 F.2d at 936.

[191]    *Id.* at 936–37.

Fed from August 8 to August 10, not 'several days' or weeks."[192]

With respect to medical care, the record indicates that plaintiff suffered from a medical condition during his detention and faced a substantial risk of being denied necessary treatment.[193]  Although the exact nature of plaintiff's medical circumstances varies from those of other putative class members, such a minor variation does not destroy typicality.

With respect to attorney access, the present record indicates that plaintiff's experiences and his claims arising from them are typical.  Declarations documenting the experiences of former detainees at 26 Fed[194] suggest that plaintiff's experience — that his access to his attorneys was limited, only telephonic, and not confidential[195] — was typical of the class.

With respect to the length of plaintiff's detention at the 26 Fed Hold Rooms, plaintiff's declarations indicate that many declarants were held there for two to five days while others were held there for longer periods.  Plaintiff's two-day stay at 26 Fed therefore appears to be typical of the putative class.

Accordingly, the Court provisionally finds that typicality is satisfied here.

---

[192]  Dkt 79 at 8.

[193]  Dkt 61 at ¶ 12.

[194]  *See* Dkts 13–20; 25–31.

[195]  *See* Dkt 61 at ¶¶ 10–11.

### iv.    Adequacy

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class."  "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."[196]

With respect to the first prong, plaintiff attests that he "want[s] to be a class representative in this litigation because what is happening at 26 Federal Plaza is not right" and he "want[s] to stand up for the people who are there."[197]  There is no evidence undermining the sincerity of plaintiff's eagerness to pursue the interests of the class.  And courts have found adequacy satisfied in similar circumstances, even where the proposed representative's individual claims were moot.[198]

---

[196]    *Denney*, 443 F.3d at 268.

[197]    Dkt 61 at ¶¶ 13–14.

[198]    *See, e.g., Abdi v. Duke*, 280 F. Supp. 3d 373, 402 (W.D.N.Y. 2017).

In *D.N.N. v. Baker*, No. 1:25-CV-01613-JRR, 2025 WL 2098633 (D. Md. July 25, 2025), the court concluded that the plaintiff, whose claims had been mooted, was not an adequate representative for a putative class of detainees at an ICE facility in Maryland.  That decision rested on the lack of evidence regarding plaintiff's knowledge of the facts of the lawsuit.  This case is distinguishable because (1) plaintiff here was detained much more recently than the plaintiff there and thus has more knowledge about relevant conditions, *cf id.* at 12 (plaintiff departed facility "months ago"), (2) defendants there raised knowledge-related adequacy concerns, which the plaintiff failed to rebut, *id.* at 12 n.14, whereas defendants here have not raised such an argument, and (3) the evidence of plaintiff's awareness of the suit is more fulsome than the record evidence in *Baker, cf id.* at 12.  In any event, the Second Circuit has noted its "general disfavor of 'attacks on the adequacy of a class representative based on the representative's ignorance.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 42 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000)).  Consistent with this precedent, the Court does not find that plaintiff is an inadequate representative based on a lack of knowledge of the suit, particularly where there is no evidence that he lacks that knowledge.

Moreover, at least one detainee who was transferred away from 26 Fed later was returned there.[199] The possibility, even if remote, that Mr. Mercado also will be returned to 26 Fed and again subjected to the conditions there provides an additional incentive for him to pursue vigorously the claims of the class.

With respect to the second prong, the record does not suggest that plaintiff's interests are opposed in any way to those of other members of the class.

Defendants argue only that adequacy is not met because plaintiff's claims and injuries are not typical. For the reasons set forth above, this argument lacks merit.

Accordingly, the Court provisionally finds that adequacy is satisfied here.

### D.    *Rule 23(b)(2)*

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."[200]  Plaintiff seeks certification under Rule 23(b)(2), which authorizes class actions where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' In other words, Rule 23(b)(2) applies only when a single

---

[199]    Dkt 25.

[200]    *Amchem*, 521 U.S. at 614.

injunction or declaratory judgment would provide relief to each member of the class."[201]

Beyond their commonality-related arguments, defendants do not dispute that certification is appropriate under Rule 23(b)(2). For the reasons set forth above with respect to commonality, provisional certification under Rule 23(b)(2) is appropriate because defendants have acted on grounds generally applicable to the class — subjecting them to the same set of policies governing their confinement and access to attorneys — thereby making appropriate final injunctive relief with respect to the class as a whole.

* * *

The requirements of Rule 23(a) and Rule 23(b)(2) provisionally are satisfied here. Accordingly, the Court provisionally certifies a class consisting of all immigration detainees who are now or in the future will be detained for 12 or more hours by ICE in the 26 Fed Hold Rooms.

The Court now turns to the substance of the preliminary injunction motion, beginning with the irreparable harm requirement.

## IV.    *Irreparable Harm*

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction. This requirement must therefore be satisfied before the other requirements for an injunction can be considered. To make this showing, the moving party must demonstrate that absent a preliminary injunction it will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. Thus, irreparable harm exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be

---

[201]    *Dukes*, 564 U.S. at 360 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. REV. 97, 132 (2009)).

returned to the positions they previously occupied.  But where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.  Therefore, the moving party must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation."[202]

Defendants argue that plaintiff's alleged injuries are susceptible to monetary compensation and that the supposed brevity of custody at 26 Fed foreclose a finding of irreparable harm.[203]  Plaintiff contends that his allegations of constitutional violations give rise to a presumption of irreparable injury and that he in any case has demonstrated (without benefit of any presumption) that detainees at 26 Fed have suffered, and will suffer, "emotional, psychological, and physical harm from [d]efendants' mistreatment."[204]

The Second Circuit has rejected the notion that allegations of constitutional deprivations *per se* necessarily represent constitutional injury.[205]  That said, a presumption does apply in some contexts.  The Second Circuit has "presumed irreparable harm for alleged deprivations of certain constitutional rights," including for First, Fourth, and Eighth Amendment rights.[206]

---

[202]

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (internal quotation marks and citations omitted) (cleaned up).

[203]

*See* Dkt 73 at 17–18.

[204]

*See* Dkt 81 at 8–9.

[205]

*See Nat'l Ass'n for Gun Rts. v. Lamont*, No. 23-1162, 2025 WL 2423599, at *23 (2d Cir. Aug. 22, 2025).

[206]

*See id.*; *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[T]he *alleged* violation of a constitutional right . . . triggers a finding of irreparable harm" (emphasis in original)); *see also Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (presumption of irreparable injury for alleged violation of Eighth Amendment right against cruel and unusual punishment); *see also Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992) (presumption of irreparable injury from alleged violation of Fourth Amendment).

With respect to the allegations that the restrictions on attorney-client communication violate plaintiff's and putative class members' First Amendment rights, the Court concludes that plaintiff has demonstrated irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[207]

Additionally, plaintiff has alleged a real and imminent First Amendment injury, rather than a "conjectural chill" which would not be afforded a presumption of irreparable harm.[208] Plaintiff has presented substantial evidence that, absent a preliminary injunction, detainees will continue to be prevented from or seriously limited in their ability to exercise their right under the First Amendment to consult with and have the advice and assistance of legal counsel.[209] The declarations submitted by plaintiff underscore that restrictions on attorney-client communication at 26 Fed have interfered and will continue to interfere with detainees' ability meaningfully to consult with legal counsel and to assert potentially meritorious claims.[210] In some cases, these restrictions not only delay legal advice but prevent any chance to obtain legal advice prior to removal from the United States.

---

[207]

See *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction.").

[208]

See *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999).

[209]

See *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.").

[210]

*See e.g.*, Dkt 14 at ¶¶ 29–32; Dkt 15 at ¶¶ 6–7, 11, 21.

Lack of access to counsel during detention at 26 Fed is not a mere inconvenience for detainees. It can have irreversible consequences. For example, one attorney declarant attests that an inability to communicate with his client delayed his filing of motions to reopen and for a stay.[211] His client was moved from 26 Federal Plaza, to New Jersey, to Arizona, and then to Texas within a few days[212] and then was removed from the United States before the Executive Office of Immigration Review ruled on the motions submitted.[213]

It is less clear, however, that a presumption of irreparable harm is triggered by plaintiff's allegations of conditions of confinement in violation of the Fifth Amendment. While the Second Circuit has not addressed whether a presumption of irreparable harm flows from allegations of unconstitutional conditions of confinement in the civil context, which arise under the Due Process Clause, it has presumed irreparable harm in the context of claims alleging unconstitutional conditions of confinement arising in the criminal context under the Eighth Amendment's right to be free from cruel and unusual punishment.[214] Although "the Supreme Court's recent emphasis on the limits of

---

[211]

See Dkt 14 at ¶¶ 23–32.

[212]

Id.

[213]

Id.

[214]

See e.g., Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984).

Several courts have reached the same conclusion in this context, see e.g., Zolnowski v. Cnty. of Erie, 944 F. Supp. 1096, 1109 (W.D.N.Y. 1996) ("[A]n allegation of a violation of a constitutional right . . . challenging conditions of confinement in a prison creates a presumption of irreparable harm potentially justifying equitable relief."), and in the parallel civil context arising under the Due Process Clause. See e.g., Albro v. Onondaga Cnty., N.Y., 627 F. Supp. 1280, 1287 (N.D.N.Y. 1986) ("Plaintiffs' allegations that they have suffered and will continue to suffer constitutional deprivations [under the Due Process Clause] from the conditions. . . satisfy the requirement of irreparable harm.").

[courts'] equitable powers caution[s] against extending the presumption to new contexts,"[215] the analogous nature of these claims suggests that a presumption of irreparable injury may be appropriate.

But even if a presumption were not triggered by plaintiff's allegations of due process violations, plaintiff has established irreparable harm by demonstrating that putative class members "face imminent risk to their health, safety, and lives."[216]  The declarations submitted by plaintiff describe numerous accounts of enduring physical and psychological harm due to the alleged inhumane conditions at 26 Fed.[217]

To be sure, defendants claim that they have made some improvements that were required by the TRO as a condition of their being permitted to continue their use of the 26 Fed Hold Rooms.  But there are ample reasons to believe that these and any other modest improvements would not continue were a preliminary injunction denied.

---

[215]

*Nat'l Ass'n for Gun Rts*, 2025 WL 2423599, at *23.

[216]

*See Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) (finding irreparable harm where, due to underlying medical issues, detained aliens faced a risk of severe harm if they contracted COVID-19).

"[P]laintiffs [are] allowed to adduce evidence of harm representatively, so long as they lay a foundation that the representative plaintiffs are similarly situated with regard to the issue of irreparable harm." *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 58 (2d Cir. 2004); *see also Orr v. Trump*, No. 1:25-CV-10313-JEK, 2025 WL 1695941, at *12 (D. Mass. June 17, 2025) ("[A] party seeking class-wide preliminary injunctive relief need not provide individualized proof that each class member is likely to experience irreparable harm, so long as it can establish that the risk of irreparable harm faced by certain class members is representative of the risk faced by all class members.").

[217]

Multiple detainees have described severe trauma from their experience, including one who was hospitalized for suicidal ideation. *See* Dkt 85 at ¶ 8.

58

As an initial matter, one may not properly lose sight of the circumstances that brought about the conditions of which plaintiff complains – which are laid bare in ICE's explanation for its waiving its prior twelve hour time limit on keeping detainees in hold rooms.   Here is its announcement:

> "On January 20, 2025, President Donald J. Trump issued several executive orders, including Protecting the American People Against Invasion and Securing Our Borders, which declared a national emergency and ordered the detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States.

> "As a result of increased enforcement efforts, ERO's average daily population has significantly increased to over 54,000. This increase has put additional strain on finding and coordinating transfers of aliens to available beds within the required timeline detailed in Directive 11087.2. Further, ERO field offices no longer have the option to discretionarily release aliens, nor decline to take aliens into custody from our counterparts in Homeland Security Investigations (HSI) or U.S. Customs and Border Protection (CBP). As a result of these constraints, ERO field offices have had to resort to holding aliens in holding facilities beyond than the 12-hour limit.

> "To accommodate appropriately housing the increased number of detainees while ensuring their safety and security and avoid violation of holding facility standards and requirements, this waiver allows for aliens to be housed in a holding facility for up to, but not exceeding, 72 hours, absent exceptional circumstances."[218]

There is no suggestion by defendants that the national emergency declaration has been rescinded.   There is no suggestion that the pressure to increase arrests has diminished.   There is no suggestion that the ERO's daily population has not continued to increase.   There is no suggestion that the strain from accommodating increasing numbers of detainees has lessened.   There is no suggestion that the previously available options such as discretionary release or of ICE declining detainees taken into custody by other agencies will be restored.   There is no suggestion that there has been any

---

[218]    Dkt 11-4 at 1–2.

relevant change in administration policy. In short, the heat remains on, and the temperature is likely to rise. There is no reason to believe that conditions in the 26 Fed Hold Rooms would not regress and, indeed, worsen in the absence of a preliminary injunction. Thus, the threat of irreparable injury absent injunctive relief is both clear and immediate.

This conclusion is reinforced by defendants' response to the plaintiff's motions and the TRO. As indicated previously, Ms. Zanello's declarations in substantial measure avoided the thrust of plaintiff's factual showing and offered unpersuasive statistics that concealed more than they disclosed despite the availability to defendants of much more illuminating data.[219] Moreover, the record casts doubt on defendants' compliance with the TRO.[220] The response to the motions thus gives no confidence that the defendants are seriously interested in making a full disclosure of conditions in the 26 Fed Hold Rooms, much less materially improving those conditions any time soon except, perhaps, to the extent they are compelled by law.[221]

---

[219]

See supra Part IV. B. i.

[220]

Plaintiff has submitted declarations which indicate that inhumane conditions persist despite the Court's TRO. A detainee in custody at 26 Fed from August 12 through August 14 reports that he received food only once or twice per day; he was not furnished with a sleeping mat or clean clothing; he observed detainees wait a day to receive medical care; he was not provided sufficient toilet paper or anything to clean his teeth; and he did not have access to regular, temporally unrestricted calls. See Dkt 84 at ¶¶ 3–10. Additionally, another detainee held at 26 Fed from August 7 through August 18 reported to her attorney, with whom she has only had brief calls, that she slept on the floor and that she was not provided with the toothbrush and change of clothes brought to the facility by her legal team. See Dkt 85 at ¶¶ 5, 11.

Additionally, according to one former detainee, the number of detainees at 26 Fed has exceeded the maximum capacity under the Court's TRO. See Dkt 84 at ¶ 6.

[221]

Even if defendants in fact have complied with the Court's TRO and taken additional voluntary remedial measures, the "court's power to grant injunctive relief survives

V.      *Likelihood of Success on the Merits*

  A.      *Fifth Amendment Claims Relating to Conditions of Confinement*

    Plaintiff claims that the conditions of confinement at 26 Fed violate plaintiff's and putative class members' due process rights under the Fifth Amendment.[222]

    "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."[223]  This duty includes provision of "basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety."[224]  Although the Constitution does not require "comfortable prisons," it forbids "inhumane ones."[225]  Claims challenging the constitutionality of conditions of confinement brought by individuals who have not been convicted of a crime, such as pretrial and immigration detainees,[226] arise under the Due Process Clause.[227]

---

[222] discontinuance of the illegal conduct." *See E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

*See* Dkt 51 at 18–19.

[223] *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).

[224] *Id.* at 200.

[225] *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

[226] Deportation proceedings are "civil, not criminal" and are assumed to be "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

[227] *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29, 33 n.9 (2d Cir. 2017); *see also Charles v. Orange Cnty.*, 925 F.3d 73, 85 (2d Cir. 2019) (finding that civil immigration detainee's deliberate indifference claims arise under the Due Process Clause); *see also Cuoco v.*

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law."[228]  This protection "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."[229]  The Due Process Clause forbids "punishment" of an individual prior to an adjudication of guilt in accordance with due process of law.[230]  Therefore, the conditions of detention for those who have not been convicted of a crime cannot be punitive in nature.[231]

"A [detainee] can establish a due process claim for inhumane conditions of confinement either by proving an official's deliberate indifference to those conditions, or by proving that those conditions are punitive."[232]  The Second Circuit has made clear that these two theories of liability are distinct.[233]

---

*Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (noting that pretrial detainee's deliberate indifference claims arise under the Fifth Amendment's Due Process Clause).

Defendants agree that claims relating to conditions of confinement and deprivations of medical care by the detainees at 26 Fed are properly brought under the Fifth Amendment's Due Process Clause.  *See* Dkt 73 at 11.

[228]  U.S. CONST. AMEND. V.

[229]  *See Zadvydas*, 533 U.S. at 693.

[230]  *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[231]  *Id.*; *cf. Youngberg v. Romeo*, 457 U.S. 307, 322 (1982) (noting that those who have been involuntary committed are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish").

[232]  *Darnell*, 849 F.3d at 34 n.12.

[233]  *Id.*

>    i.    *Deliberate Indifference to the Challenged Conditions of Confinement*

Under the "deliberate indifference" theory of liability, a detainee alleging unconstitutional conditions of confinement must establish two elements: (1) an "objective deprivation" and (2) deliberate indifference to the challenged condition.[234]

>    1.    *Objective Deprivation*

First, to establish an "objective deprivation," the plaintiff must demonstrate that the "conditions, either alone or in combination, pose an unreasonable risk of serious damage to [the plaintiff's] health, which includes the risk of serious damage to physical and mental soundness."[235]

"[T]here is no static test" to assess whether the challenged conditions meet this threshold.[236]  Rather, the conditions of confinement "must be evaluated in light of contemporary standards of decency."[237]  "[W]hen [the challenged conditions] have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise," the

---

[234]

>    *See id.* at 30–31

[235]

>    *See id.* at 30 (internal quotation marks and citations omitted); *see also Farmer*, 511 U.S. at 834 (noting that the alleged deprivation must be sufficiently serious to rise to the level of a constitutional violation).

[236]

>    *See Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995); *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

[237]

>    *See Blissett*, 66 F.3d at 537.

aggregate effect of the conditions should be considered. [238] For example, "[u]nsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items . . . can rise to the level of an objective deprivation."[239]

"[T]he proper lens through which to analyze . . . conditions of confinement is with reference to their severity and duration, not the detainee's resulting injury," although evidence of injury may be pertinent to the assessment of the severity of the alleged conditions.[240] While severity and duration are key considerations, no condition is subject to a bright-line durational or severity threshold.[241] In short, the objective prong is satisfied when, under contemporary standards of decency, the conditions of confinement — alone or, where multiple conditions compound a single deprivation, in combination — create an unreasonable risk of serious harm to the detainee's physical or mental health.

### a.    Analysis of Challenged Conditions

As an initial matter, certain conditions at 26 Fed essentially are largely undisputed. In any case, the Court finds that:

---

[238]    See Wilson v. Seiter, 501 U.S. 294, 304 (1991).

[239]    See Darnell, 849 F.3d at 30.

[240]    Id.

[241]    Darnell, 849 F.3d at 32, 37 (finding error in district court's conclusion that "no set of conditions, no matter how egregious, could state a due process violation if the conditions existed for no more than ten to twenty-four hours").

- 26 Fed Hold Rooms, at times, have housed and, absent relief, will house large numbers of detainees.  Defendants do not rebut assertions by former detainees that the hold rooms at times housed up to 90 detainees.[242]

- Many detainees are held for periods that exceed 72 hours.

- There are no beds in the hold rooms at 26 Fed and that, prior to August 18, detainees held overnight slept on the concrete floor with only an aluminum blanket.

- Detainees cannot bathe or shower during the course of their detention at 26 Fed.

- Prior to the Court's TRO, detainees were provided with only two rations of food per day.[243]

- In-person visits with attorneys are unavailable and that there are no dedicated attorney telephone call rooms at 26 Fed.

As to the remaining disputed conditions, defendants rely solely on Ms. Zanello's declarations, which do not purport to identify the precise basis of her assertions and describe conditions in the present tense only as of the time of her statements.[244]  Defendants submit no

---

[242] Analysis by the Deporation Data Project of ICE data obtained through a FOIA request determined that, on June 5, 2025, 186 people were held at 26 Fed overnight. Gwynne Hogan & Haidee Chu, *'Like Dogs in Here' — Videos Expose ICE Lockup Inside 26 Federal Plaza,* THE CITY (July 22, 2025) (updated July 23, 2025), https://www.thecity.nyc/2025/07/22/video-26-federal-plaza-immigration-ice-dhs-cells/.

[243] Defendants claim that additional meals were available upon request.  *See* Dkt 58 at ¶ 12.

[244] *See* Dkt 74 at ¶ 2.

declarations from ICE employees stationed at 26 Fed who could attest to conditions over the past several months from first-hand knowledge.

As discussed, Ms. Zanello's vague and limited representations, which presumably were made in good faith but nonetheless are misleading, describe only a brief snapshot of the conditions at 26 Fed, mostly following entry of the TRO, and shed little light on the facility's historical conditions or practices.  On this record, the defendants' showing is significantly unresponsive and unpersuasive.  By contrast,  plaintiff has submitted numerous first-hand accounts from former detainees that speak directly to the conditions at 26 Fed.  Plaintiff has submitted also declarations of recent detainees which suggest that many of these conditions persist despite the Court's TRO.  The Court credits those declarations for purposes of this motion.

With this record in mind, the Court now addresses each of the challenged conditions in turn to determine if plaintiff is likely to establish an objective deprivation.

*Sleeping Conditions*

Sleep is a basic human need.  Conditions that prevent or interfere with sleep in some circumstances may rise to the level of a constitutional violation.[245]

---

[245] *See Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) (collecting cases).

Prior to the Court's TRO,[246] detainees at 26 Fed were forced to sleep on a bare concrete floor in cramped conditions with only an aluminum blanket.[247]  In some instances, crowded conditions forced detainees to sleep sitting up[248] or laying in proximity to open toilets.  Lack of temperature control resulting in periods of excessive heat and cold, coupled with lights left on throughout the night, further interfered with sleep.[249]  These conditions not only made sustained sleep extremely challenging but also caused significant pain and risk of serious illness.[250]

Forcing detainees to sleep, if at all, in these conditions, even for short periods, deprives detainees of a basic human need and poses an unreasonable risk of harm to their physical and psychological well-being, thus rising to the level of an objectively serious deprivation.[251]

---

[246]

As noted, declarations submitted by plaintiff suggest that at least some of these conditions persist, despite the Court's TRO.

[247]

*See e.g.*, Dkt 31 at ¶ 4; Dkt 27 at ¶ 11;Dkt 15 at ¶ 12; Dkt 16 at ¶ 10; Dkt 84 at ¶ 5; Dkt 28 at ¶ 5.

[248]

*Id.*

[249]

*See e.g.*, Dkt 31 at ¶ 4*;* Dkt 27 at ¶ 11; Dkt 15 at ¶ 12; Dkt 28 at ¶ 8; Dkt 26 at ¶ 5; Dkt 15 at ¶ 12; Dkt 16 at ¶ 13; Dkt 27 at ¶ 16; Dkt 25 at ¶ 7.

[250]

*See e.g.*, Dkt 31 at ¶ 12; Dkt 62 at ¶ 12.

[251]

*See e.g., Lareau v. Manson,* 651 F.2d 96, 105 (2d Cir. 1981) ("The use of the fishtank, floor mattresses and medical unit practices, however, are too egregious to warrant any such leeway. They constitute punishment without regard to the number of days for which a prisoner is so confined."); *Vazquez v. Gray*, 523 F. Supp. 1359, 1365 (S.D.N.Y. 1981) (same); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) ("[S]everal courts have held that a jail's failure to provide detainees with a mattress and bed or bunk runs afoul of the commands of the Fourteenth Amendment.") (collecting cases); *Lyons v. Powell*, 838 F.2d 28, 31 (1st Cir. 1988) ("[S]ubjecting pretrial detainees to the use of a floor mattress for anything other than brief emergency circumstances may constitute an

*Unsanitary Conditions*

The Constitution "forbids deprivation of the basic elements of hygiene."[252] "[T]he failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation."[253] "Availability of hygienic materials is particularly important in the context of otherwise unsanitary living conditions."[254]

Defendants do not dispute that detainees at 26 Fed do not have the ability to bathe or shower at any point during their detention. Additionally, detainees report that they were denied basic hygiene items, such as clean clothing, and adequate soap, sanitary wipes, toilet paper, toothbrushes, and menstrual products.[255] Due to overcrowding, dozens of detainees were forced to share one or a few toilets, which sometimes were inoperable.[256] Lack of ventilation and inadequate cleaning further

---

impermissible imposition of punishment, thereby violating the due process rights of such detainees.").

[252]

*See Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983).

[253]

*See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013); *see also, e.g., Atkins v. Cnty. of Orange*, 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) ("The failure to regularly provide prisoners with . . . toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions." (internal quotations marks and citations omitted)).

[254]

*Id.*

[255]

*See e.g.,* Dkt 28 at ¶ 4-6; Dkt 31 at ¶ 4; Dkt 26 at ¶ 6; Dkt 15 at ¶ 18; Dkt 25 at ¶ 6; Dkt 16 at ¶ 12; Dkt 27 at ¶ 12.

A recent detainee reports that ICE continues to deny basic hygiene products despite this Court's TRO. *See* Dkt 84 at ¶ 4, 5, 7.

[256]

*See e.g.,* Dkt 15 at ¶¶ 14, 18; Dkt 27 at ¶ 13; Dkt 25 at ¶ 6; Dkt 16 at ¶ 12.

contributed to an overpowering stench of body odor, urine, and feces in the 26 Fed Hold Rooms.[257]

Because an unsanitary environment and the denial of basic personal hygiene items deprive detainees of "minimal civilized measure of life's necessities and [subject them] to unreasonable health and safety risks,"[258] the challenged conditions rise to the level of an objective deprivation.

*Food and Water*

The Constitution requires that detainees be provided adequate food and water.[259] Prior to the Court's TRO, detainees at 26 Fed were provided with only two small rations of food per day, leaving many persistently hungry and, in at least one case, causing or contributing to significant weight loss.[260]  Additionally, detainees report that they were denied water.[261]  While defendants are

---

[257]

　　　*See e.g.,* Dkt 27 at ¶ 13; Dkt 26 at ¶ 6; Dkt 25 at ¶ 7

[258]

　　　*See Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013).

[259]

　　　*See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir.1983) (per curiam) ("[T]he Eighth Amendment prohibition against cruel and unusual punishment [] require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." (internal quotation marks omitted)).

[260]

　　　*See e.g.,* Dkt 26 at ¶ 9; Dkt 27 ¶ 14; Dkt 63 at ¶ 9; Dkt 16 at ¶ 15; Dkt 28 at ¶ 7; Dkt 25 at ¶ 9;  Dkt 16 at ¶ 15; Dkt 28 at ¶ 7; Dkt 61 at ¶¶ 7, 9.

　　　Defendants represent that detainees now are provided four meals a day.  *See* Dkt 74 at ¶ 18. However, as noted, declarations by persons recently detained at 26 Fed undercut defendants' representations. *See e.g.*, Dkt 84 at ¶ 4.

[261]

　　　*See e.g.*, Dkt 27 at ¶ 14; Dkt 16 at ¶ 15.

not required to provide appetizing food, the denial of basic sustenance undoubtedly constitutes an objective deprivation.

### Medical Care

A denial of "treatment needed to remedy a serious medical condition" constitutes an objective deprivation.[262]  To determine whether a plaintiff has established a sufficiently serious medical need, courts consider "whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment," "whether the medical condition significantly affects daily activities," and "the existence of chronic and substantial pain."[263] Additionally, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."[264]

The declarations submitted by plaintiff, and credited by the Court, document delayed or absent treatment in response to several serious medical needs, including diabetes,[265] high blood

---

[262]  *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).

[263]  *Swinson v. City of New York*, No. 19 CV. 11919 (KPF), 2022 WL 142407, at *9 (S.D.N.Y. Jan. 14, 2022) (internal quotation marks omitted).

[264]  *See Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003)

[265]  *Colon v. Cnty. of Nassau*, No. 12-CV-4466 JS SIL, 2014 WL 4904692, at *6 (E.D.N.Y. Sept. 26, 2014) ("Courts in this Circuit have held that diabetes is a sufficiently serious medical condition to meet the objective prong of a deliberate indifference claim." (internal quotation marks omitted)).

pressure,[266] and seizure.[267]   For instance, failure to provide one detainee blood pressure medication

for the duration of his detention resulted in dangerously high blood pressure.[268]   Accordingly, the

inadequate medical care provided by defendants to detainees constitutes an objective deprivation.


### 2.    Deliberate Indifference

In order to establish a due process claim for inhumane conditions of confinement

under the deliberate indifference theory, in addition to establishing an objective deprivation, the

plaintiff must demonstrate also the defendants' deliberate indifference to that deprivation.[269]

To prove deliberate indifference in the context of a claim arising under the Due

Process Clause, such as here, the plaintiff "must prove that the [defendant] acted intentionally to

impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that

the condition posed to the [] detainee even though the [defendant] knew, or should have known, that

the condition posed an excessive risk to health or safety."[270]   Thus, deliberate indifference, which is

---

[266]     See Burch v. City of New York, No. 11CV2841CBAVMS, 2016 WL 11430773, at *13 (E.D.N.Y. Apr. 22, 2016) ("[S]everal courts in this Circuit have indicated that high blood pressure is a sufficiently serious medical condition to form the basis for a deliberate indifference claim.").

[267]     Dkt 15 at ¶ 16 ("[O]ne person in the holding cell was having what looked to me like a seizure or epilepsy and it took nearly 30 minutes for that person to get any medical attention.").

[268]     Dkt 13 at ¶¶ 12, 18.

[269]     See Darnell, 849 F.3d at 32.

[270]     Id. at 35.

"properly equated with the *mens rea* of recklessness," is "defined objectively for a claim of a due process violation."[271]  Mere negligence, however, is insufficient to show deliberate indifference.[272]

Based on declarations and press reports,[273] the Court finds that the defendants, at a minimum, recklessly failed to act with reasonable care to mitigate the risk the foregoing challenged conditions posed to the detainees at 26 Fed.  These conditions were largely self-evident, subjects of widespread public reporting, and posed excessive risk to detainees' health.

First, defendants were and are on notice of capacity constraints at their holding facilities.  Publicly, in December 2024, ICE's Tom Homan publicly stated that the government would need a minimum of 100,000 beds — more than double the then-available detention capacity — to carry out the in-coming administration's planned enforcement operations.[274]  Mr. Homan recently announced also that, in co-called sanctuary jurisdictions like New York City, federal immigration enforcement would "flood the zone" with agents, signaling a surge likely to increase detention needs

---

[271]

    *Id.* at 25, 32.

[272]

    *Id*. at 36.

[273]

    As noted above, the Court may consider these hearsay materials at this stage.

[274]

    *See* Eric Bradner, *Trump's border czar says he'll need funding and at least 100K beds to carry out deportation plans,* CNN (Dec. 18, 2024), https://www.cnn.com/2024/12/18/politics/border-czar-homan-trump-deportation-plans; *see also* Ted Hesson, *US immigration detention maxed out at 47,600 detainees, ICE official says,* Reuters (Mar. 12, 2025), https://www.reuters.com/world/us/us-immigration-detention-maxed-out-47600-detainees-ice-official-says-2025-03-12.

72

at facilities like 26 Fed.[275]

        Second, although ICE's Directive 11087.2 limits hold room confinement to no more than 12 hours, its June 2025 nationwide waiver extended the limit to up to 72 hours or, in exceptional circumstances, longer — a revision concededly prompted by the increased enforcement push and the acknowledged shortfall in facilities.[276]  Defendants therefore knew, or should have known, that facilities like 26 Fed — which lack essential features of long-term detention centers such as beds, showers, and attorney consultation rooms, among others — would be forced to hold many more detainees for much longer periods, essentially serving as *de facto* detention centers.  The deteriorating conditions that resulted when the population in these holding facilities increased sharply did not come, or at least should not have come, as a surprise, and the risk of harm posed by these conditions was obvious.

        Third, the allegedly inhumane conditions at 26 Fed  — and other ICE facilities — have been the subject of sustained media attention and litigation.  For example, a lawsuit filed in May 2025 alleged similar inhumane and punitive conditions of confinement at hold rooms operated by ICE's Baltimore Field Office,[277] and there has been widespread reporting on inadequate conditions

---

[275]

        *Federal immigration enforcement will 'flood the zone' in sanctuary cities, Homan says*, PBS News Hour (Sept. 4, 2025), https://www.pbs.org/newshour/politics/watch-federal-immigration-enforcement-will-flood-the-zone-in-sanctuary-cities-homan-says.

[276]

        *See* Dkt 11-4.

[277]

        First Amended Complaint, *D.N.N. v. Baker*, No. 1:25-cv-01613 (D. Md., filed May 9, 2025), Dkt 2.

at ICE holding facilities and detention centers throughout the country.[278]  Moreover, public clashes with Members of Congress who sought and were denied entry to 26 Fed further spotlighted concern over the conditions at the facility and over ICE's transparency.[279]

Accordingly, the Court finds that plaintiff has demonstrated a clear and substantial likelihood of success on his claims alleging that the challenged conditions of confinement violate his and putative class members' Fifth Amendment due process rights.

### ii.    Punitive Conditions of Confinement

In addition to the deliberate indifference theory just discussed, a detainee independently can establish a due process claim for inhumane conditions of confinement by proving that the challenged conditions are punitive.[280]

> "In considering [whether the alleged conditions are punitive], the court must decide whether the condition is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent evidence of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may

---

[278]

    *See e.g.*, Laura Barrón-López, *One meal a day, no bathing for days: Inside the 'crisis' at one Virginia ICE field office,* MSNBC (Aug. 29, 2025), https://www.msnbc.com/msnbc/news/virginia-ice-office-one-meal-day-inhumane-conditions-rcna227976); Anna McAllister, *Florida officials deny accusations of inhumane conditions at Alligator Alcatraz,* CBS Miami (July 9, 2025), https://www.cbsnews.com/miami/news/alligator-alcatraz-detainees-allege-inhumane-conditions-at-immigration-detention-center/.

[279]

    *See* Luis Ferré-Sadurní, *Video Shows Overcrowded and Unsanitary Conditions in Immigration Holding Cells,* N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

[280]

    *Darnell*, 849 F.3d at 34 n.12.

rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.  If a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.  Conversely, if a particular condition or restriction of [] detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment."[281]

Not every objective offered by the government is a legitimate one.  "Legitimate government objectives include maintaining security and order at [an] institution and making certain no weapons or illicit drugs reach detainees, ensuring the detainees' presence at trial, and managing the facility where the detainee is held."[282]  "Retribution and deterrence," on the other hand, "are not legitimate nonpunitive governmental objectives."[283]

In this analysis, courts consider whether the conditions are employed to achieve objectives that could be accomplished via "alternative and less harsh methods."[284]  This inquiry is rooted in "constitutional requirements," rather than the "court's idea of how best to operate a detention facility."[285]

Statements from senior officials suggest that harsh conditions of confinement are a

---

[281]

See *Quint v. Lamont*, No. 3:22-CV-1263 (VAB), 2022 WL 17487978, at *5 (D. Conn. Dec. 6, 2022) (internal quotation marks and citations omitted).

[282]

*Id.* (internal quotation marks omitted).

[283]

See *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20 (1979).

[284]

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. CV 18-760 (CKK), 2020 WL 3265533, at *18 (D.D.C. June 17, 2020).

[285]

See *Bell*, 441 U.S. at 539.

deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration.   Indeed, DHS has launched a national advertising campaign encouraging self-deportation,[286] and Secretary Kristi Noem recently acknowledged that ICE selected a notoriously harsh state prison as an ICE detention center for aliens charged with violent crimes in part to encourage self-deportation.[287]

Conduct by ICE guards at 26 Fed likewise suggests that detention is intended to be punitive and to induce self-deportation.  In one instance, ICE officers told a detainee that he would have to spend the next four years in detention in order to keep pursuing his asylum claim, presumably to get the detainee to self-deport.[288]  Moreover, abusive and demeaning behavior by guards supports an inference that detention facility officials have an express intent to punish.[289]  Declarations submitted by plaintiff, for example, report that ICE guards taunted hungry detainees by eating hamburgers and pizza in front of them and by squirting water into their mouths when they asked for

---

[286]

U.S. Dep't of Homeland Sec., Press Release, DHS Announces Nationwide and International Ad Campaign Warning Illegal Aliens to Self-Deport and Stay Out (Feb. 17, 2025), https://www.dhs.gov/news/2025/02/17/dhs-announces-ad-campaign-warning-illegal-aliens-self-deport-and-stay-out.

ICE's website emphasizes also that aliens who choose not to self-deport and are detained by ICE may have to spend months in detention. *See* U.S. Immigration & Customs Enforcement, Self-Deportation (July 16, 2025), https://www.ice.gov/self-deportation (last visited Sept. 8, 2025).

[287]

Sara Cline, *A notorious Louisiana prison was chosen for immigrant detainees to urge self-deportation*, Noem says, AP News (Sept. 4, 2025), https://apnews.com/article/louisiana-immigration-detention-noem-trump-682793a4db4757649cb78b0ea3aa051d.

[288]

*See* Dkt 15 at ¶ 6.

[289]

*See e.g.*, Dkt 15 at ¶¶ 8, 17; Dkt 16 at ¶ 5.

drinking water.[290]  This behavior suggests an intention to humiliate and degrade detainees.

Moreover, defendants have not identified — and the Court is unable to identify — a legitimate government objective to which the challenged conditions rationally be may connected apart from administrative convenience and resource constraints.[291]  These "basically economic motive[s] cannot lawfully excuse the imposition on the presumptively innocent of genuine privations and hardship[.]"[292]  Nor is encouragement of alien self-deportation on pain of otherwise enduring inhumane conditions of confinement a legitimate, nonpunitive objective.  ICE's PBNDS standards identify alternative humane methods to achieve any legitimate government objectives to which these conditions may be connected.[293]

Accordingly, the Court finds that plaintiff has demonstrated a clear and substantial likelihood of success with respect to his allegations that challenged conditions of confinement are

---

[290]

> *See* Dkt 27 at ¶ 14 ("The guards would eat their own food in front of us, things like pizza and hamburgers. It felt like a burla against us—we were so hungry and it felt they were jeering at us"); *See* Dkt 61 at ¶ 9 ("There was one guard who would sometimes hold a bottle of water up and people would wait to have him squirt some into our mouths, like we were animals").

[291]

> *See Lareau v. Manson*, 651 F.2d 96, 104 (2d Cir. 1981) (rejecting "the state's interest in housing more prisoners without creating more prison space").

[292]

> *See id*. at 104.

[293]

> *See, e.g.*, *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D.Cal. 2019)*; S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec*., No. CV 18-760 (CKK), 2020 WL 3265533, at *30 (D.D.C. June 17, 2020).

> Defendants argue that ICE PBNDS standards are inapplicable because 26 Fed is a holding, rather than detention, facility.  However, these standards serve as a valuable point of reference because 26 Fed acts as a *de facto* detention center, where detainees are held for days or, in some cases, weeks.

punitive in violation of the Fifth Amendment.

    B.    *First and Fifth Amendment Claims Relating to Access to Counsel*

         Plaintiff claims also that the use of 26 Fed despite its lack of facilities for attorney-client meetings and the limitations on telephonic attorney-client communication violate his and putative class members' constitutional rights under the First and Fifth Amendments.

         "The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."[294]    Moreover, "[d]uring deportation proceedings, aliens have a statutory right to be represented by counsel at their own expense," and "this right is an integral part of the procedural due process to which the alien is entitled."[295]

         When conditions of detention impinge on detainees' constitutional rights, the conditions are valid if they are reasonably related to legitimate governmental interests.[296]    In making

---

[294]

    *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000); *see also DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney, however, implicates . . . clearly established First Amendment rights of association and free speech."). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

[295]

    *See Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 128 (2d Cir. 2000) (internal quotation marks and citations omitted). "Because immigration proceedings are of a civil rather than criminal nature, aliens in removal proceedings enjoy no specific right to counsel under the Sixth Amendment to the Constitution." *Debeatham v. Holder*, 602 F.3d 481, 485 (2d Cir. 2010) (internal quotation marks omitted) (cleaned up).

    Plaintiff argues also that the restrictions on attorney-client communications are punitive and violate his and putative class members' substantive due process rights, which is governed by the standard previously discussed.  *See* Dkt 10 at 25.

[296]

    *See Turner v. Safley*, 482 U.S. 78, 89 (1987).

78

that determination, courts consider whether there is a "valid, rational connection between the []
regulation and the legitimate governmental interest put forward to justify it," "whether there are
alternative means of exercising the right that remain open to [detainees]," "the impact
accommodation of the asserted constitutional right will have on . . . [detention] resources," and "the
absence of ready alternatives."[297]

Defendants explain that there is a lack of ready alternatives because the facilities at
26 Fed do not allow for confidential attorney call rooms or in-person visitation.  That perhaps is so.
But that is not an adequate justification for the barriers to attorney-client communication imposed.

Defendants have elected to use 26 Fed as a *de facto* detention site, not as the short
term facility for occupancy of twelve or fewer hours for which it designed and equipped.  It most
certainly does not conform even to the PBNDS, which require detention facilities to permit legal
visitation seven days a week.[298]  Defendants may not properly choose a facility that is unfit for a
particular purpose and then use the inadequacies of the facility as a justification to deprive detainees
of meaningful, confidential access to legal counsel to the extent demanded by the Constitution.  And
while a short-term deprivation of in-person legal *visitation* in some instances may not violate the
Constitution,[299] the record demonstrates that this deprivation is *not* brief for many 26 Fed detainees.

---

[297]

       *Id*. at 89–90.

[298]

       *See* Dkt 11-2.

[299]

       Defendants cite *Lyon v. ICE* 171 F. Supp. 3d 961 (N.D. Cal. 2016) for the proposition that
"[i]person visits with attorneys are not a constitutional requirement when other means of
communication are available." *See* Dkt 73 at 16. But this conclusion is not supported by
*Lyon*.  In *Lyon*, the plaintiffs challenged restrictions on telephone communications at the
facilities where they were detained.  They alleged that the remote location of detention
centers rendered visitation impractical, making telephone access even more critical.  This is

A significant number are held at 26 Fed for many days and, in some cases, weeks. And, as discussed, the conditions and limitations at 26 Fed not only delay critical legal advice to which aliens have a statutory and constitutional rights, they in some instances may completely deprive a detainee of the ability to obtain timely legal advice prior to removal, particularly where the detainee is shipped rapidly from one state to another and ultimately removed swiftly from the United States.[300]

Nor have defendants identified a legitimate government interest justifying the severe restrictions placed on phone communication.  Prior to the Court's TRO, detainees at 26 Fed had access only to irregular, brief, and non-confidential phone calls.  Because many detainees lacked access to their attorneys' phone numbers and attorneys could not identify their clients' locations or schedule calls with them, these circumstances in many cases effectively prevented detainees from obtaining appropriate, timely, and confidential legal assistance.  As noted, this can have irreversible consequences for detainees.

There are feasible alternatives to this situation that would minimize the burden on detainees' First and Fifth Amendment rights.  One such alternative includes free access to unmonitored, temporally unrestricted phone calls and the ability for detainees and legal counsel to schedule calls — an option defendants claim to have offered prior to this Court's TRO but, as demonstrated by the record, did not implement in practice.

---

quite a bit different than defendants' argument.  Defendants argue that the layout of 26 Fed — a facility they choose to use for longer term detention in violation of their own standards — makes legal visitation impractical and therefore justifies depriving detainees of visitation and confidential attorney call rooms.

[300]    *See e.g.,* Dkt 14 at ¶¶ 23–32.

Because the restrictions on attorney-client communication are excessive in the absence of any legitimate justification and there are alternatives ready available, Plaintiff has shown a clear and substantial likelihood of success on his claim that these restrictions violate his and putative class members' First and Fifth Amendment rights.[301]

## VI.    The Balance of Equities and Public Interest

"The final inquiry in [the] preliminary injunction analysis requires [the Court] to consider whether the balance of equities tips in favor of granting the injunction and whether that injunction is in the public interest."[302] "Where, as here, the government is a party to the suit, the final two factors merge."[303]

Defendants contend that separation of powers and institutional competence principles require judicial restraint in matters of detention management and that the relief plaintiff seeks

---

[301]    *See e.g.*, *Vasquez Perdomo v. Noem*, No. 2:25-CV-05605-MEMF-SP, 2025 WL 1915964, at *12 (C.D. Cal. July 11, 2025) (finding likelihood of success on Fifth Amendment claim where immigration detainees alleged near total prohibition on attorney access); *Torres v. U.S. Department of Homeland Security*, 411 F. Supp. 3d 1036 (C.D. Cal. Oct. 24, 2019) (finding class of immigration detainees had adequately alleged First and Fifth Amendment violation where contact with counsel was subject to significant restrictions in terms of timing, duration, access to confidential space, and promptness); *Southern Poverty Law Center v. U.S. Department of Homeland Security*, No. 18-cv-760 (CKK) 2020 WL 3265533, at *29 (D.D.C. June 17, 2020) (finding that plaintiffs were likely to succeed on their due process conditions of confinement claim where "conditions and restrictions on remote legal visits and communications through VTCs, legal calls, and document exchanges, taken together, [were] excessive in relation to [the proposed justifications], as COVID-19 [made] in-person legal visitation no longer viable or safe.").

[302]    *See New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020).

[303]    *See id.* at 58–59.

improperly would entangle the Court in operational decisions at 26 Fed, potentially "harm[ing] Defendant's ability to effectively manage its operations" and "creat[ing] immense logistical difficulties."[304]

While defendants are correct that courts often should defer to executive judgments in detention administration, deference is not permissible in the face of continuing constitutional violations.[305] For example, while it may be convenient to permit law enforcement to beat confessions out of suspects, our nation does not tolerate and our courts do not defer to such executive judgments for a simple reason. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights"[306] and, however inconvenient compliance may be, the government suffers no harm from an injunction that merely ends unconstitutional practices or ensures that constitutional standards are implemented.[307] This perhaps is especially so here, where any claimed operational burden on defendants would be self-inflicted.

Defendants have chosen to use the 26 Fed as a *de facto* medium term detention facility while failing to comply with the Constitution and their own nationwide standards governing detention facilities. The logistical difficulties defendants invoke flow from that their own decisions to place the volume of arrests above their duty to adhere to the law in the treatment of those arrested. They

---

[304]

Dkt. 57 at 15–16.

[305]

*See Turner v. Safley*, 482 U.S. 78, 84–85 (1987) (balancing judicial restraint with the need to protect constitutional rights).

[306]

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

[307]

*See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

may not bootstrap the consequences of ignoring the Constitution and their own standards into a cognizable harm that outweighs ongoing constitutional injury.

The Court's preliminary injunction will not prevent defendants from pursuing the policies they have set. It merely will require that they conform to the demands of the Constitution in doing so. It is up to defendants to choose whether they wish to expend resources to conform 26 Fed to those requirements, or to alter the rate at which they are funneling arrestees into 26 Fed and other facilities, or to select or obtain facilities where detainees can be held in a humane and constitutional manner.

Here, plaintiff has demonstrated clear and imminent irreparable harm in the absence of a preliminary injunction and a likelihood of success on the merits of his First and Fifth Amendment claims arising from the substandard conditions and barriers to attorney-client communication at 26 Fed. Because the injunction would halt ongoing constitutional injuries while merely requiring adherence to standards defendants have already adopted for their immigration detention facilities across the country, the balance of the equities and the public interest decisively favor plaintiff.

VII.     Bond

Finally, the government contends that no preliminary injunction should issue unless plaintiff is required to post a bond.

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[308]   Nevertheless, "[t]he phrase 'in such sum as the court deems proper' vests the district court with wide discretion in the matter of security,"[309] and it may dispense altogether with security in a proper case.[310]   Moreover, "[t]he party against whom a preliminary injunction is sought has the burden of establishing the amount of a bond necessary to secure against the wrongful issuance of the injunction."[311]

Here, the government made only *pro forma* references to the to security.[312]   It made no effort to quantify the security desired nor the damages, if any, that it might sustain if relief were wrongly granted.   Accordingly, the Court conditions the continuation of the preliminary injunction on the post of a bond or other security in the amount of ten dollars.

### Conclusion

The foregoing constitute the Court's findings of fact and conclusions of law. Plaintiff's motion for a preliminary injunction (Dkt 9) is granted to the extent hereafter set forth.

Accordingly,

---

[308]   *See* Fed. R. Civ. P. 65(c).

[309]   *Elite Licensing, Inc. v. Thomas Plastics, Inc.,* 250 F. Supp.2d 372, 391 (S.D.N.Y. 2003).

[310]   13 MOORE'S FEDERAL PRACTICE ¶ 65.52; FEDERAL PRACTICE AND PROCEDURE § 2954.

[311]   *Really Good Stuff, LLC v. BAP Investors, L.C.,* No. 19 Civ. 2213 (LLS), 2019 WL 6716447, at *1 (S.D.N.Y. Dec. 10, 2019); *Elite Licensing, Inc.,* 250 F. Supp.2d at 391.

[312]   Dkt 57 at 16; Dkt 73 at 19.

1.    Plaintiff's motion for a preliminary injunction (Dkt 9) is granted to the extent set forth in the Preliminary Injunction filed today.  It is otherwise denied.

2.    Plaintiff's motion for class certification (Dkt 34), filed herein on August 8, 2025, is hereby granted to the extent that the class defined herein is provisionally certified pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

SO ORDERED.

Dated:          September 17, 2025
Issued at:      9:52 a.m.

_____
Lewis A. Kaplan
United States District Judge