UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SERGIO ALBERTO BARCO MERCADO, on his own behalf and on behalf of others similarly situated,

Plaintiff,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, in his official capacity, et al.,

Defendants.

25 Civ. 6568 (LAK)

## PLAINTIFFS' BENCH TRIAL MEMORANDUM

**TABLE OF CONTENTS**

I.      Introduction......................................................................................................... 1

II.     Background ......................................................................................................... 2

III.    Various Government-Created Factors Significantly Changed
        How 26 Fed Is Used to Detain Immigrants, Causing Unconstitutional
        Conditions of Confinement Through the Summer............................................... 3

        A.      The Number of Detained People Skyrocketed in May 2025 and
                Stayed High Until This Case Was Filed………………………………………...3

        B.      Individuals Were Held at 26 Fed for Numerous Days and
                Sometimes Weeks………………………………………………………………8

        C.      ICE Was and Continues To Be Given Nearly Unlimited
                Discretion to Hold Individuals Past 72 Hours at the
                Temporary Hold Rooms……………………………………………………….10

        D.      The Overcrowding and Extended Detentions Were Foreseeable
                and Caused By Defendants' Own Policies and Practices………………………...11

        E.      Other Conditions of Confinement Were Inhumane and Unconstitutional……….13

                1.   Detained Individuals Could Not Sleep, and It Was Frequently Cold………..13

                2.   Meals Were Small, Inedible, and Provided Only Twice Per Day……………14

                3.   Detained Individuals Could Not Shower or Clean Their Bodies or
                     Hands and Conditions Were Extremely Unsanitary…………………………15

                4.   There Was Inadequate Toilet Privacy……………………………………..17

                5.   Individuals Were Not Able to Ask for Items to Meet their Needs …………..18

        F.      People Were Detained with Serious Medical Needs and Not Provided
                with Adequate Care…………………………………………………………………19

        G.      ICE Officials and Staff Acknowledged Persistent Understaffing and
                Unsafe Conditions…………………………………………………………………..22

        H.      Guards Were Rude, Violent, and Cruel to Detained Individuals………………...23

I.      Defendants Denied Detained Individuals Confidential Legal Calls, and Attorneys Had Difficulty Finding and Accessing their Clients……………...23

      1.  Calls Were Not Regularly Provided……………………………………………….23

      2.  There Was No Privacy or Confidentiality for Calls………………………….24

      3.  Attorneys – Along with ICE Staff – Had Trouble Locating Clients…………26

      4.  Boilerplate Responses to Attorney Call Requests Further Obfuscated Clients' Location and Made Setting Up Calls Difficult……………………...26

      5.  Attorneys Who Requested Calls Were Ignored, Delayed, or Denied………..27

J.      Detained Individuals Were Deeply Harmed by Their Detentions at 26 Fed……..28

K.      Conditions at 26 Fed Were Worse Than at Other Facilities, Including Criminal Detention Facilities……………………………………………………….30

L.      Defendants Did Not or Could Not Reduce Crowding at the Hold Rooms Until This Court's Orders……………………………………………………………...30

IV.      Defendants Repeatedly Have Violated the Court's Orders and Have Withheld and Obfuscated Evidence of Violations……………………………………………………32

A.      Defendants Have Withheld and Obfuscated Evidence of Violations…………….32

B.      Defendants Further Violated the Court's Orders By Holding People on the 5th and 9th Floors Without Complying With the Court's Orders………...34

C.      Defendants Have Violated the Court's Orders in Other Ways, Including By Not Providing Confidential Legal Calls, Notices of Rights, or Health Care Services ……………………………………………………………………36

V.      Without Additional Court Intervention, the Conditions That Gave Rise to This Case Will Resume and Continue ………………………………………………………...40

VI.      Conclusion……………………………………………………………………………41

## I.      Introduction

Plaintiff Sergio Alberto Barco Mercado and the provisionally certified class ("Plaintiffs") filed this case on August 8, 2025, to address the unconstitutional and inhumane conditions of confinement and lack of confidential attorney access at 26 Federal Plaza in Manhattan ("26 Fed") that arose over the summer of 2025.  Plaintiffs expect that the evidence at trial, including testimony from people who experienced conditions at 26 Fed and ten ICE employees and agents, along with ICE emails, text messages, records, and data, will confirm Plaintiffs' allegations strikingly and comprehensively.  Defendants' evidence shows that, prior to this Court's intervention following Plaintiffs' lawsuit, individuals were held at the facility over the summer for days and sometimes weeks at a time, in extremely crowded conditions, with routinely over 100 and often over 150 individuals being held at the same time across the four small holding cells.

The evidence – largely from Defendants' communications and testimony – makes clear that the detained individuals did not have beds, showers, or confidential communications with attorneys; that they generally only received two small meals per day; that there were frequent medical emergencies and insufficient medical care, including for individuals with serious medical needs; and that there was insufficient staffing, causing what ICE officials themselves called an "unsafe environment" at the facility.  ICE officials further confirmed that this crisis was a predictable and foreseeable consequence of the Trump administration's sharp increase in immigration arrests in May 2025, combined with its policy change in February 2025 regarding discretionary release and insufficient bed space availability at other ICE detention facilities.  In other words, this crisis was of Defendants' own making.

After this Court issued a Temporary Restraining Order on August 12, 2025 and a Preliminary Injunction on September 17, 2025 (ECF Nos. 65 and 97) (together, the "Court's Orders") the number of individuals being held at 26 Fed dropped quickly and conditions improved significantly.  Yet substantial evidence shows that in the ensuing months, Defendants consistently violated the Court's Orders, exceeding the capacity limitations on a frequent basis and withholding and obfuscating evidence of such violations throughout discovery.  Defendants did not even attempt to provide detained individuals with confidential attorney calls, as required by the Court's Orders, until Plaintiffs demanded that they provide a private room as a condition of settling their motion for contempt and sanctions.  And for months, Defendants held individuals on the 9th floor in an apparent attempt to circumvent the Court's Orders, despite the fact that they explicitly apply to any space in the building where immigrants are held.  In a striking example of Defendants' cavalier approach to the Court's Orders, Deputy Field Officer Director William Joyce, the ICE official in charge of ensuring compliance with this Court's Orders, first stated in his February 3, 2026 deposition that he did not believe the Court's Orders applied to the 9th floor at all, despite its plain language, and then stated remarkably in his April 22, 2026 deposition that he had not realized until that deposition that there were limits to how many individuals could be held in each holding cell at 26 Fed, including in the main 10th floor hold rooms.

The Court found on September 17, 2025 that Plaintiffs were likely to succeed on their First and Fifth Amendment claims; the evidence Plaintiffs will submit at trial unequivocally

1

proves those claims. Defendants in fact do not appear to dispute the vast majority of Plaintiffs' allegations; their defense appears to boil down to arguments that they have complied at particular snapshots of time and even then, only in some certain ways with the Court's Orders.

This trial memo is being offered to provide, to the extent the Court finds it useful, an overview and organization of the evidence Plaintiffs are offering at trial. All of the evidence cited in this memorandum has not been objected to by Defendants pursuant to the Proposed Joint Pretrial Order, ECF No. 159 ("JPTO"), at 2, unless otherwise noted.

Plaintiffs reserve for post-trial briefing their full analysis of the relevant law and application of the trial evidence to that law. This legal analysis will show that the legal basis for the Court's preliminary injunction has only strengthened in the intervening months. Other courts have found virtually identical conditions in other hold rooms around the country unconstitutional. *E.g.*, *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084 (N.D. Cal. 2025); *D.N.N. v. Liggins*, No. 1:25 Civ. 01613 (JRR), 2026 WL 632371 (D. Md. Mar. 6, 2026); *Advocs. for Hum. Rts. v. DHS*, No. 26 Civ. 749 (NEB)(DLM), 2026 WL 850270 (D. Minn. Mar. 26, 2026); *Moreno Gonzalez v. Noem*, No. 25 Civ. 13323, 2025 WL 3170784, at *1 (N.D. Ill. Nov. 5, 2025). Other courts have recently recognized similar access to counsel issues at makeshift tent facilities and elsewhere in ICE's network. *H.C.R. v. Mullin*, No. 2:25 Civ. 747 (SPC)(DNF), 2026 WL 850555, at *23 (M.D. Fla. Mar. 27, 2026) ("It bears repeating: 'Defendants may not properly choose a facility that is unfit for a particular purpose and then use the inadequacies of the facility as a justification to deprive detainees of meaningful, confidential access to legal counsel to the extent demanded by the Constitution.'") (quoting *Barco Mercado v. Noem*, 800 F. Supp. 3d 526, 577 (S.D.N.Y. 2025)); *Gomez Ruiz v. U.S. Immigr. & Customs Enf't*, No. 3:25-CV-09757-MMC, 2026 WL 851980, at *7 (N.D. Cal. Mar. 27, 2026). Other recent opinions underscore the improper punitive, retaliatory, and deterrent intent underlying Defendants' choices of inappropriate locations for detention. *E.g.*, *D.N.N.*, 2026 WL 632371 at *33 ("Defendants' own press releases and statements suggest the complained-of conditions [in a hold room] are intended to be punitive . . . ."); *Luna Gutierrez v. Noem*, 811 F. Supp. 3d 133, 172 (D.D.C. 2025) ("[T]he Court sees unusually strong direct evidence that the Defendants chose to detain some noncitizens at Guantanamo for the express purpose of retaliating against them and deterring others' conduct. But . . . retribution and deterrence are not legitimate nonpunitive governmental objectives.") (quotation marks and citation omitted).

## II.    Background

The 10th Floor hold rooms at 26 Fed were designed for temporary, short-term use, specifically to hold people for *less than* twelve hours. *See* PX80, Defendants' Responses and Objections to Plaintiffs' First Requests to Admit ("Defs. RTA Responses"), Response No. 1 ("admit that the Hold Rooms were intended to hold individuals for 12 hours or less."); PX77, Declaration of former Assistant Field Office Director Nancy Zanello ("Zanello Decl."), ECF No. 58, August 11, 2025, ¶ 4 ("The ICE hold rooms at the 26 Federal Plaza ERO are primarily used for the short-term confinement of aliens while they await transfer to other ICE detention facilities, immigration court hearings, removal, or other processing."); PX329, Deposition of

Nancy Zanello, dated Apr. 17, 2026 ("Zanello Tr.")[1], 123:3-12 (acknowledging that the hold rooms are "short-term" and not designed or equipped for long-term detention); *see also* PX326, Second Deposition of Deputy Field Office Director William Joyce, dated Apr. 22, 2026 ("Joyce Sec. Tr. "), 312:17-25.  As summarized in an email written by Joyce and sent by Defendant Field Office Director LaDeon Francis on July 15, 2025, the hold rooms were "originally intended and constructed – for the short-term detention for a handful of aliens for processing only for under a 12-hour period."  PX 9, ICE 14164.

There are four holding cells on the 10th floor.  In accordance with their intended purpose of holding "a handful" of immigrants for under 12 hours, *id.*, they are small:  according to Defendants' own calculations, the largest one is approximately 820.78 square feet; the second largest one is 655.12 square feet; and the two smallest cells are 173.04 square feet and 173.87 square feet.  *See* Zanello Decl., ¶ 3 (providing these calculations); PX163, ICE 19395 (floor plans of the 10th floor, containing these numbers); *cf.* PX162, ICE 19354–55 (floor plans providing smaller square footage numbers for the cells: 557 square feet, 407 square feet, 121 square feet, and 125 square feet).  The holding cells are bare cells with hard floors, concrete benches, and between one and three toilets behind a half wall.  *See e.g.*, PX301 (photographs of the cells), P344, P350, P353, P366, P368, P389, P398, P471, P476, P495, P507, P516, P575, P632.  In accordance with their short-term design, they do not have beds or showers.  *See* JPTO, Stipulated Facts #2, 4.

## III.    Various Government-Created Factors Significantly Changed How 26 Fed Is Used to Detain Immigrants, Causing Unconstitutional Conditions of Confinement Through the Summer

### A.    The Number of Detained People Skyrocketed in May 2025 and Stayed High Until This Case Was Filed

In May 2025, a number of decisions by the Trump administration caused a dramatic and predictable shift in how the holding cells on the 10th floor of 26 Fed were used.  First, in February 2025, ICE officials "were advised that discretionary releases would need to be reviewed by the ICE director."  Joyce Sec. Tr., 316:18-22.  As a result, while ICE officials "could make the recommendation that [immigrants] be released, [they] couldn't act upon it without approval."  *Id.* at 316:22-24; *see also* PX104, ICE 18560–61 (Joyce writing in a February 20, 2025 memo:  "ERO NYC, as with every AOR, no longer has the option to discretionarily release aliens, nor decline to take aliens into custody from our counterparts in HSI or CBP").[2]  Then, on

---

[1] While we have not incorporated Defendants' witness statements into this memo, an initial review indicates that large portions of their direct testimony corroborate the evidence herein.  For example, several of Defendants' witnesses testify about how crowded the hold rooms were over the summer. *See, e.g.*, Direct Testimony of Lige Hampton, ¶ 14 (testifying that there were more than one hundred detained individuals on days in July and early August 2025 and that he "was concerned that the 10th Floor Hold Rooms were overcrowded."); Direct Testimony of Mitchell Hutson, ¶ 7 ("At that time, in my opinion, the 10th Floor Hold Rooms were overcrowded."); Direct Testimony of Robert Mitchell, ¶ 7 (same).  We will incorporate citations to these statements in our post-trial briefing.

[2] *See also* American Immigration Council, "Immigration Detention Expansion in Trump's Second Term" (Jan. 14, 2026), *available at* https://www.americanimmigrationcouncil.org/report/immigration-detention/.

May 21, 2025, the Trump administration issued an order imposing a quota of 3,000 immigration arrests per day.[3]  This directive led to an increase in arrests, including in New York City.  *See* Joyce Sec. Tr., 326:16–327:19.  This combination of factors – elimination of discretionary release and increase in arrests in the New York City area, without a corresponding increase in bedspace at other facilities – caused a bottleneck at 26 Fed, where "people were coming into custody faster than [ICE] could find places to put them."  *Id.* at 327:22–328:2; *see also id.*, 298:3-4 ("Nationwide population skyrocketed.  We had no place to put people.  So here we are.").

According to Defendants' own records, the number of individuals held at one time at 26 Fed rose from single digits in the beginning of May, to more than 70 individuals by the end of May.  *See* PX86, ICE-B-202–ICE-B-221 (May contractor logbook, reflecting this increase).[4]

The numbers continued to rise in June and through the summer.  From June through the date this case was filed, the number of individuals held at the same time on the 10th floor of 26 Fed was very frequently over 100, and on many occasions was well over 150.  *See* PX87, ICE-B-171–ICE-B-201 (June contractor logbook, containing a running, real-time count of individuals held at the facility); PX313, ICE-B-855–858, and PX314, ICE-B-859–900 (rescans of certain June logbook pages that were initially cut off); PX88, ICE-B-133–170 (July contractor logbook); PX315, ICE-B-774–809, and PX316, ICE-B-810–854 (rescans of certain July contractor logbook pages); PX89, ICE-B-103–112 (August contractor logbook pages through August 8); PX317, ICE-B-668–ICE-B-688 (rescans for first portion of August).  *See also* PX85, ICE 23114 ("PX85") (ICE's database of everyone who was booked in and out of 26 Fed from their digital processing system).

According to Defendants' data in PX85, as summarized by Plaintiffs' counsel's paralegal Caroline Asnes, the number peaked at 193 individuals on July 3, 2025.  *See* PX303, Witness Statement of Caroline Asnes, dated May 15, 2026 ("Asnes Statement"), ¶ 40.[5]  From May 29 to

---

("On January 20, President Trump ordered that ICE maximize its use of detention. Within weeks, ICE stopped issuing discretionary releases, requiring immigrants held in detention centers to petition immigration judges for release on bond. From January through November 29, discretionary releases from detention fell by 87 percent.").  *See also* "Protecting the American People Against Invasion," Exec. Order No. 14159, 90 Fed. Reg. 8,443 (Jan. 20, 2025) ("The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.").

[3] *See* this Court's September 17 Opinion in this case, ECF No. 96 at 2–3, n.3 (citing Hamed Aleaziz, *Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests*, N.Y. Times (June 11, 2025), *available at* https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html*; Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily,* Fox News (May 29, 2025), *available at* https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day.).

[4] These logbooks were kept by the contractors who staffed the desk and provided for the basic needs of detained individuals at 26 Fed; they were employed by Paragon.  Mitchell Tr. 82:18–84:5; 99:8–100:4 (contractors had duty to maintain logbooks as accurately as possible).

[5] Defendants have objected to Ms. Asnes's statement as hearsay and have preserved additional objections. Plaintiffs submit that Ms. Asnes's summaries of Defendants' data are admissible as Summaries to Prove

August 12, 2025 (the date this Court issued the Temporary Restraining Order), the average maximum daily population at the 10th floor hold rooms (in other words, the average of the population high points from each day) was 115.9 people. *See* Asnes Statement, ¶¶ 18–22. The average maximum daily population was 152.6 people between June 29 and July 5, 2025 and 136.3 people between July 13 and July 19, 2025. *Id.* ¶ 23.

Defendants and their employees and contractors who routinely staff the 10th floor area testified that there was serious overcrowding prior to the Court's Orders. *See* PX322, Deposition of Supervisory Detention and Deportation Officer Lige Hampton, dated Apr. 13, 2026 ("Hampton Tr."), 116:21–119:22 (stating that from July to September 2025, he was "concerned about the number of people being held in the hold rooms" and "the safety of everyone there"); *id,.* 121:24–122:11 (testifying that he considered "the numbers to be too high"); *id.*, 115:6-19 (Hampton raised crowding concerns with "upper management," including Zanello); Joyce Sec. Tr., 363:20-25 (describing the hold rooms as "not quite as crowded as a subway car, but certainly more people than – than we would prefer to have in there"); PX323, Deposition of Contractor Mitchell Hutson, dated Apr. 20, 2026 ("Hutson Tr."), 87:7-8 ("Was it overcrowded?" "Yes."); Hutson Tr., 100:18-25 (Q: "In July and early August 2025, is it fair to say that it wasn't unusual to hit more than a hundred detainees in the hold rooms on the tenth floor? A: "I believe at that time it was a hundred or more."); PX327, Deposition of Contractor Robert Mitchell, dated Apr. 20, 2026 ("Mitchell Tr."), 143:2-3 (Q: "And it was overcrowded; correct?" A: "Yes."); *id.*, 119:14-20; 130:19-22 (acknowledging there were well over a hundred detainees); *see also id.*, 150:14-22 (detained individuals complained about crowding); Hutson Tr., 86:24-87:3 (same).

Defendants also acknowledged that it was common for staff to work double shifts and overtime during that period. *See, e.g.*, PX175, Paragon_330 (reflecting contractor Mitchell Hutson working a 13-hour shift on June 26, 2025); Paragon_332 (Hutson working a 13-hour shift on June 25, 2025); Paragon_344 (Hutson working a 12.5 hour shift on June 7, 2025); Paragon_346 (Hutson working a 13.5-hour shift on July 7, 2025); Paragon_348 (Hutson working a 13-hour shift on July 8, 2025); Paragon_370 (Hutson working a 16-hour shift on August 8, 2025); *see also* Mitchell Tr., 49:2-9 (testifying that in June and July of 2025, it was "much busier" and he sometimes worked more than one shift in a row); PX75, ICE 17997–18001 (email thread seeking Deportation Officers from other units to sign up to work overtime at the 10th floor Hold Rooms; DFOD Almodovar raised concerns about how such overtime was "creating an unsafe environment").

Individuals who were detained during that time period have also testified to the level of crowding. *See* PX320, Carlos Lopez Benitez Witness Statement ("Lopez Benitez Statement"), ¶ 11 ("I was in a room with approximately 40 or 50 people."); PX332, Ibrahima Barry Witness Statement ("Barry Statement"), ¶ 6 ("I was in a small room with approximately 50 other men. We all had to sleep on the floor, often while sitting upright, because there were too many people[.]"); PX333, Nuvia Martinez Ventura Witness Statement ("Martinez Ventura Statement"), ¶ 8 ("the holding cells were completely packed with detainees"); PX321, Daniel Quevedo Witness Statement ("Quevedo Statement"), ¶ 5 (noting he was held in a cell with about 70 men); PX336, Sergio Barco Mercado Witness Statement ("Barco Mercado Statement"), ¶ 9 ("It was

---

Content pursuant to Fed. R. Evid. 1006 and that her illustrative aids are admissible pursuant to Fed. R. Evid. 107.

extremely crowded inside the holding areas"); PX335, Roberto Daniel Chilavert Olmedo Witness Statement ("Chilavert Olmedo Statement"), ¶ 5 ("We were all kept in a very small room.  The number of people in the room ranged from 45 to upwards of 65 people every day.  The crowding made it uncomfortable and I could not sleep.  I remember sleeping upright for three days because there was no room."); PX334, Oscar Pascual Lopez Witness Statement ("Pascual Lopez Statement"), ¶ 6 ("I was in a very crowded room, which sometimes held more than 60 people.").

Prior to this Court's Orders, there was in fact *no* communicated or enforced limit on how many people could be held at the hold rooms.  *See* Hampton Tr., 94:21–95:12 (stating he was not aware of any specific limit); Hutson Tr., 87:9-13 (same); *id*, 101:12-24 (noting that he wondered about the capacity); *id.*, 102:9-19 (he never heard anyone say that they could not accept more detained people or that they were at capacity, despite there being "too many" people there); Mitchell Tr., 138:5–140:5 (no maximum was communicated to him and when he asked, "people didn't know"); PX325, First Deposition of Deputy Field Office Director William Joyce, dated Feb. 3, 2026 ("Joyce First Tr."), 212:5-8 (testifying that prior to TRO, he was not aware of any sleeping capacity limitation in the hold rooms).

When asked about capacity, Zanello, who was the most senior person on site at the Hold Rooms from early July 2025 through November 2025, Zanello Tr., 38:7-13, testified that the only limit on the number that could be held at the facility prior to this Court's Orders was the fire marshal limit of 154 people.  *See id.* at 123:13–126:8; 255:4–256:18 (explaining that she would not consider the Hold Rooms to be overcrowded as long as fewer than 154 people were detained).  When asked whether she considered the fire marshal limit of 154 to be in effect even though people were sleeping at the Hold Rooms – which she acknowledged happened over the summer – she testified, "I do not know what the criteria is [sic]."  *Id.* at 124:16–125:15.  When Zanello received a communication from General Services Administration stating that the occupant limit for the 10th floor was 154 occupants for "[l]ess than 12 [h]ours" and *11 occupants* "per NFPA 101 (if held for more than 24 hours)," she sent that communication to Kathleen Sweeney and wrote, "This is what we received from gsa.  This can't be correct.  The fire marshal provides the number per cell . . . without time limits, not this weird email below."  PX70, ICE 16616.  It is not clear why she thought that the fire marshal number is "without time limits."  *See also* Zanello Tr., at 231:9-17 (discussing PX70); PX109, ICE 25462 (what appears to be the original email from GSA on August 11, 2025 with this information).  In contrast, Joyce testified that it was "fair to say" that "there's a difference between the number of people who can physically fit in a space and the number of people who can be held there over a period of days." Joyce Sec. Tr., 335:23–336:13.[6]  In any event, the number of individuals detained at the hold rooms exceeded even the fire marshal limit on a number of occasions over the summer of 2025. *See, e.g.*, PX315, ICE B 775, 780–82; PX316, ICE B 854; PX317, ICE B 668; PX314, ICE B 890–92.

---

[6] This Court in its September 17 Order of course acknowledged this critical distinction between a fire-safety occupancy load and the number of individuals that can be held safely in a facility where they are staying overnight.  *See* ECF No. 96, at 28, n.108 (citing 9 NYCRR §§ 7040.4(a), 7040.5(a), 40 Rules of the City of N.Y. § 1-04(C)(2)(2025); *id.* § 1-04(c)(5)(i)–(ii)(2025), all of which impose limits of 50 or 60 square feet per detained person).

To aid in the visualization of how crowded it was in the hold rooms over that period, Plaintiffs have used the evidence of the data provided by Defendants, PX85, and prepared illustrative aids to show how crowded it would have been at the peak summer level of detention (193 individuals), and how crowded it would have been at the average most crowded point of the day for the entire period from May 29 to August 12, 2025 (116 individuals). *See* Asnes Statement, ¶ 39–40 & Exhibit 1 (explaining basis for dimensions of each representative body within the dimensions of the holding cell space).

For example, this illustration shows how crowded the largest hold room would have been with 193 individuals:



Asnes Statement, Exhibit 1, at 1.  And this illustration shows how crowded that hold room would have been with 116 individuals – the average daily maximum during the entire period from May 29 to August 12, 2025:

7



Asnes Statement, Exhibit 1, at 9.

### B.    Individuals Were Held at 26 Fed for Numerous Days and Sometimes Weeks

As the number of individuals being held at the hold rooms increased, so did the length of time for which people were detained at 26 Fed.  Despite the fact that the hold rooms were designed to hold people for 12 hours or less, between May 29 and August 12, 2025, only 17.71% of people held at 26 Fed were held for less than 12 hours.  *See* Asnes Statement, ¶ 35.

In contrast, 2,695 people were held at 26 Fed for 12 or more hours between May 29 and August 12, 2025, compromising 82.29% of the people held at 26 Fed during that period.  During the same time frame, 2,123 people, or 64.82% of people detained, were held for 24 or more hours; 1,401 people, or 42.78% of people detained, were held for 48 or more hours; 828 people, or 25.28% of people detained, were held for 72 or more hours; 282 people, or 8.61% of people detained, were held for 120 or more hours; 157, or 4.79% of people detained were held for 144 or more hours; and 83 people, or 2.53% of people detained, were held for 168 or more hours (seven days).  Asnes Statement, ¶ 35.

These statistics in fact significantly understate the length of time that people were held at 26 Fed.  Defendants' data, PX85, only reflect the time individuals spent in detention after having an opportunity to sit with a detention officer at a computer, being asked a long series of questions, and being processed and "booked in" to Defendants' EADM/EARM system.  The

8

"book in" notation in Defendants' data therefore reflects a time several hours *after* an individual actually arrived at the facility, particularly if that person arrived in a large group.[7]

In response to Plaintiffs' Requests to Admit, Defendants admit that since May 21, 2025, more than 500 individuals have been detained at 26 Fed for over 72 hours, dozens have been detained for more than seven days, and some have been detained for longer than 20 days and in at least one case longer than 30 days. PX80, Defs. RTA Responses, Response Nos. 23, 25, 28, 29. But Defendants' own data reveal that, in fact, the numbers are much larger: Between May 29, 2025 and March 9, 2026, 944 people have been detained for 72 hours or longer, 327 people have been detained for 120 hours or longer (give days), and 96 people have been detained for 168 hours or longer (seven days). *See* Asnes Statement, ¶¶ 35–36.

As just one snapshot example, when Defendants were preparing a declaration in opposition to the motion for a Temporary Restraining Order in this case on August 11, 2025, their internal communications reflected that there were six people at the hold rooms who had been there for more than 72 hours. *See* PX8, ICE 14116. Several of Plaintiffs' witnesses likewise were held for well over 72 hours. *See* Martinez Ventura Statement, ¶ 7 (held for five days in June 2025); Quevedo Statement, ¶ 5 (held for at least five days from June to July 2025); PX337, Carlos Chalco Witness Statement ("Chalco Statement"), ¶ 8 (held for four days in November 2025, after the Court's Orders).

---

[7] *See* Hampton Tr., 247:5–248:12 (explaining that booking in happens at the end of processing); *id.*, 257:11-17 (Q: "And were there times prior to this case being filed where there were significant delays before people could be processed because of the number of people who were there?" A: "Possibly. Whatever it was, it was -- it was too long for my comfort."); Zanello Tr., 53:10-23; 82:14–83:11; 133:19–134:3 (explaining the processing and booking-in system); Joyce Sec. Tr. 416:11-418:11 (noting that the average case takes between an hour and a half to four hours to process, but that some cases take longer); PX321, Deposition of Deportation Officer John Carbone, dated Jan. 30. 2026 ("Carbone Tr."), 57:19-24 (processing takes between one and three hours); PX321, Deposition of Deportation Officer Christopher Chiauzzi, dated Jan. 28, 2026 ("Chiauzzi Tr."), 68:5-12 (processing an individual could take up to three hours). *See also* PX106, ICE 13156 (September 7, 2025 email in which Joyce notes, "[w]e all know that bodies may not be processed immediately, and that's fine, we have 48 hours from arrest to charge them."); PX319, Deposition of Assistant Field Office Director Carla Calidonio, dated Apr. 21, 2026 ("Calidonio Tr."), 122:12–123:14 (difficult to know how many people are on the tenth floor at a given time because some may not have been processed).

A spot check comparison of the contractors' logs, which according to contractor testimony, *e.g.*, Mitchell Tr., 83:16-21, reflect the time someone *actually* arrives at the hold rooms, with the data spreadsheet Defendants produced based on their computer system and which Plaintiffs used to calculate statistics regarding crowding and length of stay, PX85, demonstrates that there are often significantly longer delays between arrival and processing. For example, Joselyn Chipantiza-Sisalema, a declarant in Plaintiffs' initial TRO Motion, is noted in the contractor logbook as arriving at the Hold Rooms at 11:05 a.m. on June 24, 2025, but is not listed as booked-in on the ICE spreadsheet until June 25, 2025 at 2:16 p.m., 27 hours later. *Compare* PX 87, ICE B 192, with PX85. Discrepancies in the count appear to have been common. Carla Calidonio, who was in charge of arranging movements out of 26 Fed over the summer, wrote on June 12, 2025 to Joanna Delgado: "It's impossible for us to keep track [of the number of detained individuals] with all the movements." PX93, ICE 29840.

Just as no guidance was provided by ICE regarding any maximum number of individuals who could be held at 26 Fed, there was also no communicated maximum limit on how long individuals could be held. *See* Hampton Tr., 63:11-18; Zanello Tr., 144:21–145:3; Mitchell Tr., 145:5-15; Joyce Sec. Tr., 408:8-13; Calidonio Tr., 166:20-23.

### C.    ICE Was and Continues To Be Given Nearly Unlimited Discretion to Hold Individuals Past 72 Hours at the Temporary Hold Rooms

While ICE issued a "72-hour waiver" on June 24, 2025, which extended the time that individuals could be detained in temporary holding facilities from 12 to 72 hours, even that waiver permitted longer detention in "exceptional circumstances." *See* PX152, P300–01. Internal guidance made clear that "exceptional circumstances" was a sweeping and vague standard, and included circumstances of Defendants' own making that persisted throughout the entire summer, such as a consistent increase in arrests and a shortage of available bedspace. *See* Hampton Tr., 59:21–61:22 (when asked about circumstances that justified holding someone longer than 72 hours, stating "[t]he lack of detention placement" and that "[b]ed space wasn't able to be acquired with the number of arrests we were having at that time"); PX50, ICE 10980 (draft post orders, listing "examples" of exceptional circumstances that justify holding someone past 72 hours, which "may include but are not limited to: pending placement requests, intake bedspace issues, the release would put the alien at risk of harm, it would be inhumane to release the alien, it would be not in the best interest of ERO, or policy specifically prohibits the release of a subject during specific times/conditions"); Joyce Sec. Tr., 326:7–328:6 (Q: "So the increase in immigration arrests in the New York City area constituted exceptional circumstances?" . . . A: "I would say caused exceptional circumstances. The – you know, it's simply a function of if we have people in custody and no place to put them, that's an exceptional circumstance." Q: Right. And the reason that you had people in custody, people were coming into custody faster than you could find places to put them, was caused in part by the increase in arrests, which was in part caused by the [Trump administration's] quota. Is that fair?" A: "I would say that's fair."); *id.*, 475:13-17 (Q: "So the impetus for the [72-hour] waiver . . . was the challenge of more people being detained and held for longer periods of time; right?" A: "Yes, Without a concomitant rise in bed space availability."). Joyce testified that in July 2025 through August 8, 2025, it was "fair to say that there were frequently exceptional circumstances in play for the people being detained at 26 Fed." *Id.*, 333:12-20.

When Zanello was asked in her deposition about her statement in her August 11, 2025 Declaration that "[t]he majority of aliens in custody at the 26 Federal Plaza ERO Field Office are transported to other ICE facilities within 72 hours absent exceptional circumstances," Zanello Decl. ¶ 5 – a statement that the Court observed in its Preliminary Injunction Opinion was both in the present tense and ambiguous at best because it is not clear whether Zanello's "majority" statistic includes or excludes those for whom exceptional circumstances are present, ECF No. 96 ("PI Opinion"), at 29–30 – she changed her answer multiple times. *See* Zanello Tr., 105:22-115:6 (Q: "Taking everyone held, whether or not there are exceptional circumstances, are the majority of people in custody transferred out within 72 hours?" A: "Yes." . . . Q: "[S]o from July . . . 7th to August 8, 2025, is it your testimony that the majority of immigrants held in the 10th floor hold rooms were transferred out within 72 hours?" A: "Absent exceptional circumstances,

yes." . . . Q: "I'm asking you taking the whole group of people that are being held, . . . – from July 7th to August 8th, were the majority transferred out within 72 hours?" . . . A: "The request was made, I would have to look at the cases for that day. I don't know.").

It bears noting that the 72-hour waiver was issued in response to a self-made crisis, not because any changes had been made to the hold rooms to equip them to hold individuals in a safe or humane way. Notably, Sara Clark, an architect who has designed temporary holding facilities for ICE, wrote on February 19, 2025 in response to an email about potential construction at 26 Fed: "I assume that if 26 Fed did 72 hour holds, we would need bunks, showers, and more robust food service." PX112, at ICE 20008; Joyce Sec. Tr., 475:25–476:12; 476:22-25; 479:7-18 (describing Clark's past work). To make matters worse, while prior to June 24, 2025, any instance of holding someone over *twelve* hours required requesting and obtaining a waiver; after June 24, 2025, not only could people be detained beyond 72 hours if any "exceptional circumstance" existed, but there was no longer any requirement to request permission, report, or even document a hold longer than 72 hours. *See* Zanello Tr., 145:15-23; Joyce Sec. Tr., 313:2-19 (testifying that a waiver had to be obtained to hold someone longer than 12 hours prior to June 24, 2025); *id.*, 408:14-24 (stating he did not believe there was an equivalent process for reporting violations of the 72-hour limit after June 24, 2025).

It is an understatement to say, as Field Office Director LaDeon Francis ("Francis") wrote in an email on July 15, 2025, that these changes in the summer of 2025 represented "a shift in operations of the processing area on the 10th floor, from as it was originally intended and constructed – for the short term detention for a handful of aliens for processing only, for under a 12 hour period – to a more of a 'staging area' for up to 72 hours . . . for much larger numbers of aliens." PX9, ICE 14164. The facility was being used for a completely different purpose than it was intended, in ways that caused catastrophic consequences for the individuals being held at 26 Fed.

### D.    The Overcrowding and Extended Detentions Were Foreseeable and Caused by Defendants' Own Policies and Practices

It is undisputed that the overcrowding during the summer of 2025 was a foreseeable and inevitable consequence of Defendants' own actions. As early as February 20, 2025, Joyce submitted a waiver request seeking to extend the length of time that individuals could be held at 26 Fed, writing:

> ERO NYC, as with every AOR, no longer has the option to discretionarily release aliens, nor decline to take aliens into custody from our counterparts in HSI or CBP[] rather, under current directives, must temporarily house such individuals [f]or hours or days, awaiting a determination from the acting ICE Director. As a result, ERO NYC must request detention space nationwide . . . . This process has caused significant hold-room times for some cases for ERO NYC . . . and is likely not only to continue, but to worsen.

PX104, ICE 18560–61. *See also* PX103, ICE 18559 (Joyce writing on February 20, 2025 in an email attaching the 12-hour waiver request memorandum: "I do not anticipate the confluence of

events that brought us to this juncture being alleviated or mitigated any time soon."); *id.*, ICE 18557 (Joyce writing later in the thread on February 25, 2025: "The memo details an instance wherein we needed to violate the 12 hour hold room policy, due to our inability to house or release (of our own accord) a rather sick alien – and requests that you waive the application of same. While it thankfully has not happened since, I'm pretty sure it is only a matter of time before it happens again."); Joyce Sec. Tr., 318:4-15 (discussing PX103, and stating: "[I]t was fairly easy to say if we continued at the same pace, that we were going to have people that we would've wanted to release or would've wanted to place in a bed that didn't exist"); PX105, ICE 18545 (Joyce writing on February 25, 2025: "[I]t's difficult to predict with any degree of regularity the flow of detainees in the ERO NYC environs – although, now with the change of the Administration and the resultant E.O.s, I think that it's fairly clear to see the direction that we as an Agency are to lean forward in, and that is to detain as many illegal aliens as possible – within the bounds of the law of course, and any binding settlement agreements . . . .").

On June 30, 2025, Joyce drafted an email for Francis to circulate in which he wrote, "[a] victim of our own success, ERO NYC arrests more EOIR court room cases than bedspace can be found for locally, nor processed efficiently and effectively, resulting in the main hold room / processing area at 26 Federal Plaza which was never designed for such an operation – *leading to a predictable result – overcrowding*." PX74, ICE 16985 (emphasis added). Francis proceeded to send the language that Joyce had drafted to Interim Assistant Director for Field Operations Thomas Giles. *See* PX84, ICE 19517. Francis added in his version: "While we continue to work with DOCC and our close in proximity fellow offices to get bedspace, the reality is the numbers do not go out as fast as they are coming in." *Id.*; *see also* Joyce Sec. Tr., 482:7-12, 483:18–484:16 (reiterating this sentiment). Yet these communications were sent not to call for a stop to these practices, but to ask for authority to hold people for 72 hours or longer (PX104), and to respond to pressure from higher-up ICE officials to justify immigration arrest numbers that they considered to be too low. *See* PX74, ICE 16986 ("We need to justify what we were doing yesterday, why the numbers of teams are so high, and the numbers of arrests are so low."). Nobody appeared to suggest that arrests should be slowed or stopped in light of the crisis at the hold rooms except SDDO Lige Hampton, who wrote on August 7 in response to an email from AFOD Carla Calidonio expressing concern that numbers could reach 200 people by the weekend: "Temporarily suspending court operations until Tuesday would be a suggestion. Unpopular but practical. Just throwing it out there in the universe. Lol. Hopefully we don't wait until something negative happens." PX7, ICE 13827. Calidonio wrote, "100 agree. That's why I throw the hot potato." *Id.* Yet ultimately it was not a suspension of court operations or arrests that caused the numbers to drop, but the filing of this case one day later, and the Court's Orders shortly thereafter. Hampton Tr., 121:24–122:11 (noting that the number of individuals held on the 10th floor was consistently too high until August 12); Joyce Sec. Tr., 491:9-25 (noting that while Calidonio expressed concern about numbers reaching 200 by the weekend on August 7, 2025, the day before this case was filed, "we just reviewed the - - the logs, I don't see where we approached anything close to 200. So thankfully something happened," though he did not remember that the case had been filed the following day).

### E.    Other Conditions of Confinement Were Inhumane and Unconstitutional

Predictably, an abrupt change from using a space intended for "the short term detention for a handful of aliens for processing only, for under a 12 hour period," PX9, ICE 14164, to using that same space to regularly hold over 100 individuals for several days at a time, created a number of unconstitutional conditions of confinement for the individuals being detained there.

### 1.    Detained Individuals Could Not Sleep, and It Was Frequently Cold

In Summer 2025, the conditions at the hold rooms – which were never designed or intended for overnight use – made sleeping nearly impossible.  There were no beds, bedding mats, or pillows; detained individuals slept on the hard ground.  *See* JPTO, Stipulated Facts #2–3 (no beds or bedding mats); Hampton Tr., 165:11-19 (no pillows or anything to sleep on); Joyce First Tr., 59:24–60:2 (no mats prior to Court's orders); Joyce Sec. Tr. 419:17-19 (testifying that the holding cells have hard floors).  At most, individuals report having received an aluminum heat sheet or thin blanket to cover themselves, and it was often uncomfortably cold.  *See* Lopez Benitez Statement, ¶ 14 ("It was very cold.  The guards kept the air conditioning on all the time even at night.  We only had the aluminum blanket and had to sleep on the floor so I was freezing."); Martinez Ventura Statement, ¶ 8 ("I had to sleep on the floor, which was very difficult, especially since the temperature in our cell was very cold."); Quevedo Statement, ¶ 5 ("[W]e slept on the floor.  The officers gave us aluminum-type blankets but I was freezing the entire time."); Barco Mercado Statement, ¶ 7 ("I was freezing; I was given only an aluminum blanket, but it was not enough to stay warm."); Pascual Lopez Statement, ¶ 8 ("There were no beds.  I slept on the floor with just an aluminum blanket . . . . At times it was very cold with the air conditioning.").  ICE officials corroborated that it was too cold at times.  *See* Hampton Tr., 206:23–208:3 (noting it was too cold on at least five occasions).[8]

The lights were often left on overnight, making it more difficult to sleep.  Quevedo Statement, ¶ 5 ("the lights were kept on during our entire time there"); Chilavert Olmedo Statement, ¶ 6 ("The lights were kept on at all times, including overnight, and I lost track of the days.").  Defendants testified that the lights were sometimes kept on overnight.  PX80, Defs. RTA Responses, Response No. 49; Hampton Tr., 167:13-16; 167:24–168:5.

As noted above, with dozens of individuals being held in small cells, there was often insufficient space even to lie down.  Barry Statement, ¶ 6 ("We all had to sleep on the floor, often while sitting upright, because there were too many people and no beds."); Quevedo Statement, ¶ 5 ("We were all bunched up.").  Chilavert Olmedo recalled that people sometimes slept near the toilets on the muddy floor.  Chilavert Olmedo Statement, ¶ 8 ("Sometimes people slept in [the toilet area], but the floor was muddy because people tried to wash their feet in the toilet and

---

[8] Uncomfortably cold temperatures continued after the Court's Orders.  *See* Chalco Statement, ¶ 14 (writing about his detention in November 2025:  "It was very cold.  I tried to stay beneath the aluminum blanket whenever possible but even so my arms ached from the cold."); Hampton Tr., 208:7-23 (noting it being cold in late 2025 and early 2026).  Chiauzzi Tr., 101:24–102:7 (DO who started at the Hold Rooms in August noted in January 28 deposition that detained people complained about it being cold); Carbone Tr., 100:11–101:5 (DO testified that for "a few weeks" in late August and early September, "it was cold the whole time" and detained individuals complained about the cold).

left water splashed everywhere."); *see also* Pascual Lopez Statement, ¶ 8 ("Some people would sleep in the toilet area because there was not enough space for everyone to lay down.").

Exhibit 1 to the Asnes Statement demonstrates that it would have been physically impossible for everyone to lie down at the same time during the peak of the summer crowding, and even when it was theoretically possible, it would have required people to line up body-to-body – plainly insufficient conditions for people to sleep. *See* Asnes Statement, Exhibit 1, at 1, 3, 5, 7, *supra.*

### 2. Meals Were Small, Inedible, and Provided Only Twice Per Day

Until the Court issued the Temporary Restraining Order in this case, Defendants admit that meals were generally provided to detained individuals only twice a day. Zanello Decl., ¶ 12 ("Aliens in custody are provided with two nutritional meals a day.")[9]; Joyce Sec. Tr., 433:11-18 (expressing his view that as of July and early August 2025, the governing policy only required food every 12 hours); PX159, 17320 (June 26, 2025 email from Kareem Johnson to various individuals stating: "Currently we have over 100 detainees in the NYC hold room whom all need to eat 2-3 times per day.  Currently we go through about 10 boxes per feeding while feeding twice a day.").  The contractor logs confirm that individuals were fed twice a day, or sometimes even less frequently.  *See, e.g.* PX87, ICE-B-191–93 (On June 24, 2025 at 2:10 p.m. ("1410"), "all detained fed hot meal + water"; no other meal notations for that day); *id.*, ICE-B-193–95 (On June 25, 2025, breakfast noted at 0958 and "all detainees had a hot meal/water" was noted at 1600; no other meal notations for that day); PX88, ICE-B 136–37 (On July 3, 2025, only two meals noted in the logbook); PX88, ICE B 152–53 (on July 17, 2025, only two meals noted in the logbook, at 1640 and 2000).  Contractor Mitchell Hutson testified that all meals were logged. *See* Hutson Tr., 41:6-24, 42:10-20, 61:18–62:7.  *See also* PX118, ICE 29847–48 (Joyce texting AFOD Judith Almodovar on July 5, 2025 "Judy, we need the key to the supply room.  There isn't enough food," and later:  "TRO needs more food and water for the detainees, and we don't have a key for the supply room… can you send some up?").[10]

Formerly detained individuals confirm that they ate only twice each day, sometimes even less frequently.  *See* Lopez Benitez Statement, ¶ 12 ("We got food twice a day, at around 8 a.m. and 8 p.m."); Barry Statement, ¶ 11 ("We sometimes received food only once a day; at most, we received food only twice a day but even then it was not a lot of food. . . . I often felt hungry."); Barco Mercado Statement, ¶ 8 (stating he received a "small portion of food only twice a day"); Quevedo Statement, ¶ 6 (describing that food was offered twice a day).  Even in November 2025, months after the Court's Orders, individuals were not provided with sufficient food.  *See* Chalco Statement, ¶ 16 ("[T]he portion sizes were very small . . . . We were always hungry.  I

---

[9] Zanello was aware that meals were required every 6 hours, at least as of July 14, 2025.  *See* PX72, ICE 16763–64 (Zanello responding to Joyce, who questioned whether individuals should receive food before processing, by writing that "[p]er the updated policy . . . food every 6 hours instead of 12.").  At her deposition, when confronted with her August 11 Declaration, Zanello acknowledged that the change to provide four meals per day instead of two may not have gone into effect until after August 11.  *See* Zanello Tr., 190:21-25; 198:3–199:3.

[10] Joyce testified in his deposition that food sometimes ran out, and it could take an hour to get more.  Joyce Sec. Tr., 438:12-19.

14

barely ate anything; I would give my portion to my son and tell him to eat it instead because I knew how hungry he was."); Chilavert Olmedo Statement, ¶ 9 ("I was also hungry because we were not given adequate food.  The food was mush and we only received it twice a day."); Pascual Lopez Statement, ¶ 9 ("We received food only twice a day and it was not good.").

Individuals detained during the summer of 2025 were provided only with "Military Ready to Eat" or "MRE" meals or an equivalent.  *See* Hampton Tr., 189:4-7 (Q: "Prior to this case being filed, what food did detained people receive?" A: "I believe they just received the MREs."); Joyce Sec. Tr., 435:24–436:9 (noting that the heater meals that were provided were "[e]ssentially, the same thing" as an MRE); 507:3-6 (same).  Former AFOD Zanello stated that "heater meals" were provided "twice a day" before this case was filed.  Zanello Tr., 194:21-25; 196:6-14.  *See also* Barry Statement, ¶ 11 (food was "military style" and "pre-packaged"); Pascual Lopez Statement, ¶ 9 (noting the food "was in bags that the guards would heat up").

Formerly detained individuals have all testified that the food was disgusting and inedible. Lopez Benitez Statement, ¶ 12 ("The food they gave us looked like dog food.  I did not think it was edible.  It was only my second night there that I became so hungry that I ate it.  It was disgusting."); Chilavert Olmedo Statement, ¶ 9 ("The food was mush . . . . It was beans, chicken, and chocolate—although I am not sure you could even call it chicken.  It tasted so fake.  We saw the officers put some sort of liquid in the food, microwave it and then hand it to us.  It was like food for soldiers.  We had to eat it or we starved."); Quevedo Statement, ¶ 6 ("The guards . . . gave us food to eat but I could not call it food.  I can only call it slop.  It was a mixture of different food together like leftovers . . . I cannot tell you what the food was because it was worse than animal food.  It was unappetizing and smelled awful."); Barco Mercado Statement, ¶ 8 (calling the food "inedible").  Quevedo lost significant weight during the time he was detained, including at 26 Fed.  Quevedo Statement, ¶ 7.

While Joyce claimed that individuals who requested additional meals would receive them, he acknowledged that individuals were not informed of their right to ask for additional meals.  *See* Joyce Tr., 433:25–434:20.

### 3. Detained Individuals Could Not Shower or Clean Their Bodies or Hands and Conditions Were Extremely Unsanitary

Individuals detained at 26 Fed over the summer of 2025, many for several days, were not given proper hygiene products or any adequate way to clean their bodies.  Because the hold rooms were only designed to hold people for less than 12 hours, there are no showers available there.  JPTO, Stipulated Fact #4.  In July 2025, in response to a group complaining, Zanello allowed them to use water from bottles on their bodies in one of the holding cells; but she never offered that opportunity to anyone else going forward.  *See* PX61, ICE 16750–16753; Hampton Tr., 177:11–180:15; Zanello Tr., 172:20–175:23.  Zanello implied that nobody else needed a shower.  Zanello Tr., 175:8-12 (Q: "Did you continue that practice of allowing people to wash themselves with water in bottles after this group left but before this case was filed?" A: "I don't think we ever needed it.").  That was of course false.  *See* Barry Statement, ¶¶ 6–7 ("It was very dirty. . . .We were not able to bathe."); Chalco Statement, ¶ 15 (noting that during his November

15

2025 detention "[w]e all wanted to wash ourselves but we weren't given anything to do it with and even if we had there was no place to do it and no privacy").

Apart from this group of individuals who were allowed to try to rinse themselves off with bottles of water on one single occasion, everyone else detained at the hold rooms has received at most small wipes or towels to clean their bodies. *See* Hampton Tr., 173:11-18; *id.* at 176:19-23; Joyce Sec. Tr., 422:3-13 (noting that the "hygienic wipes" . . . "had to do"); *id.*, 422:25–423:5; Quevedo Statement, ¶ 5 ("We did not have a way to shower or clean ourselves in any capacity."); Chilavert Olmedo Statement, ¶ 8 ("We had no access to a shower at all—so for me it was for six days at 26 Federal Plaza and then longer when I was in transit. They gave us a damp towel to clean ourselves, but it did not help with the heatwave, and we were all sweating all the time."); *see also* Chalco Statement, ¶ 15 ("Twice we were given small wet towels; they were cold and I did not smell any kind of soap on them.").

Soap was – and still is – only available outside the hold rooms; Defendants insisted that individuals could simply get the contractors' attention to request soap whenever they needed to wash their hands, Zanello Tr., 170:10-172:4; Hutson Tr., 111:24-112:11; Joyce Sec. Tr., 420:6-421:3, but detained individuals testified that soap was not available, and that they would get in trouble if they tried to get the staff's attention. Chalco Statement, ¶ 15 (even in November 2025: "When people used the toilet, they had to wash with only water."); *id*., ¶ 12 ("We weren't allowed to knock on the window."); Pascual Lopez Statement, ¶ 13 (noting that knocking on the windows "seemed to make the guards angry").

There was no policy requiring officers to inform detained individuals that they could request a change of clothes, and many stayed in the clothes they arrived in for days. *See* Zanello Tr., 178:18-22 (testifying that detained people would stay in the clothes they arrived in for the duration of their detention); Joyce Sec. Tr., 449:5-20 (testifying that there was no requirement that detained people be told they could request additional supplies, such as sweatshirts); *id*., 423:18-23 (people would often stay in the clothes they arrived in for many days at a time); Hampton Tr., 182:25–183:4 (testifying that there is no policy regarding at what length of detention a person would be offered clothes); Quevedo Statement, ¶ 5 (noting he was in the same clothes during his entire several-day detention); Chalco Statement, ¶ 13 ("We stayed in the same clothes we had on when we were detained throughout our time at 26 Federal Plaza . . . The guards never offered us clothes. I recall there was one person who spoke English well and he asked for clothes, but he was not given any."); Pascual Lopez Statement, ¶¶ 5–6 (he "could not change clothes" during the eight days he was detained at 26 Fed). Martinez Ventura recalls that some women had their periods but received no menstrual products or clean clothes, so had blood stains on their pants. Martinez Ventura Statement, ¶ 8.

Detained individuals also did not receive toothbrushes. Lopez Benitez Statement, ¶ 13 ("They did not provide us with any way to brush our teeth[.]"); Barry Statement, ¶ 7 ("We were not able to . . . brush our teeth."); Chilavert Olmedo Statement, ¶ 8 ("We didn't get toothbrushes or toothpaste, and I couldn't clean my teeth during the entire time I was there."); Hutson Tr., 91:3-23 (noting toothbrushes were added after the Court's orders); Joyce Sec. Tr., 423:6-16 (detained people not given toothbrushes, only "spongy thing on a stick").

16

Due to all of these factors, it frequently smelled terrible at the hold rooms over the summer of 2025.  Barry Statement, ¶ 8 ("The room was terribly hot and it smelled terrible given the conditions."); Quevedo Statement, ¶ 5 ("There was an intense smell of sweat, urine and feces."); Barco Mercado Statement, ¶ 7 ("The room smelled of sewage."); Pascual Lopez Statement, ¶ 7 ("The smell was very bad.  Many people had not been able to bathe in 8 or 9 days.").  Some ICE officials also testified to a smell, although they attempted to downplay it. *See* Mitchell Tr., 173:5-22 (acknowledging that it smelled badly, due to overcrowding, but noting "[i]t was just body odor"); Hutson Tr., 68:20–69:2 ("Q: Did it ever start to smell?" "A: Normal people's body odor.  People would – some people have body odor; some didn't.  So sometimes it would smell; sometimes it didn't."); Joyce Sec. Tr., 421:8-16 ("I mean, I'm a smoker, so I don't have much of a sense of smell. But could other people perceive that it smelled poorly? I would assume so.").

Pascual Lopez recalls that detained individuals requested cleaning products, "like disinfectant or a broom, but the guards would not give them to us."  Pascual Lopez Statement, ¶ 7.  He stated that "the cell was not cleaned consistently: I remember up to three days passing without it being cleaned, so it got dirty."  *Id.*  During the summer of 2025, it was common for entire days – and sometimes consecutive days – to pass without any sanitation or cleaning of the cells.  *See, e.g.*, PX315, ICE-B-800–801 (no sanitation logged on July 12, 2025); PX315, ICE-B-801–802 (no sanitation logged on July 13, 2025); PX315, ICE-B-804–808 (no sanitation logged on July 15, 2025); PX315, ICE-B-808–809–PX316, ICE-B-810–811 (no sanitation logged on July 16, 2025); PX316, ICE-B-815-817 (no sanitation logged on July 18, 2025); *see also* Hutson Tr., 117:15–118:78; 120:3-12 (logbooks kept accurately in July 2025).

The temperature in the hold rooms would also fluctuate, and the hold rooms were often uncomfortably hot.  *See* Barry Statement, ¶ 8 ("The room was terribly hot[.]"); Martinez Ventura Statement, ¶ 9 ("Some of the men would take off their shirts and complain about the hot temperatures in their cells, perhaps due to the number of individuals that were locked in those cells."); Chilavert Olmedo Statement, ¶ 5 ("There was no air conditioning and since there were so many people in the room, it was hot. . . . It felt so stuffy and it was hard to breathe.").  This was also corroborated by officials who worked at the hold rooms in Summer 2025.  Hampton Tr., 204:21–206:3 (Q: "Before this case was filed, are you aware of it having been uncomfortably hot in the holding cells?" A: "Yes."); Hutson Tr., 88:23–89:22 (Q: "what were some of the other complaints that you heard?" A: "it was – it was hot[.]" and stating that "ICE staff would notify . . . the maintenance of the building that it was hot" but it would not get cooler); Mitchell Tr., 131:11–132:8; 132:20-21 (Q: "Was it uncomfortably hot?" A: "Yes.").

### 4.  There Was Inadequate Toilet Privacy

As photographs of the areas confirm, toilets in the holding cells were separated by only a partial wall measuring a few feet tall that – particularly when the rooms were crowded and people were using all available space – did not provide sufficient privacy.  *See* PX301, P350, 353, 362, 365, 366, 396, 398, 476, 477, 484, 586, 589, 598, 599, 611, 632.  *See also* Lopez Benitez Statement, ¶ 13 (noting "there [was] no privacy" and that they "would try to cover [themselves] with the aluminum blanket because of the lack of privacy."); Barry Statement, ¶ 7 ("There was no privacy to use the toilet."); Chilavert Olmedo Statement, ¶ 8 ("We did not have

17

much privacy in the bathroom.  Someone hung up one of those aluminum blankets as a shield to add privacy.").

### 5.  Individuals Were Not Able to Ask for Items to Meet their Needs

One common refrain from ICE officials was that detained individuals could simply ask for necessary items to meet their basic needs: for example, to clean themselves, for extra food or clothes, and for calls.  *See, e.g.*, Hampton Tr., 62:4-7 (food offered "upon requests" prior to the case being filed); Joyce Sec. Tr., 433:25–434:20 (admitting that detained people were not told they could request extra meals, "[b]ut again, if they asked  . . . we have absolutely no reason to not give it to them.  It keeps them happy; right? And if they're happy, they're not going to cause problems; right? . . . if you want to eat seven meals, I don't care."); *id*., 449:22-25 (Q: "[I]sn't it true that detainees were not told that they could request extra blankets or extra clothes?" A: I don't know that they weren't told. But was there a requirement to tell them that they could ask for those things? No. But, again, if somebody's telling you that they're cold, like: 'Here, here's a blanket. You want a sweatshirt? What size do you wear?'"); Mitchell Tr., 58:25–59:16 (describing that they would provide calls if a detained person asked**)**.

This picture of a helpful and supportive environment where detained individuals felt at ease and empowered to ask for whatever they needed is not only inherently incompatible with the coercive nature of detention, but also completely belied by the evidence.  ICE staff would in fact refuse and berate individuals who asked for things, further deterring any such requests.  *See* Barry Statement, ¶ 12 ("I . . . saw the guards being physically aggressive and violent with people . . . sometimes people would be screaming because they wanted to know their rights and the reason why they were detained. The guards would mistreat them so they would shut up."); Chalco Statement, ¶ 12 ("Most of the guards there were very rude. I saw them threaten to withhold people's calls.  I asked [a] guard to speak with ICE, and he yelled at me and said no. We weren't allowed to knock on the windows.  Once my son did that to ask for a call, the guards told him to get back and to sit down."); *id.*, ¶ 13 (noting that another detained individual asked for clothes but was not given any); Pascual Lopez Statement, ¶ 13 (noting in the context of being afraid to ask for medical care, "I also felt too nervous to knock on the window because it seemed to make the guards angry."); *id.*, ¶ 15 ("The guards could punish us easily, so it made me very hesitant to make requests or say anything to them.").

Moreover, ICE officials acknowledged that individuals were not informed of their rights to request additional items at all until the Court's Orders made that an express requirement.  *See* Joyce Sec. Tr., 433:24–434:20 (people not informed of their right to request extra food); *id*., 449:22-25 (not informed of their right to request extra blankets or clothes).

Even after the Court's Orders, it appears that detained individuals were not informed of their rights consistently or clearly, at least not until after the Contempt Stipulation was signed in late February 2026.  *See* Carbone Tr., 13:6–14:20, 17:3-24, 112:4-114:5 & PX124 (DO who had been working in the 10th floor processing area from August 25, 2025 to October 1, 2025 and November 1, 2025 to December 19, 2025 did not recall having seen Notice of Rights mandated by this Court's Orders, PX124, ICE 11214-15); Chiauzzi Tr., 15:7–16:13; 42:25-43:20 & PX124 (DO who had been working at the hold rooms from August 1, 2025 through his January 28

18

deposition testified that he likewise had never seen the Notice of Rights document before); Joyce Sec. Tr., 234:24–236:6 (testifying there was no policy for documenting receipt of notice of rights, no monitoring of whether notices of rights are being given out, and no system in place for ensuring that was being done).

F.      **People Were Detained with Serious Medical Needs and Not Provided with Adequate Care**

During the summer of 2025 and beyond, people with serious medical needs routinely were held at 26 Fed.  *See* Hampton Tr., 155:14–162:22 (testifying about people being detained with diabetes, heart conditions, mental illnesses, dementia, and drug and alcohol withdrawal symptoms); PX41-42, ICE 17334–17338 (ICE emails discussing detained individual with life-threatening ovarian cyst); PX62, ICE 16772–75 (ICE emails discussing detained individual with heart attack risk); PX43, ICE 17183–87 (ICE emails discussing detained individual with kidney failure, detained per PX85 from July 13 to 15, 2025); PX107, ICE 14077–14081 (ICE emails discussing the same individual's need for dialysis three times per week); PX29, ICE 18003 (person had seizure while awaiting processing) & Deposition of Assistant Health Service Administrator Mia Jacobs, dated April 15, 2026 ("Jacobs Tr."), 43:21–45:6 (confirming that no medical staff were onsite when this seizure occurred); PX44, 26393 (Joyce declaration discussing person with "severe dementia" who was held at 26 Fed, detained per PX85 for more than three weeks in February 2026); PX32, ICE 27318 (ICE emails discussing individual with Type 2 Diabetes, Hypertension, Major Depressive Disorder, and blindness in one eye, who had been detained at 26 Fed for eight days); PX170, ICE 22302–07 (emails from attorney to ICE explaining witness Nuvia Martinez Ventura's medical needs, including Type 2 Diabetes, hypertension, and high cholesterol); PX1, at ICE 10925 (Hampton discussing detained individual who had "the potential to experience methadone withdrawal = (hospital runnnnnn)."); PX166, ICE 20850–51 (attorney sending email on July 3 about physically disabled client, who according to PX85, was detained from June 24 through July 7, 2025 during the period of peak crowding); Barry Statement, ¶ 10 ("I even saw older men crying because of the pain they were in; I recall some who were diabetic people and they needed injections they were not receiving.  They were in so much pain that they were crying from desperation."); *see also* PX114, ICE 29823–29824 (Zanello and Joyce exchanging text messages about various medical emergencies, including a "[s]eizure" (in quotes), a case of monkeypox, and someone they referred to as "[c]ardiac lady," writing as to the latter "[w]e don't have her meds it's becoming an issue"); PX115, ICE 29829–29835 (Zanello and Hampton texting, referencing a man who "just passed out" and was "[n]ot breathing," later noting he had been brought in despite having been found "NOT fit for confinement" due to "complex medical needs including need for abdominal surgery ASAP and need for CPAP machine at night (or risk of sudden death due to apnea/ not breathing)," "dialysis man," "Covid man," and "[o]ne dude on floor rolling around having a fit. Anxiety or something.").

Chalco, who is legally blind, uses a cane, has diabetes and high blood pressure, and had broken a tooth when he was detained at 26 Fed, did not see a nurse until the day after he was detained at the hold rooms, and even then was given only Tylenol instead of his diabetes medication and told "this is all we have here."  Chalco Statement, ¶¶ 3, 9, 17.  Martinez Ventura has Type 2 Diabetes and suffers from frequent headaches and dizziness.  Martinez Ventura

19

Statement, ¶ 3.  Yet despite attempts to obtain adequate medical care, including bringing a letter to her check-in appointment documenting her conditions and presenting it to the ICE officer, Martinez Ventura did not receive any care or medication during her five-day detention at the hold rooms.  *Id.*, ¶¶ 7–8; *see* Jacobs Tr., 108:19–109:19; 115:13-24 (no onsite appointments available at 26 Fed for people with chronic conditions such as diabetes).

People with serious medical needs were detained at 26 Fed despite the lack of full-time medical staff or the ability to provide adequate care.  PX80, Defs. RTA Responses, Response No. 44 (admitting no medical staff on site 24 hours per day, 7 days per week); Zanello Decl., ¶ 14 (same); Jacobs Tr., 192:17-20 (same, until September 21, 2025); Jacobs Tr., 31:11–33:9 & 36:3-8 (testifying that there continues to be no on-site medical provider who can prescribe medication, make diagnoses, or order tests, and that when someone needs to see a doctor they get sent to the emergency room); *see also* Quevedo Statement, ¶ 10 (noting that there was no medical staff present after 5 p.m., "so if you got sick after that there was no one there to help."); Pascual Lopez Statement, ¶ 14 ("From what I saw, it seemed to me that overall the staff really did not attend to sick people or give them medicine.  There were times nurses were not available at all.  Even when there were nurses available, they could only provide basic medicines, but some people needed more specialized medicine.").

Moreover, detained individuals did not receive prompt medical screenings, and many people who were detained at 26 Fed in fact never received a medical screening at all.  *See* Zanello Tr., 204:3-8 (no requirement that someone who arrives at the hold rooms receives a medical screening within a set period of time); Joyce Sec. Tr., 446:14-18 (some people who passed through the hold rooms did not receive a medical screening); Jacobs Tr., 94:18–95:2 (Q: "So unless someone is in a holding cell for more than 12 hours, has a request for medical care that they make to staff; has an emergency or concerning condition that staff notices, or has an ERO request for medical intake, that person does not by policy have a required IHSC medical intake; correct?" A: "Correct. Yes."); *see also id.*, 96:22–97:2 (confirming that there is no policy that everyone gets spoken to by medical staff).

Unsurprisingly in light of all of these factors, there were frequent hospital runs and medical emergencies.  *See* Hampton Tr., 147:21-148:5 (citing panic attacks, someone who arrived with injuries, and a detained person attempting self-harm); *id.*, 152:17–153:8 (describing individual who threw himself on the floor and was banging his head); *id.*, 153:16-25 (describing incident where detained individual was able to grab scissors and threatened self-harm or harm to others); PX49, ICE 18047–50 (Calidonio emailing Joyce on July 25, 2025 writing that there were over 100 detainees in processing, that one detained individual had slipped and dislocated his arm and another was "throwing up," and that both needed to go to the hospital); *see also* Lopez Benitez Statement, ¶ 15 ("Many people in the room with me were getting sick."); Barry Statement, ¶¶ 9–10 ("Some people had trouble breathing . . . . I saw a number of people have what looked like asthma attacks.  They gasped for air and could not breathe.  I also saw many people who were not receiving their medication.").

The documents Defendants have produced document alarming medical neglect, both in terms of care (or lack thereof) of ill individuals and exposing other detained individuals to highly contagious diseases.  On July 6, one individual was brought to the hospital with a positive

Tuberculosis test after he had been held for *six days* at 26 Fed, during a period of peak crowding. *See* PX42A, ICE 18173–77 (Significant Incident Report regarding his hospitalization); PX85 (showing this person was detained June 30 through July 6, July 10 through 14, and July 31 to August 1); PX88, ICE-B-133–39 and PX315, ICE-B-774–86 (showing there were 130–75 individuals held during much of the initial period he was there the first week of July). Defendants' data in fact shows that there were *193* people held simultaneously on July 3, 2025, and that the average maximum daily population the week of June 29 to July 5 was 152.6. Asnes Statement, ¶¶ 23, 40.[11]

On July 11, 2025, after a detained individual's attorney sent an email alerting ICE to his client's serious medical needs and heart attack risk, Zanello wrote to her colleagues: "Ask med questions first thing please. We have had multiple hospital stays this week because no one is asking a simple do you have a medical condition we should know about." PX62, ICE 16773. She followed up: "This week has been one gross contagion after another . . . . We've had multiple hospital sits for cardiac and seizures." *Id.*, ICE 16772; Zanello Tr., 208:12-15 (acknowledging that if ICE officials brought "someone over to 26 that did have a contagious -- a contagion, then that would put everyone else . . . at risk"); *see also* Jacobs Tr., 85:9-14 (testifying that there was no formal process for ERO staff to document medical information at intake and provide it to IHSC); Jacobs Tr., 95:14–96:8 (to Jacobs's knowledge, IHSC does not train DOs on what medical questions to ask at intake).

In fact, individuals with serious medical needs were often held *longer* at 26 Fed because of difficulty finding a facility who could accommodate their medical needs, notwithstanding that 26 Fed itself could not accommodate their medical needs. *See* Hampton Tr., 126:18–127:14; Joyce Sec. Tr., 323:4-18; *see also* PX107, ICE 14078 (Joyce writing in response to question whether patient who required regular dialysis treatment would be kept at 26 Fed while awaiting response from other facility as to whether they would take him, "We have no choice. Release authority is invested in the ICE Director – not even the ERO Director."); PX115, ICE 29831–32 (Hampton texting with Zanello about man who had "passed out" and was "not breathing," noting that he had "been found NOT fit for confinement" due to "complex medical needs" including risk of sudden death, and writing "Bill knows, do we still need S1 approval to release? Crazy."); PX171, ICE 23580–86 (emails among ICE staff between January 6 and January 8, 2026 regarding detained individual with "a Serious Mental Disorder"; IHSC official wrote "I will send the bedspace request to the Regional CDs but wanted to give you the head's up [sic] that it may be more difficult than usual to place him since he doesn't function well in [General Population] due to his mental health issues;" this proved correct: Nassau "denied acceptance for 3 days due to BH diagnosis" and "[t]he Eastern Regional CD replied that there [we]re no appropriate beds in the East"; per PX85, the individual was ultimately detained at 26 Fed from January 5 to 15, 2026 and then again from February 15 to 21, 2026.

---

[11] Jacobs confirmed that a Tuberculosis test is not part of the routine medical screening at 26 Fed, Jacobs Tr., 152:17-21; 154:11-18, which suggests this individual was exhibiting symptoms sufficient to prompt the testing. And even if such testing were part of the screening, such screenings were not routinely or promptly given. *See supra*, at III.F.. Jacobs also confirmed that 26 Fed did not have medical isolation rooms to accommodate people with infectious diseases. *Id.*, 67:3-15.

Even witnesses who did not have serious medical conditions experienced health issues at 26 Fed and did not receive care. Barco Mercado had a painful toothache that he worried was infected while he was detained at 26 Fed, yet he only received pain medication. Barco Mercado Statement, ¶ 13 (noting he also observed diabetics who did not receive medication and were given the same food as everyone else). Chilavert Olmedo got a throat infection while he was detained at 26 Fed, but even though he asked an ICE officer for help, he was ignored and never saw a doctor or nurse. Chilavert Olmedo Statement, ¶ 6 (adding: "I felt so powerless and at the will of the officers"). He also saw someone faint during his detention; the officers took the person into a smaller room, but Chilavert Olmedo did not see any doctor or medic attend to him. *Id.* He also saw people with diabetes who "could not eat most of the food because it was unhealthy and not a part of their diet." *Id.*, ¶ 9. Pascual Lopez developed a fever while he was detained at 26 Fed but did not receive medical care. Pascual Lopez Statement, ¶ 13. He also "saw people who were sick–with a cold or the flu and with stomach pains from the food–and asked for help but did not get it." *Id.* He added: "It was clear to me that it was not possible to get medical care. I also felt too nervous to knock on the window because it seemed to make the guards angry." *Id.* Jacobs testified that that to get medical care once detained in the hold rooms, individuals needed to alert the officers. Jacobs Tr., 91:21–92:6.

### G.    ICE Officials and Staff Acknowledged Persistent Understaffing and Unsafe Conditions

Various ICE deponents confirmed understaffing, that contractors and DOs did not understand their duties, and unsafe conditions over the summer of 2025. *See* Zanello Tr., 73:2–74:13 (discussing understaffing and noting there were times when she was the only person working at the hold rooms); *id.*, 137:8–21 (same); Hutson Tr., 96:10–97:2 (noting they were short-staffed); *id.*, 110:21-23 (it was "hectic"); PX117, ICE 29845 (Zanello writing to Joyce "We have a hospital run. I can send the paragon [contractor] but then no one in processing. TRO has no one."); PX94, ICE 18920–21 (discussing contractor shortages); PX95, ICE 19775 (Calidonio writing on June 3, 2025 "Paragon again didn't have enough staff to complete two hospital detail"); PX96, ICE 18913 (Calidonio writing "This is insane . . . Paragon is saying they only have one team today ( ice air ) and one team tomorrow ( ice air ). After that we have no transport at all. We desperately need to get some detainees out of 26 fed and no transport. Something has to get done."); PX97, ICE 18914 ("Daily we are struggling with transport and have DO's doing a lot of the transports"); PX98, ICE 19755–56 (memorandum reporting Paragon not meeting transport needs); PX51, ICE16780 (Joyce writing "there are a number of things that the contractor is not doing that they are required to."); PX161, ICE 18849–56 (Joyce noting contractor shortages); PX49, ICE 18047–50 (Calidonio emailing Joyce on July 25, 2025 at 8:11 p.m.: "Can you please canvas for assistance. We have over 100 detainees in processing. Only 1 SDDO (Kareem – who has been on shift since 6am) and 3 officers)," noting one detained individual had slipped and dislocated his arm, and another was throwing up, both needed to go to the hospital; Joyce forwarded to Francis, writing "It's now 2 details to the hospital, I covered with Manhattan FugOps. This is a nearly everyday occurrence."); Calidonio Tr., 46:17–48:23 (Calidonio acknowledging she has raised the issue of shortage of contractors with Paragon manager several times and that contractor shortages happened "quite frequently, to the point where I don't even keep track of it anymore."); PX53, ICE 14568–571 (Zanello writing on July 17, 2025 that DOs had not read instructions and did not understand their duties); Hampton Tr.,

22

116:21–118:14 (Q: "So were you concerned about the safety of the staff?" A: "The safety of everyone there, yeah." Q: "Were you concerned about the safety of the individuals being detained?" A: "Yes."); Zanello Tr., 67:6–69:21 (describing unsafe conditions, including incident where detained individual obtained scissors and attempted to harm himself and others); PX48, ICE 14240–45 (details of scissors incident); PX75, ICE 17997 (Almodovar writing to Joyce that staff were working too many hours and "creating an unsafe environment").

### H.    Guards Were Rude, Violent, and Cruel to Detained Individuals

As noted above, *supra* at III.E.5., formerly detained individuals described dehumanizing, violent, and cruel treatment by ICE staff and contractors. *See* Barry Statement, ¶ 12 ("I also saw the guards being physically aggressive and violent with people," noting that the guards would especially mistreat people who were yelling "so they would shut up."); Lopez Benitez Statement, ¶¶ 8–9 (guards put pressure on him to self-deport, falsely saying that if he wanted to continue pursuing his asylum case, he would have to stay in detention until 2029; another guard showed him a picture of himself crying and mocked him); Chalco Statement, ¶ 12 ("Most of the guards there were very rude. I saw them threaten to withhold people's calls. I asked [a] guard to speak with ICE, and he yelled at me and said no."); Pascual Lopez Statement, ¶ 15 ("Once I saw through the windows that a man in the other large cell was hit and taken out of the cell by several guards–I th[i]nk as many as five guards came one after the other. They all went after him. I think it may have been for something he said to a guard."). Barco Mercado recalls that a guard would hold up a bottle of water and squirt it into the mounts of the detained individuals "like we were animals and not people." Barco Mercado Statement, ¶ 10.

### I.    Defendants Denied Detained Individuals Confidential Legal Calls, and Attorneys Had Difficulty Finding and Accessing Their Clients

Defendants have made clear that attorneys have never been able to schedule in-person legal meetings with clients held at 26 Fed. *See* PX80, Defs. RTA Responses, Response No. 58; PX78, ECF No. 74, Zanello Supplemental Declaration, dated August 18, 2025, "Zanello Suppl. Decl."), ¶ 23 ("The Federal Plaza ERO Field Office does not have in-person legal visitation or dedicated attorney call rooms for the aliens in custody."). Without in-person meetings, the need to be able to schedule attorney calls promptly is even more critical so that detained individuals can speak with attorneys about their rights and options during critical points in their cases and detentions. Yet calls were not consistently provided at all, often attorneys could not even locate their clients, and when they did occasionally succeed in scheduling a phone call with them, the calls were cut off after a few minutes and conducted in public areas in the hold rooms where ICE staff and contractors stood in close proximity.

#### 1.    Calls Were Not Regularly Provided

Calls were often cut short after a few minutes, even if they were with an individual's attorney. *See* Lopez Benitez Statement, ¶ 16 (after initial call, "I was only able to have very short calls once a day"); Barry Statement, ¶ 13 ("We were allowed to make one 5-minute phone call every few days."); Martinez Ventura Statement, ¶ 8 (noting detained individuals were offered one short call per day, about three minutes long, guard would end calls around the three-minute

23

mark); Quevedo Statement, ¶ 8 (noting calls were only one or two minutes long); Pascual Lopez Statement, ¶ 10 (when he made calls, he "could only speak for a few minutes each time"); Chalco Statement, ¶ 11 (even in early November 2025, he was able to make "at most one" call a day for around five to seven minutes). Chilavert Olmedo recalled that the detained individuals "had to form a line where an officer would give us a phone and stand next to us as we spoke. Sometimes depending on how long the line was, I was only able to speak with my sister at 1 a.m. If she didn't answer before it went to voicemail, then I was not allowed to dial again." Chilavert Olmedo Statement, ¶ 7. ICE officials confirmed that calls, including legal calls, were limited to around five minutes over the summer of 2025. *See* Hampton Tr., 215:21–216:9 (calls were between five to seven minutes, legal calls not treated differently); Zanello Tr., 213:13-23 (policy was one five-minute call that they could use to call whomever they chose); Joyce First Tr., 95:17–96:7 (attorney calls not treated differently from other calls; made using same five phones); PX2, ICE 11419 (instructions for hold rooms procedures included offering a five-minute call).

Calls were for the most part offered at the discretion of the contractors. *See* Hampton Tr., 218:18-21 (Q: "So is it fair to say that it was within the contractor's discretion when to offer phone calls to detained people?" A: "Yes."); *id.*, 210:21–212:23 (explaining that the contractors would create a schedule and let detained people out "two . . . at a time" to make calls); Hutson Tr., 54:8-16 (noting that after processing, calls were offered "basically, on request"; when asked, "did you ever schedule that in any way or did you just deal with it as it arose?" he answered, "[a]s it arose"); Carbone Tr., 91:12-19; 125:5-10 (it was at the discretion of the DOs whether and when to end a call); Joyce Sec. Tr., 451:6-19 (no schedule for calls after initial processing).

### 2. There Was No Privacy or Confidentiality for Calls

Over the summer of 2025 – and up until late February 2026 when Plaintiffs filed a motion to hold Defendants in contempt of the Court's Orders and negotiated a stipulation requiring a private room for legal calls – detained individuals made all calls in open areas near ICE staff and contractors, and none of these calls was confidential. *See* JPTO, Stipulated Fact #5 ("From January 20, 2025 through February 27, 2026, individuals detained at 26 Federal Plaza did not have access to a private room to receive legal phone calls or place outgoing legal phone calls, and ICE employees and/or contractors were present in the Processing Room when detained individuals made or received calls, including legal phone calls."); Hampton Tr., 213:10–214:22 (noting that calls took place at the phones on the contractors' desk and in the processing room, and that contractors would be near the desk within hearing distance during those calls); Zanello Tr., 214:9–215:25 (noting that calls were made at the contractors' desk and in the processing area, and when asked "if [staff] chose to listen, they could have listened?" answered, "You could do that from anywhere in the processing area."); Hutson Tr., 108:24–109:24 (Q: "[P]rior to February 2026 . . . if an individual needed to speak to a lawyer, they would use phones where other people could hear them speak; right?" A: "Yes."); Mitchell Tr., 153:22–154:15 ("Q: And all these phones are in the presence of other staff and contractors; right?" A: "Yes." Q: "So even if you might not purposely listen, you can hear them talking; correct?" A: "Yeah, I would say you - - you can."); Chiauzzi Tr., 83:12-20 ("I don't know if they're there specifically to listen, but the phones are right in front of [the contractors" desk."); Joyce First Tr., 112:18–113:11 (Q: "Is it fair to say that the officers are within earshot of some of these legal calls but your understanding is that they choose not to listen?" A: "Yeah. And, again, it - - it doesn't particularly make a

24

difference to us; right? You want to talk to your attorney, you want to fight the case, that's fine; right? Whatever you want to discuss with your attorney, go right ahead and discuss with your attorney; right? You want to talk about your litigation strategy? You do that, too. Like, we're not going to be in court. We're not listening to you. But are we within the same area that you are? Yeah. Can we probably hear what you're saying? Yes. Do we care? Not in the least bit."). *See also* PX301, P637, P648, P1049, P1053 (showing location of phones at the contractors' desk and in the processing area that were used for attorney calls until February 2026).

Contrary to Defendants' statements that while they could have listened to the calls, they never bothered to, detained individuals testified that their telephone calls were closely monitored. *See* Quevedo Statement, ¶ 8 ("There was always a guard next to us monitoring the call and it had to be on speaker."); Barco Mercado Statement, ¶ 12 ("There was a guard next to me as I called [my attorney], and I could hear a second person breathing audibly on the line."); Chilavert Olmedo Statement, ¶ 7 (noting that during calls, an officer would "stand next to us as we spoke"); Pascual Lopez, ¶ 10 ("I think that a guard was listening both times [he made calls] and could hear everything.  I felt very nervous to speak.  I felt afraid for my family members and did not want them to get in trouble."); Chalco Statement, ¶ 11 (noting that in November 2025, "[t]here was always a guard there" when he made calls).

Detained individuals were not told that they had a right to make legal calls.  *See* Barco Mercado Statement, ¶ 11; Quevedo Statement, ¶ 9; Barry Statement, ¶ 14; Lopez Benitez Statement, ¶¶ 16–17; Pascual Lopez Statement, ¶ 11; Chilavert Olmedo Statement, ¶ 11. Chilavert Olmedo in fact "asked to speak with an attorney but was told that was not allowed until my hearing."  Chilavert Olmedo Statement, ¶ 10.  In any event, because, as described above, even legal calls were limited to a few minutes and not confidential, meaningfully speaking to an attorney was not possible anyway.

The inability to speak confidentially with attorneys had serious consequences for the detained individuals.  After a guard falsely told Lopez Benitez that he would have to stay in detention until 2029 if he wanted to keep pursuing his asylum case, he seriously considered accepting self-deportation.  *See* Lopez Benitez Statement, ¶¶ 8, 17 ("It would have helped me a lot to speak with an attorney because I was very upset by what the officer told me and I believed I would have to stay detained for four years to continue seeking asylum. If my sisters had not given me the strength to continue, I might have considered accepting deportation like many others with me at 26 Federal Plaza decided to do.").  Quevedo explained that he "felt confusion" throughout his detention at 26 Fed and "had no idea what was going to happen to me and what my options were."  Quevedo Statement, ¶ 11.  He added: "The officers said confusing and contradictory things and I was not able to contact any attorney to help me clarify the situation." *Id.*  Quevedo in fact had his family buy a flight for him to leave the country when he was given misinformation by an ICE officer.  *Id.*, ¶ 12.  When he learned that the agency was no longer facilitating voluntary departure, he asked ICE how to get his money back "but they did not care." *Id.*  Pascual Lopez stated: "I did not know anything about my case or what would happen to me, so I would have liked to speak with a lawyer."  Pascual Lopez Statement, ¶ 11.

### 3. Attorneys – Along with ICE Staff – Had Trouble Locating Clients

Attorneys who attempted to locate their clients who were detained at 26 Fed frequently had difficulty doing so, and astonishingly, Defendants also often had trouble locating people in their custody.  *See. e.g.*, PX64, ICE 17475 (attorney tried to obtain call with client who was held at 26 Fed from June 30 through July 6, 2025, but had trouble locating him and obtaining a call); PX164, ICE 20593 (attorney emailed New York Outreach address on June 6, 2025 attempting to locate client and asking how she could contact him after client's family indicated he had been at 26 Fed for days; internal ICE email noted that "[a]ccording to EARM latest comments, subject was taken into custody on June 4, 2025 but he's not booked in EARM, can someone please respond to this attorney . . . ?"); PX306, ICE 19049–53 (internal ICE emails on July 17 reflected individual was "currently detained in the NYC Hold Room since 07/16/2025," but PX85 reflects that he was detained at 26 Fed from July 10 to 16, 2025); PX308, ICE 14182–84 (ICE communications attempting to locate a detained individual following an attorney call request; a deportation officer wrote on July 3 at 10:34 a.m. "Subject is in Central Islip, as per EARM.  In addition I called out his name several times here at 26 Federal Plaza."; PX85 reflects that he was not booked out of 26 Fed until 6:52 p.m. that day); PX309, ICE 15456–57 (August 7, 2025 email reflecting internal confusion regarding detained individual's location:  "EARM comment says the respondent was transported to EWR for ICE Air to Winn Correctional Center although the banner still has him at NYC Holding. And then I see NTA and I-830 filed in ECAS on 7/30 that says that he is detained at Orange County Jail."); PX59, ICE 17016–21 (attorney falsely told that her client had been transferred out of 26 Fed when he was still there and she needed to prepare him for a trial a few days later; SDDO Joseph Pujol expressed frustration at error:  "Why did they book him out to MSV then? Now we gave wrong info to the attorney and already filed the i830. This stuff is really messing us up.").

ICE officials have repeatedly acknowledged problems with the book-in and book-out processes.  *See, e.g.*, PX58, ICE 17025 (Joyce writing on June 29, 2025, "one of the issues that needs to be addressed is the booking in and out of the bodies – to include for booking them out of custody when removed . . . . It's not been working – I'm not looking to cast aspersions or assign blame, it just hasn't been, particularly with transfers"); PX59, ICE 17016–21 (internal frustration over book-out error); Zanello Tr., 157:18-22 (acknowledging book-in and book-out errors); Joyce Sec. Tr., 409:12-24 ("So, yes, there were times that people weren't booked out that they should have been.").

### 4. Boilerplate Responses to Attorney Call Requests Further Obfuscated Clients' Location and Made Setting Up Calls Difficult

Attorneys often received boilerplate responses to location and call requests that merely said:  "Your client remains in transit to their final detention housing. Please utilize the online detainee locator and reach out to the relevant field office once a detention location is displayed." *See, e.g.*, PX167, ICE 20900–03 (New York.Outreach@ice.dhs.gov email account sent standard boilerplate messages to attorney in June 2025 even after client was not appearing on Detainee Locator more than 72 hours after being detained at 26 Fed; when the person monitoring that inbox asked Acting AFOD Pujol whether "we just continue to answer the same way even if it has been over 72 hours?" Pujol responded: "They are both at 26 'in transit'"); *see also* PX24, ICE

26

17031–32 (internal email from SDDO Joseph Pujol to Zanello on July 10, 2025 proposing the "Your client is currently in transit" message be sent in response to any inquiry regarding someone detained at 26 Fed). The effect of this message in response to an attorney call request is of course functionally to prevent attorneys from scheduling calls (or even knowing with certainty where their clients are) for the entire time the client is detained at 26 Fed. For example, on July 31, 2025, an attorney emailed the New York Outreach email address noting that his client had been detained and was being held at 26 Fed, asking to schedule a legal call. PX66, ICE 15451. New York Outreach promptly responded: "Your client is currently in transit to a detention housing facility. Please utilize the online detainee locator and reach out to the relevant field office once a detention location is displayed." *Id.* The attorney reasonably responded to ask where his client was heading and did not receive a response. *Id.*, ICE 15450. The next day he followed up, noting that his client was still being identified as detained at 26 Fed and asking again for a call, and five hours later, the message was forwarded internally to SDDOs at 26 Fed, though it is not clear that a call was ever made. *Id. See also* PX305, ICE 20550 (attorney asked for information about his client at 26 Fed and was told nearly 24 hours later that his client was in transit). Joyce also acknowledged that "prior to this case, there was no publicly posted information anywhere instructing attorneys how they could contact or set up a call with their clients who were detained at the 26 Fed hold rooms." Joyce Sec. Tr., 451:21–452:3.

The fact that ICE officials would direct attorneys to the detainee locator is particularly troubling because the locator itself frequently was inaccurate. *See* Hampton Tr., 226:17–227:14 (aware of issues with locator: "Whatever the location that was indicated on the detainee locator was different from where that detainee actually was" as recently as "late 2025"); PX68, ICE 16988–16991 (Pujol wrote to Zanello on June 30, 2025 regarding attorney expressing frustration about not being able to obtain information about her client: "Cases like this are displaying wrong on the detainee locator because nobody is transferring them to the correct dockets . . . He has been in custody for 6 days and is still on a CIP docket. Not sure if this is the responsibility of TRO or the processing officers, but there's many cases like this in custody a 26 and elsewhere."); PX80, Defs. RTA Responses, Response No. 56 (locator was inaccurate at least once).

### 5. Attorneys Who Requested Calls Were Ignored, Delayed, or Denied

Even attorneys who knew that their clients were being held at 26 Fed had trouble scheduling calls with them. *See, e.g.*, PX10, ICE 15498–99 (detained person did not receive call with attorney on August 4, 2025 despite ICE attorney's attempts to coordinate one); PX63, ICE 17370–74 (attorney repeatedly tried to obtain call with client who was held at 26 Fed from June 26 through July 5, 2025 per PX85, as of July 2, 2025 he had not received one); PX304, ICE 20756–57 (attorney requested call on June 16, 2025, saying client was being held at 26 Fed; he received a message the next day directing him to use the detainee locator; after he responded that he knew his client was at 26 Fed and needed to speak to him, he was told his client was "in transit"); PX169, ICE 21774–76 (attorney requested call with client on July 2, 2025 and received message the next day that stated: "Your email has been received and forwarded to the unit currently responsible for review. Due to an overwhelming amount of inquiries being received at this time, please allow a minimum of 5-10 business days for a response," despite multiple follow up emails, it does not appear that a call was facilitated; PX85 shows the client was detained from June 27 to July 4, 2025); PX6, ICE 13809–11 (attorney sent call request on August 6, 2025 and

27

received "Your client is current in transit . . ." boilerplate response; she followed up on August 10 and her request was finally forwarded internally to SDDOs at 26 Fed who told her to forward a letter of representation and a G-28); Barry Statement, ¶ 15 (attorney had requested a legal call with him but he was not able to speak with her until after he had been transferred).[12]

One exchange from early July 2025 is illustrative of just how difficult it was for attorneys to speak to clients at 26 Fed during that time, no matter how persistent they were. On July 2, 2025, an attorney emailed ERONYCAPPOINTMENTS@ice.dhs.gov, along with the New York Outreach email address, saying she was informed that her client was at 26 Fed, stating that he did not have a removal order and could not be removed, instructing ICE not to question him outside the presence of his counsel, and requesting a call immediately, providing her phone number. PX168, ICE 21773. The following day she received a response instructing her to submit a G-28. *Id.*, ICE 21772. She attached the G28 and again requested a call immediately. *Id.*, ICE 21771. She then received the standard "Your client is currently in transit . . ." boilerplate email. *Id.* A few minutes later, the attorney requested that her client be permitted to call her, stating that he had a right to counsel. *Id.*, ICE 21770. She received another response from SDDO Pujol stating, "A legal call will be facilitated" and instructing her to "utilize the online detainee locator to determine his detention location once he is transferred and reach out to the relevant field office." *Id.*, ICE 21769. Ten hours later, the attorney responded that she still had not received a legal call from her client, stating "[h]e spoke with a friend who said that he doesn't remember my phone number and ICE will not allow him to access his phone contacts. Obviously you all have my phone number (see below) and should give it to him." *Id.*, ICE 21769. She followed up again the following morning, July 4, and did not receive a response until July 6, when she again received the boilerplate "Your client remains currently in transit to their final detention housing" language. *Id.*, ICE 21768. The following day, July 7, she followed up *again*, writing that from what she saw online and heard from the client's family, he was still at 26 Fed. *Id.*, ICE 21767. Five hours later she received the "Your client is currently in transit" language yet again. *Id.* Defendants' data reveals that the client was at 26 Fed throughout the entire five-day period that the attorney was diligently trying to arrange a call with him. PX85.

## J. Detained Individuals Were Deeply Harmed by Their Detentions at 26 Fed

Individuals detained at 26 Fed over the summer of 2025 suffered substantially and have sustained lasting trauma from the experience. *See* Lopez Benitez Statement, ¶ 19 ("I consider myself fortunate to have survived what I saw at 26 Federal Plaza. It was a miserable place. I hope no one has to ever live what I lived."); Chalco Statement, ¶¶ 20–21 ("It's traumatic to remember. I have tried to forget . . . . Being detained at 26th Federal–that is what truly takes the greatest toll: the desperation, the trauma, not knowing if I would get out, or when. That is what leaves a lasting mark on your life: it is incredibly difficult for a person's mind to endure"); Barry

---

[12] Defendants frequently also requested signed Form G-28s, even for prerepresentational calls, creating an additional obstacle for attorneys. *See, e.g.*, PX67, ICE 10965–68 (Zanello told attorney on August 22, 2025 that "your G-28 is unsigned by your supposed client or authorized signatory therefore we cannot disclose information nor facilitate a call."; when the attorney submitted a G-28, Zanello responded: "Your G28 is not signed."). In contrast, Joyce testified in his February 3, 2026 deposition that the policy prior to and after the Court's Orders was that only an attorney needed to sign a G-28 to facilitate a call for an adult who is detained. Joyce First Tr., 180:5–184:22.

Statement, ¶ 16 ("My time at 26 Federal Plaza affected me very negatively emotionally.  I feel I was treated like an animal."); Barco Mercado Statement, ¶ 21 (noting his time at 26 Fed was "very traumatizing"); Pascual Lopez Statement, ¶ 17 ("The experience of being at 26 Federal Plaza was very traumatic. . . . I was extremely worried and fearful not knowing what would happen to me, and not being able to speak to an attorney who could have explained my situation and options made my fear worse.").

Moreover, many people were pressured to self-deport particularly as a result of receiving misinformation from guards and being blocked from speaking with their attorneys to learn about their rights and options.  *See* Lopez Benitez Statement, ¶ 17 ("It would have helped me a lot to speak with an attorney because I was very upset by what the officer told me and I believed I would have to stay detained for four years to continue seeking asylum,  If my sisters had not given me the strength to continue, I might have considered accepting deportation like many others with me at 26 Federal Plaza decided to do."); Pascual Lopez Statement, ¶ 12 ("Many of the people I spoke with at 26 Federal Plaza had agreed to be deported. . . . It was a very difficult situation to be in.").

Martinez Ventura suffered a particularly traumatic experience at 26 Fed.  She has five dependent children, including two with autism and another with Type 1 Diabetes, and is their primary caregiver.  Martinez Ventura Statement, ¶ 3.  She was terrified during her detention that her children were not receiving adequate care, yet despite repeated emails from her attorney advising ICE both of Martinez Ventura's medical conditions and the critical risks to her children, ICE took no action; as a result, one of her children was hospitalized during Martinez Ventura's detention at the hold rooms.  *Id.* at ¶ 8; PX170, ICE 22302.  In addition to the terror of wondering what would happen to her children, Martinez Ventura found the conditions at 26 Fed deeply upsetting and harmful.  *See* Martinez Ventura Statement, ¶¶ 9, 11 (noting the stress of watching others suffer in inhumane conditions, and the harm of feeling like "a body that they crammed into a room, almost as if to be forgotten.").

Quevedo found the detention experience at 26 Fed deeply traumatizing and states that he "had not even gone through something like this in my home country" of Venezuela, which he left in 2023 because of fear for his life.  Quevedo Statement, ¶¶ 2, 13.  He also developed back pain from sleeping on the floor and still has nightmares about the lights being kept on for hours and being treated "worse than an animal."  *Id.*, ¶¶ 4, 16.  He "was in constant fear that [he] would disappear and no one would know where [he] was."  *Id.*, ¶ 16.

Chilavert Olmedo testified that his time at 26 Fed "affected [him] negatively emotionally."  Chilavert Olmedo Statement, ¶ 13.  He stated: "It is very painful to think about my six days there and that more people are going to keep getting jailed there just for going to court. It felt awful.  It is the first place ICE officers take you after being detained, and you have no idea why you're being punished in the first place."  *Id.*  When Chilavert Olmedo arrived in Paraguay after taking voluntary departure, he was not feeling well and lost consciousness on the street and later at the doctor's office.  *Id.*, ¶ 14.  He "received physical and neural exams, but the doctors stated that there was nothing physically wrong with [him.]  They said [he] needed to speak to a psychiatrist."  *Id.*  He now has "intense anxiety" that he takes medication for, and high blood pressure, which he did not have previously.  *Id.*  He wrote: "I feel like my time at 26 Federal

29

Plaza still haunts me. It is a nightmare and I cannot believe that human beings can be treated like that in a place like the United States." *Id.*, ¶ 15.

### K.    Conditions at 26 Fed Were Worse Than at Other Facilities, Including Criminal Detention Facilities

Evidence shows that conditions at 26 Fed were worse than at other facilities, including criminal detention facilities. Barry, who spent a total of eight months in detention, including at Delaney Hall and at a criminal detention facility in Nassau County, stated: "Of all the places I was detained in the U.S., I can say that 26 Federal Plaza was one of the worst – because we didn't eat, it was hard for me to find a place to sleep, we didn't take any showers, we couldn't brush our teeth." Barry Statement, ¶ 18. Quevedo noted that at Jackson Parish Correctional Center, he was finally able to have legal calls and "the officers actually speak to me and tell me that I have the right to seek counsel." Quevedo Statement, ¶ 15. Chilavert Olmedo noted: "I was in Joe Corley Detention Center after [26 Fed] and 26 Federal Plaza was the worst. There was no location worse than 26 Federal Plaza." Chilavert Olmedo Statement, ¶ 13. Pascual Lopez stated that he was eager to move somewhere else, and "[i]t was not until I was transferred that I was finally attended to, got medicine, and began to feel better." Pascual Lopez, ¶ 16. Joyce acknowledged that jails have beds and showers, and 26 Fed does not. Joyce Sec. Tr., 333:22–334:25. Joyce also conceded that while jails sometimes hold dozens of people in an open dormitory, such rooms are not the size of the holding cells at 26 Fed. *Id.*, 335:2-17. Once again, the hold rooms were not designed to hold people for days. *See supra*, at II & III.C–D.

### L.    Defendants Did Not or Could Not Reduce Crowding at the Hold Rooms Until This Court's Orders

Until Plaintiffs filed this case, Defendants could not or would not successfully bring down detention numbers at 26 Fed. *See* Hampton Tr., 121:24–122:11 (noting that the number of individuals held on the 10th floor was consistently too high until August 12). On August 7, *one day* before this case was filed, Calidonio sent an urgent email to various ICE officials and staff, writing "We currently have 138 detainees in NYC Hold Room," adding "The DOCC has communicated today that there is no bed space nationwide." PX7, ICE 13828–29. She wrote "New York City AOR is averaging 60 arrest[s] a day. If this average is accurate that would leave close to 200 detainees in NYC hold throughout the weekend." *Id.*, ICE 13829. As noted above, Joyce was asked about this email in his deposition. He acknowledged it was fair to say that Calidonio's email "reflected an urgent situation with too many people being in the hold rooms and there not being anywhere to transfer them to." Joyce Sec. Tr., 488:20–489:2. In response to Calidonio's concern on August 7, 2025 that the *status quo* "would leave close to 200 detainees in NYC hold throughout the weekend," Joyce stated: "It does say that. But since we just reviewed the - - logs, I don't see where we approached anything close to 200. So thankfully something happened." *Id.*, 491:9-16. While Joyce did not recall when he made that statement that this case was filed the following day on August 8, *id.*, 491:17-25, the numbers speak for themselves. The contractors' August logbook shows a sharp decrease in the numbers of detained individuals following the Court's TRO on August 12. *See* PX89, ICE-B-115 (August logbook, August 12); PX317, ICE-B-692 (rescanned pages, clearer but out of order, August 12).

30

Joyce acknowledged that the Court's Orders in this case played a large role in ultimately reducing numbers at the hold rooms. *See* Joyce Sec. Tr., 299:18–300:3 (Q: "And at some point, the numbers in the hold rooms did come down significantly; right?" . . . A: "Yes. Certainly beginning with the TRO, we got it down to the 22 that we came up with based on the parameters that were given to us by the judge."); *id.*, 346:14-17 (noting that in addition to bedspace becoming available at MDC Brooklyn, the Court's orders in this case "also played a factor in bringing the numbers down"); *see also* PX102, ICE 25449 (Joyce writing in an email responding to contractor shortfalls, "We are also restricted now by Court order to maintain the population at a much more manageable level, so, there is that, as well.").

Likewise, Defendants were only able to increase medical staffing to 24 hours per day because of the Court's order. Before the Court's order, Jacobs had already recognized the need for overnight medical coverage and "had already requested overnight staffing" from her superiors. Jacobs Tr., at 54:20–55:5. Her superiors did not approve that request until after the Court issued its order, and she "was happy" that the Court's order required this 24/7 staffing because, in her words, the "mission had shifted" at the hold rooms. *Id.*, 55:2-56:11; *see also* PX33, ICE 11256–57. Joyce also called the imposition of 24/7 IHSC healthcare staffing at 26 Fed "one silver lining" of the litigation. PX32, ICE 27316, and Zanello wrote on August 18, 2025 that the 24/7 staffing was "good news." PX33, ICE 11256–57.

There is no question that Defendants had notice of the overcrowding and other conditions at 26 Fed over the summer of 2025. In addition to the many internal emails cited throughout this memo and the fact that ICE officials were on site witnessing the egregious conditions, there was also extensive press coverage of the overcrowding and conditions at 26 Fed over the summer. *See* PX141–149 (miscellaneous new articles).[13]

Moreover, Defendants were violating their own policies. Defendants' Hold Room Directive, Policy Number 11087.2, PX150, P53-67 imposes standards on temporary ICE hold rooms, including that meals are provided at least every six hours, that hold rooms are "safe [and] clean," that detained individuals have "access to . . .prescribed medication as necessary," and that holding facilities should be emptied upon the conclusion of daily operations, absent exceptional circumstances (or within 72 hours as modified by the June 24, 2025 waiver). *Id*. at

---

[13] PX141 (Luis Ferré-Sadurní, "ICE Must Improve Conditions in N.Y.C. Migrant Holding Cells, Judge Rules," *New York Times* (updated August 13, 2025)); PX142 (Luis Ferré-Sadurní, "Immigrants File Class-Action Lawsuit to Stop ICE Courthouse Arrests," *New York Times* (July 16, 2025)); PX143 (Emily Ngo, "Is 26 Federal Plaza a Detention Facility?," *Politico* (July 22, 2025)); PX144 (Joe Torres, "NYC Leaders Call for Inspection After Video Shows Poor Conditions at Federal Plaza Detention Center," *ABC7* (July 23, 2025)); PX145 (Alice Gainer & Adi Guajardo, "Video Shows Conditions Inside NYC's ICE Processing Center at 26 Federal Plaza," *CBS News* (July 23, 2025)); PX146 (Luis Ferré-Sadurní, "Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan," *New York Times* (July 22, 2025)); PX147 (Luis Ferré-Sadurní, "What's Inside a 10th Floor ICE Office? New York Democrats Want to Know.," *New York Times* (June 20, 2025)); PX148 (Haidee Chu & Gwynne Hogan, "'Like Dogs in Here' – Videos Expose ICE Lockup Inside 26 Federal Plaza," *The City* (July 22, 2025)); PX149 (Arya Sundaram, "'They're Killing Us': Immigrants Complain of Inhumane Conditions Inside NYC Holding Site," *Gothamist* (July 9, 2025)). Defendants have objected to these exhibits as hearsay, but these often include admissions by Defendants, Fed. R. Evid. 801(d)(2)(A); additionally, many statements are not submitted for the truth of the matters asserted, but rather to show that Defendants were on notice.

§ 3.2 n.3, § 4.4.1.2, § 4.4.1.3, and § 5.7(2).  Conditions at 26 Fed over the summer also violated Defendants' National Detention Standards, which requires ICE to permit legal visitation seven days a week including holidays, allow all detained individuals to place calls to attorneys and other legal representatives, and provide detained individuals with basic personal hygiene items. PX151, P68–299, at 19, 65, 166.  *See also* PX153, P302–21 (ICE Performance Based National Detention Standards, 5.6 & 5.7).[14]

**IV.    Defendants Repeatedly Have Violated the Court's Orders and Have Withheld and Obfuscated Evidence of Violations**

**A.    Defendants Frequently Have Violated Cell Capacity Limits**

As shown in the previous section, Defendants' records make clear that the number of individuals being held at 26 Fed dropped significantly after this Court's Orders.  Nevertheless, Defendants routinely have violated the Court-ordered capacity limits acknowledged by Zanello in her August 18, 2025 Supplemental Declaration:

> When providing at least fifty square feet of floor area to each alien in custody (exclusive of floor area within eight feet from any toilet), the following maximum number of aliens can be held:  Room #1 (820.78 sq. ft.) – eleven aliens; Room #2 (173.87 sq. ft.) – one alien; Room #3 (173.04 sq. ft.) – one alien; and Room #4 (655.12 sq. ft.) – nine aliens.[15]

Zanello Suppl. Decl., ¶ 9.  On well over 100 occasions between September 2025 and March 2026, as documented in emails circulated by Defendants internally twice a day – most of which Defendants did not produce until May 1, 2026 – the cell counts for individual cells exceeded the capacity limits permitted by the Court's Orders.  *See, e.g.*, PX179, ICE 31192–93 (cell 2 at 300% over capacity on September 19, 2025); PX21, ICE 23291–92 (cell 4 at 36% above capacity on December 30, 2025); PX12, ICE 23238 (same on December 31, 2025); PX13, ICE 23239 (same on January 1, 2026).  *See also* PX14, PX176–178, PX185–PX300 (reflecting 125 more instances of cell capacity violations between September 2025 and March 2026).

In fact, on April 22, 2026, Joyce – *the person in charge of compliance with the Court's Orders*, *see* PX 128 (Defendants' Amended Supplemental Responses and Objections to Plaintiff's First Combined Discovery Requests), at 5; Joyce First Tr. 65:18–66:13; 235:19-22; Joyce Sec. Tr., 349:24–350:14; 352:20–353:15; 456:13-18 – acknowledged that prior to his April 22, 2026 deposition, he had not been thinking about cell-specific limits, and had only been focused on keeping the number of detained individuals under the 22-person total cap.  *See* Joyce

---

[14] As this Court noted in its PI Opinion, "Defendants argue that ICE PBNDS standards are inapplicable because 26 Fed is a holding, rather than detention, facility.  However, these standards serve as a valuable point of reference because 26 Fed acts as a *de facto* detention center, where detainees are held for days, or in some cases, weeks.").  PI Opinion, at 76, n.293.

[15] It bears noting that even when the population is kept under these limits, it is still tight in the holding cells.  *See, e.g.*, Chalco Statement, ¶ 9 (noting that during his detention in early November 2025 there were "usually around 8 to 11 people in the room we were in" and "[t]here was not much space to move around.").

Sec. Tr., 456:25–468:8; PX174, ICE 32912–13 (April 23, 2026 email from Joyce to Hampton the day after his deposition instructing him to "look at the capacity of **\*each\*** individual cell, as opposed to the maximum of 22 for the cells collectively as we had been previously") (emphasis in original). Contractor Robert Mitchell, one of the individuals responsible for placing people in the holding cells, likewise acknowledged that he did not understand the per-cell limits, approximately eight months after this Court ordered them in place. *See* Mitchell Tr., 167:8-19 (Q: "[S]itting here today, what do you understand the maximum number of people can be put in each of the four cells?" A: "I believe it's - - I - - I believe it's - - I want to say 20 in one of the cells; 18 or 16. I can't remember. And then the smaller cells; I believe it was 3 to 4. Okay. Somewhere along those lines.").

Even considering only the total 22-person limit, as Defendants apparently had been doing until April 22, 2026, Defendants' own data indicates that between August 13, 2025 and March 9, 2026, the population exceeded 22 at some point during the day on 102 days, or 48.8% of days. *See* Asnes Statement, ¶ 26. It appears that the contractors' logs significantly under-counted the detained population, as those logs rarely acknowledged there being more than 22 people detained at 26 Fed during that time same period. *See* DX64 and 65. Yet even the contractors' logs confirm that on some occasions after the TRO was issued, more than 22 people were held at the hold rooms. *See, e.g.*, PX317, ICE-B-696–711 (population often significantly above 22, sometimes over 60, before August 22, 2025); PX317, ICE-B-719 (detained population reached 26 on August 27, 2025); PX317, ICE-B-721–211 (detained population reached 24 on August 28, 2025) PX154, ICE-B-1151 (detained population reached 23 on September 11, 2025).

The following chart shows how high the detainee population reached on each day from January 1, 2025 to March 9, 2026, with bars in red indicating days the population exceeded 22:



## B.    Defendants Have Withheld and Obfuscated Evidence of Violations

Not only have Defendants failed to comply with the Court-ordered capacity limits, but they have repeatedly withheld and obfuscated evidence of their non-compliance.  To give one egregious example, when Defendants produced compliance-related documents in December 2025, specifically in connection with Plaintiffs' *motion to hold Defendants in contempt of the Court's Orders*, they redacted the following statement by Zanello from an email she sent on August 18, 2025:  "[T]he hold room needs to drop the population to 22. We are in violation of the TRO. We are currently at 48 and have at least 13 more coming in. We also have court arrests occurring."  PX69, ICE 11635 (unredacted version).

Original redacted version:



34

PX127. Unredacted version eventually produced:



From: Zanello, Nancy ████████████████
Sent: Monday, August 18, 2025 9:51 AM
To: Almodovar, Judith ███████
Cc: Joyce, William P ███████████████    Morales, Alberto ████████████
Subject: TRO - Compliance
Importance: High

Good morning,

Just spoke to Xiao, the hold room needs to drop the population to 22. We are in violation of the TRO.

We are currently at 48 and have at least 13 more coming in. We also have court arrests occurring. Has HQ provided any guidance?

PX69.

This redaction was one of hundreds of improper redactions that invoked, without support or basis, the law enforcement and/or deliberative process privileges. Because Defendants originally produced a version of this document that redacted this statement – and the portion of Joyce's response about the exceeded capacity – Plaintiffs' counsel was not able to question Joyce about it during his first deposition on February 3, 2026. *See* PX127, ICE 11635 (original redacted version). We confronted Joyce with the redacted version of the document at his contempt-related deposition because it contained a statement by him referring to the TRO as "crippling," Joyce First Tr., 164:25–166:9, but we had no opportunity to confront him with Zanello's express acknowledgements of a capacity-limit violation, and did not have the opportunity to use that document in preparing our contempt reply papers.[16]

Moreover, despite the fact that Defendants have been sending out emails with the count of each holding cell twice a day since at least September 2025, *see* PX11–14; PX176-300; Calidonio Tr., 181:16–182:8; 189:24–190:12, Defendants did not produce any daily cell count email in discovery until March 27, 2026, at which time they produced only a handful of them. This delay occurred despite the parties' negotiated ESI search terms implemented in December and March 2025 including the word "capacity," which appears in several of these emails. *See, e.g.*, PX176, PX207, PX218, PX222, PX226. Defendants finally produced the majority of the daily cell-count emails only on May 1, 2026, after Plaintiffs' counsel demanded them again following Calidonio's acknowledgment in her April 21, 2026 deposition that such were routine and ongoing. Defendants also did not produce the contractors' logbooks – core, contemporaneous records easily ascertainable and available, and reflecting crowding numbers and later of compliance or non-compliance with the Court's Orders – until we learned of their existence during Lige Hampton's deposition on April 13, 2026. *See* Hampton Tr., 193:17-

---

[16] It was only after Plaintiffs pressed Defendants for a privilege log, which they first produced on April 7, 2026, that Defendants identified the purported bases for their privilege assertions. Plaintiffs subsequently challenged the majority of the privilege assertions, and Defendants then produced unredacted versions of nearly all of the documents containing challenged assertions beginning on April 15, after depositions in the case in chief had already begun.

194:13.  The first set of logs were only produced to us on April 17, 2026, months after the first document responses were due from Defendants in this case.

Other documents suggest that Defendants have attempted to hide other evidence of non-compliance with the Court's Orders in this case.  Logbook pages reveal apparent mathematical errors that falsely identify the total count as within the 22-person limit.  *See* PX156 (at 0135 on December 31, 2025, a detained person was brought in and contractor noted "+1," but total number stayed at 22 instead of increasing to 23).  *See also* PX89, ICE-B-117 (notation in contractor log on August 15, 2025 stating: "Spoke to supervisor Hampton to inform him that cell 4 has a [sic] occupancy of 16 he stated continue as usual").  Most strikingly, while the contractor logbooks for September 2025 through April 2026 almost never show the count going over 22, *see* DX64, ICE-B-1131–1268 and DX65, ICE-B-1269–1331, analysis of Defendants' own book-in and book-out data, which as noted above *understates* the amount of time an individual spends at 26 Fed, *see* n.7 *supra*, reveals that between August 13, 2025 and March 9, 2026, the population exceeded 22 at some point in the day on ***102*** days, or on 48.8% of days.  *See* Asnes Statement, ¶ 26.  This suggests that the contractors' logs were often significantly undercounting the population held at 26 Fed, likely after the Court's Orders in this case were entered.

## C.    Defendants Further Violated the Court's Orders By Holding People on the 5th and 9th Floors Without Complying With the Court's Orders

Evidence further indicates that Defendants attempted to exploit what they perceived was a loophole in the Court's Orders by holding people on the 9th and 5th floors instead of on the 10th floor, despite the fact that the Court's Orders explicitly stated that Defendants must ensure that:  "no person detained by ICE at 26 Federal Plaza, New York, New York . . . is held or detained in any hold room or other room, cell, or other space," and thus plainly applies to any such cell or space in the building.  ECF No. 97.  *See* Joyce First Tr., 152:13-23 (stating at February 3 deposition that people were held on the 9th floor and that he was not aware of anyone applying the requirements of the Preliminary Injunction to the 9th floor); Hampton Tr., 102:19–107:3 (stating that individuals were frequently held on the 5th and 9th floors when there were more than 22 people on the 10th floor); Hampton Tr., 109:21-24 (testifying that he was not aware of any policy applying to people held on the 9th floor); Joyce Sec. Tr., 302:8–305:5 (noting that individuals and families are held on the 9th and 5th floors).  While Defendants were holding individuals on the 9th floor, they did not circulate or apply the Court's Orders' capacity limitations to those cells.  According to floor plans produced in discovery, PX163 at 12, the 9th floor cells are 201.60 square feet, 193.97 square feet, 164.75 square feet, and 132.44 square feet. The first three cells listed have a toilet, so excluding space within 8 feet of a toilet as required by the Court's Orders, these cells can hold at most one or two individuals.  *See* TRO § 1(a) & Prelim. Inj. § 1(a).  Photos of these cells reveal that they are tiny and cramped.  *See* PX 301, at P001319, P001320, P001322, P001324, P001326, P001331, P001332, P001333, P001334, P001337, P001338, P001339, P001340, P001342, P001344, P001348, P001351, P001353, P001356, P001357, P001360, P001371, P001374, P001376, P001377, P001380.

Despite the small size of the 9th floor cells, Defendants would nevertheless hold multiple people in them after the Court issued its Orders.  *See, e.g.*, PX21, ICE 23291 ("11 bodies on the 9th floor" on December 30, 2025); PX20, ICE 23290 ("11 bodies on the 9th floor" on December

36

31, 2025); PX13, ICE 23239 (11 individuals being held on the 9th floor on January 1, 2026); PX18, ICE 23274 (4 men in 9th floor Hold on January 9, 2026); PX203, ICE 31072 (noting "4 males from NCDM 9th floor" in population count email); PX223, ICE 31428 (holding two men in one ninth floor cell, despite available space in other cells); PX228, ICE 32896 ("6 detainees on 9th floor sally port"); PX231, ICE 32428 (3 men in one cell on 9th floor); PX238, ICE 32832 (6 men in one cell on 9th floor on January 5, 2026, Joyce noted "Not ideal for watching two different floors"); PX246, ICE 32820 (two men in cell 2 and four men in cell 3 on the 9th floor); PX247, ICE 32485 (4 men on 9th floor); PX248, ICE 32612 (three men in cell 2 and three men in cell 3 on the 9th floor); PX255, ICE 32397 (six people on the 9th floor); PX257, ICE 32354 (same); PX263, ICE 32325 (five people on the 9th floor); PX272, ICE 32335 (same); PX273, ICE 32336 (3 individuals in one cell on 9th floor);. Hampton testified that he would instruct individuals to be held on the 9th floor when the 10th floor was full but also testified that he was not aware of the capacity limits for the cells on the 9th floor. *See* Hampton Tr., 238:12-239:7 (people were held in the 9th floor cells, but not aware of capacity limits); Hampton Tr., 266:14-269:4 (acknowledging he would sometimes send people to the 9th floor when others were being held there); PX19, ICE 23284-85 (Hampton sending someone to the 9th floor because the 10th floor was at max capacity, without addressing capacity on the 9th floor).

Defendants acknowledged that families are also detained on the 5th floor, and that they do not apply the terms of the Court's Orders to the 5th floor. *See* PX328, Deposition of Assistant Field Office Director Alberto Morales, dated Apr. 23, 2026 ("Morales Tr."), 63:5-10 (roles and responsibilities did not change on the 5th floor after the Court's Orders); *id.*, 151:2-152:24, 230:24–231:23 (discussing family detained on the 5th floor until 8:30 p.m.); *id.*, 273:4–274:7 (testifying that once a family is detained, they are held on the 5th floor pending transfer to the contractor); *id.*, 166:7-18 (no instructions provided to families about ability to use private room for attorney calls and no medical personnel on the 5th floor); *id.* at 194:10-17 (door of room for attorney calls remains open); *id.*, 286:23–287:6 (no policies governing when individuals can make phone calls on the 5th floor); *id.*, 299:13-22 (no process for attorneys to request to speak to families).

**D.    Defendants Have Violated the Court's Orders in Other Ways, Including By Not Providing Confidential Legal Calls, Notices of Rights, or Health Care Services**

Defendants have violated the Court's Orders in other ways. For months after the Court issued its orders, Defendants did not even attempt to provide confidential calls. *See* Chalco Statement, ¶ 11 (writing that in November 2025, he was only offered one five-to-seven-minute call per day and "[t]here was always a guard there when I did so"). *See, e.g.*, III.I.2., *supra* (making clear that calls took place in the processing area and at the contractors' desks, where there was no privacy and contractors and other staff could listen to them, through February 2026); Carbone Tr., 60:8–61:20; 66:4–68:18; 80:8–20; 89:12–90:18 (describing that the phone calls would take place "up front at the intake desk" where there were "[u]sually between" "two to four" contractors stationed or "in the back area where the processing is taking place"). This practice changed only after Plaintiffs required Defendants to begin providing a confidential room for attorney calls as a condition for settling their contempt motion. *See* Contempt Motion Stipulation and Order, ECF No. 141, ¶ 2.

37

Even then, attorneys continued to encounter difficulties in scheduling calls with their clients who were detained at 26 Fed.  *See* PX133, ICE 10655–57 (in response to attorney call request on October 1, 2025, attorney was instructed to submit a signed G-28, then was told there was no availability that week, the next available time offered was six days later); PX137, ICE 167–69 (on November 26, 2025, ICE officers disrupted and ended legal call and when attorney requested to be put back on the phone, did not receive a response until five and a half hours later, when an SDDO Marcellin told her that her client was *en route* to another facility); PX139, ICE 177–78 (attorney requested call on November 26, SDDO Marcellin asked for a contact number, which she provided promptly; when she followed up *five* days later, she was told her client had been moved); PX140, ICE 212 (attorney requested call with two individuals detained at 26 Fed on December 10, 2025, did not receive a response).

As recently as February 17, 2026 – months after Plaintiffs filed a motion to hold Defendants in contempt for failing to comply with the Court's Orders, particularly those pertaining to attorney access – attorneys were still having difficulty scheduling calls.  On February 15, 2026 at 9:22 a.m., an attorney emailed the dedicated email inbox set up by ICE in November 2025 for attorney calls for 26 Fed, *see* PX136, Declaration of William Joyce, dated Dec. 9, 2025, ¶ 27, with the subject line "URGENT – Legal call with detainee", requesting a call. PX310, ICE 28614.  At 7:01 pm that evening, nearly ten hours later, she received an email asking when would be a good time for her client to contact her.  *Id.*  She responded that she was available any time that night or the next day and provided her phone number.  *Id.  Two days later*, at 11:47 a.m. on February 17, 2026, the attorney followed up, asking for her client to call her.  *Id.*, ICE 28613.  Six hours later, at 5:50 p.m., she received an email saying that her client would "be calling you now."  It is not clear whether this call was ever made, but according to PX85, ICE 23114, that individual was booked out on February 17, 2026 at 5:35, 15 minutes before that email was sent.

It also became evident in contempt-related discovery that the notice of rights mandated by the Court's Orders was not being given to detained individuals in any routine, consistent, or documented way.  *See* Section III.E.5., *supra* (discussing this issue); *see also* Chalco Statement, ¶ 10 ("Neither my son nor I got any kind of paper telling us what our rights were, such as the right to request a private call or a change of clothes.").

Another ongoing issue of non-compliance was that calls to the phone number for attorneys to call detained individuals at 26 Fed were being diverted to a call center that lacked adequate information to field such call requests, which Defendants later acknowledged in testimony.  Joyce First Tr., 199:12–200:5; 222:12-15.  Even when Defendants were put on notice of these issues, they did not improve.  *See, e.g.*, PX129 (Plaintiffs' counsel's second non-compliance letter to defense counsel in this case dated November 12, 2025, raising attorney access and other violations of the Court's Orders); PX134, ECF No. 114 (attorney Deisy Flores reporting in declaration that when she called the (212) 436-9400 number, she was told it was not the right number and calls for individuals held at 26 Fed got routed to them "a lot").[17]  These

---

[17] Defendants have objected to Exhibits PX129 and PX134 as hearsay; Plaintiffs have provided these exhibits not for the truth of the statements therein but to show that Defendants were on notice.

problems were addressed in the Contempt Stipulation that was executed on February 27, 2026. ECF No. 141.

There was also a period of time during which ICE Health Service Corps's ("IHSC") own policy appeared to violate the health-care related requirements of the Court's Orders. On September 17, 2025, Joyce drafted a Leadership Advisory stating that "while ERO New York City has done everything within its power and authority to maintain compliance with the overreaching and overly burdensome [Preliminary Injunction] . . . At issue and of concern is that IHSC may be unaware that these requirements, now in the form of a PI, are imposed by a competent court of jurisdiction and that IHSC's policy may violate the order, specifically as it relates to this imposed condition – that aliens in custody are able to *"...request and to be provided without charge with professional services of licensed medical personnel between the hours of 7a.m. and 9:30 p.m. and, in case of emergency, during all other periods"*, in that local IHSC has indicated that IHSC leadership has directed that *"26 Federal Plaza will operate as a 12-hour hold facility, for medical purposes"* . . . and that . . *"any processes currently occurring outside the scope of a 12-hour facility will cease"*, specifically that they will:

- *Cancel all TDY APP requests.*
- *Discontinue daily sick call and pill line.*
- *Realign the staffing schedule for 12-hour coverage.*
- *Discontinue routine medication management.*

PX38, ICE 11755; *see also* Jacobs Tr., 126:9-17. Jacobs, Assistant Health Service Administrator, testified that IHSC leadership had directed that TDY APP requests – "temporary duty station . . . advanced practice provider" requests – be cancelled. Jacobs Tr., 127:4-22. Accordingly, advanced practice providers such as physicians assistants, nurse practitioners, and physicians, who are all able to prescribe medication and make diagnoses, have not been available on-site at 26 Fed since a single period of under two weeks, and the pill line and daily sick calls were likewise discontinued after a short period in the summer 2025. *Id.*, 127:20–128:9; 134:8-11; 134:24–136:6; 140:12–141:9 (discussing PX38); 32:31:11–33:2. *See also* PX39, ICE 23562 (noting on January 22, 2026 "We don't have APPs onsite at Federal Plaza."). Relatedly, at his deposition, Hampton was unaware of any policies regarding prescription medication at the hold rooms. Hampton Tr., 158:21–159:4; *see* Prelim Inj. § 2(g).

Moreover, despite evidence of Defendants holding individuals on the 5th and 9th floors, Jacobs testified that she did not know whether there is any healthcare provided on those floors. Jacobs Tr., 23:20–24:6, 25:20–26:5; 117:13–118:14 ("We don't see anybody who's not booked into the tenth floor hold room at 26 Federal Plaza. If they're elsewhere, they're not our patient.").

Finally, as recently as April 2026, the contractors who provide for the basic needs of the detained population at 26 Fed do not receive specific training about the facility, and while post orders apparently do exist, contractors acknowledged not having reviewed them. *See* Hutson Tr., 28:15-23 (no 26 Fed-specific training); *id.*, 29:22–31:5 (aware of post orders but never really mentioned or reviewed); Mitchell Tr., 77:12–78:2 (describing the ICE PBNDS as the relevant policy document); *id.*, 156:15-20 (Mitchell, a supervisor, never saw post order); *see also* Joyce

Sec. Tr., 278:5-10 (testifying generally that he was not aware of "any specific training for the 10th floor").

### V.    Without Additional Court Intervention, the Conditions That Gave Rise to This Case Will Resume and Continue

All of the circumstances that led to the unconstitutional and inhumane conditions at the hold rooms over the summer of 2025 persist.  Zanello testified that the rate of immigration arrests had not gone down as of her April 17, 2026 deposition.  Zanello Tr., 246:9-12.  Joyce testified that there is still no option to discretionarily release immigrants, which sometimes leads to longer detentions at 26 Fed.  Joyce Sec. Tr., 324:7-14.  And the Trump administration continues to make public statements about their intention to continue arresting high numbers of immigrants, including in the New York area.  In a January 20, 2026 press release, DHS stated: "In 2026, CBP will continue to deliver the most secure border ever and continue to support ICE operations by arresting and removing the worst of the worst criminal illegal aliens from our nation's interior. . . . Now, in 2026, ICE has the ground running with 120% more officers and agents after hiring 12,000 Americans to help President Trump deliver on his signature promise."[18]

On May 5, 2026, Tom Homan threatened that if New York enacted any laws to protect immigrants:  "We're going to flood the zone. You're going to see more ICE agents than you've ever seen before."[19]

---

[18] *DHS Sets the Stage for Another Historic, Record-Breaking Year Under President Trump*, Dep't of Homeland Sec. (Jan. 20, 2026), *available at* https://www.dhs.gov/news/2026/01/20/dhs-sets-stage-another-historic-record-breaking-year-under-president-trump.  Like the articles cited above, these articles include admissions by Defendants, Fed. R. Evid. 801(d)(2)(A).

[19] Jimmy Vielkind, *Trump Immigration Czar Pledges Punishment if NY Lawmakers Limit Cooperation with ICE*, Gothamist (May 5, 2026), *available at* https://gothamist.com/news/trump-immigration-czar-pledges-punishment-if-ny-lawmakers-limit-cooperation-with-ice.  Plaintiffs offer these articles for the fact that the Trump administration made these announcements of its intended policies, and as statements of a party-opponent.

## VI.    Conclusion

In summary, voluminous evidence produced in discovery, largely by Defendants, establishes clearly that the conditions at 26 Fed over the summer of 2025 prior to this case being filed violated the First and Fifth Amendment rights of the thousands of individuals held there during that time.  This Court's Orders have made an enormous impact in forcing the reduction of numbers of detained individuals at the facility and in improving conditions for the people who are held there.  Defendants' communications, pattern of persistent non-compliance, and obfuscation after the Orders went into effect demonstrate that further Court intervention is necessary to prevent future constitutional violations, particularly because the underlying circumstances have not changed.  We request that the Court issue a permanent injunction to protect the rights of everyone who will be held at 26 Fed in the future.[20]

---

[20] This Court already conducted a "full Rule 23 analysis" in provisionally certifying the class, ECF No. 96 at 43 (citation omitted), and Defendants have not sought to decertify this class for purposes of permanent relief. Plaintiffs thus believe no further briefing is necessary on class certification.  However, should the Court desire briefing explaining why this full Rule 23 analysis applies with equal force based on the current evidentiary record, Plaintiffs will submit a motion for non-provisional class certification. Plaintiffs likewise plan to move to modify the class definition to include people held at 26 Fed for under 12 hours. The Court's initial class certification ruling found that "[p]laintiff does not allege plausibly that detainees held for less than 12 hours suffer any injury — much less one that is common with the rest of the class — as a result of defendants' alleged constitutional violations." *Id.* at 44. Plaintiff plans to explain in this motion that the present evidentiary record supplies the showing that the Court found lacking at the preliminary injunction stage. Plaintiffs will request the Court's guidance on the proper timing for such a motion.

41

Dated: May 20, 2026

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
Carmen Iguina González
915 15th Street, N.W.
Washington, DC 20005
202-548-6616
ciguinagonzalez@aclu.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
Kyle Virgien

425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

kvirgien@aclu.org

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher
Robert Hodgson
Claire Molholm
Molly K. Biklen
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300
abelsher@nyclu.org
rhodgson@nyclu.org
cmolholm@nyclu.org
mbiklen@nyclu.org

WANG HECKER LLP

 /s/ Heather Gregorio_____
Heather Gregorio
Mariann Meier Wang
Alice Reiter
Daniel Mullkoff
Lily Sawyer Kaplan
111 Broadway, Suite 1406
New York, New York 10006
(212) 620-2600
hgregorio@wanghecker.com
mwang@wanghecker.com
areiter@wanghecker.com
dmullkoff@wanghecker.com
lsawyerkaplan@wanghecker.com

MAKE THE ROAD NEW YORK
Harold A. Solis
Paige Austin
301 Grove Street
Brooklyn, NY 11237
Tel. (718) 418-7690
Fax (866) 420-9169
harold.solis@maketheroadny.org
paige.austin@maketheroadny.org

*Attorneys for Plaintiff and the provisionally certified class*