UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: __________
DATE FILED: 9/24/2026

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SERGIO ALBERTO BARCO MERCADO, etc.,

Plaintiff,

-against-

25-cv-6568 (LAK)

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, etc., et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION GRANTING PERMANENT INJUNCTION AND CERTIFYING CLASS**

Appearances:

Alice Reiter
Heather Gregorio
Mariann Meier Wang
Daniel Mullkoff
WANG HECKER LLP

Carmen Iguina Gonzalez
Kyle Virgien
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Harold A. Solis
Paige Austin
MAKE THE ROAD NEW YORK

Amy Belsher
Molly K. Biklen
Robert Hodgson
NEW YORK CIVIL LIBERTIES UNION FOUNDATION

*Attorneys for Plaintiff*

Jeffrey Oestericher
Rachel Kroll
Assistant United States Attorneys
JAMES M. MCDONALD
UNITED STATES ATTORNEY
*Attorneys for Defendants*

***Table of Contents***


Facts . . . . . 3
ICE . . . . . 4
ICE Holding Facilities and Hold Rooms Generally . . . . . 5
ERO Directive 11087.2 . . . . . 6
National Detention Standards . . . . . 8
ICE – Overwhelmed by Arrest Volume – Eliminates Any Effective Limits On Hold Room Conditions . . . . . 11
26 Fed Hold Rooms . . . . . 16
Tenth Floor . . . . . 17
Ninth Floor . . . . . 23
Fifth Floor . . . . . 25
Arrest Volume Swamps 26 Fed . . . . . 27
Overcrowding . . . . . 27
Extended Duration . . . . . 33
Inadequate Sleeping Conditions . . . . . 36
Unsanitary Conditions and Denial of Personal Hygiene and Privacy Needs . . . . 39
Insufficient Food and Water . . . . . 44
Inadequate Medical Precautions and Care . . . . . 48
Restrictions on Access to Counsel . . . . . 55
Cruelty and Effect on Detainees . . . . . 64
The TRO and PI . . . . . 69
ICE's Noncompliance with the TRO and PI . . . . . 72
Exceeding Capacity Limitations . . . . . 73
Failing to Provide Confidential Legal Calls . . . . . 78
Detaining Individuals on Other Floors . . . . . 81
Reducing Overcrowding But Failing Consistently to Improve Other Conditions . . . . . 85
Discussion . . . . . 90
I. Subject Matter Jurisdiction – Mootness . . . . . 91
II. Permanent Injunction . . . . . 94
A. Fifth Amendment Claims Relating to Conditions of Confinement . . . . . 94
1. Deliberate Indifference to Inhumane Conditions of Confinement . . . . . 96
2. Punitive Conditions of Confinement . . . . . 102
B. First and Fifth Amendment Claims Relating to Access to Counsel . . . . 105
III. Class Certification . . . . . 108
A. Rule 23(a) Requirements . . . . . 109
1. Numerosity . . . . . 110
2. Commonality . . . . . 111
3. Typicality . . . . . 115
4. Adequacy . . . . . 117
B. Rule 23(b)(2) Requirements . . . . . 118
IV. Relief . . . . . 119
Conclusion . . . . . 124

LEWIS A. KAPLAN, *District Judge*.

Our nation often has been deeply divided over immigration policy. While there have been times when immigration was unrestricted or liberally allowed, there have been others marked by conflicts over who should be allowed to settle here, in what numbers, and on what terms. As immigration, particularly illegal immigration, to the United States has swelled in recent history, many – as is their right – again have taken up calls for tighter restrictions and stricter enforcement.

The current administration has answered those calls by promising to deliver "the largest deportation operation in the history of our country."[1] In pursuit of that goal, the administration has attempted to make as many immigration arrests as possible.[2] It has insisted – contrary to prevailing law and practice – that substantially all arrested persons be incarcerated pending often lengthy removal proceedings.[3] It has paid inadequate regard to the shortage of suitable facilities in which to hold them. This has "produced – and reportedly continue[s] to produce

1 *Promises Made, Promises Kept: Border Security Achieved in Fewer than 100 Days*, WHITE HOUSE (Apr. 28, 2025), https://www.whitehouse.gov/releases/2025/04/promises-made-promises-kept-border-security-achieved-in-fewer-than-100-days/ (internal quotation marks omitted).

2 *See* Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. TIMES (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html (describing administration's current goal of 2,000 arrests per day); Hamed Aleaziz, *Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests*, N.Y. TIMES (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html (describing administration's previous goal of 3,000 arrests per day); Cameron Arcand, *Trump Administration Sets New Goal of 3,000 Illegal Immigrant Arrests Daily*, FOX NEWS (May 29, 2025, at 15:25 ET), https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day (same).

3 *See, e.g.*, Pet. Writ Cert. at 2, *Putra v. Lopez-Campos*, No. 25-1415 (U.S. June 22, 2026).

– a surge of detainees that has overwhelmed existing facilities and strained operational resources."[4] For want of sufficient appropriate places to put them, U.S. Immigration and Customs Enforcement ("ICE") has confined many of those arrested in overcrowded, squalid, and degrading rooms for excessive periods of time.

Among the facilities overwhelmed by the recent surge in immigration arrests has been the ICE regional office at 26 Federal Plaza in New York City ("26 Fed"). That location has so-called "hold rooms" that were intended and designed only for very short-term custody – twelve hours or less – of arrested persons pending their transfer to other facilities. The hold rooms have no showers, no beds, no cots, no windows, and lack many other things found in prisons and detention facilities. But ICE has been arresting as many people as it can – more people than it can accommodate in appropriate detention facilities or remove from the country. ICE has dealt with those resource constraints by misusing the hold rooms. It has overcrowded severely the 26 Fed hold rooms, subjecting detainees for extended periods to inhumane conditions that violate the Constitution, not to mention any decent concern for the Golden Rule or the demands of humanity. And 26 Fed is not unique. Comparable litigation has been brought in several other locations with respect to several other ICE detention and holding facilities.[5]

---

[4] *Mercado v. Noem*, 800 F. Supp. 3d 526, 540 & n.4 (S.D.N.Y. 2025) (citing sources).

[5] *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084 (N.D. Cal. 2025), *appeal filed sub nom. Garcia v. Albarran*, No. 25-8055 (9th Cir. Dec. 23, 2025); *D.N.N. v. Liggins*, 822 F. Supp. 3d 543 (D. Md. 2026); *Gomez Ruiz v. ICE*, 834 F. Supp. 3d 835 (N.D. Cal. 2026), *appeal filed sub nom. Gomez Ruiz v. CoreCivic, Inc.*, No. 26-3344 (9th Cir. May 26, 2026); *Gonzalez v. Noem*, No. 25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025); *L.T. v. ICE*, No. 26-cv-322, 2026 WL 2338452 (C.D. Cal. Aug. 12, 2026).

Make no mistake, decisions about immigration and related enforcement policies are largely committed to the political branches of our government – Congress and the Executive, not the courts. But there are limits. The Constitution demands humane treatment of everyone in government custody. It requires that they receive due process of law. And it limits the Executive to enforcing the laws that Congress has enacted rather than doing whatever it wishes. Whether the current administration has violated the limits placed upon it by the Constitution in turn is a question that emphatically is within the province of the courts.

This Court previously has restrained temporarily some of the worst practices at 26 Fed. It now has held a full trial and must decide whether the temporary improvements effected by its previous orders should be made permanent as well as fine-tuned and expanded. This much now is clear: Unless the number of persons arrested is reduced or the number of empty spaces in more appropriate detention facilities increased so that detainees can be housed properly in appropriate facilities – and neither seems likely in any reasonable span of time – the overcrowding and other abuses of the hold rooms at 26 Fed will resume. Accordingly, the Court grants permanent relief.

## ***Facts***

This Court already has confronted the question of the constitutionality of the conditions of confinement at 26 Fed when this action began. It did so, however, only in an interim posture on a motion for a preliminary injunction (the "PI").[6] Having now conducted a full trial on the merits in which the parties collectively have submitted over a dozen additional witness

---

[6] The successors to original-defendants Kristi Noem, Todd Lyons, and Ladeon Francis automatically are substituted as defendants. FED. R. CIV. P. 25(d).

declarations, significant portions of deposition transcripts of several of defendants' witnesses, well over 400 exhibits, and approximately 100 pages of briefing, the Court here determines the final relief, if any, to which plaintiff and the putative class are entitled.

Given the overlap between the issues on the PI motion and this post-trial decision, the Court here necessarily covers much of the same factual ground as it did in its PI opinion but this time for the purpose of making final determinations of fact and law rather than provisional assessments.[7] It first provides background on ICE, its holding facilities and hold rooms, and the policies that supposedly govern them. It next describes the physical characteristics of the spaces and associated areas in 26 Fed relevant to this case and explains which ICE components, officials, and employees are responsible for operations in those spaces. It then describes the conditions at 26 Fed before this case was filed and explains the relief it granted in the PI because of those conditions. It finally describes the conditions at 26 Fed following entry of the PI and addresses the extent to which defendants have complied (and failed to comply) with the directives in the Court's previous orders.

*ICE*

ICE is responsible for immigration enforcement in the interior of the United States.[8] It has the authority (usually upon the issuance of an administrative warrant) to arrest and detain

---

[7] Evidence that was received on the PI motion that would be admissible at trial becomes part of the trial record. FED. R. CIV. P. 65(a)(2).

[8] HILLEL R. SMITH, CONG. RSCH. SERV., IMMIGRATION ARRESTS IN THE INTERIOR OF THE UNITED STATES: A PRIMER 1 (June 13, 2025), https://www.congress.gov/crs_external_products/LSB/PDF/LSB10362/LSB10362.7.pdf.

noncitizens pending decisions on whether they are to be removed.[9] Within ICE, the Enforcement and Removal Operations component ("ERO") "manages all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of aliens who are subject to removal or are unlawfully present in the U.S."[10] ERO operates twenty-four field offices, one of which is in New York at 26 Fed.[11] ICE Health Service Corps ("IHSC") is a unit of ERO that is responsible for "oversee[ing] compliance with medical detention standards" in the field offices.[12]

*ICE Holding Facilities and Hold Rooms Generally*

ERO operates holding facilities within each of its field offices, including 26 Fed. The stated purpose of these facilities "is to process individuals who are being arrested for immigration violations including, but not limited to, arrests pursuant to final removal orders or those who are subject to mandatory detention under the Immigration and Nationality Act during their removal proceedings."[13] These facilities are governed by at least two sets of internal policies and procedures, both of which are described below.

---

9 8 U.S.C. § 1226(a); *see id.* § 1357(a)(2) (authorizing arrests without a warrant in certain situations).

10 *Enforcement and Removal Operations*, ICE (June 17, 2026), https://www.ice.gov/ero.

11 *ICE Field Offices*, ICE (June 17, 2026), https://www.ice.gov/contact/field-offices?page=4.

12 *ICE Health Service Corps*, ICE (June 15, 2026), https://www.ice.gov/detain/ice-health-service-corps.

13 DX77 ¶ 8.

*ERO Directive 11087.2*

ICE holding facilities are governed by ERO Directive 11087.2 (dated January 31, 2024).[14] It defines a holding facility as "[a] facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency."[15] It in turn defines a hold room as "[a] holding cell, cell block, or other secure enclosure within a holding facility."[16] "Short term" is defined ***"as a period not to exceed [twelve] hours, absent exceptional circumstances."***[17] And it reiterates that ***"[a]bsent exceptional circumstances, no detainee should be housed in a holding facility for longer than [twelve] hours."***[18] While the "exceptional circumstances" language would have permitted hold-room detention of particular detainees for more than twelve hours in some rare circumstances, there is no evidence that such detentions occurred in any material number before the current administration increased immigration enforcement efforts.[19] In sum, hold rooms, as defined by ICE, are secure spaces in field offices primarily or perhaps even almost always previously used to confine individuals for not more than twelve hours after they were arrested and before they were transferred to a longer-term detention facility.

---

14 *Id.* ¶ 9; DX78 ¶ 8; DX80 ¶ 7; PX150, at 1.

15 PX150 ¶ 3.2; *accord* DX78 ¶ 7; DX79 ¶ 5; DX80 ¶ 7.

16 PX150 ¶ 3.3.

17 *Id.* ¶ 3.2 n.3 (emphasis added).

18 *Id.* ¶ 5.1(1) (emphasis added).

19 *See* PX326, at 313:2-318:19.

In addition to limiting the time in which detainees could be kept in hold rooms to twelve hours (more on that later), ERO Directive 11087.2 lays out several other responsibilities of ERO officers, including:

- "Ensuring that detainees are provided a meal at least every six hours;"[20]
- "Ensuring that hold rooms are safe, clean, [and] equipped with restroom facilities"[21] or otherwise providing detainees with "regular access to restroom facilities;"[22]
- "Monitor[ing] detainees for any apparent indications of a mental or physical health condition . . . that may require closer supervision or emergency medical care;"[23]
- "Provid[ing] detainees with access to drinking water in hold rooms at all times;"[24]
- "Allow[ing] detainees to keep personal inhaled medication on their person and have access to other prescribed medication as necessary;"[25] and

---

20 PX150 ¶ 4.4.1(2).

21 *Id.* ¶ 4.4.1(3).

22 *Id.* ¶ 5.2(3).

23 *Id.* ¶ 5.1(2).

24 *Id.* ¶ 5.2(2).

25 *Id.* ¶ 5.7(2).

- "Maintain[ing] a detention log for every detainee brought into custody, regardless of purpose . . . . record[ing], at a minimum," among other things, basic biographical information, the time the detainee was brought into custody, and the time the detainee was removed from custody.[26]

Neither ERO Directive 11087.2 nor the procedures document referred to in the footnote include any requirements related to sleeping conditions, temperature, or access to counsel, presumably because any such reference was thought unnecessary for places in which the maximum holding period was twelve hours.

*National Detention Standards*

In 2025, ICE issued also National Detention Standards (the "NDS") to "ensure that detainees are treated humanely; protected from harm; provided appropriate medical and mental health care; and receive the rights and protections to which they are entitled."[27] While the NDS are advisory, they are relevant to assessing the actual conditions in ICE holding facilities. They state, among other things, the following:

- "A detainee may not be held in a hold room for more than [twelve] hours;"[28]

---

26 *Id.* ¶ 5.8(1).

A 2025 ERO Holding Facilities Procedures document reiterates many of the above requirements but further states that "[b]asic personal hygiene items must be provided as appropriate including soap, toilet paper, feminine-hygiene items, diapers and sanitary wipes." PX26.

27 PX151, at ii.

28 *Id.* ¶ 2.5.II.B.

- "Single[-]occupant hold rooms shall contain a minimum of [thirty-seven] square feet," and "[m]ultiple-occupant hold rooms shall provide an additional seven square feet of unencumbered space for each additional detainee;"[29]
- "Hold rooms shall be well ventilated;"[30]
- "Hold rooms will contain sufficient seating for the maximum room capacity;"[31]
- "Bunks, cots, beds, and other sleeping apparatus are not permitted inside hold rooms;"[32]
- "[H]old rooms shall be equipped to provide handwashing and potable water;"[33]
- "Hold rooms with toilets shall allow for an appropriate amount of privacy. If the hold room is not equipped with a toilet, . . . regular access to toilet facilities" must be provided;[34]

---

29 *Id.* ¶ 2.5.II.A.2.

30 *Id.* ¶ 2.5.II.A.3.

31 *Id.* ¶ 2.5.II.A.4.

32 *Id.* ¶ 2.5.II.A.5.

33 *Id.* ¶ 2.5.II.A.6.

34 *Id.*

- "Each facility shall maintain a log which records custodial information about all detainees placed in and removed from hold rooms;"[35]
- "Officers shall provide a meal to any adult in the hold room for more than six hours;"[36] and
- "Staff shall ensure that sanitation and temperatures in hold rooms are maintained at acceptable levels."[37]

Finally, although the NDS do not address specifically the subject of access to counsel for detainees in hold rooms, they mandate that detention facilities more generally "permit legal visitation seven days a week, including holidays . . . . for a minimum of eight hours per day on regular business days, and a minimum of four hours per day on weekends and holidays."[38] "Legal service providers need not complete a Form G-28 (stating that they are the legal representatives of the detainee) to meet with a detainee."[39] Such visits must be "confidential and shall not be subject to auditory supervision."[40]

With respect to legal telephone calls, detention facilities should allow "direct, free calls . . . as soon as possible after the [detainee's] request," generally within eight "waking hours"

---

[35] *Id.* ¶ 2.5.II.D.2.

[36] *Id.* ¶ 2.5.II.D.3.

[37] *Id.*

[38] *Id.* ¶ 5.5.II.G.2.

[39] *Id.* ¶ 5.5.II.G.7.

[40] *Id.* ¶ 5.5.II.G.8.

at most and certainly within twenty-four hours.[41] Detention facilities "shall not restrict the number of calls a detainee places to his or her legal representatives or to obtain representation" or "limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones. If time limits are necessary for such calls, they shall be no shorter than [twenty] minutes, and the detainee shall be allowed to continue the call, if desired, at the first available opportunity."[42] Detainees should be able to conduct these calls privately, "without being overheard by officers, other staff, or other detainees."[43]

*ICE – Overwhelmed by Arrest Volume – Eliminates Any Effective Limits On Hold Room Conditions*

In early 2025, shortly after the current administration took office, ICE sharply curtailed the ability of officials at its field offices, like 26 Fed, to act in their discretion to release on bond detained noncitizens thought to be illegally present in the United States.[44] Yet, by June 2025, ICE was arresting too many people to accommodate in the longer-term detention facilities available to it. So on June 24, 2025, it issued a nationwide waiver (the "Waiver") purporting to allow "for aliens who are recently detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency to be housed in a holding facility, ***for up to, but not***

---

41 *Id.* ¶ 5.4.II.E.

42 *Id.* ¶ 5.4.II.F.

43 *Id.* ¶ 5.4.II.J.

44 Regional officials could do so only with the approval of the ICE director from that point onwards. *See* PX326, at 314:21-317:13.

***exceeding, [seventy-two] hours, absent exceptional circumstances.***"[45] And then matters became even worse. In July 2025, the administration insisted – inconsistent with prior practice and long-settled law – that Section 235(b) of the Immigration and Nationality Act[46] *mandated* that all noncitizens unlawfully present in the country be detained pending their removal.[47]

---

45 PX152, at 1 (emphasis added).

46 8 U.S.C. § 1225(b).

47 *See generally Barco Mercado v. Francis*, 811 F. Supp. 3d 487, 491-93 (S.D.N.Y. 2025) (LAK) (describing decision and how the government unlawfully attempted to apply it in plaintiff's case).

In analogous cases, the First, Second, Third, Fourth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits (as well as the vast majority of district courts to consider the question) have agreed with this Court that the administration's unilateral decision to attempt to apply that section of the Immigration and Nationality Act to mandate detention for noncitizens illegally present in the United States was unlawful. *Guerrero Orellana v. Moniz*, No. 25-2152, 2026 WL 2352042 (1st Cir. Aug. 13, 2026); *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026), *cert. filed sub nom. Rhoney v. Barbosa da Cunha*, No. 26-104 (U.S. July 23, 2026); *Buele Morocho v. Warden, Philadelphia FDC*, No. 26-1150, 2026 WL 2546223 (3d Cir. Aug. 28, 2026); *Lopez Garcia v. Guadian*, No. 25-7044, 2026 WL 2661092 (4th Cir. Sept. 10, 2026); *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026), *cert. filed sub nom. Putra v. Lopez-Campos*, No. 25-1415 (U.S. June 24, 2026); *Cirrus Rojas v. Olson*, 183 F.4th 909 (7th Cir. 2026); *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160 (9th Cir. 2026); *Santillan Quiroz v. Mullin*, 180 F.4th 1226 (10th Cir. 2026); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258 (11th Cir. 2026). Only the Fifth and Eighth Circuits have disagreed, siding with the government. *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026), *cert. filed sub nom. Buenrostro-Mendez v. Blanche*, No. 26-43 (U.S. July 10, 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026), *cert filed sub nom. Avila v. Blanche*, No. 26-354 (U.S. Sept. 17, 2026).

To be sure, the administration's action permitted case-by-case humanitarian parole by the Secretary of Homeland Security or his designees, including the ICE director. 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 212.5(a). As it was the ICE director who promulgated the administration's change in interpretation of the statute, however, by July 2025, ICE essentially would not and did not release people once they were in its custody, irrespective of lack of danger to the community or of risk of flight.

Moreover, the new seventy-two-hour (i.e., three days and nights) limit, even assuming it in fact served as a limit, alone would have been a qualitative change. As anyone who ever has waited in a hospital emergency room, sat out a flight delay at a crowded airport gate, or been subjected to any other protean difficulty of modern life could attest, such an experience is unpleasant, uncomfortable, and undesirable. But those relatively brief experiences cannot reasonably be compared to an otherwise analogous experience for as much as three uninterrupted days and nights, much less three uninterrupted days and nights in windowless rooms lacking showers, beds, and private bathrooms. And that is not the worst of it, for the new seventy-two-hour period was no true limit at all.

How so?

First of all, the circumstances had changed. ICE had to accommodate the sharp increase in arrests by holding more detainees for longer periods. Until space could be found for those detainees in longer-term detention facilities – usually by removing other detainees from the United States – ICE had no place to keep them except in the hold rooms. One obvious way to attempt to justify keeping detainees in hold rooms for even longer than seventy-two hours was to characterize the changed circumstances as "exceptional."[48] ICE personnel seized on that opening, construing that language with exceptional breadth.

"Exceptional circumstances," according to some ICE officials, included the combination of (1) the increase in immigration arrests in the New York City area prompted by the administration's push for as many immigration arrests per day as possible, and (2) the persistent lack

48 The "exceptional circumstances" language appeared in the pre-June 24, 2025 ERO Directive 11087.2 and was unchanged by the June 24, 2025 Waiver. It was not defined in either document or, so far as the record discloses, anywhere else.

of bed space at longer-term detention facilities in the New York City area.[49] As former deputy field office director William Joyce testified, "it's simply a function of if we have people in custody and no place to put them, that's an exceptional circumstance."[50] Other exceptional circumstances, in ICE officials' view, included when (i) "release would put the alien at risk of harm" or "would be inhumane" (as decided by ICE), (ii) release "would be not in the best interest of ERO,"[51] or (iii) when a detainee's placement options were limited as a result of ongoing habeas proceedings.[52] ICE officials thus defined "exceptional circumstances" as they saw fit. They consistently decided that such circumstances existed whenever they found it necessary or convenient to hold detainees at 26 Fed for longer than seventy-two hours.[53] In other words, the evidence made clear that, so far as those responsible for the 26 Fed hold rooms were concerned, pretty much anything was an "exceptional circumstance."

And then there was the somewhat subtle procedural change. Before June 24, 2025, ICE policy required that facilities with hold rooms report up the chain of command every instance

---

49 PX322, at 59:21-60:11; PX326, at 298:23-299:16, 326:7-328:6; PX329, at 114:19-23; *see* DX84 ¶ 12.

50 PX326, at 327:9-19; *id.* at 326:7-14 (agreeing that "exceptional circumstances would include the fact that [ICE] had nowhere else to put the newly arrested immigrants"); *see also id.* at 297:13-298:4 ("Nationwide population skyrocketed. We had no place to put people. So here we are.").

51 PX76; *see* PX326, at 330:9-332:5 (Joyce explaining that this included when a detainee was going to be deported or otherwise transferred shortly after seventy-two hours).

52 PX326, at 332:6-25.

53 *See id.* at 333:12-20; *see also* PX329, at 120:13-20 (former assistant field office director Nancy Zanello agreeing that "there are a lot of reasons that could constitute exceptional circumstances that would justify holding someone over [seventy-two] hours").

of a detainee being held in a hold room for more than twelve hours.[54] The Waiver not only increased the twelve-hour limit to seventy-two hours. It abrogated the reporting requirement entirely.[55] This enabled ICE officials and staff at field offices to detain individuals beyond the new, purported seventy-two-hour limit without ever having to explain what "exceptional circumstances" justified them doing so.

So what happened?

With the sharp increase in the number of persons arrested, the shortage of available capacity in ordinary detention facilities, and no effective limits on how long detainees could be held in small hold rooms not designed for the purpose for which they were being used, the system backed up. ICE kept more and more detainees in the hold rooms for longer and longer periods because its own policy – a policy ultimately found to be illegal by almost every court to consider it – precluded their release, and it had nowhere else to put them. The limiting factor on the number of detainees being held on the tenth floor each day was not any physical capacity limit, but the number of immigration arrests ICE made that day.[56] This predictably led to overcrowding, which some ICE officials, staff, and contractors responsible for 26 Fed at the time thought unproblematic because they believed that there was no limit on how many people could be detained in the tenth-floor hold

---

54. *See* PX326, at 313:12-19, 408:14-19; PX103, at ICE-0018559.

55. PX326, at 408:14-24; PX329, at 145:4-23.

56. PX329, at 245:21-246:3.

rooms at once[57] or on how long they could be detained.[58] Joyce summarized the dynamic at 26 Fed in a June 30, 2025 internal email in which he wrote that New York ERO was "[a] victim of [its] own success" because it "arrests more [immigration] court room cases than bed[]space can be found for locally, []or processed efficiently and effectively."[59] This, in his words, led "to a predictable result" – "*the main hold room / processing area at 26 Fed[,] which was never designed for such an operation*," being "*overcrowd[ed]*."[60] In other words, ICE treated the hold rooms as the "give" – perhaps the only "give" – in the system.

*26 Fed Hold Rooms*

According to ICE's website, ERO operates its New York field office out of the ninth floor of 26 Fed.[61] Yet, the designated hold rooms are on the tenth floor of 26 Fed[62] and, as will be discussed in greater detail, detainees have been held on the fifth floor as well. The Court therefore describes the layout of the relevant portions of those three floors and the ICE officials, staff, and contractors who are responsible for the relevant duties on those floors.

---

57 *See* PX322, at 94:21-95:12; PX323, at 87:9-18, 101:12-22; PX327, at 138:5-13, 145:5-15; PX329, at 125:17-126:8.

58 PX319, at 166:20-23; PX322, at 63:7-18; PX326, at 408:8-13; PX329, at 144:21-145:3.

59 PX74, at ICE-0016985.

60 *Id.* (emphasis added).

61 *ICE Field Offices*, ICE (June 17, 2026), https://www.ice.gov/contact/field-offices?page=4.

62 DX77 ¶ 13.

*Tenth Floor*

The tenth floor contains four designated hold rooms, two of which are approximately 173 square feet in area and the others approximately 655 square feet and 820 square feet, respectively.[63] As shown in the following photographs, they have concrete or thinly covered concrete floors and some bare, concrete bench seating along a couple of the walls. There are fluorescent lights and no outside-facing windows.[64] The two smallest hold rooms contain one toilet and one sink each.[65] The second largest contains two of each.[66] The largest contains three of each.[67] The toilets and sinks are "partitioned off by half walls" but otherwise are open to the rest of the hold room in which they are situated.[68] Accordingly, detainees using the toilets have virtually no privacy.

---

63 *Id.*; DX80 ¶ 80.

64 PX331 ¶ 5; PX332 ¶ 8.

65 DX77 ¶ 14.

66 *Id.*

67 *Id.*

68 *See id.*



Second largest tenth-floor hold room. PX301, at P000571. In the summer of 2025, ICE did not provide the bedding mats and blankets visible in this photograph.



One of the smallest tenth-floor hold rooms. PX301, at P000389.



Toilet and sink in tenth-floor hold room. PX301, at P000589.



Toilet and sink behind half wall in tenth-floor hold room. PX301, at P000350.



View from toilet behind half wall in tenth-floor hold room. PX301, at P000617.

The tenth-floor hold rooms are connected to a central area, which includes a front desk at which ICE contractors sit.[69] The contractors are responsible for "maintain[ing] a physical logbook" in which they are supposed to log when detainees arrive at 26 Fed, in addition to "all [detainee] requests and activities, including when detainees are fed, when they go to the nurse, medical emergencies, phone calls, if detainees are provided with additional clothing or blankets, and any incidents."[70] The contractors are responsible also "for the day-to-day care of the detainees, including placing them into the cells; providing meals, bottled water, hygiene products, clean clothes, mats, blankets; facilitating telephone calls (including legal calls); etc."[71] Two to three

69 DX77 ¶ 15.

70 *Id.* ¶ 61; DX79 ¶ 46; DX80 ¶ 45.

71 DX77 ¶ 18; *accord* DX78 ¶ 10; DX79 ¶ 10; DX80 ¶ 13.

contractor employees usually work each shift on the tenth floor.[72] The areas in front of and behind the contractors' desk are used for holding and processing detainees, respectively, before they are placed in a hold room.[73] There are storage spaces, a nurses' room, and a private interview room connected to the processing area.[74]

Posted on the windows and walls of the tenth-floor hold rooms and the processing area are signs promoting the administration's program of "voluntary departure," or self-deportation. The signs – Spanish versions of which also are posted – inform detainees that certain noncitizens may "[a]sk[] to return home now" and receive a "$2,600 stipend per family member," "[f]ree flight for you and your family," and "the opportunity to enter the United States lawfully in the future." Other versions of the sign ask in big letters, "Do You want to Return Home?"




English version of self-deportation sign in tenth-floor hold room. PX343, at P000455.

---

72 DX77 ¶ 18.

73 *Id.* ¶ 15.

74 *Id.*; DX79 ¶ 7; DX80 ¶ 10.




English version of other self-deportation sign in tenth-floor hold room. PX343, at P000537.

As noted above, Joyce, as deputy field office director, was responsible for the operation of the tenth-floor hold rooms for most of the relevant period – i.e., from early July 2025 through his retirement in May 2026.[75] He in turn reported to the ICE field office director, Kenneth Genalo, as of May 2026,[76] but Genalo since has left that position, and the job, as far as the Court has been informed, has not been filled since.

An assistant field office director reported directly to Joyce and was responsible for the day-to-day supervision of the tenth-floor hold rooms.[77] Nancy Zanello was the assistant director

75 DX80 ¶ 4.

Alberto Morales served as the acting deputy field office director for approximately two weeks in June 2025 and one month in August 2025. DX82 ¶ 5.

76 DX77 ¶ 6.

77 *Id.*; DX80 ¶ 4 ("As the [assistant field office director], I was responsible for, among other things, oversight of the civil immigration arrest and detention of detainees in the New York

from approximately July 7 to October 31, 2025.[78] She then was succeeded in the position by Merlin Marcellin as acting assistant director.[79] As the tenth floor previously had been used by ICE's Transportation and Removal Operations component instead of ERO,[80] Zanello established "from the ground up" the intake and processing units on the tenth floor and oversaw the deportation officers, including a supervisory deportation and detention officer (often Lige Hampton during the relevant period)[81] each shift, and the contractors who worked on the tenth floor.[82] Mia Jacobs, the acting health services administrator for IHSC, oversaw and still oversees medical staffing on the tenth floor.[83]

*Ninth Floor*

The ninth floor of 26 Fed contains another processing area with tables and computers for deportation officers to process detainees.[84] It has four more designated hold rooms.[85] One of

City area.").

78 DX77 ¶ 4; DX80 ¶ 4.

79 DX78 ¶ 4.

80 DX80 ¶ 12.

81 *See* DX79 ¶ 4.

82 DX80 ¶ 16.

83 DX85 ¶ 4.

84 DX77 ¶ 59; DX79 ¶ 44.

85 *See* DX77 ¶ 59; DX79 ¶ 44.

these is about 114 square feet in area, two are about 116 square feet, and the fourth and smallest is about 90 square feet.[86] Three of these hold rooms appear similar to the tenth-floor hold rooms insofar as they have concrete floors and benches, and the toilets and sinks are partitioned behind half walls.[87] The remaining room appears to have linoleum floors, contains metal benches, and has no toilet or sink. Both the processing area and the hold rooms on the ninth floor now contain the same signs promoting self-deportation as are present on the tenth floor. During the summer of 2025, however, the ninth-floor hold rooms were not in use.[88]



Smallest ninth-floor hold room. PX301, at P001351.

86 DX59B; *see* DX77 ¶ 59; DX79 ¶ 44.

87 *See* DX78 ¶¶ 29-31.

88 DX77 ¶ 57; DX80 ¶ 42; *see* DX82 ¶ 32.



Ninth-floor hold room with linoleum floors, metal benches, and no toilet. PX301, at P001314.

*Fifth Floor*

ICE's family unit operates on the fifth floor of 26 Fed.[89] Alberto Morales, another assistant field office director, oversaw and still oversees that unit, supervising day-to-day operations on the fifth floor.[90] According to Morales, there are no hold rooms or other detention spaces on the fifth floor.[91] Instead, "[t]he processing area for the [f]amily [u]nit . . . is akin to a large conference room," with "approximately [eighty] chairs" in which families may sit while waiting to be processed.[92] On a typical day, he said, there were around sixty or seventy people – consisting of

89 DX82 ¶ 10.

90 *See id.* ¶ 8.

91 *Id.* ¶ 11; PX328, at 94:5-10.

92 DX82 ¶ 12.

twenty to twenty-five family units – in the processing area at any given time.[93] The fifth floor contains also "a private room that families can use to meet with their attorneys,"[94] although the door to that room remains open so that ICE employees can see inside.[95] Like the tenth-floor hold rooms, the fifth-floor processing area now contains signs in English and Spanish promoting self-deportation.



Fifth-floor processing area. PX301, at P001418.

Through the summer of 2025, still according to Morales, only family units were detained on the fifth floor and detention was not the norm.[96] Most families who reported to 26 Fed for immigration appointments were released, while approximately one family unit was detained each

---

93 PX328, at 135:17-136:20.

94 DX82 ¶ 13.

95 PX340, at 163:13-164:4.

96 *See* DX82 ¶¶ 20, 31.

day.[97] Once detained, those family units no longer were free to leave the fifth-floor processing area – although they could move within that space freely – while they awaited transport to ICE's detention facility for families.[98] In general, families waited for two to six hours for transport, and they almost always were transported out of 26 Fed by 4:00 p.m.[99]

*Arrest Volume Swamps 26 Fed*

As ICE reacted to increasing immigration arrests by holding more detainees in 26 Fed for longer periods, the conditions of confinement in the tenth-floor hold rooms worsened dramatically.

*Overcrowding*

Before the summer of 2025, ICE generally held fewer than ten detainees at a time in the tenth-floor hold rooms.[100] Toward the end of May 2025, however, that number increased to the point where ICE typically was holding between forty and seventy detainees in the hold rooms at any given time.[101] The typical number of detainees continued to rise through June 2025,[102] and it

---

97 *Id.*

98 *Id.* ¶¶ 25-26.

99 *Id.* ¶ 29.

100 PX86, at ICE-B-000202-17 (listing number of detainees from May 1 to May 28, 2025).

101 *Id.* at ICE-B-000217-21 (listing number of detainees from May 28 to May 31, 2025).

102 PX87, at ICE-B-000171-91 (listing number of detainees from June 2 to June 23, 2025).

especially skyrocketed after ICE issued the Waiver and unilaterally decided that a never-before-applied law mandated that it detain all noncitizens illegally present in the country. Between then and early August 2025, ICE often detained over 100 people in the tenth-floor hold rooms.[103] On some days, it even crammed over 150 people into the hold rooms.[104] In fact, the day before this case was filed – August 8, 2025 – ICE officials feared that they would have to hold close to 200 detainees in the hold rooms over the then-coming weekend.[105]

It is one thing to read those numbers and imagine in the abstract so many people in the four tenth-floor hold rooms. It is another thing to picture it graphically. The diagrams below demonstrate just how crowded the *largest* of the tenth-floor hold rooms would have been on a day when ICE was detaining 193 individuals in the hold rooms,[106] assuming that it proportionally divided detainees among the hold rooms based on their relative size. The hold rooms remained extremely crowded even on days when ICE was detaining closer to 100 individuals in the hold rooms, something it did frequently in the summer of 2025.

---

103 DX77 ¶ 24; DX79 ¶ 14; DX81 ¶ 7; DX83 ¶ 7; PX323, at 100:18-101:9; PX326, at 338:5-10; PX327, at 104:18-23.

104 *E.g.*, PX88, at ICE-B-000136; PX89, at ICE-B-000103; PX323, at 13:24-14:11.

105 PX7.

106 Plaintiff asserts that the number of detainees held at one time "peaked at 193 individuals on July 3, 2025." Pl.'s Bench Trial Mem. (Dkt 166-1) at 4. As discussed later, defendants contest the accuracy of the data on which plaintiff relied. The Court need not address that dispute now because the evidence establishes that ICE detained at least 175 individuals on July 1, 2025, PX315, at ICE-B-000775, and contemplated having to hold "close to 200 detainees in NYC hold throughout the weekend" of August 8, 2025, PX7. In any event, the diagrams here are provided for demonstrative purposes only.

**Hold Room 1 (820.78 sq. ft.)**
With 87 people
(out of 193 people total)

Lying Down/Sitting



Diagram showing the largest tenth-floor hold room containing eighty-seven detainees in which each rectangle represents one lying-down detainee with the average height and shoulder width of an adult man and each circle represents one sitting-down detainee with the average shoulder width of an adult man. PX303, Ex. 1.

**Hold Room 1 (820.78 sq. ft.)**
With 87 people
(out of 193 people total)

All Sitting



Diagram showing the same with each detainee sitting down. PX303, Ex. 1.

**Hold Room 1 (820.78 sq. ft.)**
With 52 people
(out of 116 people total)

All Lying Down



Diagram showing the largest tenth-floor hold room containing fifty-two detainees with each detainee lying down. PX303, Ex. 1.

**Hold Room 1 (820.78 sq. ft.)**
With 52 people
(out of 116 people total)

All Sitting




Diagram showing the same with each detainee sitting down. PX303, Ex. 1.

At least some ICE employees became concerned about the number of people being held. For instance, supervisory deportation and detention officer Hampton testified that he was concerned for the safety of everyone in 26 Fed for "[t]he entire time [he] was there" from "July of 2025 to September of 2025."[107] He, as well as contractors who worked on the tenth floor at the time, agreed that the number of people then held was too high.[108] In quite obvious understatements, Hampton acknowledged that the hold rooms were "overcrowded,"[109] and Joyce described the hold rooms as "not quite as crowded as a subway car, but" containing "certainly more people than . . . [he] would [have] prefer[red] to have in there."[110] The overcrowding became so bad in early August 2025 that Hampton suggested that ICE "[t]emporarily suspend[]" its practice of arresting noncitizens at their immigration hearings for several days."[111] Joyce acknowledged that the tenth-floor hold rooms simply were not designed to hold over a hundred people at a time for a period of days based on current detention standards.[112] Yet that exactly is how ICE was using them.

---

107 PX322, at 116:21-117:5.

108 *Id.* at 121:19-122:11; DX81 ¶ 7; DX83 ¶ 7; PX323, at 87:4-8; PX327, at 143:2-3.

109 *See* PX322, at 116:21-119:7.

110 PX326, at 363:20-25.

111 *See* PX7 (Hampton calling the suggestion "[u]npopular but practical," and explaining that he "[j]ust [was] throwing it out there in the universe. Lol."); *see also* PX322, at 118:18-119:14 (Hampton explaining how one idea he contemplated to reduce overcrowding was "paus[ing] arrests for a significant amount of time or a period").

112 PX326, at 336:15-22; *see* PX327, at 142:15-19 (contractor agreeing that the physical space lacks the capacity to hold hundreds of people); *see also* PX329, at 123:9-12 (Zanello agreeing that hold rooms were not equipped to hold people for weeks at a time).

Despite these facts, ICE officials – particularly Zanello – at other points in this case have attempted to downplay the level of overcrowding that existed during the summer of 2025. As the day-to-day supervisor of the tenth-floor hold rooms who was present on the tenth floor on at least most days from 7:00 a.m. to 3:00 p.m.,[113] she was quite evasive about how many people generally were held there at a time.[114] She would not provide even an estimate.[115] In addition to her unbelievable claims that she could not recall approximately how many people were being held at any given time and that there is no such thing as an average number of people who were being held

113 PX342, at 122:7-10, 127:19-22.

114 PX342, at 126:9-131:6 ("Q. Over the summer of 2025 while you were there . . . there were often 100 people held on the [tenth-]floor hold rooms at a time. Right? A. I would have to look at the day. Q. What is your best recollection as you sit here of the average number of people who [were] being held in the [tenth-]floor hold rooms in July 2025? A. There is no average that you can provide . . . . [T]he best I could do was a high and a low. Q. Okay. What's the high and the low? A. I don't know. Q. . . . [L]et's take one time period each day. Let's take noon . . . . What is your best recollection of how many people were being held there at noon in July? A. . . . . I would have to look at a specific date and time to give you that number . . . . Q. Okay. I'm asking you how many people do you recollect being held? A. It depends on the day. I would have to look at the day. Q. But you have no recollection of what the numbers were like as you sit here today under oath? A. It could have been zero. It could have been max. I don't know. I would have to look at the day. Q. Okay. Give me a rough estimate of one of the most crowded days you can remember? A. I would have to look at the day. I'm not going to guess on a number. Q. Fair to say that at times there were more than a hundred people at a time? A. I would have to look at the day . . . . Q. But sitting here today you cannot even give a rough estimate of how many people were there? . . . . [A.] Again, I would have to look at the day. There is no average. I would have to look at the day and time. [Q.] Right. So your testimony is that you cannot give a rough estimate of how many people were there? . . . . [A.] I would have to look at the date and time . . . Q. Okay. So your testimony is that you are not able to give me a rough estimate of the most crowded day? A. I would have to look at the date and time . . . . Q. Right. So is it true that you cannot give me a rough estimate as you sit here today? . . . . [A.] I would have to look at the date and time. There is no such thing as an average . . . . Q. I am not asking you for an average. I'm asking if you can give me a rough estimate of one of the most crowded days? A. It changes throughout the day. I would have to look at the date and time. Q. So as you sit here today you will not give me a rough estimate; correct? A. A rough estimate is an average. I would have to look at the date and time.").

115 *Id.*

during that time, she stated that she would have thought that the hold rooms were overcrowded *only if* the number of detainees exceeded the fire department occupancy limit of 154 people total across the four hold rooms.[116] She claimed that "as long as there were fewer than 154 people being held at the hold rooms," then "it was not overcrowded."[117]

Zanello's testimony with respect to the number of detainees in the hold rooms during the summer of 2025 is not credible. It plainly is contradicted by the testimony of several other ICE officials, staff, and contractors who also were on the tenth floor and who admitted how crowded the hold rooms were. And it is ridiculous to claim that a space is not crowded until its fire occupancy is hit. "The safe occupancy for a given space that people are free to leave at will at any moment is quite a different matter from confining numbers of people in such a space for [twenty-four] hours a day, day after day . . . ."[118]

In any event, the numbers do not lie, and they show that ICE detained in the hold rooms far more people than the hold rooms were intended to hold.

*Extended Duration*

Not only did ICE frequently hold detainees in overcrowded hold rooms through the summer of 2025, but it held them in such conditions for far longer than seventy-two hours. The accounts of plaintiff's witnesses bear out this fact.

---

116 PX329, at 255:4-256:4.

117 *Id.* at 256:14-18.

118 *Mercado*, 800 F. Supp. 3d at 552.

Most of plaintiff's witnesses were detained by ICE after they attended routine hearings in immigration court at 26 Fed.[119] And most were detained between June 11, 2025, and August 12, 2025.[120] One was held for about five days "in a relatively small cell with approximately [fifteen] other women."[121] From where she was held, she could see also that about thirty men were "crammed" into another hold room, "which did not look like [it was] supposed to hold that many people."[122] In her words, "the holding cells were completely packed with detainees."[123] A different woman was detained for about ten days "in a small room with more than [twenty] other women."[124] Another individual was detained for nine-and-a-half days with about seventy other men, packed into the hold room so tightly that they "were all bunched up."[125] Five others each were detained with

---

119 PX330 ¶ 5; PX331 ¶ 4; PX332 ¶ 4; PX333 ¶ 7; PX335 ¶ 3; PX336 ¶¶ 4-5; Dkt 26 ¶ 4; Dkt 28 ¶ 3; Dkt 84 ¶ 3. *But* PX334 ¶ 4 (detained after encountering ICE in a park near his home); Dkt 15 ¶ 5 (detained at ICE office in the Bronx); Dkt 27 ¶ 4 (detained at his home); Dkt 62 ¶ 4 (detained at probation appointment in Poughkeepsie); Dkt 83 ¶ 3 (detained at Suffolk County jail).

120 PX333 ¶ 7 (June 11, 2025); Dkt 28 ¶ 3 (June 24, 2025); PX331 ¶ 4 (June 25, 2025); Dkt 27 ¶ 4 (June 26, 2025); PX332 ¶ 4 (July 3, 2025); Dkt 26 ¶ 4 (same); Dkt 15 ¶ 5 (July 6, 2025); PX335 ¶ 3 (July 10, 2025); PX330 ¶ 5 (July 16, 2025); PX334 ¶ 4 (August 3, 2025); Dkt 83 ¶ 3 (August 6, 2025); PX336 ¶¶ 4-5 (August 8, 2025); Dkt 84 ¶ 3 (August 12, 2025).

121 PX333 ¶¶ 7-8.

122 *Id.* ¶ 9.

123 *Id.* ¶ 8.

124 Dkt 28 ¶¶ 4-5.

125 PX331 ¶¶ 5, 8; *see* Dkt 26 ¶ 8 ("It was a lot of people. Some rooms had around [seventy] or [eighty] people inside.").

about forty other men for several days.[126] One of those men described his hold room as "incredibly crowded" and said that "some areas looked even more crowded."[127] Another estimated that "[t]he number of people in [his] room ranged from [forty-five] to upwards of [sixty-five] people every day" for six days.[128] For him, the crowding not only "made it uncomfortable," but "hard to breathe."[129] Another was held for about eight days "in a very crowded room, which sometimes held more than [sixty] people."[130] Perhaps the most extreme account is that of a man who was detained for almost three weeks in a room with "as many as [ninety] people."[131] Finally, plaintiff described the room in which he was held for two days as "extremely crowded" and estimated that the room "always had at least [forty] people inside and sometimes more."[132]

Similarly to how she attempted to downplay the level of overcrowding that existed, Zanello claimed also that the majority of individuals detained during the summer of 2025 were

---

126 PX330 ¶ 11; PX332 ¶¶ 5-6; Dkt 15 ¶ 12; *see* Dkt 83 ¶ 5 ("There were a lot of people – I think there were around [eighty] men in two small rooms."); Dkt 84 ¶ 6 ("When I arrived . . . there were only about [twenty] people in the room with me. But later it held as many as [thirty] or [forty] people.").

127 Dkt 15 ¶ 12.

128 PX335 ¶ 5.

129 *Id.*

130 PX334 ¶¶ 5-6.

131 Dkt 27 ¶¶ 6, 8.

132 PX336 ¶¶ 5-6, 9.

transferred out of 26 Fed within seventy-two hours.[133] That testimony, like her testimony with respect to the overcrowding, is not credible. First, Zanello admitted that individuals were detained longer when there were exceptional circumstances present, although she claimed to be unable to recall whether "that happened a lot over the summer."[134] Second, Joyce stated that it was not until the end of September or October 2025 that most people began to be transferred out of 26 Fed within seventy-two hours.[135] And third, Zanello's testimony is inconsistent with the reality described by those who actually were detained in the tenth-floor hold rooms during that period.

There thus is no question that ICE detained in the hold rooms far more people *for far longer* than for what the hold rooms were intended and designed.

*Inadequate Sleeping Conditions*

Sleeping conditions in the hold rooms during the summer of 2025 were dreadful.

ICE provided no beds, cots, mats, sleeping bags, cushions, or pillows.[136] With nothing upon which to sleep save a thin aluminum or mylar sheet – similar to what runners wear after a

---

[133] PX342, at 121:2-5.

[134] *Id.* at 121:6-122:24.

[135] *See* PX325, at 213:9-215:20.

[136] PX330 ¶ 11; *see* PX336 ¶ 7.

marathon, for example – detainees were forced to try to sleep on the hard concrete floors or benches.[137] One resorted to using his "shoes as a makeshift pillow."[138]

ICE made sleeping all the more difficult by keeping the lights on in the hold rooms at all times, including overnight.[139] It kept the air conditioning running all the time too,[140] even at night.[141] Detainees were "very cold" and even "freezing" at times.[142] One described the hold room in which he was kept as an "icebox."[143] The aluminum or mylar sheets ICE provided were "not enough to stay warm."[144] Even deportation officers admitted that the hold rooms were "uncomfortably cold" at times.[145] At other times, the hold rooms were "uncomfortably hot,"[146] due

---

137 PX326, at 419:12-19; PX331 ¶ 5; Dkt 15 ¶ 12; Dkt 26 ¶ 5; Dkt 27 ¶ 11; Dkt 28 ¶ 5; Dkt 62 ¶ 12.

138 Dkt 15 ¶ 12.

139 PX323, at 80:18-21; PX331 ¶ 5; PX335 ¶ 6; Dkt 15 ¶ 12 ("The lights were on the entire time and it was hard to know what time of day it was. I tried putting a shirt or a piece of the aluminum blanket over my eyes to try to be able to rest."); Dkt 27 ¶ 11; Dkt 84 ¶ 5; *see* PX322, at 166:19-168:5.

140 Dkt 15 ¶ 12 ("I was moved to another holding area where the air conditioning was on all day. It was freezing in there . . . .").

141 PX330 ¶ 14.

142 *Id.*; PX331 ¶ 5; PX333 ¶ 8; PX334 ¶ 8; PX336 ¶ 7; Dkt 84 ¶ 5.

143 Dkt 26 ¶ 5.

144 PX336 ¶ 7; *see* Dkt 28 ¶ 8 ("I was extremely cold at night sleeping on the floor because we did not get real blankets."); Dkt 83 ¶ 6 ("It was very uncomfortable. At times it was very cold . . . . I had only an aluminum blanket to try to keep warm.").

145 DX79 ¶ 22; *see* PX320, at 100:11-101:5.

in part to how crowded they were.[147] One detainee described it as "like being in an oven" and "like torture."[148]

Additionally, detainees often had to try to sleep while sitting upright given the overcrowding.[149] They simply did not have enough room to lay down.[150] Some even resorted to sleeping next to the toilets, behind the half-wall partitions.[151]

---

Hampton estimated that such was the case only between five and ten times during the summer of 2025. PX322, at 206:23-208:6. Deportation officers insisted that they would provide detainees who complained of being cold with sweatshirts or sweatpants. PX320, at 101:6-18; PX321, at 101:24-103:2. Yet none of plaintiff's witnesses reported being offered extra clothing.

146 DX79 ¶ 21; PX322, at 204:21-205:6; PX332 ¶ 8; Dkt 15 ¶ 12 ("My first night, I was placed in a holding area that was very hot when the air conditioning was not on . . . ."); Dkt 27 ¶ 16 ("During the day, it was very hot because they turned off the air conditioning and would only turn it on again in the middle of the afternoon."); Dkt 62 ¶ 12; Dkt 83 ¶ 6; *see* DX81 ¶ 12; DX83 ¶ 12; PX323, at 89:7-10; PX327, at 131:11-21.

Hampton estimated that such was the case also between five and ten times during the summer of 2025. PX322, at 206:13-22.

147 PX335 ¶ 5.

148 Dkt 62 ¶ 12.

149 PX332 ¶ 6; PX335 ¶ 5; Dkt 26 ¶ 5; Dkt 28 ¶ 5.

150 PX334 ¶ 8.

151 *Id.*; PX335 ¶ 8.

All in all, before this case was filed, ICE made sleeping in the hold rooms "very difficult,"[152] if not impossible.[153]

*Unsanitary Conditions and Denial of Personal Hygiene and Privacy Needs*

The living conditions inside the hold rooms during the summer of 2025 were squalid.

Detainees had no way to bathe themselves, shower, or brush their teeth.[154] The hold rooms have no showers,[155] and the detainees received neither soap nor toothbrushes.[156] Some detainees tried to wash using the small sinks on top of the toilets, but the sinks were inadequate for the numbers of people detained,[157] and those efforts only exacerbated the problem by causing "muddy" water to "splash[] everywhere."[158]

152 PX333 ¶ 8; *accord* Dkt 15 ¶ 12; *see* Dkt 27 ¶ 11 ("At most I slept a few hours per night, in short bursts because it was so uncomfortable and painful sleeping on the floor that I would awaken and have to adjust my position. It hurt my arms, my back, my shoulders.").

153 PX335 ¶ 5.

154 PX330 ¶ 13; PX331 ¶ 5; PX332 ¶ 7; PX334 ¶ 6; PX335 ¶ 8; PX336 ¶ 7; Dkt 15 ¶ 18; Dkt 26 ¶ 6; Dkt 27 ¶ 12; Dkt 28 ¶ 6; Dkt 62 ¶ 12; Dkt 83 ¶ 9; Dkt 84 ¶ 5.

155 PX333 ¶ 8.

156 PX332 ¶ 7; PX335 ¶ 8.

157 PX334 ¶ 6.

158 PX335 ¶ 8.

Most detainees remained in the same clothes in which they were arrested for the entirety of the time in which they were detained.[159] One reported being "in the same clothes for [nineteen] days, without ever having an opportunity to bathe."[160] Women did not receive adequate menstrual products and, without changes of clothing, sometimes had to continue to wear clothes stained with their menstrual blood.[161] One woman described how she "had [her] period for [five] days" while she was detained, yet, "[d]uring those five days, guards only gave [her] whole room [two] pads for all the women who were there."[162] She was unable "to get a pad, and [her] underwear and pants got stained with a lot of blood."[163]

Detainees were forced to use the toilet, separated by only a half wall that provided minimal privacy, in the same room in which they and often scores of others ate and slept.[164] Two of the hold rooms each contained only one toilet for all the detainees they held.[165] Even the rooms with more toilets "got dirty very quick" because of the number of people in the hold rooms.[166] One

159 PX331 ¶ 5; PX332 ¶ 7; PX333 ¶ 8; PX334 ¶ 6; Dkt 83 ¶ 9; Dkt 84 ¶ 4; *see* Dkt 26 ¶ 6.

160 Dkt 27 ¶ 6.

161 PX333 ¶ 8.

162 Dkt 28 ¶ 6.

163 *Id.*

164 PX330 ¶ 13; PX335 ¶ 8; Dkt 15 ¶ 18; *see* PX332 ¶ 7.

165 *See* PX333 ¶ 8.

166 Dkt 15 ¶ 14.

detainee said that there rarely was enough toilet paper.[167] Sometimes, she said, she "would just have to hold it in."[168] At other times, the toilets clogged, and detainees would not be able to use them.[169] The hold rooms reeked of "sweat, urine and feces."[170] One detainee described the conditions as "awful" and "very dirty."[171] He said that he "was disgusted by the conditions there."[172]

To be sure, some ICE officials, staff, and contractors claimed that certain basic personal hygiene products always were available to detainees and that they took steps to keep the hold rooms clean. They claimed that detainees received "wipes and teeth cleaning products" – but not toothbrushes[173] – before being placed in the hold rooms and that female detainees were provided "[f]emale sanitary items . . . upon request."[174] They claimed also that detainees "were offered new clothes as necessary based on the observation of the [deportation officers] or the [c]ontractors" or

---

167 Dkt 28 ¶ 5.

168 *Id.*

169 *Id.*

170 PX331 ¶ 5; PX336 ¶ 7 ("The room smelled of sewage"); Dkt 28 ¶ 5 ("The room smelled terrible because no one had bathed. There was a bathroom in that room that smelled of urine and feces."); *see* PX332 ¶ 8 ("[I]t smelled terrible given the conditions."); PX334 ¶ 6 ("The smell was very bad."); Dkt 15 ¶ 14 (describing "a horrific stench in the room" and stating that the smell of the bathroom "was everywhere"); Dkt 26 ¶ 6 (similar); Dkt 27 ¶ 13 (similar); *see also* PX335 ¶ 8 ("[W]e were all sweating all the time.").

171 PX332 ¶ 6; *see* PX334 ¶ 7 (recalling that "[t]he cell was not cleaned consistently . . . so it got dirty"); Dkt 84 ¶ 7 ("I only saw the room I was in be cleaned once in the two-and-a-half days I was there.").

172 PX332 ¶ 6.

173 PX325, at 423:6-16.

174 DX77 ¶ 27; DX81 ¶ 8; DX83 ¶ 8; *accord* DX79 ¶ 16; DX80 ¶ 19.

"upon request."[175] They moreover insisted that the hold rooms, including the toilet areas, were "cleaned regularly,"[176] at least three times per day.[177] As for soap, they admitted that it was not available in the hold rooms out of fear that detainees would ingest it, but they claimed that they made it available in the restroom near the nurses' office.[178] They suggested also that the half walls partitioning off the toilets provided detainees with "reasonable privacy."[179]

These claims, however, cannot be reconciled with the accounts of plaintiff's witnesses – none of which defendants assert is false. If the hold rooms regularly were cleaned and new clothes regularly provided, why did the hold rooms reek of sweat, urine, and feces? If feminine hygiene products readily were available, why did female detainees wear clothes stained with their own menstrual blood? No one rationally would choose to live in such conditions. Furthermore, the claims of ICE officials, staff, and contractors all paint with a broad brush. They speak of general practices and fail to specify, for example, how often deportation officers observed detainees with soiled clothes and provided them with new ones or how often female detainees requested and received feminine hygiene products. In contrast, the accounts of plaintiff's witnesses are specific and detailed, and thus

---

175 DX77 ¶ 28; DX79 ¶ 17; DX80 ¶ 20; *accord* DX81 ¶ 9; DX83 ¶ 9.

176 DX77 ¶ 31; DX79 ¶ 20; DX81 ¶ 11; DX83 ¶ 11.

177 DX77 ¶ 43; DX78 ¶ 17; DX80 ¶ 23; PX329, at 182:19-183:8; *see* DX81 ¶ 11 (contractor stating that during his shift, he "would see the cleaning crew at least twice"); DX79 ¶ 20 (supervisory deportation and detention officer stating the same).

178 DX77 ¶ 40; DX78 ¶ 18.

There is no evidence that the detainees had regular access to that restroom.

179 *E.g.*, DX77 ¶ 14.

should be afforded more weight. Moreover, those accounts are corroborated by some of the testimony of defendants' witnesses, as well as documentary evidence. For example, Joyce admitted that detainees tended to stay in the same clothes that they were wearing when they were arrested.[180] And one contractor admitted that "[o]n some occasions, the cells smelled badly due to body odor"[181] and overcrowding.[182] There also is no getting around the fact that detainees lacked access to showers or baths regardless of how long they were held and with how many other people.[183] While Zanello refused to admit that the hold rooms ever smelled bad,[184] that denial is belied by the fact that she at one point felt that a group of detainees' complaints regarding the lack of showers had such merit that she personally went out and bought empty water bottles and baby shampoo, filled the bottles with warm tap water, and allowed those detainees to wash themselves one-by-one in an empty hold room.[185] Finally, the notion that the half walls provided meaningful privacy for detainees using the toilet is dispelled by (i) the photographs of the hold rooms showing the view into and out of the toilet

---

180 PX325, at 423:18-23.

181 DX81 ¶ 7.

182 PX327, at 173:5-7.

183 PX326, at 334:12-17; PX329, at 172:7-10; *see* PX322, at 172:22-173:18, 176:19-23 (admitting that the only way for detainees to clean their bodies would have been with the wipes).

184 PX342, at 172:11-19.

185 PX329, at 173:3-175:23; PX61, at ICE-0016750.

areas, and (ii) the very reason ICE officials claimed that the toilets are partitioned off by half walls only – "*to maintain sight supervision* for safety and security."[186]

Thus, despite some attempts by ICE personnel to sanitize the record, the facts show that the living conditions in the hold rooms through the summer of 2025 were anything but sanitary. They were woefully inadequate, and detainees were denied basic privacy.

*Insufficient Food and Water*

ICE provided inadequate amounts of both food and water to detainees during the summer of 2025.

Through most of that period, ICE's policy was to provide detainees only two meals a day – one meal every twelve hours.[187] And, as plaintiff's witnesses testified, that for the most part is what ICE did in practice.[188] In some instances, however, ICE provided detainees food only once a day[189] or not at all.[190] To be sure, a couple of ICE employees each testified that they believed that

186 *See, e.g.*, DX77 ¶ 14 (emphasis added).

187 DX77 ¶ 32; DX80 ¶ 24; PX326, 433:11-18.

188 PX330 ¶ 12 (stating that he received food twice a day, at around 8:00 a.m. and 8:00 p.m.); Dkt 27 ¶ 14 (same); PX332 ¶ 11; PX334 ¶ 9 ("We received food only twice a day . . . ."); PX335 ¶ 19 ("[W]e only received [food] twice a day."); PX336 ¶ 8; Dkt 15 ¶ 15 ("We usually got about [two] meals a day along with a water bottle."); Dkt 26 ¶ 9 ("We received food twice a day."); Dkt 83 ¶ 7 ("We got food in bags twice a day . . . .").

189 PX332 ¶ 11; Dkt 28 ¶ 7; Dkt 84 ¶ 4.

190 Dkt 28 ¶ 7.

detainees always received three meals per day,[191] but that account is undercut by what Joyce and Zanello said was then ICE's policy and by what detainees themselves reported.

In any case, the amount of food that ICE provided to detainees during that period was "inadequate," and detainees always felt "hungry."[192] One said that "the food was almost non-existent."[193] According to ICE officials, staff, and contractors, they in theory would have provided detainees additional or alternative food upon request,[194] but that is yet another example of ICE employees trying to sanitize the record after the fact. After all, Joyce admitted in his deposition that detainees were not told that they could ask for additional meals.[195] And there is no evidence that they otherwise knew that they could do so, much less that they did do so in practice.

When ICE did provide meals, the meals that it provided were so-called "heater meals."[196] These meals – akin to what one might eat on a camping trip – consist of various pre-packaged snacks and a pre-cooked entree that supposedly could be warmed by activating a self-heating bag in which the entree is contained.[197] Notwithstanding what defendants at trial described

191 DX79 ¶ 23; DX81 ¶ 13.

192 PX332 ¶ 11; PX335 ¶ 9 ("I was also hungry because we were not given adequate food."); Dkt 15 ¶ 15 ("The portion sizes were small so I was usually still hungry even after I ate."); Dkt 27 ¶ 14; Dkt 28 ¶ 7; Dkt 62 ¶ 12.

193 PX333 ¶ 8.

194 DX77 ¶ 32; DX80 ¶ 24; DX83 ¶ 13; PX326, at 433:20-434:20.

195 PX326, at 433:20-434:20.

196 DX28.

197 *See id.*

as the "quite ingenious" self-heating mechanism,[198] the food bags usually were served cold.[199] And they (to put it lightly) were unappetizing. While detainees of course were not entitled to restaurant-quality meals, they almost unanimously described the food as "disgusting."[200] One stated that it "looked like dog food" and that it more appropriately should have been called "slop."[201] He said that it "smelled awful," "worse than animal food," and that he lost ten pounds in the three or four days in which he was detained.[202] Nor was he the only detainee who lost weight due to being unable to stomach the food. At least three other detainees described experiencing or witnessing the same thing.[203]

---

198 May 26, 2026 Trial Tr. at 40:16-18.

199 Dkt 27 ¶ 14; Dkt 83 ¶ 7; Dkt 84 ¶ 4.

200 PX330 ¶ 12; *see* PX334 ¶ 9 ("[I]t was not good."); PX336 ¶ 8 ("[I]t was inedible."); Dkt 26 ¶ 9 (same); Dkt 15 ¶ 15 ("The food I received was awful."); Dkt 27 ¶ 14 ("The food was processed and awful; it was difficult to eat."); *see also* PX333 ¶ 9 ("It tasted so fake.").

201 PX330 ¶¶ 6-7 (describing it as a "mixture of different food together like leftovers"); PX335 ¶ 9 (describing it as "mush").

202 PX330 ¶¶ 6-7.

203 Dkt 26 ¶ 9 ("In the whole five days I was there I did not eat it. I weighed 160 pounds when I was free but now I weigh 142 pounds."); Dkt 83 ¶ 7 ("I could not eat it because it was so bad. I lost around [ten] pounds . . . ."); *see* PX334 ¶ 9 ("I saw some people around me begin to lose weight from the lack of decent food.").




Heater meals. DX27.

ICE failed also to provide sufficient water to detainees despite claims to the contrary by ICE officials, staff, and contractors.[204] Plaintiff testified that he and other detainees "did not always get enough water."[205] He described how "one guard . . . would sometimes hold a bottle of water up and people would wait to have him squirt some into our mouths, like we were animals and not people."[206] Another detainee stated that "[i]f they wanted more water, [they] were told that there wasn't any more so [they] had to drink water from the sinks next to the toilets."[207] A third stated that

---

[204] DX77 ¶ 33 (claiming to have provided detainees with bottled water at each meal and upon request); DX79 ¶¶ 24, 35 (same); DX80 ¶ 25 (same); DX81 ¶ 14 (same); DX83 ¶ 14 (same).

[205] PX336 ¶ 10.

[206] *Id.*

[207] Dkt 15 ¶ 15; *see* Dkt 28 ¶ 7 ("I was also very thirsty because we were also only given a small [eight] ounce bottle for the whole day."); Dkt 62 ¶ 12.

though they got water with their food, they got it at additional times "only when the guards felt like it."[208] Defendants have not disputed the truth of any of these accounts, which the Court credits.

Even setting aside the quality of the food that ICE provided to detainees, at a minimum ICE did not provide detainees with sufficient amounts of food or water during the summer of 2025.

*Inadequate Medical Precautions and Care*

The medical precautions and care ICE provided to detainees during the summer of 2025 also was inadequate.

To begin, ICE regularly detained in the hold rooms individuals who were unfit for detention in such crowded conditions or for detention at all. For example, at the peak of the overcrowding in early July 2025, ICE held a detainee who subsequently tested positive for tuberculosis for *six days* in the tenth-floor hold rooms.[209] ICE on those days held at least 70 and at most 170 detainees across the four hold rooms, thus exposing some significant number of people every day to that detainee in extremely close quarters.[210] On another occasion, a detainee had been diagnosed with a large ovarian cyst that, in the words of a supervisory deportation and detention officer's summary of a nurse's report, "could become a life or death emergency if ruptured."[211] As

[208] Dkt 27 ¶ 15.

[209] *See* PX42A, at ICE-0018175.

[210] *See* PX88, at ICE-B-000133-39 (showing number of detainees in the hold rooms between June 30, 2025, and July 6, 2025, when detainee who tested positive for tuberculosis also was detained).

[211] PX41.

that supervisory deportation and detention officer acknowledged, according to the nurse, that detainee needed to be able to shower and "sleep in a clear sterile bed as to avoid infection."[212] ICE realized that it nevertheless had been detaining her for at least three days in the tenth-floor hold rooms.[213]

That ICE would fail to learn of these and doubtless many other detainees' serious health conditions until several days into their detention, if at all, was predictable. Medical screenings as part of the intake process "to determine, among other things, whether the detainee had particular medical needs, and whether the detainee had an acute medical need that required immediate attention" occurred "*as needed*."[214] In other words, not every detainee was medically screened before being placed in a hold room.[215] A medical screening occurred only when "(a) it [was] requested by ERO staff or contractors based on their observations or if a medical need was conveyed to staff by the detainee; (b) a detainee [had] been detained at least [twelve] hours; and/or (c) the facility that the detainee [was] being transferred to request[ed] paperwork that include[d] medical information."[216] Yet there was no formal process or training for how deportation officers or contractors ought to determine while performing intake which detainees required medical screenings.[217] Nor was there

212 *Id.*

213 *Id.*

214 DX77 ¶ 26 (emphasis added); DX80 ¶ 18.

215 PX324, at 95:15-18, 96:22-97:2.

216 DX85 ¶ 8; *accord* PX324, at 92:7-17, 94:18-95:2; *see id.* at 85:19-86:10 (Jacobs stating that IHSC typically will not do a medical screening for a detainee who is going to be held for less than twelve hours).

217 PX324, at 85:9-14, 95:14-96:8; *see* PX329, at 200:3-201:13, 203:8-23, 204:3-8 (Zanello acknowledging that there was no policy regarding screening detainees within a certain time

any formal way, such as with a written form, for a detainee to request medical care.[218] Nor is there any evidence that medical screenings actually were conducted for detainees who had been detained at least twelve hours.

Additionally, ICE failed to provide meaningful and prompt care to detainees experiencing serious illnesses and medical emergencies. Plaintiff's witnesses described a series of incidents that they observed or experienced in which detainees did not receive care despite presenting with serious medical conditions. One detainee came down with what he described as a "throat infection," but was "ignored" when he asked to see a doctor or nurse.[219] At one point, he witnessed someone else faint, but that individual merely was put in a smaller room and then brought back into the hold room without ever having been seen by a doctor or nurse.[220] Two other detainees "developed fever[s]" and "began to feel sick" but "did not get any medical help" despite asking for it.[221] They saw others too who appeared to have "a cold or the flu and with stomach pains" and who "asked for help but did not get it."[222] At least one other detainee "did not receive any care or medication for [her] diabetes" while at 26 Fed.[223] A fifth "saw a number of people have what looked like asthma

---

or at all).

218 *See* PX324, at 90:25-91:5.

219 PX335 ¶ 6.

220 *Id.*

221 PX334 ¶ 13; *accord* Dkt 27 ¶ 22.

222 PX334 ¶ 13; *accord* Dkt 27 ¶ 21.

223 PX333 ¶ 8; *see* Dkt 62 ¶ 12 ("They gave me chocolate, which was bad for my blood sugar, and they didn't give me my medication the first time I was at 26 Fed[]."); PX336 ¶ 13 ("I

attacks. They gasped for air and could not breathe."[224] Yet all ICE did for them was remove them from the hold rooms temporarily.[225] A sixth saw one person "having what looked to [him] like a seizure or epilepsy and it took nearly [thirty] minutes for that person to get any medical attention."[226] Plaintiff himself had an infected tooth while he was detained, which caused him "a lot of pain," made his face swell, and impacted his speech.[227] He was provided with "pain medication . . . but that was it."[228] Detainees often waited days for medical assistance.[229]

Testimony by ICE staff and documentary evidence reflect other instances of medical emergencies that occurred in the tenth-floor hold rooms during the summer of 2025. Supervisory deportation and detention officer Hampton observed a couple of detainees have panic attacks near or in the hold rooms, a detainee who already was injured upon his arrival and required medical attention, and a detainee who attempted self-harm by throwing himself on the floor and repeatedly

---

saw many other people in the same situation [with respect to not receiving treatment beyond pain medication], including diabetics who were not receiving their medication. They were also given the same meals as everyone else.").

224 PX332 ¶ 9.

225 *See id.*

226 Dkt 15 ¶ 16.

227 PX336 ¶ 13.

228 *Id.*

229 Dkt 83 ¶ 8 ("I had a severe headache during my time there but I had to wait a day to receive pills for the pain. I saw other people also ask for medical help and also face a wait similar to me."); Dkt 84 ¶ 10 ("I saw some people request medical assistance who waited a day to be attended to.").

banging his head against the floor.[230] He described also detaining individuals with diabetes, heart conditions, mental illness, dementia, and those going through withdrawal from drugs or alcohol.[231] ICE on multiple occasions had to bring detainees going through withdrawal to the hospital after they had cardiac episodes or seizures in the hold rooms.[232] Other detainees who were throwing up or who slipped and hurt themselves also had to be brought to the hospital.[233] Some of these medical emergencies occurred when there was no IHSC staff on site.[234] Indeed, IHSC staff was present only between the hours of 7:00 a.m. and 11:30 p.m. on weekdays and between 7:00 a.m. and 7:30 p.m. on weekends.[235]

Finally, even when ICE attempted to provide medical care, the level of care that it could provide necessarily was limited because ICE employed no nurse practitioners, physician

---

230 PX322, at 147:21-148:17, 152:17-153:8.

231 *Id.* at 155:14-17, 156:6-9, 156:24-157:5, 159:13-17, 161:23-162:2.

232 *See* PX62; PX329, at 208:21-209:9; *see also id.* at 212:13-16 (Zanello acknowledging that hospital runs happened very frequently during that period).

233 PX40, at ICE-0018050.

234 *See* PX29 (seizure at 4:23 a.m. induced by alcohol withdrawal); *see also* PX331 ¶ 10 ("[T]here was no medical staff there after 5 p.m."); PX332 ¶ 10 ("There were not doctors or nurses there all the time . . . ."); PX334 ¶ 14 ("There were times nurses were not available at all.").

235 PX324, at 40:25-41:11; *see also* DX77 ¶ 26 (describing IHSC staff as being on-site for approximately twelve hours per day).

assistants, or doctors on the tenth floor.[236] Instead, it had only two to four registered nurses on-site.[237] Those nurses could not prescribe medicine, diagnose medical conditions, order diagnostic tests, develop or modify treatment plans, or order referrals or specialty consultations.[238] Instead, when such a medical need arose, a nurse only could call an "off-site medical provider," who would "direct the registered nurse about how to address the medical need [for] the individual on site or advise the nurse to send the individual to a hospital for treatment. Medical emergencies such as heart attacks, seizures, and strokes [therefore could not] be treated on site by registered nurses and . . . required transport to a hospital."[239] Similarly, if there was a medication that IHSC could not administer, such as methadone,[240] ICE would have to arrange for an offsite hospital visit rather than provide treatment at 26 Fed.[241] And though the nurses for the most part could administer to detainees whatever "prescription medication . . . they had in their possession at the time of their arrest" or that was brought to them by their attorney or family members,[242] it is unclear from the record what the nurses

---

[236] PX324, at 31:11-32:14.

[237] DX79 ¶ 15; DX80 ¶ 18.

[238] PX324, at 32:15-33:15.

[239] DX85 ¶ 7; *accord* PX324, at 34:24-35:18.

[240] *See* PX1; PX339, at 167:16-23.

[241] PX322, at 157:25-158:20.

[242] DX77 ¶ 47; *accord* DX78 ¶ 21; DX79 ¶ 34; DX80 ¶ 34; DX85 ¶ 9.

Detainees have not been allowed to keep and self-administer their prescription medications (other than inhalers) "due to safety and security reasons." DX78 ¶ 21; DX79 ¶ 34; DX80 ¶ 34; DX85 ¶ 9.

would do if a detainee's attorney or family could not bring his or her medication because, for example, the detainee lacked an attorney or the detainee's family themselves feared being arrested and detained.[243]

That 26 Fed could not and did not care adequately for detainees with life-threatening illnesses or those experiencing medical emergencies is evident from Joyce's response to an internal ERO memorandum circulated on July 3, 2025. The assistant director of IHSC in that memorandum stated that "[i]llegal aliens . . . in need of life-preserving medications, such as insulin, should not be in a holding room, but sent to an ICE detention facility."[244] Joyce responded, "I would be willing to bet that there isn't one Field Office that would prefer to keep an alien in a holding room, as opposed to a detention facility. I can tell you that we certainly would not, *however, we do not have the capacity to do so*."[245] Joyce in other words was saying that he did not want to keep detainees – presumably those with serious illnesses in particular – for extended periods in the hold rooms at 26 Fed, but that he had "no choice" but to do so.[246]

Not only did ICE continue to detain individuals with serious medical conditions in the hold rooms, but it detained such individuals for longer periods than it did those without serious medical conditions. It was harder for ICE to find longer-term detention facilities that could care for

---

243 *But see* PX322, at 157:25-158:9 (supervisory deportation and detention officer Hampton claiming that if a detainee needed medication that IHSC did not have, "[ICE] would find a way to order it").

244 PX35, at ICE-0019521.

245 *Id.* at ICE-0019520 (emphasis added).

246 PX107, at ICE-0014078 (Joyce describing why a detainee requiring dialysis three times a week had to remain detained at 26 Fed).

detainees with serious medical conditions.[247] That dynamic still exists,[248] and the same has been true for transgender detainees or detainees with disabilities.[249] As Joyce in his deposition admitted, "obviously we want to get someone with [a] disability to a place where they can be accommodated and those are much more difficult to house than an otherwise healthy adult male."[250]

It always was apparent that ICE would have to address serious medical needs and emergencies given the volume of people that it was detaining every day in such overcrowded conditions. Yet the evidence shows that through the summer of 2025, ICE could not and did not provide adequate medical care to the detainees it held, particularly (and tragically) for the detainees who most needed treatment and thus often were stuck at 26 Fed for the longest.

*Restrictions on Access to Counsel*

The ability of detainees to access counsel in any meaningful way was severely restricted through the summer of 2025.

ICE does not allow in-person visits at 26 Fed. And it severely constrained also detainees' opportunities to make calls. Some were denied calls at the outset of their detention[251] or

---

247 PX319, at 61:12-25, 63:23-64:24, 67:6-13; *see* PX322, at 126:18-127:14, 160:15-24.

248 *See* PX32 (describing a detainee with "Significant Medical and Disability Issues" who had "been in a NYC Hold Room for eight days" as of January 21, 2026, after a longer-term detention facility denied the request to transfer him there).

249 PX319, at 64:25-65:17; PX325, at 215:21-216:19.

250 PX325, at 215:21-216:19.

251 Dkt 15 ¶ 9 ("While I was being processed, I asked to be able to speak with my lawyer, but I was told no and that I had to wait.").

for a few days at a time during their detention.[252] And those who were allowed to make calls could make only short phone calls – lasting for a few minutes each time – at most once a day.[253] They often were given that chance "late in the day, after business hours when one could call an attorney."[254] ICE staff or contractors typically were near them – close enough to hear their conversations – during those calls.[255] This made at least one detainee feel "fearful and powerless," preventing him from "speak[ing] freely."[256] Sometimes the deportation officers or contractors "would hurry [a detainee]

---

252 Dkt 27 ¶ 18; *see* Dkt 84 ¶ 8 ("On Thursday, I asked for another call and the guards said no.").

253 PX330 ¶ 16; PX331 ¶ 8 ("I was able to call my family only five times during the nine-and-a-half days I spent at 26 Fed[] but only for one or two minutes each time."); PX332 ¶ 13 ("We were allowed to make one [five]-minute phone call every few days."); PX333 ¶ 8 ("I remember the guards would offer us approximately one short call per day—about three minutes—but we had to place the calls in an open area with guards right next to us, who would end our call around the three-minute mark."); PX334 ¶ 10 ("The entire time I was at 26 Fed[], I was able to make only two calls" and "could only speak for a few minutes each time."); PX335 ¶ 7 ("During my six days, I had four one- to three-minute calls with my sister."); PX336 ¶ 11 ("We were given only very short calls once each day."); Dkt 15 ¶ 9 ("During my entire time at 26 Fed[], I think I was only able to make two calls to speak with my wife, for around [three to five] minutes per call."); Dkt 26 ¶ 7 ("[W]e got calls only at night and for a few minutes."); Dkt 27 ¶ 17; Dkt 28 ¶ 9 ("I was able to call my family only three times during the nine-and-a-half days I spent at 26 Fed[] but only for one or two minutes each time."); Dkt 62 ¶ 9 ("When I was there, I was only able to speak to my partner . . . two times, for around [five] minutes per call."); Dkt 83 ¶ 10 ("While at 26 Fed[], I was only able to call my family for three or five minutes each time. I got a call each day . . . ."); Dkt 84 ¶ 8.

254 Dkt 27 ¶ 17 ("Sometimes I called my family around 9:00 p.m. and one time I was not given a turn to call until 1:30 a.m."); *see* Dkt 15 ¶ 9; Dkt 26 ¶ 7; Dkt 62 ¶ 8.

255 PX331 ¶ 8 ("There was always a guard next to us monitoring the call and it had to be on speaker."); PX333 ¶ 8; PX334 ¶ 10; PX335 ¶ 7 ("We had to form a line where an officer would give us a phone and stand next to us as we spoke."); PX336 ¶ 12 ("There was a guard next to me as I called [my attorney], and I could hear a second person breathing audibly on the line. So I believe that there were at least two people monitoring my call."); Dkt 27 ¶ 17; Dkt 28 ¶ 9; Dkt 84 ¶ 8.

256 Dkt 26 ¶ 8; *see* Dkt 83 ¶ 10 ("[T]here was always a guard listening. It made me nervous.").

if they thought that [the detainee] was taking too long."[257] Furthermore, many detainees did not know that they could request legal calls because they never were told that they had such a right and that there was a way for them to do so, at least in a confidential way.[258] One even reported being told that he *was not allowed to speak to an attorney* until after his removal hearing because, according to the deportation officer who said it, "an attorney could not do anything for [him]."[259] Another described being told that he "*was not allowed to call a lawyer* because [he] already had a deportation order" against him.[260]

Such restrictions on access to counsel for any person being held in state custody would be deeply troubling. These restrictions, however, were all the more troubling because these detainees were being held in immigration detention. ICE often arrested them on the theory that they were removable at immigration hearings at which they did not have counsel. And, from the moment ICE detained them, they faced the prospect of being whisked away at a moment's notice to a detention

257 Dkt 15 ¶ 9; Dkt 26 ¶ 7 ("The guards would yell at us to hurry up: they would say 'move it,' 'hurry up' and 'talk fast.' I heard one who spoke Spanish say 'it's not your house, talk quickly.'").

258 PX330 ¶ 16; PX331 ¶ 9; PX332 ¶ 14; PX333 ¶ 8; PX334 ¶ 10; PX335 ¶ 11; PX336 ¶ 11; Dkt 15 ¶ 10; Dkt 26 ¶ 10; Dkt 27 ¶ 25; Dkt 28 ¶ 11; Dkt 62 ¶ 10; Dkt 83 ¶ 11.

259 PX335 ¶¶ 10-11; *see* Dkt 28 ¶ 10 ("I asked to speak with an attorney but was told by ICE officers that was not allowed until my hearing.").

260 Dkt 84 ¶ 9 (emphasis added).

facility in a remote part of the country,[261] to their home country,[262] or, even worse, to a far-off part of the world to which they had no connection.[263] Many of them did not speak English – at least as a first language – and, until ICE arrested them, never before had faced removal or been detained. They therefore had little awareness of what was happening and even less ability to advocate for themselves. Having access to a lawyer often was their only hope of regaining their liberty and preventing, or at least delaying, their transfer out of the state or their removal from the country.

Perhaps in implicit recognition of the legal and ethical imperative to provide detainees with access to lawyers, ICE officials, staff, and contractors claimed that detainees always were provided many opportunities to make phone calls to counsel, family, or others. In their telling, "[e]ach detainee was given a phone call upon arrest and another call during processing. Once they were detained, detainees were permitted calls at the scheduled times for phone calls each day. Attorney calls outside of the scheduled time for calls were also facilitated."[264] If an attorney wanted

---

261 *See generally* Aala Abdullahi & Geoff Hing, *ICE Detained Them, and Then They Vanished*, MARSHALL PROJECT (June 1, 2026, at 06:00 ET), https://www.themarshallproject.org/2026/06/01/ice-transparency-immigrants-disappear-transfers (describing how frequently and quickly detainees are transferred to other states upon their arrest).

262 *See generally Make the Road N.Y. v. Noem*, 805 F. Supp. 3d 139, 152-53 (D.D.C. 2025) (describing how the administration has deported noncitizens within days of arresting them using expedited removal proceedings), *vacated sub nom. Make the Road N.Y. v. Mullin*, 179 F.4th 16 (D.C. Cir. 2026).

263 *See generally D.V.D. v. DHS*, 821 F. Supp. 3d 102, 119-26 (D. Mass. Feb. 25, 2026) (describing third-country removal policy and the administration's attempts to deport noncitizens to countries that were not their own, such as Libya and South Sudan), *aff'd in part and vacated in part*, No. 26-1212, 2026 WL 2797801 (1st Cir. Sept. 18, 2026).

264 DX77 ¶ 29; DX79 ¶ 18; DX80 ¶ 21; DX81 ¶ 10; DX83 ¶ 10. *But* PX325, at 89:13-90:6 (Joyce agreeing that a detainee's first opportunity to make a call would be during processing).

to schedule a call with a detainee, according to ICE employees, he or she supposedly could email a designated inbox to set up a call.[265] To do so, the attorney had to provide a signed form attesting to his or her representation of the detainee – known as a G-28 form.[266] That form supposedly needed to be signed only by the attorney, not by the detainee.[267] And an attorney *seeking* to represent a detainee supposedly was not required to submit a G-28 form to schedule a pre-representation call with the detainee.[268] Those calls, still according to ICE employees, "were not monitored," although "detainees would be asked who they were calling and the phone number, and that information would be logged."[269] Contractors furthermore claimed that they "never denied a detainee a phone call."[270] Staff and contractors acknowledged, however, that "[b]ecause there were a significant number of individuals in detention during this time, the calls generally were limited to a short duration to allow all individuals the opportunity to make phone calls."[271] That limit likely was approximately five

---

265 DX77 ¶ 30; DX79 ¶ 19; DX80 ¶ 22.

266 PX325, at 94:21-95:7, 123:6-14.

267 *Id.* at 123:15-19, 183:23-184:22.

268 *See id.* at 94:21-95:7, 123:6-14.

269 DX77 ¶ 29; DX79 ¶ 18; DX80 ¶ 21.

270 DX81 ¶ 6; DX83 ¶ 6; *see* PX322, at 216:10-15 (supervisory deportation and detention officer Hampton agreeing that he never saw a detainee's request to make a call be denied). *But see* PX320, at 86:16-87:11 (deportation officer recalling one instance in which a detainee was denied a call because he was "causing a ruckus").

271 DX79 ¶ 18; DX81 ¶ 10.

minutes,[272] although it was at the discretion of a deportation officer or contractor precisely when to end the call.[273]

There are several ways in which this supposed system did not work as described through the summer of 2025. Some appear to have been intentional and the rest perhaps reckless or merely negligent. Regardless, there is no getting around the fact that ICE severely restricted detainees' ability to contact attorneys and the outside world.

First, despite claims that detainees were permitted calls at *scheduled* times, the evidence makes clear that the times at which detainees were permitted to make additional calls after they were processed was a matter of *discretion*. As supervisory deportation and detention officer Hampton testified, the contractors would decide each day when was "a *good time* for [detainees] to start doing legal calls or phone calls."[274] It fully was "[w]ithin [their] discretion when to offer phone calls to detained individuals."[275]

Second, it is unclear how an attorney would have known which email address to contact to schedule a legal call because ICE declined to post any information publicly instructing

---

[272] PX322, at 215:21-216:9; PX329, at 212:19-213:23.

[273] PX320, at 91:7-19.

At least one deportation officer stated that he had never seen a deportation officer or contractor terminate a detainee's call. PX321, at 42:8-20, 82:12-15.

[274] PX322, at 210:21-211:21 (emphasis added).

[275] *Id.* at 218:18-21.

attorneys on how to contact staff at the hold rooms or otherwise set up calls with their detained clients.[276]

Third, it is equally unclear how any schedule would have been adhered to considering that apparently no schedule of attorney calls ever has been maintained or circulated among ICE staff and contractors at 26 Fed.[277]

Fourth, there undisputedly were some instances in which deportation officers prevented detainees from speaking with their attorneys because the detainees had not signed the G-28 forms, even though their signatures supposedly were not required.[278]

Fifth, deportation officers in other instances prevented attorneys who did not represent detainees *yet* from scheduling calls because those attorneys had not submitted signed G-28 forms, even though such forms supposedly were not required for pre-representation calls.[279]

Sixth (and most troubling), ICE staff at times claimed that a detainee "remain[ed] in transit at 26 Fed[]" or was "currently in transit" for days at a time such that a legal call could not be scheduled.[280] This practice in particular was insidious and duplicitous since it was intentional – i.e.,

---

276 PX326, at 451:21-452:3.

277 PX320, at 93:5-9; PX325, at 120:13-17.

278 PX325, at 124:5-125:19.

279 *E.g.*, PX4, at ICE-0011455 (deportation officer requiring that attorney seeking to schedule a pre-representation call submit G-28 form because, according to him, "[a]ttorneys are required to submit Form G-28 . . . . [whether] it be for representation or pre representation").

280 *E.g.*, PX63 (failing to provide legal call for over a week because client "remains in transit at 26 Fed[]"); PX64 (failing to provide legal call for at least four days because client "remains in transit at 26 Fed[]"); PX66 (failing to provide legal call for at least two days because client "is currently in transit" despite still being at 26 Fed); PX166 (failing to provide legal call for at least two days because client "is in transit to their final detention

ICE staff knew that the detainees were at 26 Fed and yet purposefully "continue[d] to answer [in] the same way" and declined to provide detainees with an opportunity to speak to an attorney.[281]

Seventh, ICE staff sometimes failed to update a detainee's location in its online tracker such that his or her attorney or family was unable to find him or her and schedule a call.[282]

Eighth, ICE staff at other times claimed that they were so busy at 26 Fed that it would take "a minimum of [five to ten] business days" to respond to attorney outreach.[283] They then would transfer the detainee in the meantime without him or her ever getting a chance to speak with counsel.[284]

Ninth, ICE staff at least once simply failed to provide a scheduled call for no reason at all (or, at least, no reason it chose to explain).[285]

And tenth, when detainees *were* permitted to make or receive calls, including legal calls, they did so mostly at the contractors' desk or sometimes in the processing area behind the contractors' desk.[286] According to Hampton, there always have been two phones each at the

---

housing" despite still being at 26 Fed); PX168 (failing to provide legal call for at least five days because client "is currently in transit now to their final detention housing" despite still being at 26 Fed).

281 PX167.

282 *E.g.*, PX164 (failing to update location for at least three days); PX167 (failing to update location for four or five days).

283 *E.g.*, PX169.

284 *See, e.g.*, *id.*

285 *E.g.*, PX10 (failing to provide legal call until day after when call initially was scheduled).

286 PX320, at 90:3-18; PX321, at 83:3-20; PX322, at 212:16-23; PX325, at 96:4-7.

contractors' desk and in the processing area for detainee calls.[287] Those calls, again, including legal calls, thus were made out in the open,[288] in the presence of deportation officers and contractors who also happened to be sitting at the front desk (which always was supposed to be the case)[289] or in the processing area[290] and in the presence of other detainees making phone calls.[291] Detainees' calls thus never were private before this case was filed.[292]

Claims that detainees were offered ample opportunities to contact their friends, families, and attorneys before this case was filed simply are unsupported by the record. The evidence shows instead that ICE – deliberately at times and recklessly or negligently at others – prevented detainees from having meaningful contact with the outside world and particularly with attorneys who might have been able to obtain their release or at least hamper ICE's efforts to transfer or deport them with as little procedure as possible.

---

287 PX322, at 211:22-212:15; *see* Dkt 26 ¶ 8 ("There were only four telephones . . . ."). *But* PX325, at 89:4-12 (Joyce recalling there being five total phones for detainee calls before this case was filed, including three at the contractors' desk); PX329, at 214:12-14 (Zanello recalling there being five or six total phones for detainee calls, including one at the supervisory deportation and detention officer's desk and one in the IHSC area).

288 PX325, at 96:8-12.

289 PX322, at 213:23-214:22.

290 PX321, at 39:2-42:4, 83:12-20; PX325, at 98:18-100:20 ("[T]here's always going to be somebody nearby."); PX329, at 215:13-25 (acknowledging that calls tended to be made a few feet away from ICE staff or contractors).

291 *See* PX322, at 213:10-22 (Hampton stating that detainees generally made calls two at a time).

292 PX323, at 108:15-109:24; PX327, at 154:5-15.

*Cruelty and Effect on Detainees*

The cruelty detainees experienced at 26 Fed through the summer of 2025 extended beyond the overcrowding, sleep deprivation, insufficient food and water, inadequate medical care, and restrictions on access to counsel. Some of the ICE staff and contractors who oversaw the hold rooms inflicted additional suffering on detainees through their behavior. They could be "intimidating and abusive" and at times treated the detainees "as if [the detainees] were the worst of the worst."[293] One detainee described how ICE officers took pictures of him crying upon being placed in a hold room and mocked him for doing so.[294] Another described how "[t]he guards would eat their own food in front of [the detainees], things like pizza and hamburgers," as if the ICE staff and contractors were "jeering at [the detainees]."[295] Several detainees even witnessed ICE staff and contractors beating detainees.[296]

It might be one thing if it had been convicted criminals whom ICE had been detaining. But that was not the case. Those who were detained had broken the law at least by staying in the United States illegally. Yet – as plaintiff's witnesses exemplify – many of those detained were

293 Dkt 15 ¶ 17; *see* Dkt 62 ¶ 12 ("When we asked for water or blankets, the guards would get angry and not give us anything that we asked for.").

294 PX330 ¶ 9.

295 Dkt 27 ¶ 14.

296 Dkt 15 ¶ 17 ("One guy who was in another cell was screaming at some point and he was beaten by various guards who put their foot on his neck and head and then grabbed his arms behind his back."); PX334 ¶ 15 ("Once I saw through the windows that a man in the other large cell was hit and taken out of the cell by several guards—I th[i]nk as many as five guards came one after the other. They all went after him."); *see* PX332 ¶ 12 ("I also saw the guards being physically aggressive and violent with people . . . .").

otherwise law-abiding and contributing members of society.[297] Many had been living in the United States for several years.[298] Some had married U.S. citizens.[299] Some had young children.[300] And many had been forced to flee their home countries to escape persecution and the threat of violence.[301]

---

297 PX330 ¶ 3 (stating that he never had been arrested before ICE detained him); PX331 ¶ 19 ("I followed all the rules in the U.S. and attended my court dates."); PX333 ¶ 6 ("I have always tried to do what was required of me by the immigration authorities. For example, I was required to check in with ICE, and I always did my best to comply."); PX334 ¶ 3 (stating that he had no criminal history); PX336 ¶ 3 (describing how he filed for asylum, consistently attended immigration court hearings, and kept immigration authorities updated as to his address); Dkt 15 ¶ 4 ("For nearly five years, I had reported without issues."); Dkt 26 ¶ 3 ("I worked in construction; applied for asylum; and attended my court dates."); Dkt 27 ¶¶ 3, 5 ("I attended immigration court and was scheduled to have my next hearing in October 2025. I worked in delivery; construction; and gardening . . . . I have no criminal history in any country."); Dkt 28 ¶ 2 ("I enrolled in high school. I also volunteered with my church and spent time with friends and my younger brother."); Dkt 62 ¶ 3 ("I have been working in house painting and remodeling for approximately ten years. I go to church with [my partner of two years, whom I plan to marry,] when I am not working."); Dkt 84 ¶ 2 ("I just graduated from high school in June. Before I was detained, I was working in a kitchen and trying to save money to go to community college. My dream is to join the United States Army . . . . I have never been arrested.").

298 PX330 ¶ 2 (over two years); PX331 ¶ 2 (going on two years); PX332 ¶ 3 (same); PX333 ¶ 2 (approximately ten years); PX334 ¶ 2 (going on two years); PX335 ¶ 2 (over two years); PX336 ¶¶ 2-3 (over three years); Dkt 15 ¶ 3 (approximately twenty years); Dkt 26 ¶ 2 (going on three years); Dkt 27 ¶ 2 (going on two years); Dkt 28 ¶ 2 (over a year); Dkt 62 ¶ 2 (approximately sixteen years); Dkt 83 ¶ 2 (approximately thirteen years); Dkt 84 ¶ 2 (going on three years).

299 Dkt 15 ¶ 3.

300 PX331 ¶ 3 (nine-year-old daughter); PX333 ¶ 3 (five young children, three of whom are U.S. citizens, two of whom have autism, and one of whom has diabetes); PX336 ¶ 3 (at least one child born in the United States); Dkt 15 ¶ 3 (ten-year-old daughter and six-year-old son, both of whom were born in the United States); Dkt 26 ¶ 3 (two children, the youngest of whom was six-months old and was born in the United States); Dkt 83 ¶ 2 (three children, all of whom were born in the United States).

301 PX330 ¶ 2; PX331 ¶ 2; PX332 ¶ 3; PX333 ¶ 4; PX335 ¶ 2; Dkt 27 ¶ 2; Dkt 28 ¶ 2; Dkt 62 ¶ 2.

ICE nevertheless kept them detained for days on end in conditions that were "miserable,"[302] "horrible,"[303] "confusing,"[304] "unbelievable,"[305] "traumatiz[ing],"[306] "inhumane,"[307] "very bad,"[308] "very painful to think about,"[309] "awful,"[310] "desperate,"[311] "a nightmare,"[312] and "like being in hell."[313] A couple of detainees expressed that they hoped that no one, including their "worst enemy,"[314] ever would have to experience what they did.[315] Multiple detainees said that they were

---

302 PX330 ¶ 18.

303 PX331 ¶ 4.

304 *Id.* ¶ 11.

305 PX332 ¶ 19.

306 PX333 ¶ 8; PX334 ¶ 17; PX336 ¶ 21; Dkt 27 ¶ 7.

307 PX333 ¶ 11.

308 PX334 ¶ 5.

309 PX335 ¶ 13.

310 *Id.*

311 Dkt 83 ¶ 4.

312 PX335 ¶ 15; Dkt 15 ¶ 19; Dkt 27 ¶ 7; *see* PX331 ¶ 4 (describing how he "still ha[s] dreams about what happened to [him] that day and how [he] was treated afterwards").

313 Dkt 15 ¶ 19.

314 *Id.*

315 PX330 ¶ 18; *see* PX336 ¶ 21 (plaintiff explaining that he wants to "stop others from having the same experience").

treated "like" or "worse than" animals,[316] and one said that "[i]t felt like no one on the [tenth] [f]loor cared about [her] wellbeing."[317] She felt like "a body that [ICE had] crammed into a room, almost as if to be forgotten."[318] To her, no one "deserves to be treated that way."[319] Another agreed that he "felt like [his] dignity was taken from [him]."[320] Yet another said that 26 Fed was "one of the worst" places that he was detained in the United States over the course of eight months in immigration detention and that he "never imagined that [he] would spend a night in a place like that."[321] Several others expressed that it was hard to "believe that human beings [could] be treated like that in a place like the United States."[322]

This cruelty took a toll on plaintiff's witnesses and doubtless many other detainees. They sustained at a minimum lasting psychological trauma from the experience.[323] And many

---

316 PX331 ¶ 16; PX332 ¶ 16; Dkt 15 ¶ 18; Dkt 27 ¶ 7.

317 PX333 ¶ 11.

318 *Id.*; *see* Dkt 15 ¶ 19 ("It was as if they totally forgot that I too was a husband and a father."); *see also* PX331 ¶ 16 (describing how he lived "in constant fear that [he] would disappear and no one would know where [he] was"); PX334 ¶ 17 ("I was extremely worried and fearful not knowing what would happen to me.").

319 PX333 ¶ 11.

320 Dkt 15 ¶ 19.

321 PX332 ¶¶ 18-19; *see* PX335 ¶ 13 ("There was no location worse than 26 Fed[].").

322 PX335 ¶ 15; *see* PX334 ¶ 5; *see also* PX331 ¶ 13 (stating that he never had experienced anything like this in his home country, which he fled to escape persecution and the threat of violence).

323 PX331 ¶ 16; PX332 ¶ 16; PX333 ¶ 8; PX334 ¶ 17; PX335 ¶ 13; PX336 ¶ 21; Dkt 27 ¶ 7; Dkt 28 ¶ 16.

physically were harmed by the experience. One detainee testified that he now has high blood pressure and "intense anxiety" for which he has to take medication.[324] Some lost significant amounts of weight rapidly while detained.[325] Some have lasting pain from being forced to sleep on the floor while detained.[326] One testified that his feet "hurt and changed into a yellowish color" during his detention and that he then became "very sick."[327]

Some detainees even decided to self-deport to avoid continued confinement in those conditions.[328] As one described it, before he was detained, he had wanted to fight to stay in the United States, "but after what happened to [him] at 26 Fed[]," he "lost [his] will to stay detained and fight."[329] He did not "want to be a prisoner anymore. [He] wanted to be free," even if his freedom came at the cost of his asylum claim.[330] And perhaps that was at least one reason for the appalling conditions and the cruelty. After all, when another detainee told a deportation officer that he wanted to continue to pursue his asylum case in response to the deportation officer's pressure on him to self-

---

324 PX335 ¶ 14.

325 Dkt 26 ¶ 9; Dkt 27 ¶ 26; Dkt 83 ¶ 7.

326 PX331 ¶ 16; Dkt 28 ¶ 16; Dkt 62 ¶ 12.

327 Dkt 62 ¶ 12.

328 *See* Dkt 26 ¶ 12; Dkt 27 ¶ 20.

329 PX331 ¶¶ 13, 17.

330 *Id.* ¶ 17.

deport, the deportation officer "told him that he would have to remain detained until his merits hearing in 2029."[331]

*The TRO and PI*

Plaintiff Sergio Alberto Barco Mercado filed this action on August 8, 2025, after he was arrested and detained by ICE at 26 Fed. He moved that same day (1) for a temporary restraining order ("TRO") and a PI enjoining defendants to remedy the alleged unconstitutional conditions of confinement and restrictions on access to counsel at 26 Fed, and (2) to certify a class consisting of all immigration detainees who are or will be detained by ICE at 26 Fed.

On August 12, 2025, the Court granted the TRO. As subsequently modified, the TRO required defendants to ensure that no person detained by ICE at 26 Fed "is held or detained in any hold room or other room, cell or other space" without being provided (a) fifty square feet of floor area (exclusive of floor area within eight feet from any toilet) for each individual detained therein, (b) a clean bedding mat when being held overnight, (c) an area all of which is "cleaned thoroughly at least three times each day," (d) "adequate supplies of soap, towels, toilet paper, oral hygiene products (including tooth brushes and toothpaste)," and, for female detainees, feminine hygiene supplies, (e) "means of making confidential, unmonitored, unrecorded, temporally unrestricted, and free legal telephone calls to counsel" within twenty-four hours of being detained and at least once every twelve hours thereafter, including also "the ability to schedule legal calls with counsel" within six hours of a request being made between 9:00 a.m. and 4:00 p.m. or within sixteen hours of any

---

[331] PX330 ¶ 8.

other request, and (f) at least one landline telephone "dedicated solely to accommodating [d]etainee legal calls for each five or fewer [d]etainees" at 26 Fed.[332]

Within two days of the TRO being issued, defendants had to display on ICE's website a telephone number for attorneys to call to schedule legal calls with detainees.[333] That phone line was to be "monitored and answered without undue delay from 9 a.m. until 5 p.m."[334] Attorney calls were to be "scheduled for the date and time requested by the attorney or as soon thereafter as [was] reasonably practicable," and the relevant detainee was to be informed of the scheduled call.[335]

Defendants were ordered also to provide each detainee with a "printed Notice of Rights" within one hour of being detained.[336] The Notice of Rights was to be provided in English and Spanish, with interpretation or oral translation services available for detainees who were not proficient in reading English or Spanish.[337]

In addition to the above requirements, defendants were required to provide detainees upon request, without charge, and promptly (a) "clean clothing" and "a private area for the purpose of changing clothing," (b) "professional services of licensed medical personnel between the hours of 7 a.m. and 9:30 p.m. and, in case of emergency, during all other periods," (c) detainees' "personal

---

332 TRO (Dkt 65) ¶¶ 1(a)-(f).

333 *Id.* ¶ 4(a).

334 *Id.* ¶ 4(b).

335 *Id.* ¶¶ 4(c)-(d).

336 *Id.* ¶ 2.

337 *Id.* ¶¶ 5-6.

inhaled medication in their possession at the time of arrest" and "such inhaled medication brought for them by family members or their attorney(s)" – which detainees could retain on their person – and "other such prescribed medication from ICE medical personnel, one or more of whom . . . shall be on the premises at 26 Fed[] at all times," (d) "additional blanket or blankets," (e) bottled water, and (f) "one additional meal per day."[338]

Additionally, defendants were required to ensure that ICE's online detainee locator system "accurately identifie[d] the location of each [d]etainee in real time or as close thereto as [was] reasonably possible."[339]

Finally, the TRO prohibited defendants from retaliating in any manner against plaintiff.[340]

The parties subsequently completed briefing on plaintiff's motion for a PI and for class certification and waived an evidentiary hearing.[341] Noting that defendants largely failed to "contest . . . plaintiff's specific assertions about the treatment experienced prior to the entry of the TRO," this Court found plaintiff's witnesses "to be credible and [found] the facts for plaintiff in all such respects."[342] It amended plaintiff's proposed class definition to limit it to "all immigration detainees who now or will be detained for [twelve] or more hours by" ICE at 26 Fed and

---

338 *See id.* ¶¶ 2(a)-(j); Order (Dkt 77) ¶ 1(b).

339 TRO (Dkt 65) ¶ 3.

340 *Id.* ¶ 7.

341 Defs.' Aug. 20, 2025 Letter (Dkt 78); Pl.'s Aug. 21, 2025 Letter (Dkt 80).

342 Opinion (Dkt 96) at 36.

provisionally certified the class.[343] It then found that (1) the class had been and would be irreparably harmed absent judicial relief, (2) it was likely to succeed on the merits of its claims, and (3) the balance of equities and the public interest favored an injunction.[344] On September 17, 2025, the Court accordingly entered the PI against defendants. The PI imposed substantially the same requirements on defendants as were imposed by the modified TRO.[345] In other words, defendants have been required – by order of this Court – to comply with the directives set forth in the TRO and PI since August 12, 2025.

*ICE's Noncompliance with the TRO and PI*

Despite some improvement in conditions at 26 Fed following entry of the TRO and PI, plaintiff nevertheless identifies three primary areas in which defendants, he says, consistently have violated the Court's orders. He argues that defendants have (1) "exceed[ed] the capacity limitations on a frequent basis," (2) "not even attempt[ed] to provide detained individuals with confidential attorney calls," and (3) held individuals on other floors of 26 Fed "in an apparent attempt to circumvent the Court's [o]rders."[346] As with plaintiff's PI motion, defendants by and large have declined to dispute any of plaintiff's specific factual contentions. In their words (thrice repeated

---

343 *Id.* at 46.

344 *Id.* at 53-83.

345 *See* PI (Dkt 97).

346 Pl.'s Bench Trial Mem. (Dkt 166-1) at 1.

during trial), "the facts are the facts."[347] They nevertheless maintain that ICE always has used its best efforts to comply with the TRO and PI, and for the most part has done so. But, as will become clear below, the facts show that ICE repeatedly has violated this Court's orders either by intentionally flouting them or by employing so-called "best" efforts that simply have not been good enough.

*Exceeding Capacity Limitations*

Defendants admit that ICE violated the capacity limit on the tenth floor on two days after this Court issued the TRO. On both September 11 and October 1, 2025, they say, ICE held twenty-three individuals in the hold rooms.[348] The more glaring instance of ICE disregarding the maximum capacity of the tenth-floor hold rooms, however, occurred on August 18, 2025. At 9:51 a.m. that morning, Zanello sent an email stating that ICE needed to "drop the population" of the hold rooms to twenty-two because it was "in violation of the TRO."[349] She explained that ICE "currently" was holding *forty-eight* detainees and had "at least" *thirteen* "more coming in," as well as those being brought in from the ongoing "court arrests."[350] Joyce did not respond until 4:32 p.m., when he confirmed that excess detainees could be transferred to an ICE detention facility in Newark so that ICE could return to compliance with the TRO.[351]

---

347 May 26, 2026 Trial Tr. at 35:9-10, 36:22-25, 46:25-47:1.

348 DX86 ¶ 6.

349 PX69.

350 *Id.*

351 *Id.*

Not only was ICE in violation of the TRO for at least those six-and-a-half hours on August 18, 2025, but defendants and Zanello then either intentionally concealed or recklessly disregarded the truth in their subsequent submissions to this Court. Also on August 18, 2025, at 4:06 p.m., Zanello signed a declaration "under penalty of perjury" that defendants submitted in opposition to plaintiff's PI motion.[352] Zanello there asserted that "*[a]s of 11:59p.m. EDT August 15, 2025*, there are *currently* [eight] aliens in custody at [26 Fed]."[353] Yet, at the time Zanello signed that declaration, she knew that there were far more than eight detainees in the hold rooms and that ICE at that time – i.e., *currently* – was "in violation of the TRO."[354] She had said as much that very morning. Indeed, ICE's own records reflect that it was detaining *sixty* individuals in the hold rooms as of August 18, 2025, at 4:06 p.m.[355] Not eight like Zanello said.

Defendants since have attempted to recast the inaccuracy in Zanello's declaration as an accidental byproduct of litigating in the face of a "constant flow in and out of detainees throughout the day."[356] But that dog won't hunt. Defendants knew they would be submitting Zanello's declaration on August 18, 2025. They nevertheless included the detainee headcount as of August 15, 2025, and, even worse, described that headcount as *current*. Furthermore, even if Zanello in her declaration had intended to represent accurately the detainee headcount as of August 15, 2025, at

---

352 PX78.

353 *Id.* ¶ 9 (emphasis added).

354 PX69.

355 *See* PX89, at ICE-B-000120.

356 May 26, 2026 Trial Tr. at 37:18-21.

11:59 p.m., her statement still would have been false. ICE at that time actually was holding twenty-two detainees in the tenth-floor hold rooms.[357] Again, not eight like Zanello said.

When defendants submitted Zanello's declaration, the Court was considering whether to issue a PI, which defendants actively were opposing. One of their primary arguments against the proposed PI relied on Zanello's false statement to assert that ICE had resolved the issues necessitating the TRO, including overcrowding, and that the then-current "conditions of confinement at [26 Fed] d[id] not violate the Constitution."[358] That was incorrect. Zanello knew before she signed her declaration that it was incorrect, and she knew, or should have known, that it was incorrect when she signed it. Defendants knew, or should have known, the same.

But those three days (August 18, September 11, and October 1, 2025) were far from the only instances in which ICE failed to comply with this Court's orders with respect to the capacity limits of the hold rooms. In fact, plaintiff claims that there were 102 days between August 13, 2025, and March 9, 2026, in which the maximum number of detainees held in the tenth-floor hold rooms exceeded twenty-two.[359] Defendants respond that plaintiff, in relying on ICE's electronic records, has used an over-inclusive data pool that does not distinguish between people booked into ICE's system on different floors of 26 Fed.[360] Defendants urge the Court instead to rely on the contractor

---

357 Defs.' June 15, 2026 Letter (Dkt 176) at 1.

358 Opp'n Mot. Prelim. Inj. (Dkt 73) at 14.

359 PX303 ¶ 26.

360 *See* May 26, 2026 Trial Tr. at 45:23-46:25; PX56, at ICE-0012213 (August 27, 2025 email from acting field office director stating that ICE could not "create multiple 'hold room' locations or sublocations for the Field Office within [its electronic system] if they happen to exist at the same street address").

logbook as the only accurate record of how many detainees were in the tenth-floor hold rooms at any given time.[361]

Plaintiff concedes that ICE's electronic records may not reflect accurately "where individuals were being held" and "that conflicting information in the [contractor] logbooks [could be] more accurate."[362] The Court is inclined to agree, but it need not resolve definitively the discrepancies between ICE's electronic and paper records because other evidence proves that defendants often violated this Court's orders with respect to capacity limits.

To begin, the contractor logbooks show that there were over twenty-two detainees in the tenth-floor hold rooms between at least August 13 and 22,[363] and August 27 and 28,[364] in addition to September 11, and October 1, 2025.

Furthermore, as Joyce admitted, there "were occasions when although the overall capacity limit of twenty-two detainees was being adhered to, the individual room limits nonetheless were exceeded."[365] In both the TRO and PI, the Court mandated that for each individual detained at 26 Fed, there be a floor area (exclusive of the floor area within eight feet of any toilet) of at least fifty square feet in the space in which the detainee is being held. Zanello accordingly calculated that the largest hold room could hold eleven detainees at most, the second-largest could hold nine detainees,

---

361 *See* May 26, 2026 Trial Tr. at 45:23-46:25.

362 Pl.'s June 26, 2026 Letter (Dkt 183) at 2.

363 PX89, at ICE-B-000116-24.

364 *Id.* at ICE-B-000128-29.

365 DX77 ¶ 55; DX79 ¶ 42.

and each of the smallest could hold one detainee.[366] Yet there were at least *eighty-four* days between the start of September 2025 and mid-March 2026 in which ICE detained more individuals in a hold room than was permitted by this Court's orders and Zanello's own calculations.[367]

---

366 DX77 ¶ 34; DX79 ¶ 25; DX80 ¶ 26; DX83 ¶ 15.

367 PX176 (September 3, 2025); PX177 (September 16, 2025); PX178 (September 18, 2025); PX179 (September 19, 2025); PX180 (September 22, 2025); PX181 (September 24, 2025); PX182 (September 25, 2025); PX183 (September 26, 2025); PX184 (October 1, 2025); PX185 (October 2, 2025); PX186 (October 7, 2025); PX187 (October 8, 2025); PX188 (October 9, 2025); PX189 (October 10, 2025); PX190 (October 11, 2025); PX191 (October 15, 2025); PX192 (October 16, 2025); PX193 (same); PX194 (October 17, 2025); PX195 (October 18, 2025); PX196 (October 19, 2025); PX197 (October 21, 2025); PX198 (same); PX199 (October 22, 2025); PX200 (October 23, 2025); PX201 (October 24, 2025); PX202 (same); PX204 (October 25, 2025); PX203 (October 26, 2025); PX207 (October 28, 2025); PX208 (same); PX209 (October 30, 2025); PX210 (same); PX211 (November 4, 2025); PX212 (November 6, 2025); PX213 (November 10, 2025); PX214 (November 11, 2025); PX215 (November 13, 2025); PX216 (November 15, 2025); PX217 (November 16, 2025); PX218 (November 20, 2025); PX221 (December 14, 2025); PX222 (December 15, 2025); PX223 (December 16, 2025); PX224 (December 17, 2025); PX225 (December 18, 2025); PX226 (same); PX227 (December 20, 2025); PX228 (same); PX229 (December 22, 2025); PX231 (December 23, 2025); PX232 (same); PX233 (December 24, 2025); PX234 (same); PX12 (December 31, 2025); PX20 (same); PX21 (same); PX22 (same); PX236 (same); PX322, at 265:19-266:5 (Hampton agreeing that would be a violation of the PI); PX13 (January 1, 2026); PX326, at 464:9-25 (same); PX237 (January 2, 2026); PX14 (January 6, 2026); PX23 (same); PX239 (same); PX240 (same); PX241 (same); PX322, at 269:16-270:6 ("By cell, yes, this would be [a violation of the Court's orders]."); PX242 (January 7, 2026); PX243 (same); PX244 (same); PX245 (January 8, 2026); PX15 (same); PX322, at 270:7-25 (Hampton agreeing that would be a violation of the Court's orders); PX249 (January 10, 2026); PX250 (January 11, 2026); PX251 (January 12, 2026); PX252 (same); PX253 (January 13, 2026); PX256 (January 15, 2026); PX257 (January 16, 2026); PX258 (same); PX259 (January 17, 2026); PX260 (same); PX261 (January 18, 2026); PX263 (January 20, 2026); PX264 (January 21, 2026); PX265 (same); PX266 (same); PX267 (January 22, 2026); PX268 (same); PX269 (same); PX270 (January 23, 2026); PX271 (same); PX272 (same); PX273 (January 24, 2026); PX274 (January 28, 2026); PX275 (January 29, 2026); PX277 (February 3, 2026); PX278 (February 4, 2026); PX279 (same); PX280 (February 5, 2026); PX281 (February 6, 2026); PX282 (same); PX283 (February 7, 2026); PX284 (February 10, 2026); PX285 (February 11, 2026); PX288 (February 19, 2026); PX289 (same); PX290 (February 22, 2026); PX291 (February 23, 2026); PX292 (February 26, 2026); PX293 (February 27, 2026); PX294 (February 28, 2026); PX295 (March 3, 2026); PX296 (March 9, 2026); PX297 (March 10, 2026); PX298 (same); PX299 (March 12, 2026); PX300 (March 13, 2026).

That this was the case is unsurprising given that Joyce – the ICE official in charge of overseeing the hold rooms and ensuring compliance with the TRO and PI – one week before trial testified that "[u]ntil recently, [he] had not *remembered* the individual cell limitations *per se*."[368] It was only after he was deposed in this case *for a second time* that he "recall[ed]" what this Court had ordered him to do since August 12, 2025.[369] In other words, had Joyce not been questioned about the terms of the PI at his second deposition, there is no reason to believe that he ever would have "remembered" this Court's orders "per se," let alone obeyed them.

ICE's disregard of this Court's orders regarding capacity limits at 26 Fed has been persistent, egregious, and, at a minimum, reckless, if not willful.

*Failing to Provide Confidential Legal Calls*

Following issuance of the TRO and PI, ICE designated a telephone number for attorneys to call to schedule legal calls with detainees.[370] The number has been "conspicuously display[ed] on ICE's website."[371] And that phone line *supposedly* was "monitored and answered without undue delay" during regular business hours.[372] When the line was not answered, the call

[368] DX77 ¶ 55 (emphasis added).

[369] PX326, at 462:17-463:5 (Joyce being asked whether he was "aware of there being specific cell capacity limits" to which he responded, "Yeah. Had I seen it, yes, I'm sure. Do I . . . recall it necessarily? No.").

[370] DX77 ¶ 49; DX78 ¶ 26; DX79 ¶ 39; DX80 ¶ 39.

[371] DX77 ¶ 51.

[372] *Id.* ¶ 49; *accord* DX78 ¶ 26; DX79 ¶ 39; DX80 ¶ 39.

would bounce to an ICE call center where it *supposedly* would be answered, and an attorney call with the detainee in question *supposedly* would be "scheduled for the time requested by the attorney or as soon thereafter as [was] reasonably possible."[373] ICE created also an email address *supposedly* "to field requests from attorneys to schedule calls and receive documents."[374]

Calls, including legal calls, nonetheless continued to occur in the processing area without any privacy.[375] When to schedule those calls continued to be in the discretion of the supervisory deportation and detention officer "manning the phone line."[376] And attorneys at times continued to be unable to schedule calls without providing G-28 forms signed by the detainee at issue[377] or within reasonable periods following their request.[378]

Defendants admit that not until February 27, 2026 – after plaintiff brought a motion seeking to hold them in contempt of the PI – did they begin to ensure that confidential legal calls actually would be confidential and that attorney requests to schedule legal calls actually would be

---

373 DX77 ¶ 50; *accord* DX79 ¶ 39; DX80 ¶ 39.

374 DX77 ¶ 52; *accord* DX78 ¶ 26; DX80 ¶ 39.

375 PX323, at 108:24-109:24 (contractor describing how they still occurred at the contractors' desk); PX325, at 111:10-20, 112:18-113:11 (Joyce agreeing that ICE staff and contractors could hear detainee calls, including legal calls); *id.* at 96:16-98:3 (Joyce describing how there could be upwards of thirty staff and contractors in the area during detainee calls).

376 PX325, at 159:6-162:4.

377 PX67 (Zanello refusing to schedule a legal call because the " G-28 is unsigned by [the] supposed client or authorized signatory").

378 PX131 (offering call in four days at the earliest); PX132 (offering call in six days at the earliest); PX133 (same and during which detainee was transferred); PX139 (failing to respond for five days during which detainee was transferred); PX310 (failing to facilitate call for over two days); PX311 (failing to respond for over one day).

responded to promptly.[379] It was only then that the tenth floor began to "contain[] five land line telephones for the purpose of allowing the detainees to conduct legal calls," with "at least one land line telephone dedicated solely to accommodating detainee legal calls."[380] It was only then that "a private room [was] set aside from which detainees [could] place legal calls [that] are confidential, unmonitored, unrecorded, unrestricted, and free to detainees and their counsel."[381] And it was only then that ICE staff and contractors stopped limiting the length of legal calls and the ability of attorneys to schedule such calls.[382] Yet those all were required by this Court's August 12, 2025 TRO. And at least Joyce always understood that legal calls were supposed to be confidential, meaning, in his words, that ICE employees or contractors were "not supposed to be listening to [them]."[383] ICE's disregard of this Court's orders regarding access to counsel thus also has been persistent, egregious, and, at a minimum, reckless.

---

379 *See* Contempt Mot. Stip. & Order (Dkt 141); Joint Pretrial Order (Dkt 159) ¶ III.5; DX77 ¶ 55 ("There are a couple of aspects in which compliance with the TRO and PI has not been perfect. In the last few months, ICE designated a room to be used by detainees for confidential calls with attorneys. Additionally, we updated the instructions to the call center which receives calls that are not answered by the on-duty supervisory deportation and detention officer to ensure that supervisors in the [Tenth] Floor Hold Room are promptly notified of attorney requests for phone calls with their clients."); DX79 ¶ 42.

380 DX77 ¶ 48; *accord* DX78 ¶ 25; DX79 ¶ 38; DX80 ¶ 38.

381 DX77 ¶ 48; *accord* DX78 ¶ 25; DX79 ¶ 38; DX80 ¶ 38.

382 DX77 ¶ 48; DX78 ¶ 25; DX79 ¶ 38; DX80 ¶ 38.

383 PX325, at 110:23-111:9.

*Detaining Individuals on Other Floors*

Taking the fifth floor first, defendants maintain that they have not and do not detain individuals on the fifth floor who, absent the TRO and PI, would have been detained on the tenth floor.[384] They insist that the fifth floor is used for primarily family units checking in with ICE and that most families are not detained.[385]

Despite family processing being the primary use of the fifth-floor processing area, at least three ICE employees testified that single, adult detainees sometimes are processed and held there and then brought to the tenth floor when space becomes available.[386] Indeed, Morales, the assistant field office director who oversees day-to-day operations on the fifth floor, has confirmed that this practice exists.[387] It thus is apparent that ICE has used the fifth-floor processing area as an overflow space when it cannot fit additional detainees on the tenth floor.

The fifth-floor processing area in some ways has complied with the PI. It has an "unmonitored and unrecorded land line phone that [at least] families can use."[388] Heater meals,

384 *See* May 26, 2026 Trial Tr. at 48:21-49:5 ("The fifth floor is not a holding room.").

385 DX82 ¶¶ 20, 31 (estimating that ICE now detains "one to two families per week" in the fifth-floor processing area).

386 PX321, at 17:13-16, 21:22-22:10 ("So we sometimes keep them down there . . . if another unit arrests them, for example, and then they would bring them upstairs . . . whenever they're told to bring them upstairs to the tenth floor."); PX322, at 106:14-107:23; *see* PX325, at 31:16-23.

387 PX328, at 124:8-125:6.

388 DX82 ¶ 13.

snacks, and beverages are available there.[389] At least detained families may retain the medications they have on their person.[390] And there is no evidence that a family or other detainee has spent an overnight on the fifth floor, thus obviating the need for bedding mats and blankets.[391] Nor is there evidence that the fifth floor gets overly crowded such that detainees would have less than fifty square feet per person.[392]

But the fifth floor in other ways has failed to comply with the PI. Because ICE officials and staff never have viewed the fifth floor as a holding area or subject to this Court's orders,[393] there simply are no specific policies that govern detainees kept on the fifth floor.[394] There thus are no policies or procedures regarding providing such detainees with confidential legal calls,[395]

---

389 *Id.* ¶ 27.

390 *Id.* ¶ 28.

391 *See id.* ¶¶ 29-30.

392 *See id.* ¶ 31; PX328, at 135:17-136:20.

393 *See* PX328, at 63:15-20 (stating that roles and responsibilities on the fifth floor did not change in any way after the Court's orders).

394 *See* PX328, at 271:19-24.

395 *See id.* at 297:12-298:21, 299:13-22.

bedding mats,[396] blankets,[397] hygiene products,[398] food,[399] or extra clothing.[400] Additionally, there are no medical personnel on the fifth floor nor is medication readily available there.[401]

In contrast to how defendants describe the fifth floor, they admit that after this Court entered the TRO, "some additional hold rooms [were] refurbished and put into use on the ninth floor."[402] According to ICE officials and staff, those hold rooms are used "for brief periods of time" until space becomes available on the tenth floor or longer-term detention arrangements are made.[403] Defendants at trial claimed that "[t]his is not a way to avoid compliance with the [PI]. It's a way to continue compliance with the [PI]."[404] And they argued that because "[t]here is no testimony from

396 *See id.* at 209:6-17.

397 *See id.*

398 *See id.* at 209:18-22, 211:15-212:14.

399 *See id.* at 216:6-218:13, 318:20-320:8.

400 *See id.* at 308:4-309:2.

401 *See id.* at 166:12-167:22, 226:14-227:4.

402 May 26, 2026 Trial Tr. at 49:6-10; PX325, at 150:4-152:11.

403 *See* DX77 ¶ 60; DX79 ¶ 55; DX80 ¶ 44; PX19; PX22; PX322, at 102:9-106:13 (describing how individuals frequently were held on the ninth floor while awaiting space on the tenth floor); PX325, at 152:13-16, 153:13-154:10.

404 May 26, 2026 Trial Tr. at 49:10-12.

ICE employees or plaintiffs' clients that anyone has been held overnight or for more than [twelve] hours on the ninth floor," the ninth floor simply is not relevant to this case.[405]

Like the fifth-floor processing area, there is no question that ICE has treated the ninth-floor hold rooms as overflow space to hold detainees while awaiting space in the tenth-floor hold rooms. Moreover, as of February 3, 2026, Joyce did not consider the ninth-floor hold rooms to be subject to the PI.[406] It was only after his first deposition in this case in connection with plaintiff's contempt motion that Joyce so much as recommended that ICE calculate how many people could be held on the ninth floor to remain compliant with the Court's orders.[407] But as of April 13, 2026, supervisory deportation and detention officer Hampton still was unaware of whether there were any capacity limits on the ninth-floor hold rooms despite his previously having directed that detainees be held there.[408] And as of April 22, 2026, Joyce still was unaware whether anyone ever actually had measured the ninth-floor hold rooms to determine their maximum capacities as he had

---

[405] *Id.* at 49:17-20; *see* DX77 ¶ 44 ("I am not aware of any situation where a detainee was held overnight on the ninth floor."); DX82 ¶ 32; PX322, at 109:14-20; PX325, at 31:24-32:18 (Joyce stating that he was unaware of anyone being detained on the ninth floor for over twelve hours).

[406] PX325, at 40:5-41:5, 152:17-23.

[407] *See* PX326, at 463:10-464:8.

[408] *See* PX22; PX322, at 238:22-239:7, 266:17-269:4.

recommended.[409] The evidence shows that during this time, ICE nevertheless frequently detained multiple people in these hold rooms.[410]

It is hard to accept defendants' arguments regarding the purpose of the fifth and ninth floors. The terms of the PI plainly extended to them. Both the fifth-floor processing area and the ninth-floor hold rooms unambiguously constitute "any hold room or other room, cell or other space" in which persons were "held or detained" by ICE at 26 Fed.[411] To deny as much disregards the plain meaning of the language of the PI.

*Reducing Overcrowding But Failing Consistently to Improve Other Conditions*

After this Court issued the TRO and PI, ICE detained far fewer individuals at 26 Fed and kept them there for far less time. Though it regularly disregarded each hold room's individual capacity limit and pretended that this Court's orders did not apply to other floors of 26 Fed, ICE generally held no more than twenty-two detainees in the tenth-floor hold rooms at any given time after entry of the TRO.[412] And, according to plaintiff's analysis, between entry of the TRO and March 9, 2026, approximately 61 percent of detainees were held at 26 Fed for less than twelve hours,

---

409 PX326, at 463:10-464:8.

410 *E.g.*, PX231 (three detainees in one room on December 23, 2025); PX238 (six detainees in one room on January 5, 2026); PX246 (four detainees in one room on January 8, 2026); PX248 (three detainees in each of two rooms on January 9, 2026); PX273 (three detainees in one room on January 24, 2026).

411 PI (Dkt 97) ¶ 1.

412 *See* PX2; DX77 ¶¶ 35-36; DX78 ¶ 15; DX79 ¶¶ 25, 27; DX80 ¶¶ 26, 28; DX81 ¶ 15; DX83 ¶ 15; PX320, at 84:2-9; PX321, at 48:17-49:17.

and approximately 94 percent were detained for less than forty-eight hours.[413] Thus, even if plaintiff's analysis relied on an over-inclusive data pool, it remains the case that ICE rarely held detainees at 26 Fed for even seventy-two hours, let alone more, following entry of the TRO.[414] The hold rooms have been far less crowded as a result.

That is not to say, however, that the fundamental problem of ICE detaining more individuals than it has capacity for has been resolved. It has not. Indeed, it may be getting worse as ICE continues to arrest and detain more people every day without yet having expanded substantially its detention facilities.[415] But ICE no longer can cram surplus individuals into the tenth-floor hold rooms at 26 Fed as it was doing through the summer of 2025.

With reduced overcrowding and the TRO and PI in place, one would expect many of the other conditions at 26 Fed to have improved. To be sure, some have. Detainees now each are provided with a clean bedding mat and cotton or polyester blankets.[416] They receive at least three meals per day, approximately six hours apart.[417] Breakfast and lunch generally are from a deli – consisting of bagels and spreads for breakfast and sandwiches and chips for lunch – and dinner is a

---

413 PX303 ¶ 36.

414 *Id.*; PX325, at 213:9-215:20.

415 Albert Sun & Allison McCann, *ICE Arrests Soar as People with No Criminal Record are Increasingly Targeted*, N.Y. TIMES (Aug. 27, 2026), https://www.nytimes.com/interactive/2026/08/27/us/ice-immigrant-arrests-trump-deportation-dhs.html.

416 DX77 ¶ 42; DX78 ¶ 16; DX79 ¶¶ 28-29; DX80 ¶¶ 29-30; DX81 ¶¶ 16-17; DX83 ¶¶ 16-17; PX326, at 419:2-11.

417 DX77 ¶ 44; PX325, at 217:16-218:12.

heater meal.[418] Detainees may receive an additional meal upon request,[419] and "vegetarian, kosher, and halal meals [also are] available on request."[420] They furthermore may request bottled water throughout the day and receive it with every meal too.[421] Detainees still receive the same hygiene products that they received before the TRO but now receive also body wipes, more hand sanitizer, and toothbrushes and toothpaste,[422] and are provided with additional products upon request.[423] They have toilet paper inside the hold rooms.[424] They can get new clothes if their existing clothes appear soiled or upon request.[425] And they can access a private area to change clothes if they so desire.[426] The hold rooms are cleaned thoroughly at least three times a day.[427] Finally, there now is IHSC

---

418 DX78 ¶ 23; DX79 ¶ 36; DX80 ¶ 36; DX81 ¶ 23; DX83 ¶ 23; PX321, at 36:2-12; PX329, at 194:8-195:16.

419 DX77 ¶ 44.

420 DX78 ¶ 23; DX80 ¶ 36.

421 DX77 ¶ 45; DX78 ¶ 22; DX79 ¶ 35; DX80 ¶ 35; DX81 ¶ 22; DX83 ¶ 22; PX320, at 104:13-21; PX321, at 36:2-12, 108:14-20.

422 PX323, at 90:22-91:23.

423 DX77 ¶ 40; DX78 ¶ 18; DX79 ¶ 31; DX80 ¶ 32; DX81 ¶ 19; DX83 ¶ 19.

424 PX322, at 174:19-25.

425 DX77 ¶ 41; DX78 ¶ 19; DX79 ¶ 32; DX80 ¶ 33; DX81 ¶ 20; DX83 ¶ 20.

426 DX77 ¶ 41; DX81 ¶ 20; DX83 ¶ 20.

427 DX78 ¶ 17; DX79 ¶ 30; DX80 ¶ 31; *see* DX81 ¶ 18; DX83 ¶ 18.

medical staff at 26 Fed at all times,[428] typically consisting of two to four nurses on the tenth floor between 7:00 a.m. and 9:30 p.m., and then one to two nurses overnight.[429]

ICE's adherence to its changed policies and practices nevertheless has been inconsistent at best. Only one of plaintiff's witnesses was detained at 26 Fed after the TRO and PI took effect. Like plaintiff's other witnesses, he had been in the United States illegally for a few years and had lived an otherwise law-abiding life before being detained by ICE.[430] He was detained from November 4 to 8, 2025,[431] and his account of his detention corroborates that at least the overcrowding at 26 Fed improved following entry of the TRO and PI.[432] But he still was so cold in the hold room in which he was detained that his arms "ached" from it.[433] While he received a "thin mattress" on which to sleep, he still got only a mylar or aluminum sheet instead of a real blanket.[434] And though he received three meals a day,[435] he always was hungry due to the "very small" portion sizes.[436] He

---

428 DX77 ¶ 46; DX78 ¶ 20; DX79 ¶ 33; DX81 ¶ 21; DX83 ¶ 21.

429 DX85 ¶ 12; PX324, at 24:7-25:14.

430 *See* PX337 ¶¶ 2, 4.

431 *Id.* ¶ 8.

432 *Id.* ¶ 9 ("While we were at 26 Federal Plaza, there were usually 8 to 11 people in the room we were in.").

433 *Id.*; *see* PX322, at 208:7-209:5 (supervisory deportation and detention officer Hampton describing how cold the hold rooms were in late 2025 and early 2026).

434 *Id.* ¶ 14.

435 *Id.* ¶ 16.

436 *Id.*

never was offered a change of clothes[437] and was unable to wash himself due to a lack of soap and privacy.[438] Most concerningly, he did not receive medical attention for a day despite having diabetes, high blood pressure, and a broken tooth.[439] And when he was seen by an IHSC nurse, he received only pain medication.[440] Additionally, he was permitted "at most one call a day . . . . for around [five] to [seven] minutes," and there always was an ICE employee or contractor present near him for his calls.[441] He never was told that he could make a private legal call.[442] And he never received "any kind of paper telling [him] what [his] rights were."[443] He said that "the guards there were very rude" and that the "treatment [he] received was ugly."[444] He described the experience as "such a terrible trauma that [he] just want[ed] to get past it."[445] Indeed, he self-deported in December 2025 "because

---

437 *Id.* ¶ 13 ("The guards never offered us clothes. I recall there was one person who spoke English well and he asked for clothes, but he was not given any.").

438 *Id.* ¶ 15.

439 *Id.* ¶ 17.

440 *Id.*

441 *Id.* ¶ 11.

442 *Id.* ¶¶ 10-11.

443 *Id.* ¶ 10.

444 *Id.* ¶¶ 12, 19.

445 *Id.* ¶ 21.

[he] could not live with the fear and uncertainty that [his] detention and [his] treatment in custody had caused [him]."[446]

* * *

To borrow defendants' oft-quoted phrase, "the facts are the facts." And the facts here are that before this case was filed, defendants detained often over 100 individuals at a time for days on end in hold rooms that never were intended to serve such a purpose. The hold rooms were small, dirty, and usually freezing cold. Detainees were denied basic items to enable them to sleep or care for their personal hygiene, sufficient food and water, adequate medical care, and the ability to access counsel.

The facts further are that some of these conditions changed after this Court issued the TRO and PI but only inasmuch as defendants chose to comply with this Court's orders. They often did not. Despite the TRO and PI, defendants have continued to crowd the tenth-floor hold rooms beyond each room's capacity limit, prevent detainees from accessing counsel in a confidential and thus fully meaningful way, and disregarded this Court's orders by treating the fifth and ninth floors as extensions of the tenth floor to do with detainees as they wish. To the extent other conditions have improved, that improvement has been inconsistent at best.

***Discussion***

Plaintiff seeks a permanent injunction comparable to the PI issued previously and to certify a class of all immigration detainees who now are detained and who will be detained in the future by ICE at 26 Fed. He thus seeks to broaden the class provisionally certified previously, which

---

[446] *Id.* ¶ 2.

was limited to detainees who had been or would be detained for twelve or more hours at 26 Fed. Defendants by and large do not dispute plaintiff's factual contentions. Nor do they argue that the Court *should not* convert the PI into a permanent injunction. They instead limit their argument to claiming that "ICE [now] is in compliance with the [PI]" and that "[a]ny permanent relief" therefore "should not exceed the terms of th[e PI]."[447] They, however, oppose plaintiff's request to expand the certified class beyond that which was certified provisionally in the PI.

*I. Subject Matter Jurisdiction – Mootness*

The Court begins with its independent duty to confirm that there remains a live controversy and that it thus retains subject matter jurisdiction.[448] As this Court previously explained when it issued the PI, any argument that plaintiff's claims have been mooted by virtue of the fact that plaintiff no longer is detained at 26 Fed would be wrong in light of the inherently transitory doctrine.[449] And, although defendants have asserted that ICE now is in compliance with the PI, even if that were true (it is not in some respects), they still would have failed to argue that its supposed

---

447

May 26, 2026 Trial Tr. at 50:7-10.

Defendants suggest some changes at the margins to the terms of the proposed injunction. *See id.* at 38:9-13 (suggesting that the permanent injunction not require providing detainees with towels); *id.* at 48:10-16 (suggesting that the permanent injunction require only thirty-seven square feet per detainee in single-occupant hold rooms with an additional seven square feet of unencumbered space for each additional detainee in multiple-occupant hold rooms); *id.* at 50:10-16 (suggesting that the permanent injunction require medical staffing only between 7:00 a.m. and 9:30 p.m.). These proposed terms are addressed in the relief section below.

448

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013); *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025).

449

*Mercado*, 800 F. Supp. 3d at 557-58.

current compliance means that a permanent injunction should not issue. They in contrast have conceded that it is "likely" that the PI will be converted into a permanent injunction.[450] Because defendants have not argued that ICE, absent this Court's orders, would refrain from subjecting plaintiff and putative class members to the same conditions of confinement as existed at 26 Fed through the summer of 2025, the Court need not consider such an argument in light of the principle of party presentation.[451]

Even if defendants had raised the issue, it would have been without merit. "[V]oluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice"[452] and to grant injunctive relief to prevent future violations,[453] especially where, as here, the cessation was under compulsion of previous court orders. Defendants have failed to so much as attempt to persuade the Court "that the challenged conduct [could not] reasonably be expected to start up again"[454] absent continued court order. In any case, to make such an argument would be contrary to (i) the administration's recent promise to "flood the zone" with "more ICE agents than you've ever seen before" in New York if the state were to pass laws limiting how local police departments could work with ICE,[455] (ii) the recent surge in ICE arrests

---

450 May 26, 2026 Trial Tr. at 35:22-36:3, 48:10-11.

451 *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026).

452 *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).

453 *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

454 *Friends of the Earth, Inc. v. Laidlaw Enviro. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

455 Nick Reisman, *Tom Homan's ICE Surge Threat Isn't Stopping Sanctuary Bills in New York*, POLITICO (May 6, 2026, at 15:12 ET),

nationwide[456] and in New York,[457] and (iii) the administration's recent termination of TPS for hundreds of thousands of noncitizens who suddenly are without legal status in the face of political pressure to start arresting and removing them[458] – a particular problem for 26 Fed in light of the large Haitian population in New York City.[459] Additionally, any argument regarding ICE's commitment to maintaining improved conditions of confinement absent court order would be inconsistent with its failures to comply with the PI, Zanello's sometimes inaccurate and at other times evasive testimony, and Joyce's nonsensical argument that the PI did not apply to 26 Fed beyond the tenth-floor hold rooms.

Accordingly, this controversy remains live, and the Court retains subject matter jurisdiction to address the merits of plaintiff's claims. Furthermore, as will be relevant when the Court turns to the merits and the question of relief, should the Court determine that ICE in fact

---

https://www.politico.com/news/2026/05/06/tom-homans-new-york-ice-surge-threat-isnt-stopping-sanctuary-bills-00908594.

456 *See* Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. TIMES (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html (describing administration's current goal of 2,000 immigration arrests per day).

457 *See* Dionne Searcey & Madeleine Ngo, *U.S. Announces Thousands of Arrests in New York Immigration Operation*, N.Y. TIMES (Sept. 1, 2026), https://www.nytimes.com/2026/09/01/nyregion/immigration-arrests-new-york.html.

458 *See* Madeleine Ngo & Hamed Aleaziz, *After Supreme Court Win, Trump Officials Under Pressure to Deport Haitians*, N.Y. TIMES (Aug. 8, 2026), https://www.nytimes.com/2026/08/08/us/politics/tps-haitians-deport.html.

459 *See* Jennifer Bisram, *NYC Officials Call on Trump Administration to Stop TPS Rollback for Haitians*, CBS NEWS (Feb. 27, 2025, at 18:46 ET), https://www.cbsnews.com/newyork/news/nyc-tps-rollback-canceled-haiti/ (citing New York City's Office of Immigrant Affairs).

violated plaintiff's and the putative class's constitutional rights through the summer of 2025, the circumstances in this case amount to "positive proof of a reasonable likelihood that past wrongdoing [would] recur" if a permanent injunction were not issued.[460]

## *II. Permanent Injunction*

Plaintiff, putatively on behalf of all immigration detainees who have been or will be detained by ICE at 26 Fed, claims that the conditions of confinement at 26 Fed violated his due process rights under the Fifth Amendment and his right to access counsel under the First and Fifth Amendments. It bears emphasis that defendants do not dispute plaintiff's claims as they relate to detainees held in the tenth-floor hold rooms for more than twelve hours. Defendants instead argue that detainees held for less than twelve hours, particularly those held on other floors, do not endure the same constitutional deprivations as do detainees held for twelve or more hours in the tenth-floor hold rooms. They therefore oppose any broadening of the PI. With this in mind, the Court turns to each of plaintiff's claims.

### *A. Fifth Amendment Claims Relating to Conditions of Confinement*

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law."[461] This protection "applies to

---

460 *See SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977); *see also SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 537 (2d Cir. 1984) (requiring only a "proper showing of a reasonable likelihood that the wrong will be repeated" or "some cognizable danger of recurrent violation") (internal quotation marks omitted).

461 U.S. Const. amend. V.

all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."[462] The Due Process Clause forbids "punishment" of an individual prior to an adjudication of guilt in accordance with due process of law.[463] Claims challenging the constitutionality of conditions of confinement brought by individuals who have not been convicted of a crime, such as pretrial and immigration detainees, thus arise under the Due Process Clause.[464]

Though there nevertheless are circumstances in which those who have not been convicted of a crime may be detained, the conditions of such detention cannot be punitive in nature.[465] Because deportation proceedings, including immigration detention, are "civil, not criminal," they are supposed to be "nonpunitive in purpose and effect."[466]

---

462 *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

463 *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

464 *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017); *see also Charles v. Orange Cnty.*, 925 F.3d 73, 85 (2d Cir. 2019) (finding that civil immigration detainees' Section 1983 claims alleging deliberate indifference arise under Due Process Clause of Fourteenth Amendment); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (finding that pretrial detainee's *Bivens* claim alleging deliberate indifference arises under Due Process Clause of Fifth Amendment).

When opposing plaintiff's PI motion, defendants agreed that claims relating to conditions of confinement by "immigration detainees are properly brought under the Fifth Amendment's Due Process Clause." Opp'n Mot. Prelim. Inj. (Dkt 73) at 11.

465 *Bell*, 441 U.S. at 536-37; *see Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982) (noting that those who have been involuntarily committed are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish").

466 *Zadvydas*, 533 U.S. at 690.

Regardless of the reason for detention, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."[467] This duty includes providing for "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety."[468] Although detention need not be "comfortable," it may not be "inhumane."[469]

An immigration detainee thus "can establish a due process claim for inhumane conditions of confinement either by proving an official's deliberate indifference to those conditions, or by proving that those conditions are punitive."[470] These two theories of liability are distinct,[471] and plaintiff here advances both of them.

*1. Deliberate Indifference to Inhumane Conditions of Confinement*

Deliberate indifference to inhumane conditions of confinement exists when an official "recklessly failed to act with reasonable care to mitigate the risk that the condition[s] posed to the . . . detainee even though the defendant-official knew, *or should have known*, that the condition[s] posed an excessive risk to [the detainee's] health or safety."[472] In other words, the conditions of

---

467 *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

468 *Id.* at 200.

469 *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (describing analysis of Eighth Amendment claim by convicted prisoner).

470 *Darnell*, 849 F.3d at 34 n.12.

471 *Id.*

472 *Charles*, 925 F.3d at 87 (quoting *Darnell*, 849 F.3d at 35).

confinement, "either alone or in combination," must have "posed an unreasonable risk of serious damage" to the plaintiff's health or safety,[473] thus constituting an objective deprivation of at least one basic human need.[474] And the official must have "acted with reckless disregard for the substantial risk posed" by this deprivation.[475] Although the length of confinement is relevant in determining the risk that a given set of conditions pose,[476] "there is no static test" to assess whether the conditions meet the requisite threshold of objective deprivation.[477] Rather, the conditions "must be evaluated in light of contemporary standards of decency."[478] Conditions properly are considered together "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need."[479]

The Second Circuit (and this Court) has found that (i) conditions that prevent or interfere with sleep,[480] (ii) unsanitary conditions and the failure to provide detainees with toiletries

---

473 *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

474 *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

475 *See Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).

476 *See Lareau v. Manson*, 651 F.2d 96, 103 (2d Cir. 1981); *cf. Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."), *abrogated on other grounds by Welch v. Tex. Dep't of Highways and Pub. Transp.*, 483 U.S. 468 (1987).

477 *See Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

478 *See Blissett*, 66 F.3d at 537.

479 *See Wilson*, 501 U.S. at 304.

480 *See Walker*, 717 F.3d at 126 (collecting cases); *Mercado*, 800 F. Supp. 3d at 571.

and other hygienic materials,[481] (iii) inadequate food or water,[482] (iv) the denial of "treatment needed to remedy a serious medical condition,"[483] and (v) the "failure to adequately screen newly arrived [detainees] for communicable diseases"[484] each or in combination may rise to the level of a constitutional violation.

Each of these conditions was present in the tenth-floor hold rooms at 26 Fed before this Court issued the TRO and PI.

First, ICE deprived detainees of sleep by forcing them into overcrowded hold rooms in which they often did not have room to lay down. Even when they could lay down, they were forced to do so on hard, concrete floors or benches in rooms that were brightly lit and usually freezing cold, with only a thin, mylar or aluminum sheet to attempt to stay warm. "[S]leep is critical to human existence."[485] Accordingly, "[f]orcing detainees to sleep, if at all, in these conditions, even for short periods, deprives detainees of a basic human need and poses an unreasonable risk of harm to their physical and psychological well-being, thus rising to the level of an objectively serious deprivation."[486]

---

481 *See Walker*, 717 F.3d at 127; *Mercado*, 800 F. Supp. 3d at 571-72.

482 *See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (per curiam); *Mercado*, 800 F. Supp. 3d at 572.

483 *Weyant*, 101 F.3d at 856; *Mercado*, 800 F. Supp. 3d at 572-73.

484 *Lareau*, 651 F.2d at 109.

485 *Walker*, 717 F.3d at 126.

486 *Mercado*, 800 F. Supp. 3d at 571.

Second, ICE deprived detainees of sanitary living conditions and the basic elements of hygiene. Detainees could not wash themselves and were forced to stay in the same clothes for days on end. They were forced to use open-air toilets (when they were operable) in the same rooms as where they ate and slept. They sometimes were not provided with adequate toilet paper or feminine hygiene products. The "[a]vailability of hygienic materials is particularly important in the context of otherwise unsanitary living conditions."[487] These conditions, combined with the overcrowding, caused the hold rooms to be dirty and to reek of body odor and excrement. Detainees are entitled to sanitation,[488] and no individual may be forced "to live, eat and perhaps sleep in close confines with his [or her] own human waste."[489] "Because an unsanitary environment and the denial of basic personal hygiene items deprive detainees of [the] 'minimal civilized measure of life's necessities and [subject them] to unreasonable health and safety risks,' the challenged conditions rise to the level of an objective deprivation."[490]

Third, ICE deprived detainees of adequate food and water. Detainees received at most two meals a day and constantly were hungry. Several lost weight during their detentions. They did not receive sufficient water either. "[T]he denial of basic sustenance undoubtedly constitutes an objective deprivation."[491]

---

487 *Walker*, 717 F.3d at 127.

488 *See id.*

489 *See LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972).

490 *Mercado*, 800 F. Supp. 3d at 572 (quoting *Walker*, 717 F.3d at 126) (second alteration in original).

491 *Mercado*, 800 F. Supp. 3d at 572.

Fourth, ICE deprived detainees of adequate medical care. Illnesses, infections, asthma attacks, seizures, drug and alcohol withdrawal, cardiac episodes, and chronic diseases requiring treatment went ignored or care otherwise was delayed. These were serious medical conditions.[492] Yet, the extent of care that could be administered for them in any event was limited to sending detainees to the nearest hospital since IHSC nurses could not diagnose medical conditions, prescribe medicine, or treat medical emergencies. "[T]he inadequate medical care provided by defendants to detainees constitutes an objective deprivation."[493]

Fifth, ICE deprived detainees of adequate medical screenings to ensure that newly arrived detainees did not carry communicable diseases. Medical screenings occurred at the discretion of ICE staff and contractors, who were neither medical professionals nor trained to determine when a medical screening was necessary. On at least one occasion, this resulted in a detainee who had tested positive for tuberculosis being held in a crowded hold room for six days, threatening the well-

---

492 *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (holding that a "tooth cavity" can become a "serious medical condition" if it is not treated in a timely fashion due to the possibility of degeneration); *Colon v. Cnty. of Nassau*, No. 12-cv-4466, 2014 WL 4904692, at *6 (E.D.N.Y. Sept. 26, 2014) ("Courts in this Circuit have held that diabetes is a sufficiently serious medical condition to meet the objective prong of a deliberate indifference claim.") (internal quotation marks omitted); *Burch v. City of New York*, No. 11-cv-2841, 2016 WL 11430773, at *13 (E.D.N.Y. Apr. 22, 2016) ("[S]everal courts in this Circuit have indicated that high blood pressure is a sufficiently serious medical condition to form the basis for a deliberate indifference claim."); *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-cv-622, 2018 WL 1626348, at *13 (S.D.N.Y. Mar. 29, 2018) ("Courts have held that drug or alcohol withdrawal alone constitutes a serious medical condition."); *Flemming v. Velardi*, No. 2-cv-4113, 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003) ("Difficulty breathing due to asthma may be a serious medical condition, depending on the severity of the asthma attack.").

493 *Mercado*, 800 F. Supp. 3d at 573.

being of potentially hundreds of other detainees. Such "an indiscriminate threat to all" constitutes an objective deprivation.[494]

Defendants at a minimum were reckless in disregarding these objective deprivations. ICE officials, staff, and contractors constantly were present on the tenth floor. They placed detainees in the hold rooms and could see (and in some instances feel or smell) the conditions to which detainees were subjected. They testified to knowing that the hold rooms were overcrowded and that the hold rooms never were designed to hold so many people for so long. They decided when to give detainees food and water and thus were the ones that gave detainees an inadequate amount of each. They observed and often had to respond to many of the medical emergencies that were taking place. They either knew or should have known that whole time that they were out of compliance with the formal, written policies and procedures that supposedly governed hold rooms – i.e., ERO Directive 11087.2 and the NDS. Yet, until the Court issued the TRO and PI, defendants failed to act. It was only after the Court issued the TRO and PI that defendants abated some of the deprivations. Sleeping conditions have improved, and more food and water now are provided to detainees. There is at least one registered nurse on the tenth floor at all times. Detainees on average are held at 26 Fed for less time and in far less crowded conditions. The Court's orders to some extent have worked. But, as described at length above, defendants have complied with its orders only when convenient for them and persistently have disregarded them in certain ways. There is every reason to believe that the deprivations that existed in the summer of 2025 would resume were this Court's orders not in effect.

---

494 *Lareau*, 651 F.2d at 109.

Plaintiff thus has proven that the challenged conditions of confinement violated his and putative class members' Fifth Amendment due process rights on a theory of deliberate indifference.

*2. Punitive Conditions of Confinement*

"In addition to the deliberate indifference theory just discussed, a detainee independently can establish a due process claim for inhumane conditions of confinement by proving that the challenged conditions are punitive."[495] Conditions of confinement are punitive when they exist "with an 'expressed intent to punish.'"[496] Absent such an expressed intent, conditions of confinement nonetheless are punitive when they "are not 'rationally related to a legitimate nonpunitive governmental purpose'" or "appear excessive in relation to that purpose."[497] Again, "the duration of confinement should be taken into account in judging the constitutionality of certain conditions."[498]

As this Court explained when it issued the PI, the administration's actions with respect to noncitizens illegally present in the country and the conduct by ICE staff and contractors at 26 Fed "suggest that harsh conditions of confinement are a deliberate feature" of the administration's mass

495 *Mercado*, 800 F. Supp. 3d at 576 (citing *Darnell*, 849 F.3d at 34 n.12).

496 *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (quoting *Bell*, 441 U.S. at 538).

497 *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 561).

498 *Lareau*, 651 F.2d at 103.

deportation program.[499] That conclusion has been reinforced by passage of time and the full development of the record. Since this Court issued the PI, the administration has continued to attempt to detain and deport as many noncitizens illegally present in the country as possible, as fast as possible, and with as little procedure as possible. Part of that program has been its self-deportation project, which, as the administration has described it, "offers illegal aliens a choice: leave voluntarily with [f]ederal support and financial assistance or *face strict enforcement and penalties*."[500] That the harsh conditions of confinement at 26 Fed are one aspect of this "strict enforcement and penalties" is supported by the fact that ICE has papered walls and windows on the fifth, ninth, and tenth floors with flyers asking detainees, "Do You want to Return Home?" and incentivizing them with money to "[a]sk[] to return home now." These flyers serve as an ever-present visual reminder of the Hobbesian choice posed to detainees and described by an ICE officer at 26 Fed: self-deport or "remain detained" for years.[501]

Other challenged conditions of confinement at 26 Fed – most of which stemmed from the overcrowding of the hold rooms – also lack a reasonable connection to a legitimate governmental objective apart from administrative convenience and resource constraints. As Joyce himself explained, both the Waiver in general and the overcrowding at 26 Fed specifically served to further

---

499 *Mercado*, 800 F. Supp. 3d at 575-76.

500 *Fact Sheet: President Donald J. Trump Establishes Project Homecoming*, WHITE HOUSE (May 9, 2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-president-donald-j-trump-establishes-project-homecoming/ (emphasis added).

501 *See* PX330 ¶ 8.

the administration's interest in housing more detainees without creating more bed space.[502] But "[t]his basically economic motive cannot lawfully excuse the imposition on the presumptively innocent of genuine privations and hardship over any substantial period of time."[503] The same can be said for the "failure to adequately screen newly arrived [detainees] for communicable diseases."[504] "[T]he 'resulting threat to the well-being of the [detainees] is so serious, and the record so devoid of any justification for . . . defendants' policy, that . . . this practice constitutes 'punishment' in violation of the Due Process Clause."[505]

The Court is not alone in failing to find any legitimate governmental objectives that might justify what otherwise would be inhumane conditions of confinement at an ICE holding or detention facility. Four other district courts have concluded (at least preliminarily) that the harsh conditions of confinement present at ICE's facilities in Baltimore, San Francisco, California City (located in the Mojave Desert), and Adelanto (also located in the Mojave Desert), respectively, are intended to be punitive and likely violate the Constitution.[506] A fifth district court – in the context

---

502 PX326, at 475:13-18; *see id.* at 327:9-19; PX74, at ICE-0016985; PX152, at 2.

503 *Lareau*, 651 F.2d at 104.

504 *Id.* at 109.

505 *Id.* (quoting *Lareau v. Manson*, 507 F. Supp. 1177, 1195 (D. Conn. 1980)).

506 *D.N.N.*, 822 F. Supp. 3d at 596; *Pablo Sequen*, 810 F. Supp. 3d at 1128-31; *Gomez Ruiz*, 834 F. Supp. 3d at 847-50; *L.T.*, 2026 WL 2338452, at *15-19; *see also Pablo Sequen v. Albarran*, No. 25-cv-6487, 2026 WL 1805114, at *35-37 (N.D. Cal. June 23, 2026) (concluding that the Waiver itself could be punitive and purporting to vacate it as arbitrary and capricious), *appeal filed sub nom. Garcia v. Albarran*, No. 26-4310 (9th Cir. July 7, 2026); *cf. Nguyen v. Scott*, 796 F. Supp. 3d 703, 732-35 (W.D. Wash. 2025) (concluding that administration's practice of third-country removal to countries where deportees will be imprisoned in harsh conditions likely is punitive and violates due process).

of a procedural due process claim – stated that the manner in which "ICE has been deploying its 'holding rooms'" in the Central Islip courthouse "shocks the conscience."[507] As that court put it, "ICE's seeming disregard of procedural requisites, combined with the chillingly brutal conditions of confinement . . . cr[y] out for immediate remedy."[508] Finding no justification for the conditions of confinement at 26 Fed during the summer of 2025, the Court here is forced to conclude the same.

Plaintiff thus has proven that the challenged conditions of confinement were punitive and violated his and putative class members' Fifth Amendment due process rights.

### B. *First and Fifth Amendment Claims Relating to Access to Counsel*

"The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."[509] Even a detainee convicted of a crime retains his or her First Amendment rights as long as they "are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."[510] Immigration detainees specifically enjoy "a statutory right to be represented by counsel at their own expense. This right is 'an integral part of the procedural due process to which the alien is entitled.'"[511] These lines

507 *Clarke v. U.S. DHS*, No. 25-cv-6773, 2025 WL 3674471, at *6 (E.D.N.Y. Dec. 18, 2025).

508 *Id.* at *9.

509 *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000); *accord DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990).

510 *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

511 *Iavorski v. INS*, 232 F.3d 124, 128 (2d Cir. 2000) (Sotomayor, J.) (quoting *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993)) (internal citation omitted); *see Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in

of precedent thus establish that detained noncitizens have a First and Fifth Amendment right to access counsel. Such access must be meaningful so as not "to render the right to counsel 'an empty formality.'"[512]

Conditions of detention may impinge on detainees' constitutional rights only if they are reasonably related to legitimate governmental interests.[513] In making that determination, a court considers (1) whether there is a "valid, rational connection between the [challenged] regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to [detainees]," (3) "the impact accommodation of the asserted constitutional right will have on . . . the allocation of [detention] resources generally," and (4) "the absence of ready alternatives."[514]

Despite insistence by ICE officials, staff, and contractors that detainees were offered numerous opportunities to contact counsel at the outset of and during their detention, the evidence proves otherwise. 26 Fed essentially was a black site before this Court issued the TRO and PI. Attorneys had no way to get in touch with detainees other than through ICE staff, who persistently delayed scheduling attorney-client calls by erecting procedural roadblocks, claiming that 26 Fed was too busy (again, a problem of ICE's own making), failing to update the location of detainees in its

---

the Due Process Clause and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A).").

"Because immigration proceedings are of a civil rather than criminal nature, aliens in removal proceedings enjoy no specific right to counsel under the Sixth Amendment to the Constitution." *Debeatham v. Holder*, 602 F.3d 481, 485 (2d Cir. 2010) (cleaned up).

512 *Biwot*, 403 F.3d at 1099 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

513 *See Turner v. Safley*, 482 U.S. 78, 89 (1987).

514 *Id.* at 89-90 (internal quotation marks omitted).

online tracker such that attorneys were unable to find their clients, or lying and saying that a detainee currently being held at 26 Fed was "in transit." Detainees often were transferred out of 26 Fed in the course of ICE's stalling. Detainees received at most one, time-limited call each day, but such calls frequently occurred at night, after business hours, and they never were private. Defendants suggest that the right to counsel in immigration proceedings may be violated "only where conditions are tantamount to denial of counsel."[515] Yet that exactly is what ICE routinely did before the TRO and PI were issued. And even after that point, ICE continued to prevent detainees from making confidential legal calls.

No legitimate governmental interests could justify so depriving detainees of the ability to obtain timely legal advice, particularly when there are feasible alternatives that would minimize the burden on detainees' First and Fifth Amendment rights. Other district courts that have confronted similar restrictions in ICE holding facilities have agreed (again, at least preliminarily).[516] The NDS plainly set an alternative standard in holding facilities, and defendants have shown by their belated compliance with the PI that it is possible to provide detainees with confidential, unmonitored, unrecorded, temporally unrestricted, and free legal telephone calls to counsel promptly upon their detention and upon request.

Plaintiff thus has proven that the challenged restrictions on the ability to access counsel violated his and putative class members' First and Fifth Amendment rights.

* * *

---

515 *See* Opp'n Mot. Class Certification (Dkt 174) at 7 (internal citations omitted).

516 *See Advocs. for Hum. Rts. v. DHS*, 825 F. Supp. 3d 858, 892 (D. Minn. 2026), *appeal filed*, No. 26-2064 (8th Cir. May 29, 2026); *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 878-81 (C.D. Cal. 2025).

The conditions of confinement to which ICE subjected immigration detainees at 26 Fed during the summer of 2025 were inhumane and unconstitutional. By detaining far more persons in the hold rooms than ever was intended and for far longer than ever was intended, ICE objectively deprived detainees of sleep, sanitary living conditions, basic personal hygiene needs, sufficient food and water, and adequate medical care. ICE prevented detainees from accessing counsel, who might have stood in the way of what it was doing. Some of these deprivations impacted detainees immediately; others only after longer periods. ICE knew, or should have known, that how it was treating detainees was wrong, yet it continued to do it anyway. It did so to inflict punishment on detainees and induce them to self-deport. The TRO and PI abated ICE's constitutional violations, but ICE's ongoing noncompliance and the cognizable danger that it, amid rising immigration arrests, again will use 26 Fed as the "give" in the system prove that a permanent fix is needed to protect the Constitution against the administration's mass deportation program. Plaintiff's request for declaratory relief and a permanent injunction is granted. To whom that injunction applies and its terms are addressed in the following sections.

## *III. Class Certification*

A plaintiff seeking class certification must satisfy the requirements of Rule 23(a) and demonstrate that the proposed class action falls within one of the subsections of Rule 23(b).[517] The plaintiff bears the burden of proving compliance with Rule 23 by a preponderance of the evidence.[518] A court evaluating a motion for class certification must "make a 'definitive assessment of Rule 23

---

[517] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

[518] *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement."[519] The Court first addresses the requirements of Rule 23(a) before turning to those of Rule 23(b).

### *A. Rule 23(a) Requirements*

Rule 23(a) demands that a putative class satisfy four requirements:

> "(1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or questions of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class."

Defendants argue that plaintiff's proposed class "is overbroad because it includes all present and future detainees regardless of how long they are held at 26 Fed[], under what conditions, and in what type of space in the building."[520] In defendants' view, without limiting the class (i) temporally to detainees held for twelve or more hours and (ii) spatially to detainees held in *hold rooms* (as opposed to other spaces in 26 Fed), the putative class would lack commonality and typicality. Though defendants hang their hat on those requirements only, the Court addresses each requirement in turn to ensure compliance with Rule 23(a).

---

519 *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (quoting *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)).

520 Opp'n Mot. Class Certification (Dkt 174) at 3.

*1. Numerosity*

The numerosity requirement demands that joinder of all putative class members would be impracticable.[521] Although its satisfaction "depends on all the circumstances surrounding a case, not [just] on mere numbers,"[522] numerosity nevertheless is presumed when there are at least forty putative class members.[523] Evidence of the exact putative class size or the identities of the putative class members is not necessary.[524] Besides the approximate putative class size, "[r]elevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute suits, and requests for prospective injunctive relief [that] would involve future class members."[525] Putative classes "including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such [putative] class members, much less joining them.'"[526]

Here, there is no question that the numerosity requirement is met. ICE has detained thousands of individuals at 26 Fed, and there is little doubt that it will continue to detain thousands more. Defendants never have suggested otherwise. Moreover, the putative class members have been

---

521 FED. R. CIV. P. 23(a)(1).

522 *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

523 *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

524 *Robidoux*, 987 F.2d at 935.

525 *Id.* at 936.

526 *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (per curiam) (quoting 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:15 (5th ed. 2018)).

and frequently will be transferred to detention facilities around the country or deported out of the country in short order following their detention at 26 Fed. All are noncitizens, and many have limited resources. Certifying the putative class thus would promote judicial economy and make possible the adjudication of claims that otherwise would not be brought. That this action seeks prospective injunctive relief for future class members further counsels in favor of certification.

*2. Commonality*

The commonality requirement necessitates that the claims of putative class members "depend upon a common contention," the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke."[527] "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."[528]

The case for commonality here is straightforward. Plaintiff claims that ICE's policies and practices at 26 Fed denied detainees their Fifth Amendment right to due process and their First Amendment and Fifth Amendment right to access counsel. Though ICE rarely put its actual policies and practices – i.e., the ones that it followed – into writing, it nevertheless has subjected all detainees it has held at 26 Fed to substantially the same conditions of confinement, many of which have continued (albeit on a far smaller scale) despite the TRO and PI and would have continued unabated in the absence of this Court's orders. Defendants still "do not contend that provision of [adequate

527 *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

528 *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)).

bedding, meals, hygiene products, access to medical care, medication, and confidential communication with attorneys] varies by detainee."[529] It matters not that the facts underlying each putative class member's claims may vary somewhat. Their "claims for relief need not be identical for them to be common."[530] Whether any, all, or some combination of the conditions of confinement at 26 Fed rises to the level of a constitutional violation is a common question.

Defendants nonetheless insist that commonality is lacking because, in their view, "detainees who spend a short time at 26 Fed[] do not suffer the same alleged deprivations as those who may be there for longer."[531] And, according to defendants, detainees "held on different floors and in different types of spaces" have "widely" varying experiences.[532] Defendants assert that their proposed temporal and spatial limitations therefore are necessary for there to be commonality.

Defendants' argument regarding its proposed spatial limitation is wrong as a factual matter. Detainees being held on the fifth and ninth floors have experienced and continue to experience many of the same conditions as existed in the tenth-floor hold rooms *even before* this Court issued the TRO. Simply put, defendants have used the fifth-floor processing area and the ninth-floor hold rooms as overflow rooms – places to keep detainees who would have been crammed into the tenth-floor hold rooms were it not for this Court's orders preventing as much. Despite treating these spaces as extensions of the tenth floor for purposes of detaining individuals, defendants

---

529 *Mercado*, 800 F. Supp. 3d at 562.

530 *Johnson*, 780 F.3d at 137.

531 Opp'n Mot. Class Certification (Dkt 174) at 4.

532 *Id.* at 10.

have chosen not to treat them as extensions of the tenth floor for purposes of complying with the terms of the PI. According to the relevant ICE officials, staff, and contractors at 26 Fed, there are no policies or procedures in place with respect to providing detainees on the fifth or ninth floors with confidential legal calls, bedding mats, blankets, hygiene products, food, extra clothing, or medical care. Nor are there capacity limits that ICE follows with respect to either floor. It further appears that ICE on multiple occasions has detained more individuals in the ninth-floor hold rooms than likely would be allowed under the terms of the PI. Whether any, all, or some combination of those conditions rises to the level of a constitutional violation remains a common question regardless of slight variations among the experiences of being detained on different floors of 26 Fed.

Additionally, defendants' proposed spatial limitation would not comport with the equitable tradition because it would carve out as much of the putative class as defendants choose to detain in other parts of 26 Fed and thus prevent this Court from "administer[ing] complete relief between the parties."[533] The Court attempted to head off this possibility when it crafted the TRO and PI to define a "Hold Room" as "any hold room *or other room, cell or other space*" in which ICE holds or detains persons at 26 Fed.[534] Defendants claim prejudice for not having been aware until now that the fifth and ninth floors are at issue in this case,[535] but this case never has been about only the tenth-floor hold rooms. The language of the TRO and PI made that clear. Any claimed prejudice to defendants resulting from their failure to present evidence regarding conditions of confinement

---

533 *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928).

534 *E.g.*, PI (Dkt 97) ¶ 1 (emphasis added).

535 *See* Opp'n Mot. Class Certification (Dkt 174) at 8-10 (claiming that plaintiff has "constructively amended" the complaint).

on the fifth and ninth floors is prejudice of their own making. After all, they are the ones who have chosen to detain individuals on the fifth and ninth floors while failing to comply with this Court's orders that facially and actually apply to 26 Fed as a whole. The Court declines to bless defendants' noncompliance by adopting their willful or reckless misreading of its previous orders.

Defendants' proposed temporal limitation fails as well. It confuses a difference in degree for a difference in kind. Whether the alleged violations of which plaintiff complains are unconstitutional only after a certain length of detention is less a question of commonality and more a question of the merits of plaintiff's claims and the scope of relief warranted. Regardless of the answer, it remains the case that all detainees at 26 Fed have experienced and (absent a permanent injunction) would experience many of the alleged constitutional violations immediately upon their arrival at 26 Fed or shortly thereafter. These include a lack of adequate medical care, an inability to make confidential legal calls, and being subjected to overcrowded, non-temperature-regulated, and unhygienic conditions of confinement.[536] They may include also inadequate sleeping conditions for detainees who are held overnight, even if their detention ends up being less than twelve hours.[537] When the Court limited the provisionally certified class of detainees to those held at 26 Fed for twelve or more hours, it did so because plaintiff had not demonstrated yet that "detainees held for less

536 *See Gonzalez v. Noem*, No. 25-cv-13323, 2025 WL 3204602, at *3 (N.D. Ill. Nov. 17, 2025) (rejecting defendants' argument that the proposed class was overbroad because of durational variance in detention lengths since "the alleged total denial of access to counsel would injure all detainees at [ICE's detention facility], not just those that were at [the facility] for a relatively longer duration," and "the alleged . . . lack of access to medical care[] and lack of access to appropriate toilet facilities would injure all detainees, not just long-term detainees").

537 *See Pablo Sequen*, 810 F. Supp. 3d at 1125 n.116 (concluding that a temporal limit on the detention class would be "inappropriate" because "[t]he lack of medical intakes, access to medication, or adequate medical care risks harm to all detainees, as do the unsanitary and unclean conditions in hold rooms" and the "inadequate sleeping conditions").

than [twelve] hours *suffered any injury* – much less one that is common with the rest of the class."[538] It did so on a preliminary record where the evidence showed at most that all detainees *risked* injury, whereas only detainees who were held for twelve or more hours *suffered* injury. The fully developed factual record has shown that not to be the case. Because at a minimum several of the alleged violations are common to all detainees regardless of how long they are held at 26 Fed, the Court finds that the commonality requirement of Rule 23(a) is met.

*3. Typicality*

The typicality requirement demands that "the claims of the [putative] class representative[] be typical of those of the [putative] class."[539] It "is satisfied when each [putative] class member's claim arises from the same course of events, and each [putative] class member makes similar legal arguments to prove the defendant's liability."[540] Typicality can exist notwithstanding "minor variations in the fact patterns underlying individual claims."[541] It is not a "demanding"

---

538 Opinion (Dkt 96) at 44 (emphasis added).

539 *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).

540 *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

541 *Robidoux*, 987 F.2d at 936-37.

requirement.[542] What matters is whether "defendants committed the same wrongful acts in the same manner, against all members of the [putative] class."[543]

Here, the course of events giving rise to plaintiff's claims is as follows. Plaintiff had filed for asylum and consistently attended immigration court hearings over the multiple years in which he had been living in the United States. He nonetheless was detained by ICE after one such hearing at 26 Fed. He was held for multiple days in an overly crowded, foul-smelling hold room on the tenth floor. He did not receive anything on which or with which to sleep beyond a mylar or aluminum sheet and was cold throughout his detention. He had no way to wash himself or brush his teeth. He received heater meals, which he described as inedible, and did not receive enough water. He received no medical treatment beyond pain medication despite dealing with a serious medical condition. He was able to make only short phone calls once a day and always in the presence of ICE staff or contractors. He never was told that he had a right to contact an attorney, let alone make a confidential call to one. He found the whole experience traumatizing.

Plaintiff's story sadly is not unique. It is substantially shared by the other detainees who filed declarations in this case, as well as the thousands of other detainees whom ICE has held and will hold at 26 Fed, including those on the fifth and ninth floors. His claims, like his story, therefore are not unique either. They are typical of those of the putative class. The typicality requirement of Rule 23(a) thus is met.

---

542 *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012) (LAK) (quoting *In re Prestige Brand Holdings, Inc.*, No. 5-cv-6924, 2007 WL 2585088, at *3 (S.D.N.Y. Sept. 5, 2007)).

543 *Tsereteli*, 283 F.R.D. at 208 (quoting *In re NYSE Specialists Secs. Litig.*, 260 F.R.D. 55, 72 (S.D.N.Y. 2009)).

*4. Adequacy*

The adequacy requirement necessitates that the putative class representative have "an interest in vigorously pursuing the claims of the [putative] class" and "no interests antagonistic to the interests of other [putative] class members."[544] Conflicts within a putative class may be tolerated so long as they are not "fundamental" and could be cured by dividing the class into subclasses.[545]

Plaintiff here "continues to want to be a class representative in this litigation because," according to him, "what is happening at 26 Fed[] is not right."[546] He wants to "stand up" for people detained in 26 Fed so that they can get better "food," "medicine," and "medical car[e]," "confidential phone calls" and "longer phone calls to family," and overall more "humane" conditions.[547] He wants to "fight" for people who cannot do so for themselves and who lack lawyers.[548] He "remain[s] committed to doing what [he] can to stop others from having the same experience" as him.[549] He (and his counsel) vigorously has pursued his claims and has demonstrated no interests antagonistic to the putative class. The adequacy requirement of Rule 23(a) has been satisfied.

---

544 *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

545 *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011).

546 PX336 ¶ 14.

547 *Id.* ¶¶ 15-16.

548 *Id.* ¶ 14.

549 *Id.* ¶ 21.

*B. Rule 23(b)(2) Requirements*

If a putative class satisfies the requirements of Rule 23(a), it may proceed under Rule 23(b)(2) if "the party opposing the [putative] class has acted or refused to act on grounds that apply generally to the [putative] class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"[550]

Here, Rule 23(b)(2) is satisfied for the same reason that the commonality requirement of Rule 23(a) has been satisfied. Putative class members all have been subject to substantially the same conditions of confinement. Their claims concern only ICE's treatment of them while they were and are detained in 26 Fed. Their claims thus turn on their membership in the putative class rather than on any of their other characteristics or individual circumstances.[551] Any permanent injunction prohibiting or mandating certain conditions of confinement equally would apply to all those detained in 26 Fed and thus "would provide relief to each member of the [putative] class."[552]

---

550 *Wal-Mart Stores*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

551 *See L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 616-17 (S.D.N.Y. 2018) (certifying class of all children who are or will be in the custody of DHS and who are or have ever been housed in a "staff-secure facility" because "the propriety of the challenged administrative actions does *not* turn on the particular circumstances of each plaintiff" and "a single injunction enjoining director review would provide relief to the entire class"); *Bertrand v. Sava*, 535 F. Supp. 1020, 1025 (S.D.N.Y. 1982) (certifying class of noncitizen detainees seeking "to remedy defendant's policies which operated as to each of them" on the basis of their group membership), *rev'd on other grounds*, 684 F.2d 204 (2d Cir. 1982).

552 *Wal-Mart Stores*, 564 U.S. at 360; *see Vazque Perez v. Decker*, No. 18-cv-10683, 2020 WL 7028637, at *9 (S.D.N.Y. Nov. 30, 2020) (Nathan, J.) ("Because [plaintiff] has alleged that ICE policies and practices result in injuries that generally apply to the proposed class as a

* * *

Having shown that putative class members have experienced substantially similar conditions of confinement at 26 Fed irrespective of where in the building or for how long they have been detained and that final injunctive relief could remedy those conditions as to the entire putative class, plaintiff's motion for class certification is granted. The class of all immigration detainees who are detained and those who will be detained in the future by ICE at 26 Fed is certified.

## *IV. Relief*

Though comparable to the PI previously issued, the permanent injunction that plaintiff seeks in some respects goes somewhat beyond the PI and imposes some additional requirements on defendants.[553] Defendants already agreed to some of those requirements when resolving plaintiff's previous contempt motion,[554] and the Court accordingly need not address them. Defendants argue generally that the permanent injunction otherwise should not exceed the terms of the PI and suggest a couple of specific changes at the margins to the proposed terms.[555] Neither party, however, has offered any briefing or substantial argument regarding their proposed changes to the terms of the PI. The Court deems any arguments not made to be forfeited yet nevertheless addresses each proposed

---

whole, and because [plaintiff] seeks injunctive and declaratory relief that would benefit the proposed class as a whole, Rule 23(b)(2) is satisfied here."); *see also Clarkson v. Coughlin*, 783 F. Supp. 789, 797 (S.D.N.Y. 1992) (noting that class actions generally are appropriate where "underlying claims tend to remain" even as "[p]risoners frequently come and go from institutions").

553 *See* Joint Pretrial Order, Ex. D (Dkt 159-4).

554 *See* Contempt Mot. Stip. & Order (Dkt 141).

555 *See* May 26, 2026 Trial Tr. at 38:9-13, 48:10-16, 50:7-16.

change one-by-one, taking plaintiff's proposals first and then turning to those of defendants to the extent they remain.

First, plaintiff seeks to limit the occupancies of the tenth-floor hold rooms to the capacity limits Zanello previously calculated and the occupancies of the ninth-floor hold rooms to plaintiff's own calculated capacity limits using the requirement that each detainee have a floor area of at least fifty square feet exclusive of any space within eight feet from any toilet.[556] Defendants assert that the only evidence about appropriate calculations for capacity limits are the NDS, which require slightly less space per detainee than was mandated in the PI.[557] Given that ICE continued to overcrowd the hold rooms after entry of the PI, the Court declines to decrease the amount of space defendants must afford to each detainee. It does, however, agree with defendants insofar as they argue that slightly less space for a detainee in a single-occupancy hold room might not raise the same concerns as it could for detainees held in a hold room containing multiple detainees.

Second, plaintiff seeks to require defendants to provide a pillow to each detainee held overnight and to dim the lights in the hold rooms between the hours of 9:00 p.m. and 7:00 a.m.[558] The Court agrees that these requirements are necessary to ensure adequate sleeping conditions.

---

556 Joint Pretrial Order, Ex. D (Dkt 159-4) ¶¶ 3(a)(i)-(ii).

557 *See* May 26, 2026 Trial Tr. at 48:10-50:6.

558 Joint Pretrial Order, Ex. D (Dkt 159-4) ¶¶ 3(b), (d).

Third, plaintiff seeks to require defendants to maintain the hold rooms "at a comfortable temperature."[559] The Court finds that proposed term as written ambiguous but agrees that setting a required temperature range is appropriate.

Fourth, plaintiff seeks to require defendants to sanitize bedding mats, blankets, and pillows at least three times each day.[560] The Court considers such a requirement unnecessary given that each detainee held overnight already must be furnished with a clean bedding mat, pillow, and blanket.

Fifth, plaintiff seeks to require defendants to provide detainees with means of making legal calls within four hours of a request by a detainee or their attorney (regardless of whether the attorney has filed a Form G-28) within the period 7:00 a.m. to 9:30 p.m. and by 11:00 a.m. the next morning for a request made thereafter.[561] Plaintiff seeks to require also that every detainee be offered the opportunity to make a call within one hour of being detained.[562] The Court agrees that most of these changes are necessary to ensure detainees have meaningful access to counsel. Scheduled legal calls, however, should be confined to normal business hours, which in any event is the period during which defendants are required to monitor and answer without undue delay the dedicated attorney phone line.[563]

---

559 *Id.* ¶ 3(c).

560 *Id.* ¶ 3(e).

561 *Id.* ¶ 3(g).

562 *Id.*

563 *See id.* ¶ 11(b).

Sixth, plaintiff seeks to require defendants to provide detainees with on-site medical services at all times and to have medical professionals conduct medical screenings of each detainee before that detainee is placed in a hold room.[564] Defendants in contrast urge the Court to reduce medical staffing to between 7:00 a.m. and 9:30 p.m. due to the decreased number of detainees being held at 26 Fed at any given time.[565] Based on the facts that (i) ICE so far has employed detention officers or contractors with no special training to identify the detainees who require medical screenings from IHSC, (ii) ICE has kept detainees in hold rooms who for medical reasons never should have been confined in close quarters with others or confined at all, and (iii) the NDS set a norm of medical screenings for new arrivals "[a]s soon as possible,"[566] the Court agrees that these changes are appropriate to ensure the safety of those detained at 26 Fed.

Seventh, plaintiff seeks to require defendants to provide detainees with as much additional food as detainees desire on top of three meals per day.[567] The Court finds that requirement unnecessary as one additional meal per day as was provided for in the PI should be sufficient.

Eighth, plaintiff seeks to require defendants to post an additional, abbreviated version of the Notice of Rights in each hold room.[568] The Court finds that requirement unnecessary.

---

564 *Id.* ¶¶ 4(f)-(g).

565 May 26, 2026 Trial Tr. at 50:7-16.

566 PX151 ¶ 4.3.II(D).

567 *See* Joint Pretrial Order, Ex. D (Dkt 159-4) ¶ 4(k).

568 *Id.* ¶ 5.

Ninth, plaintiff seeks to require defendants to provide to detainees phone numbers for pro bono legal service providers.[569] Given that such a requirement would help to ensure access to counsel and that ICE already is supposed to maintain a list of "free legal service providers" within the jurisdiction of each field office,[570] the Court agrees with this proposed change.

Tenth, plaintiff seeks to impose a reporting requirement according to which defendants must provide to plaintiff's counsel every thirty days (i) a log of individuals held at 26 Fed, (ii) scans of the contractors' logbooks or comparable documentation, and (iii) a sworn affirmation regarding their compliance (or lack thereof) with the permanent injunction.[571] Plaintiff seeks also permission in perpetuity to have his counsel inspect and photograph the hold rooms upon four hours' notice.[572] The Court agrees that a limited right to inspect the contractors' logbooks or comparable documentation is appropriate but finds the proposed requirements to go further than necessary and to be overly burdensome. Should plaintiff have good cause to believe defendants are failing to comply with the permanent injunction and that more extensive discovery therefore is necessary, the Court promptly could address a request to that effect.

Finally, as for defendants' requested changes to the proposed terms of the permanent injunction, the only item that the Court has not addressed yet is their suggestion that the permanent injunction not require them to provide detainees with towels because there are no shower facilities

---

[569] *Id.* ¶ 11(e).

[570] PX151 ¶ 5.4.II(E).

[571] Joint Pretrial Order, Ex. D (Dkt 159-4) ¶¶ 14(a)-(c).

[572] *Id.* ¶ 15.

in 26 Fed.[573] The Court always has construed this requirement to refer to paper towels and will specify as such in the permanent injunction.

### *Conclusion*

The foregoing opinion constitutes the Court's findings of fact and conclusions of law. Plaintiff's motion for declaratory relief and a permanent injunction (Dkt 1) and motion for class certification (Dkt 167) are granted to the extent hereafter set forth.

Accordingly,

1. This case is certified as a class action on behalf of all immigration detainees who are detained and who hereafter will be detained by U.S. Immigration and Customs Enforcement at 26 Federal Plaza, New York, NY.

2. Plaintiff Sergio Alberto Barco Mercado is hereby appointed to be the named representative of the class.

3. Plaintiff's counsel of record are hereby appointed as counsel for the class.

4. Injunctive relief is granted to the extent set forth in the Final Judgment of Permanent Injunction filed today. It is otherwise denied.

[Remainder of page intentionally left blank]

---

573 *See* May 26, 2026 Trial Tr. at 38:9-13.

5. The Clerk shall close the case, provided, however, that the Court retains jurisdiction over the Permanent Injunction for enforcement purposes.

SO ORDERED

Dated: September 24, 2026

Lewis A. Kaplan
United States District Judge