UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SERGIO ALBERTO BARCO MERCADO, on his own behalf and on behalf of others similarly situated,

Plaintiff,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, in his official capacity, et al.,

Defendants.

25 Civ. 6568 (LAK)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 4

I. Rule 59 Does Not Permit Defendants to Relitigate Resolved Issues or Introduce Evidence That Was Available Before Judgment. ........ 4

II. Defendants' Requests to Eliminate Pillows, Restore the G-28 Requirement, and Dispense with Nighttime Light Dimming Should All Be Rejected. ........ 8

A. Defendants' Unsupported Security Assertions Do Not Justify Eliminating Pillows. ........ 8

B. Changing the Color Temperature of the Bulbs Is Not a Substitute for Dimming the Lights Overnight. ........ 10

C. Reimposing the Form G-28 Requirement Would Reimpose a Barrier to Counsel That the Court Expressly Addressed. ........ 12

III. The Court Should Preserve Continuous Medical Staffing. ........ 14

A. Jacobs Confirms that ICE Relies on Non-Medical Personnel to Recognize Medical Problems. ........ 15

B. The Need to Transfer Detained Individuals For Emergency Treatment Supports, Rather Than Undermines, Continuous Medical Staffing. ........ 15

C. The Government Has Not Demonstrated That the Cost of Overnight Medical Staffing Constitutes Manifest Injustice. ........ 16

D. Defendants' Proposed Staffing Schedule Would Leave Detained Individuals Without On-Site Medical Personnel for Extended Overnight Periods ........ 17

IV. Defendants' Request to Weaken the Injunction's Prescription-Medication Protections Should Be Rejected ........ 19

V. Plaintiffs Do Not Oppose Narrowly Tailored Clarifications That Preserve the Injunction's Substantive Protections. ........ 22

A. The Definition of "Hold Room" May Be Clarified for Particular Requirements Applicable to Enclosed Holding Cells. ..... 22

B. Plaintiffs Do Not Oppose an Equivalent Call-Center Procedure That Preserves Attorney Access and Response Deadlines ..... 23

C. Plaintiffs Are Amenable to Clarifying the Medical-Screening Requirements, Provided Detained Individuals Receive Necessary Care Without Delay..... 24

1. Medical Screening and Treatment. ..... 25

2. Communicable Diseases and Medically Necessary Diets ..... 26

CONCLUSION ..... 26

# TABLE OF AUTHORITIES

## CASES

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
684 F.3d 36, 52 (2d Cir. 2012) .......... 4

*Charles v. Orange Cnty.*,
925 F.3d 73 (2d Cir. 2019) .......... 25

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) .......... 25

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*,
10 F. Supp. 3d 460 (S.D.N.Y. 2014) .......... 4

*Hollander v. Members of Bd. of Regents*,
524 F. App'x 727 (2d Cir. 2013) .......... 4

*In re Johns–Manville Corp.*,
759 F.3d 206 (2d Cir. 2014) .......... 6

*Mexico Infrastructure Fin., LLC v. Corp. of Hamilton*,
No. 17 Civ. 6424, 2020 WL 5646107 (S.D.N.Y. Sept. 21, 2020) .......... 6

*Network Enters., Inc. v. APBA Offshore Prods., Inc.*,
No. 01 Civ. 11765, 2006 WL 2707335 (S.D.N.Y. Sept. 20, 2006) .......... 5

## STATUTES

Federal Rule of Civil Procedure 59 .......... *passim*

Plaintiff Sergio Alberto Barco Mercado and the certified class ("Plaintiffs") respectfully submit this memorandum in opposition to Defendants' motion to alter or amend the October 2, 2026 amended final judgment of permanent injunction (ECF No. 191) or, in the alternative, for a new trial. ECF No. 192.

## PRELIMINARY STATEMENT

This case concerns Defendants' knowing and cruel mistreatment of people in their custody at 26 Federal Plaza in Manhattan ("26 Fed"), which this Court found unconstitutional and punitive. Following extensive discovery and a full trial on the merits, the Court issued a detailed 125-page opinion finding that ICE frequently crammed more than 100 people at a time into filthy, freezing, cramped holding rooms for several days on end, depriving them of sleep, adequate food and water, basic hygiene, necessary medical care, and access to confidential communications with counsel. Detained individuals were forced to sleep on crowded concrete floors under glaring lights, beside exposed toilets, sometimes without room to lie down. The experience left detained individuals physically injured and psychologically traumatized; some were so desperate to escape the conditions that they abandoned their efforts to remain in the United States. *See* Opinion Granting Permanent Injunction and Certifying Class, ECF No. 186 ("September 24 Opinion"), at 27–69, 98–108.

The Court found that Defendants knew or should have known of the suffering they were inflicting, recklessly disregarded detained individuals' basic needs, and subjected them to punitive conditions intended in part to induce self-deportation. *Id.* at 101–08. And the Court further found that even after the Court intervened in August 2025 and ordered protections to remedy these unconstitutional conditions, Defendants repeatedly disregarded its orders, complying only when convenient and continuing to deny detained individuals fundamental

protections, and that agency officials made knowing, false statements to the Court in the process. *Id.* at 72–90, 101.

The Permanent Injunction was the product of these extensive findings – not an abstract exercise in setting detention-facility standards, but a carefully tailored remedy for grave, intentional constitutional violations and the demonstrated danger of their recurrence.

Against this extraordinary record, the Government now asks the Court to dismantle several of the injunction's central protections. The Government identifies no intervening change in controlling law, no previously unavailable evidence, and no clear error or manifest injustice warranting such extraordinary relief. Instead, Defendants advance arguments that either were raised and rejected or could have been presented before judgment, and they present declarations by their own employees whose testimony was – or could have been – part of the trial record. The Court should reject these arguments. Rule 59 does not permit a losing party to repair its trial presentation or relitigate resolved issues.

Indeed, several of Defendants' requests seek to undo protections that the Court expressly considered and found necessary before or after trial. The Court specifically addressed the need for pillows and dimmed lighting to ensure adequate sleeping conditions, the importance of eliminating Form G-28 requirements that had impeded access to counsel, the necessity of around-the-clock medical staffing, and the need for detained individuals to retain certain personal medications. *See* September 24 Opinion, at 120–23; ECF 70. Defendants' motion largely ignores these determinations and the extensive evidentiary record underlying them.

Not only do Defendants flout the procedural requirements of Rule 59; their requests also run counter to the well-developed record, which makes clear that Defendants' proposed modifications would cause substantial harm to detained individuals. Eliminating

pillows and the requirement to dim lights overnight would undermine their ability to sleep in already harsh conditions. Reimposing a G-28 prerequisite would renew a proven barrier to confidential attorney access, including for individuals seeking representation. Weakening the prescription-medication protections would deprive detained individuals of the ability to keep their inhalers and risk delaying access to other necessary medications. And eliminating overnight medical staffing would leave detained individuals without access to on-site medical professionals for up to eleven and a half hours at a time, even when they experience medical emergencies. These are not minor administrative adjustments; they would undermine protections the Court found necessary to remedy unconstitutional conditions of confinement.

Even ignoring the procedural impropriety of Defendants' attempt to introduce three new declarations, their substance does not cure these defects. Merlin Marcellin offers speculative security concerns and operational objections; John Melecio identifies potential difficulties installing dimmers without establishing that doing so is infeasible; and Mia Jacobs describes longstanding medical practices and staffing costs without demonstrating that the Court's requirements are unworkable. *See* Declaration of Merlin Marcellin, ECF No. 194 ("Marcellin Decl."); Declaration of Mia Jacobs, ECF No. 195 ("Jacobs Decl."); Declaration of John Melecio, ECF No. 196 ("Melecio Decl."). None of these declarations establishes that the evidence was previously unavailable or that the injunction would result in manifest injustice.

Defendants' assertion that compliance is burdensome does not excuse them from remedying unconstitutional conditions. The Court already considered ICE's operational constraints in fashioning the injunction. The Government's preference for less expensive or more convenient procedures does not equate to a showing of manifest injustice. Defendants attempt to point to the Court's rejections of their requests for certain provisions as clear error or

overlooked evidence. But the Court issued a thoroughly reasoned opinion on a full trial record. The fact that this opinion rejected many of Defendants' thinly supported requests shows that Defendants received a full and fair trial and lost on the record they chose to present – not that there was any clear error or overlooked evidence.

Plaintiffs nevertheless do not oppose three narrow clarifications that would preserve the injunction's substance: (1) distinguishing temporary, active processing areas from spaces used for overnight confinement for purposes of bedding and lighting; (2) allowing an equivalent call-center procedure for unanswered attorney calls; and (3) accommodating reasonable medical screening and off-site-treatment arrangements without delaying necessary care.

Apart from these limited modifications, the Court should deny Defendants' motion and preserve the carefully tailored protections it fashioned in response to the extensive evidence of Defendants' egregious constitutional violations.

## ARGUMENT

### I. Rule 59 Does Not Permit Defendants to Relitigate Resolved Issues or Introduce Evidence That Was Available Before Judgment

Rule 59(e) relief is an extraordinary remedy available only upon a showing of an intervening change in controlling law, newly available evidence, clear error, or manifest injustice. *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 475 (S.D.N.Y. 2014); *Hollander v. Members of Bd. of Regents*, 524 F. App'x 727, 729 (2d Cir. 2013). A Rule 59(e) motion is not a vehicle for presenting arguments or evidence that could have been raised before entry of judgment. *See Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012).

Defendants fare no better under Rule 59(a)(2). Although that rule permits a court following a nonjury trial to reopen the judgment and receive additional evidence, it does not

confer an unrestricted opportunity to supplement an unsuccessful trial presentation. As the Government itself acknowledges, relief following a bench trial requires a manifest error of law or clearly erroneous factual determination by the judge resulting in manifest injustice. Defendants' Memorandum of Law in Support of Rule 59 Motion, ECF No. 193 ("Def. Mem.") at 3 (citing *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, No. 01 Civ. 11765, 2006 WL 2707335, at *3 (S.D.N.Y. Sept. 20, 2006)).

Defendants do not satisfy either standard.

First, Defendants seek to revisit matters the Court expressly decided. Their request to eliminate around-the-clock medical staffing is especially striking. The Government made that very argument at trial, urging the Court to reduce medical staffing to the hours of 7:00 a.m. to 9:30 p.m. *See* September 24 Opinion at 122 & n.565 (citing Trial Tr. at 50:7-16). The Court rejected the proposal, finding that around-the-clock staffing was necessary in light of ICE's reliance on personnel without medical training to identify detained individuals needing care, its history of confining individuals who should not have been held in close quarters or detained at all for medical reasons, and applicable medical-screening standards. *Id.* at 122. Defendants now request substantially the same weekday schedule the Court rejected, with even shorter weekend hours. Def. Mem. at 9–10.

Defendants likewise seek to relitigate the Court's longstanding prescription-medication protections. In August 2025, the Court considered Defendants' safety concerns regarding prescription medications and expressly ordered that detained individuals be permitted to retain personal inhaled medication and have prompt access to other prescriptions through ICE medical personnel. ECF Nos. 67, 69, 70 at 2. These protections were carried forward in the Preliminary Injunction and Permanent Injunction, and Defendants did not present any basis at

trial to oppose those protections. ECF Nos. 97 ¶ 2(g); ECF No. 191 ¶¶ 5(a), (b), (d). Defendants offer no basis to revisit that determination now.

Similarly, the Court specifically considered Plaintiff's requests for pillows, nighttime dimming, and legal calls without G-28 forms. September 24 Opinion at 120–21. The Court in fact already held that the Parties had forfeited any arguments pertaining to the same changes to the Preliminary Injunction by failing meaningfully to brief them, *see* ECF No. 159-4, September 24 Opinion, at 119, a finding that conclusively defeats Defendants' argument on reconsideration that such changes would result in manifest injustice. *See Mexico Infrastructure Fin., LLC v. Corp. of Hamilton*, No. 17 Civ. 6424, 2020 WL 5646107, at *2 (S.D.N.Y. Sept. 21, 2020) ("no manifest injustice" where "the movant's arguments for relief were available to the party and the party proffers no reason for its failure to raise the arguments") (quoting *In re Johns–Manville Corp.*, 759 F.3d 206, 219 (2d Cir. 2014)) (internal alterations omitted).

The Court "nevertheless addresse[d] each proposed change one-by-one," September 24 Opinion, at 119–20. The Court expressly found pillows and dimmed lighting necessary for adequate sleeping conditions and determined that the requested attorney-access modifications were necessary to ensure meaningful access to counsel. *Id.* at 120–21. The Government cannot characterize these carefully considered determinations as oversights merely because it disagrees with them.

Second, the submitted declarations do not establish that the asserted evidence previously was unavailable. The physical configuration of the holding cells, their lighting systems, ICE's security procedures, its Form G-28 practices, and its medical staffing costs all were known – or at minimum readily ascertainable – before trial.

To give one example, Jacobs has overseen health care operations at 26 Fed since approximately February 26, 2025. Jacobs Decl. ¶ 1. Her declaration describes existing medical capabilities, physical constraints, and practices dating back to or beyond the September 2025 Preliminary Injunction – not newly discovered circumstances. *Id.* ¶¶ 3–19. Indeed, Jacobs expressly acknowledges that around-the-clock medical staffing began in September 2025 after the Court entered the Preliminary Injunction. *Id.* ¶ 17. Thus, by the time of the May 2026 trial, ICE had approximately eight months of experience with that requirement and could have presented the actual costs, logistical issues, and alleged effects on other facilities, through an expert or otherwise. The screening-area configuration and limits of on-site treatment likewise predated trial. *Id.* ¶¶ 3–14. Defendants do not explain why those facts could not have been presented then. Nor do they even attempt to explain Jacobs' contrary deposition testimony, which was before the Court at trial, that when the Court's Preliminary Injunction issued, she had been "happy to hear that [26 Fed] was ordered to staff 24/7." PX324, Jacobs Deposition Transcript ("Jacobs Tr.") at 51:21–52:2.

Defendants' request for a new trial to present additional evidence concerning those same issues underscores the defect in its motion. They seek a second opportunity to build a record on matters that were foreseeable and fully litigable before judgment. That is not the function of Rule 59.

Finally, ICE's decision to suspend operations in the ninth- and tenth-floor holding rooms after judgment – thereby avoiding the need to implement the challenged requirements – does not itself establish impossibility or manifest injustice. *See* Marcellin Decl. ¶ 2; Jacobs Decl. ¶ 2. Instead, their unilateral decision to suspend operations leaves them without evidence that actual implementation of the challenged requirements has proved unsuccessful.

## II. Defendants' Requests to Eliminate Pillows, Restore the G-28 Requirement, and Dispense with Nighttime Light Dimming Should All Be Rejected

### A. Defendants' Unsupported Security Assertions Do Not Justify Eliminating Pillows

Paragraph 1(b) of the Permanent Injunction requires a clean bedding mat or mattress, pillow, and blanket for each detained individual held overnight. ECF No. 191 ¶ 1(b). This requirement was not inadvertent. Plaintiffs specifically requested pillows, Defendants did not present any basis to oppose them, and the Court expressly found them necessary to ensure adequate sleeping conditions. September 24 Opinion at 120.

The Court's conclusion was rooted in the extensive evidence regarding the inhumane and traumatizing sleeping conditions at the facility. The Court found that sleeping conditions were "dreadful": that detained individuals had been forced to sleep on hard concrete floors and benches and that one person resorted to using his shoes as a makeshift pillow. *Id.* at 36–38; *see also id.* at 37 n.138 (citing ECF 15 ¶ 12). These were not incidental inconveniences but part of the degrading conditions of confinement that the Court found unconstitutional.

Against this record, Defendants offer a single conclusory assertion that pillows pose a security risk because detained individuals might use them to harm themselves or others. Marcellin Decl. ¶ 7. Marcellin identifies no incident involving a pillow, assessment of different pillow materials, or explanation why ordinary supervision could not address any particular risk.

The Court has already confronted and rejected an analogous argument. In August 2025, Defendants sought modification of the Temporary Restraining Order to eliminate the requirement to provide toothbrushes, citing safety concerns. ECF No. 67 ("providing toothbrushes, rather than teeth cleaning wipes, presents a potential safety concern for other aliens in custody as well as ICE personnel because toothbrushes can be readily improvised as

weapons."). After Plaintiffs noted that individuals in immigration custody routinely receive toothbrushes, citing Defendants' own detention standards, ECF No. 69 at 1–2, the Court denied the requested modification. ECF No. 70 at 2.

The Government now seeks to eliminate another basic necessity based on similarly generalized assertions of imagined misuse. But as with toothbrushes, pillows are routinely provided in immigration detention facilities, and once again, ICE's own detention standards expressly provide for them in other contexts. *See* ICE Performance-Based National Detention Standards 2011 (rev. 2016), Standard 4.5, § V(G)(1) (requiring standard-issue bedding to include a mattress, blanket, and pillow); *see also* DHS Office of Inspector General, *Results of an Unannounced Inspection of ICE's Denver Contract Detention Facility*, OIG-24-29, at 9–10 (June 12, 2024), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2024-06/OIG-24-29-Jun24.pdf (finding that the facility violated ICE detention standards by failing to issue pillows); 2025 ICE National Detention Standards, Standard 4.4 ¶ II(E) & II(U)(3) (requiring clean pillowcases and, if needed, "additional pillows" for pregnant detained individuals). Defendants offer no evidence that pillows have caused security incidents at 26 Fed, nor do they explain why pillows routinely provided in other ICE facilities would pose an unacceptable danger here. Their conclusory assertion is particularly insufficient given their failure to address this issue at trial and the Court's express finding that pillows are necessary to remedy the deplorable sleeping conditions at 26 Fed. *See* September 24 Opinion at 36–38, 120.

A hypothetical possibility of misuse, without supporting facts, does not justify reconsidering this Court's finding that pillows are necessary for adequate sleep. Defendants identify no particularized risk or less restrictive alternative. The request should be denied.

### B. Changing the Color Temperature of the Bulbs Is Not a Substitute for Dimming the Lights Overnight

Paragraph 1(d) of the Permanent Injunction requires the lights in the holding rooms to be dimmed between 9:00 p.m. and 7:00 a.m. ECF No. 191 ¶ 1(d). The Court should reject the Government's proposal to replace this requirement with a requirement for 32-watt bulbs with a color temperature of 3000K or lower. Def. Mem. at 6.

Defendants' proposal would defeat the purpose of the substantive protection the Court ordered. The Court found that lights remained on overnight at 26 Fed, worsening sleep deprivation amid overcrowding and inadequate bedding. September 24 Opinion at 37–38, 120. The Court cited multiple witness accounts describing the unsound sleeping conditions and resulting harm. *See* PX 323 at 80:18–21 (Contractor Mitchell Hutson testifying that lights typically were kept on overnight); PX 331 ¶¶ 5, 16 (Daniel Quevedo, who was detained at 26 Fed from June 26 to July 2, 2025, testifying that he had nightmares about the lights being kept on for hours); PX 335 ¶ 6 (Roberto Daniel Chilavert Olmedo, who was detained at 26 Fed from July 10 to July 16, testifying that "[t]he lights were kept on at all times, including overnight, and I lost track of the days"); Dkt. 15 ¶ 12 (Geovani Maradiaga Ochoa, who was detained at 26 Fed from July 6 to 11, 2025, testifying: "The lights were on the entire time and it was hard to know what time of day it was. I tried putting a shirt or a piece of the aluminum blanket over my eyes to try to be able to rest."); Dkt. 27 ¶ 11 (Hugo Sanchez Trillos, who was detained at 26 Fed from June 26 to July 14, 2025 apart from three days at another facility, testifying that "[t]hey never turned off the lights so it was difficult to sleep"). The Court credited these accounts and specifically determined that dimming the lights overnight was necessary to ensure adequate sleeping conditions. September 24 Opinion at 120.

Defendants have not shown that their proposed alternative would remedy this well-documented harm. Although Defendants propose replacing the existing bulbs with 32-watt, 3000K bulbs that would produce warmer-colored light, they offer no evidence to establish how much the substitution would reduce illumination in the holding cells, or whether the resulting lighting would be sufficiently dim to actually permit detained individuals to sleep.

Moreover, Defendants have not established that dimming is infeasible, only that GSA has not yet determined the feasibility of doing so. *See* Melecio Decl. ¶¶ 8–12. The Court subsequently ordered Defendants to submit additional evidence regarding the feasibility of installing dimmers. *See* ECF No. 201. Plaintiffs respectfully submit that any such evidence should establish, with concrete and specific facts, that installation is genuinely infeasible, rather than merely difficult or inconvenient. Conclusory assertions of infeasibility, like those offered in support of other aspects of Defendants' motion, should not suffice to eliminate a protection the Court expressly found necessary.

Defendants' generalized concern about officers needing to monitor detained individuals likewise does not justify eliminating nighttime dimming. The injunction mandates dimming, not darkness. Sufficient visibility can be maintained while reducing sleep disruption. Moreover, Supervisory Detention and Deportation Officer Lige Hampton testified that the lights were sometimes turned off overnight, undermining Defendants' assertions of the need to keep them on for safety reasons. *See* PX322 at 166:19-168:5. ICE contractors' own logbook entries reflect that the lights were occasionally turned off even when the Hold Rooms were extremely crowded. For example, on July 15, 2025 at 2:17 a.m., an entry in the logbook states "ICE supervisor told us we could turn off the lights." PX88, at ICE-B-148. The count of detained individuals at that time was 110. *Id.* If it was possible to monitor detained individuals with the

lights off when the count was over 100, it should be feasible to dim or even turn off the lights in the holding cells (while keeping them on in the adjoining processing areas) when there are fewer than 22 individuals detained on the tenth floor.

The requested modification should be denied.

### C. Reimposing the Form G-28 Requirement Would Reimpose a Barrier to Counsel That the Court Expressly Addressed

Defendants' proposed G-28 modification is particularly objectionable because the trial record established that ICE abused G-28 requirements in the past to prevent detained individuals from speaking with attorneys. Equally fatal is that their motion lacks any actual evidence to support their proposed modification.

First, the Court made explicit findings on this issue. It found that ICE personnel prevented detained individuals from speaking with their attorneys because the detained individuals had not signed G-28 forms, notwithstanding ICE's purported policy that client signatures were unnecessary. September 24 Opinion at 61–62. The Court further found that ICE personnel prevented attorneys who did not yet represent detained individuals from scheduling calls because they had not submitted signed G-28 forms, notwithstanding ICE's purported exemption for pre-representation calls. *Id.* *See also* PX4, at ICE 0011455 (ICE requiring attorney seeking to schedule a pre-representation call to submit G-28 form because, according to him, "[a]ttorneys are required to submit Form G-28 . . . [whether] it be for representation or pre representation"); PX6, ICE 13809–11 (attorney told to submit a G-28 form after being put off for five days with boilerplate messages); PX168, ICE 21767–73 (attorney was delayed from scheduling a call for days, including by being told to submit a G-28).

G-28 Forms were used as a barrier for attorneys to schedule calls *even after the Court's orders*, ultimately contributing to Plaintiffs filing a contempt motion. *See, e.g.*, PX67,

ICE 10965–68 (Assistant Field Office Director Nancy Zanello told attorney on August 22, 2025 that "your G-28 is unsigned by your supposed client or authorized signatory therefore we cannot disclose information nor facilitate a call."; when the attorney submitted a G-28, Zanello responded: "Your G28 is not signed."); PX133, ICE 10655–57 (in response to attorney call request on October 1, 2025, attorney was instructed to submit a signed G-28, then was told there was no availability that week, the next available time offered was six days later).

Moreover, the Government itself acknowledges that attorneys were told they needed client-signed G-28s even when the client was already detained and could not provide a signature or when the proposed call was pre-representational. Def. Mem. at 7.

Second, while Defendants now propose accepting a G-28 signed by counsel alone, they offer no evidence to support their proposed modification. Instead, they point to a G-28 policy (that they ignored before and after the Court first issued preliminary relief) and suggest that an attorney-signed G-28 is necessary to verify the person requesting a legal call is an attorney. *See* Marcellin Decl. ¶ 9. Their argument fails on its own terms and, worse, would do nothing to address the concerns the Court sought to reconcile in fashioning its Permanent Injunction.

As a basic matter, a Form G-28 is a notice of entry of appearance, not a means of verifying that a caller is an attorney.[1] Defendants make no effort to explain otherwise. Moreover, requiring an attorney to submit a notice of appearance before speaking with a prospective client is fundamentally incompatible with the right to consult counsel for the purpose of determining whether representation will be undertaken. Further, even without the detained individual's signature, the proposed rule would effectively (a) require a formal appearance document before a potentially pre-representational consultation, (b) condition access to counsel

---

[1] DHS, *Form G-28: Notice of Entry of Appearance as Attorney or Accredited Representative* (Sept. 17, 2018), https://www.uscis.gov/sites/default/files/document/forms/g-28.pdf [https://perma.cc/6L47-RXHB].

on a form that is subject to Defendants' control, and (c) could – as the trial record established – be used to create a procedural ground for delay.

Attorney status can instead be checked against public bar-registration records and professional contact information. To the extent the Court finds that some affirmative verification is required prior to a call, Plaintiffs would not object to a neutral, expeditious verification requirement, such as providing the attorney's bar number.

The Court expressly included language permitting legal calls regardless of whether counsel has filed a G-28. ECF No. 191 ¶ 2. That language is essential to the remedy, not an incidental administrative detail, and Defendants have presented no basis for altering it.

## III. The Court Should Preserve Continuous Medical Staffing

As noted above, Defendants' effort to eliminate around-the-clock medical staffing is another impermissible attempt to relitigate a matter this Court already considered and decided.

At trial, Defendants urged the Court to reduce on-site medical staffing to 7:00 a.m. through 9:30 p.m., citing the reduced number of detained individuals held at 26 Fed. September 24 Opinion at 122 & n.565. The Court rejected that argument.

In doing so, the Court identified concrete reasons why continuous medical staffing was necessary. ICE had relied on detention officers and contractors without specialized medical training to determine which detained individuals needed medical screening. ICE had also held individuals in the holding rooms who, because of their medical conditions, should not have been confined in close quarters with others or confined at all. The Court further considered applicable detention standards requiring timely medical screening. *Id.* at 122–23.

### A. Jacobs Confirms That ICE Relies on Non-Medical Personnel to Recognize Medical Problems

Rather than undermine the Court's findings, Jacobs's declaration reinforces the need for qualified personnel.

Jacobs describes a system in which ICE officers and guards refer detained individuals to medical personnel based on detained individuals' reported symptoms and officers' personal observations. Jacobs Decl. ¶ 14. Her list of conditions warranting referral includes mental health issues, prescription medication needs, pregnancy, pain, contagious disease, suicidal ideation, difficulty breathing, disorientation, heat stroke, hypothermia, and severe dehydration. *Id.*

These are precisely the kinds of medical issues that may require professional assessment. Yet Jacobs's proposed system depends upon officers and guards to recognize their significance and determine whether screening is warranted. That reliance on non-medical personnel is not a solution to the problem the Court identified; it is part of the problem.

The Court expressly found that ICE had employed detention officers and contractors without specialized training to identify detained individuals requiring medical attention. September 24 Opinion at 122. Jacobs does not identify any intervening improvement in those personnel's medical training or any reliable alternative screening system that would eliminate the risks underlying the Court's findings.

### B. The Need to Transfer Detained Individuals for Emergency Treatment Supports, Rather Than Undermines, Continuous Medical Staffing

Jacobs states that on-site nurses cannot provide definitive treatment for heart attacks, strokes, or seizures and that such emergencies require hospital transfer. Jacobs Decl.

¶ 16. But this observation does not support eliminating overnight medical personnel; instead, it underscores their importance.

The function of on-site medical staff is not limited to providing definitive treatment. Qualified medical professionals also assess symptoms, recognize emergencies, determine the urgency of intervention, and facilitate appropriate care.

Jacobs states that detained individuals may be transported to New York-Presbyterian Hospital or Bellevue Hospital for necessary medical treatment. *Id.* ¶ 5. But the availability of an outside hospital does not address who would correctly classify the situation as an emergency, determine the appropriate response, or ensure that the individual receives timely and appropriate medical care if medical personnel are not present. Jacobs is silent on this point.

Jacobs asserts that ICE provides transportation for off-site medical care regardless of whether medical personnel are on site. *Id.* ¶ 19. She does not establish, however, that officers and guards are qualified to identify medical emergencies or that an adequate substitute for on-site professional assessment exists during the proposed overnight staffing gaps. The Court already found otherwise.

### C. The Government Has Not Demonstrated That the Cost of Overnight Medical Staffing Constitutes Manifest Injustice

The Government also relies on the cost of medical staffing to argue for a change in the Court's ruling. Jacobs states that ICE spends an average of $18,371 per month on temporarily detailed Public Health Service nurses for overnight coverage, including travel and lodging. Jacobs Decl. ¶ 17. She also identifies approximately $116,032 in monthly contract-staff expense and a cumulative total of more than $1.63 million in cumulative expenses for temporary details and contract staff. *Id.*

Nothing about these figures establishes manifest injustice.

The asserted overnight-detail expense is approximately $18,371 monthly; Defendants do not explain why that cost, or any unavoidable cost of continuous coverage, is disproportionate to the serious medical risks faced by detained individuals, particularly in light of the extensive evidentiary record of medical crises at the facility. *See. e.g.*, September 24 Opinion at 50–55 (describing emergencies including infections, fevers, cold and flu, untreated diabetes, asthma attacks, seizures, self-harm attempts, dementia, and cardiac episodes).

Second, Jacobs does not identify any budgetary restriction that makes the expenditure unsustainable. Nor does she establish that ICE has exhausted less expensive methods of providing continuous coverage, including alternative staffing arrangements.

Third, the total amount expended since the Court's orders went into effect does not establish that the injunction is unjust. It reflects the cost of complying with basic constitutional standards. The Government cannot establish manifest injustice simply by aggregating the costs of compliance over time.

Finally, Jacobs also asserts that temporary details strain medical resources at other detention facilities. *Id.* ¶ 18. But she provides no staffing figures for those facilities, no identification of services that have been curtailed, no analysis of alternative staffing arrangements, and no specifics at all. Her generalized assertion does not establish that maintaining a licensed medical professional at 26 Fed creates an unavoidable conflict with the Government's obligations elsewhere.

### D. Defendants' Proposed Staffing Schedule Would Leave Detained Individuals Without On-Site Medical Personnel for Extended Overnight Periods

Defendants propose staffing 26 Fed with on-site medical personnel from 7:00 a.m. to 9:30 p.m. on weekdays and from 7:00 a.m. to 7:30 p.m. on weekends. Def. Mem. at 9–

10; Jacobs Decl. ¶¶ 15, 19. That leaves the facility without on-site medical personnel for nine and a half hours on weeknights and eleven and a half hours on weekend nights.

Medical emergencies do not follow administrative schedules. Detained individuals may experience respiratory distress, severe withdrawal symptoms, psychiatric crises, seizures, or other urgent medical problems – which the record demonstrates were frequent and severe at 26 Fed in 2025 – during those periods. *See, e.g.*, September 24 Opinion at 50–52.[2]

Defendants' proposal would render vulnerable detained individuals dependent on the judgment of untrained, non-medical personnel during precisely the hours when immediate access to outside medical care may be most difficult to coordinate, a conclusion that the Court already reached based on the extensive trial record. September 24 Opinion at 122.

---

[2] *See also* PX322, Deposition of SDDO Lige Hampton, dated Apr. 13, 2026 155:14–162:22 (testifying about people being detained with diabetes, heart conditions, mental illnesses, dementia, and drug and alcohol withdrawal symptoms); PX41-42, ICE 17334–17338 (ICE emails about detained individual with life-threatening ovarian cyst); PX62, ICE 16772–75 (ICE emails about detained individual with heart attack risk); PX43, ICE 17183–87 (ICE emails about detained individual with kidney failure, detained per PX85 from July 13 to 15, 2025); PX107, ICE 14077–14081 (ICE emails about the same individual's need for dialysis three times per week); PX29, ICE 18003 (person had seizure while awaiting processing); Jacobs Tr., 43:21–45:6 (confirming no medical staff were onsite when this seizure occurred); PX44, ICE 26393, ¶¶ 31–34 (Joyce discussing person with "severe dementia" detained per PX85 for more than three weeks in February 2026); PX32, ICE 27318 (ICE emails about individual with Type 2 Diabetes, Hypertension, Major Depressive Disorder, and blindness in one eye, detained for eight days); PX170, ICE 22302–07 (emails from attorney to ICE explaining witness Nuvia Martinez Ventura's Type 2 Diabetes, hypertension, and high cholesterol); PX1, at ICE 10925 (Hampton discussing detained individual who had "the potential to experience methadone withdrawal = (hospital runnnnnn)."); PX166, ICE 20850–51 (attorney email about physically disabled client, who according to PX85, was detained from June 24 through July 7, 2025); PX332, Ibrahima Barry Witness Statement, ¶ 10 ("I even saw older men crying because of the pain they were in; I recall some who were diabetic people and they needed injections they were not receiving."); *see also* PX114, ICE 29823–29824 (Zanello and Joyce exchanging text messages about various medical emergencies, including a "[s]eizure" (in quotes), a case of monkeypox, and someone they referred to as "[c]ardiac lady," writing as to the latter "[w]e don't have her meds it's becoming an issue"); PX115, ICE 29829–29835 (Zanello and Hampton texting about a man who "just passed out" and was "[n]ot breathing," later noting he had been brought in despite having been found "NOT fit for confinement" due to "complex medical needs including need for abdominal surgery ASAP and need for CPAP machine at night (or risk of sudden death due to apnea/ not breathing)," "dialysis man," "Covid man," and "[o]ne dude on floor rolling around having a fit. Anxiety or something.").

Moreover, Defendants' assertion that the facility typically holds detained individuals for fewer than twelve hours does not eliminate these risks. Jacobs Decl. ¶ 7. A detained individual may experience an urgent medical condition within minutes of arrival. Furthermore, the Court's findings concerning prolonged detentions over the summer of 2025 and ICE officials' "not credible" attempts to downplay the duration of such detentions, *see, e.g.*, September 24 Opinion at 35–36, demonstrate why Defendants' own characterization of its current practices cannot substitute for actual medical protections.

The Court should retain the requirement for continuous on-site medical staffing.

## IV. Defendants' Request to Weaken the Injunction's Prescription-Medication Protections Should Be Rejected

The core prescription protections were litigated and resolved in August 2025, when Defendants sought to modify the Temporary Restraining Order based on asserted safety and liability concerns associated with allowing detained individuals to retain prescription medications. ECF No. 67 at 1.

Plaintiffs responded by proposing that detained individuals be permitted to retain personal inhaled medication and have prompt access to other prescribed medications through medical personnel, consistent with ICE's own Directive 11087.2, ¶ 5.7. ECF No. 69 at 2–3. Defendants agreed that detained individuals could retain inhaled medication, but sought to limit that right to medication needed for emergency use. *Id.* at 3. After considering the Parties' submissions, the Court rejected that limitation and expressly ordered that detained individuals be permitted to retain personal inhaled medication in their possession, including medication brought by family members or attorneys, and have prompt access to other prescribed medications from ICE medical personnel, "one or more of whom, as necessary for the well being of Detainees,

shall be on the premises of 26 Federal Plaza at all times of the day or night." ECF No. 70 at 2; *see also* ECF No. 97 ¶ 2(g).

The Permanent Injunction carries forward those protections in Paragraphs 5(a), (b), and (d). ECF No. 191 at 4–5. Paragraph 5(c) is a natural extension of those protections: it requires that individuals prescribed inhaled medication by ICE medical personnel be permitted to receive and retain it immediately, just as they may retain inhaled medication brought with them or delivered by family members or attorneys.

Defendants now seek to delete the word "personal" from Paragraphs 5(a) and (b), eliminate the requirement that newly prescribed inhaled medication be made available "immediately" under Paragraph 5(c), and remove references to ICE medical personnel from Paragraphs 5(c) and (d). ECF No. 193-1 at 3. These changes would weaken protections the Court deliberately imposed to ensure that detained individuals have access to medically necessary prescriptions.

Indeed, Defendants acknowledge that they have not been complying with the Court's longstanding requirement that detained individuals be permitted to retain their personal inhaled medication. Although the Court expressly ordered in August 2025 that detained individuals be permitted to retain such medication in their possession, Defendants now explain that all medications brought into the facility are taken by IHSC personnel for verification, after which nursing staff contact an on-call medical provider who may authorize administration of the medication. Under this procedure, Defendants acknowledge, "[d]etainees do not retain their 'personal' medication." Def. Mem. at 8–9. That admission is made specifically in connection with Paragraphs 5(a) and (b), which govern detained individuals' right to retain their inhalers.

Defendants thus seek to weaken a protection that their own submission indicates they have not been honoring. Failure to comply with the existing requirement is not a basis for modifying it.

Nor have Defendants established that their procedures for verifying and obtaining prescribed medication justify delaying access to necessary treatment. To the extent Defendants require prescription verification or reissuance, they must establish procedures that ensure detained individuals receive their medications promptly enough to avoid missing medically necessary doses. And there is no basis for overriding the Court's prior determination that detained individuals must be permitted to retain their personal inhaled medication, which they may need at any moment and which ICE's own Hold Room Directive allows. PX150, 11087.2, ¶ 5.7. The evidence already established there were individuals suffering apparent asthma attacks and struggling to breathe while detained at 26 Fed, and individuals not receiving necessary medication. *See*, *e.g.*, PX 332 ¶¶ 9–10. Those findings underscore the importance of preserving immediate access to inhalers and other necessary medications.

It is particularly troubling that Defendants seek to weaken these prescription-medication protections while simultaneously asking to eliminate on-site medical staffing for substantial portions of each day – nine and a half hours on weekdays and eleven and a half hours on weekends. Defendants insist that detained individuals cannot simply retain medications they bring with them, but instead must wait while medical personnel verify their prescriptions and contact an authorized provider to obtain approval for administration. Yet Defendants simultaneously seek permission to remove the very medical personnel responsible for initiating and coordinating that process for hours at a time. They offer no explanation of how detained individuals would obtain timely access to necessary prescriptions during those prolonged staffing

gaps. The Court should reject these mutually reinforcing requests to weaken protections that are essential to ensuring that individuals in ICE custody receive the medications they need.

## V. Plaintiffs Do Not Oppose Narrowly Tailored Clarifications That Preserve the Injunction's Substantive Protections

Although Defendants have not established grounds for the broad modifications they seek, Plaintiffs would agree to limited clarifications that address genuine operational concerns without undermining the relief the Court ordered. Plaintiffs attach as Exhibit A a redline reflecting these acceptable changes, described below.

### A. The Definition of "Hold Room" May Be Clarified for Particular Requirements Applicable to Enclosed Holding Cells

Plaintiffs recognize that certain provisions of Paragraph 1 are designed principally for enclosed spaces in which detained individuals are confined for extended periods or held overnight. Defendants identify legitimate practical distinctions between enclosed holding cells and open, mixed-use processing areas in which officers conduct intake and administrative work.

For example, Plaintiffs do not contend that an individual seated temporarily at a processing desk must be furnished with a pillow or that lights in an active processing area must be dimmed while officers are performing necessary administrative functions. Nor do Plaintiffs contend that a person must receive a medical screening before being processed, provided ICE promptly addresses obvious or reported urgent medical needs and does not use processing to defer screening for an extended period.

Accordingly, Plaintiffs are amenable to clarifying that certain physical-conditions requirements such as nighttime dimming apply to enclosed holding cells and other spaces used for custodial confinement or extended detention only, rather than to open processing areas used for active administrative processing.

Such a clarification must be carefully drawn. Defendants' proposed wholesale substitution of "holding cell" for "Hold Room" is overbroad and would create an obvious avenue for evading the injunction simply by moving detained individuals into other spaces.

The Court's findings establish that ICE has previously held detained individuals outside the designated ninth- and tenth-floor holding cells, including on other floors. September 24 Opinion at 81–85. Any modification of this provision of the injunction therefore must preserve the intended application to individuals detained elsewhere in the building.

In particular, requirements concerning food, water, access to counsel, medical care, sanitation, and other basic necessities must continue to protect detained individuals regardless of the particular room or area in which ICE chooses to confine them. Defendants' proposed Paragraph 2, ECF No. 193-1, attempts to extend the meal requirement to other spaces, but that is underinclusive.

Nor should ICE be permitted to circumvent protections governing overnight confinement by designating an area as a "processing area" while using it in practice to hold detained individuals for prolonged periods.

A narrowly tailored clarification could distinguish between (1) spaces used solely for active administrative information processing and (2) enclosed holding cells or other spaces used for custodial confinement, with the relevant requirements determined by the actual use of the space rather than its designation.

### B. Plaintiffs Do Not Oppose an Equivalent Call-Center Procedure That Preserves Attorney Access and Response Deadlines

The Government seeks to modify Paragraph 9 to remove references to voicemail, explaining that unanswered calls are routed to a call center that receives the caller's contact information and forwards it to ICE personnel.

Plaintiffs take no position on whether a call center or voicemail system is preferable as a technical matter. The essential requirement is that attorneys can reliably communicate their requests and receive timely responses.

Accordingly, Plaintiffs do not oppose a clarification permitting unanswered calls to be handled through a staffed call center rather than voicemail, provided that the system reliably records and transmits the attorney's request, preserves the applicable response deadlines, and does not create additional barriers to scheduling confidential legal calls.

In particular, the four-hour deadline for responding to legal calls requested between 9:00 a.m. and 5:00 p.m., and the 11:00 a.m. deadline for responding to requests made thereafter, must be preserved. ECF No. 191 ¶¶ 2, 9. Any clarification also should ensure that the Government remains responsible for timely responding to an attorney's request, regardless of whether it is initially received by ICE personnel, a call-center employee, or an automated system.

### C. Plaintiffs Are Amenable to Clarifying the Medical-Screening Requirements, Provided Detained Individuals Receive Necessary Care Without Delay

The Government raises practical concerns regarding the scope of medical screening and treatment available at 26 Fed.

Jacobs's declaration explains that the medical personnel assigned to the tenth-floor holding rooms are registered nurses who can assess detained individuals through screening questions and observations and triage their medical needs, but cannot perform the full range of physical examinations, diagnoses, prescriptions, or treatments available at a long-term detention facility. Jacobs Decl. ¶¶ 4–10.

Plaintiffs do not insist that a short-term holding facility have the capacity to perform every medical intervention available at a hospital or long-term detention center. But

medical screening must accurately identify urgent needs, lead to necessary care, preserve prescription access, and trigger prompt transfer when treatment is unavailable on site.

**1. Medical Screening and Treatment**

Jacobs states that IHSC personnel can identify some conditions but cannot always initiate definitive treatment; individuals with needs beyond the facility's capabilities may require transfer. *Id.* ¶¶ 5–6.

Plaintiffs do not object to revising Paragraph 4(a) to require ICE to identify medical conditions, initiate medically necessary treatment within the capabilities of on-site personnel, and promptly arrange appropriate outside medical care when necessary treatment cannot be provided on site. However, the Court should reject Defendants' proposed substitution of mere documentation for treatment. Requiring personnel to document reported medical conditions rather than ensure that necessary treatment is initiated or obtained plainly is insufficient. Jacobs Decl. ¶ 10.

If medical personnel identify a condition requiring treatment that cannot be provided at 26 Fed, the Government must promptly arrange for treatment at an appropriate medical facility. And Defendants must ensure that the person is transferred quickly enough to receive any treatment they require. The inability to provide a particular intervention on site cannot justify delaying necessary care. ICE cannot take someone into its custody and then fail to provide for their basic medical needs. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (government custody entails responsibility for basic needs, including medical care); *Charles v. Orange Cnty.*, 925 F.3d 73, 82–83 (2d Cir. 2019) (applying that principle to civil immigration detention).

### 2. Communicable Diseases and Medically Necessary Diets

Jacobs states that 26 Fed lacks appropriate isolation areas for detained individuals with communicable diseases. Jacobs Decl. ¶ 8. Plaintiffs do not object to clarification that appropriate segregation and treatment may be accomplished through prompt transfer when adequate isolation or care is unavailable on site. But pending transfer, ICE must protect the affected individual and others; mere documentation is insufficient.

Jacobs also explains that registered nurses cannot independently prescribe specialized medical diets. *Id.* ¶ 9. She does not, however, explain why those nurses cannot "call the . . . nurse practitioner, PA, or . . . physician" who she explained at deposition is "on call 24/7" to provide "their orders or their directions." Jacobs Tr. at 34:24–35:18 *see also* DX85, ¶ 7.

Plaintiffs do not require nurses to exceed their authority. But ICE must obtain an authorized medical assessment and provide necessary dietary accommodations or timely transfer if it cannot meet those needs on site. This is yet another reason why there must be appropriate medical staffing overnight.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion under Rules 59(e) and 59(a)(2), except insofar as the Court adopts narrow clarifications concerning processing areas, unanswered attorney calls, and medical-screening and treatment procedures that preserve the injunction's intended substantive protections.

In particular, the Court should reject Defendants' requests to alter the injunction with respect to requirements pertaining to pillows, nighttime dimming, attorney access without a Form G-28 prerequisite, continuous medical staffing, and meaningful access to prescribed medications.

Dated: November 5, 2026

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
Carmen Iguina González
915 15th Street, N.W.
Washington, DC 20005
202-548-6616
ciguinagonzalez@aclu.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
Kyle Virgien
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
kvirgien@aclu.org

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher
Robert Hodgson
Claire Molholm
Molly K. Biklen
125 Broad Street, 19th Floor
New York, NY 10004
Tel: (212) 607-3300
abelsher@nyclu.org
rhodgson@nyclu.org
cmolholm@nyclu.org
mbiklen@nyclu.org

WANG HECKER LLP

/s/ Heather Gregorio
Heather Gregorio
Mariann Meier Wang
Alice Reiter
Daniel Mullkoff
111 Broadway, Suite 1406
New York, New York 10006
(212) 620-2600
hgregorio@wanghecker.com
mwang@wanghecker.com
areiter@wanghecker.com
dmullkoff@wanghecker.com

MAKE THE ROAD NEW YORK
Harold A. Solis
Paige Austin
301 Grove Street
Brooklyn, NY 11237
Tel. (718) 418-7690
Fax (866) 420-9169
harold.solis@maketheroadny.org
paige.austin@maketheroadny.org

*Attorneys for Plaintiffs*